# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

GMS INDUSTRIAL SUPPLY, INC.,

        Plaintiff,

v.                                              Action No. 2:19cv324

G&S SUPPLY, LLC, et al.,

        Defendants.

## UNITED STATE MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

This matter comes before the Court on the motion of defendant, Wayne Side, to dismiss the claims against him for lack of personal jurisdiction. ECF No. 58. The motion was referred to the undersigned United States Magistrate Judge on September 12, 2019, pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b). ECF No. 73. For the reasons discussed below, the undersigned recommends that the motion to dismiss for lack of personal jurisdiction be **GRANTED**.

## I. PROCEDURAL HISTORY

On June 20, 2019, plaintiff, GMS Industrial Supply, Inc. ("GMS Industrial"), a Virginia company, filed a thirteen-count complaint against ten out-of-state defendants, comprised of seven individuals, including defendant Wayne Side ("Side"), and three entities reportedly owned and operated by one or more of the individual defendants. ECF No. 1 at 1–5. The complaint alleges GMS Industrial sells industrial supplies to U.S. government and military entities and has done so, under either its current or a previous business name, since 2001. *Id.* at ¶¶ 2, 17–18. The complaint alleges the individual defendants previously were affiliated with GMS Industrial as sales agents

and, in the case of Westly Greer, in other capacities. *Id.* at ¶¶ 34–35, 38, 41, 82. The individual defendants, while affiliated with GMS Industrial, allegedly secretly worked together to organize and form a new company, defendant G&S Supply, LLC ("G&S Supply"), to compete with and take business from GMS Industrial, misappropriating its trade secrets and confidential information, infringing upon its trademark, and interfering with its contractual relationships. *Id.* at ¶¶ 1–2. By such actions, the defendants allegedly, individually and/or collectively, violated federal and state laws, defrauded GMS Industrial, and violated their fiduciary, common law and contractual duties to the firm, all as set forth in counts one through thirteen of the complaint. *Id.* at 50–76.

Soon after filing the complaint, GMS Industrial moved for the issuance of a temporary restraining order and injunction. ECF No. 2. Following a multi-day hearing in late July 2019, the Court granted in part and denied in part GMS Industrial's motion and issued an order for a preliminary injunction. ECF No. 70.

On August 6, 2019, defendant Side moved to dismiss the complaint for lack of personal jurisdiction over him, pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure. ECF No. 58. On August 20, 2019, GMS Industrial filed a response opposing Side's motion. ECF No. 66. On August 26, 2019, Side filed a reply in support of his motion to dismiss. ECF No. 68. After review of the parties' submissions, the Court concludes that a hearing is unnecessary and this matter is ready for decision. *See* Local Civil Rule 7(J).

2

## II. FACTUAL BACKGROUND[1]

The complaint alleges that GMS Industrial maintains its principal place of business in Virginia Beach, VA, while also operating from San Diego, CA, the home state of the company's owner and president, Rachel Gorken. ECF No. 1 at ¶¶ 2, 18, 20; ECF 1-9 at 5. While controlling and directing its business operations from Virginia Beach, where ten internal employees work, GMS Industrial services its customers elsewhere via sales representatives located in other states. ECF No. 1 at ¶ 18. From its Virginia Beach headquarters, GMS Industrial conducts various functions, including: corporate planning and administration; accounting and banking; contracting; vendor sourcing and account administration; sales order processing; marketing development, planning, and analysis; weekly and quarterly meetings (via video/chat) among sales managers and sales personnel; and processing sales personnel reimbursement and commission paperwork. *Id.* at ¶¶ 21, 31.

The complaint alleges that defendant Side resides in Alexandria Bay, NY. *Id.* at ¶ 10. On November 5, 2015, Side signed a sales agent agreement with GMS Industrial and agreed to serve as a non-exclusive sale agent for its products in New York state.[2] *Id.* at ¶ 82. The agreement

---

[1] The facts discussed herein are taken from the complaint and the attachments thereto, as well as the declarations and exhibits attached to the parties' filings in conjunction with the pending motion. As discussed further below, in deciding whether plaintiff has made a *prima facie* showing of personal jurisdiction over Side based upon the papers, the Court "must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). When, however, a defendant proffers evidence contesting the existence of facts "essential for jurisdiction, the plaintiff must, under threat of dismissal, present sufficient evidence to create a factual dispute on each jurisdictional element . . . on which the defendant has presented evidence." *Colt Def., L.L.C. v. Heckler & Koch Def., Inc.*, No. 2:04cv258, 2004 U.S. Dist. LEXIS 28690, at *29–30 (E.D. Va. Oct. 22, 2004) (citation and internal quotation marks omitted).

[2] The agreement prohibited Side from selling products outside of New York, absent prior written approval by GMS Industrial. ECF No. 59-2 at ¶ 7. The preamble to the agreement also lists Side's New York address and GMS Industrial's Virginia Beach address. *Id.* at 1.

specified that Side would earn commissions of 5 to 25% on the products sold and would be paid biweekly, after the sold goods shipped. ECF No. 59-2 at ¶¶ 3 (noting issuance of form 1099 at year end for taxes), 4, 12, 15 (listing status as an independent contractor). To facilitate such sales, the sales agent agreement provided that Side may receive access to confidential and proprietary information of GMS Industrial including business information, methods and practices, technologies for conducting business, and marketing and business strategies. *Id.* at ¶ 13. Side agreed not to disclose or use such information for personal gain without the company's written consent. *Id.* Side also agreed not to recruit, or assist others to recruit, employees or agents of GMS Industrial (during the last year of his work with the firm), and not to work for or serve as an agent of competitors of GMS Industrial ("during [his] employment and for twelve (12) months subsequent to [his] employment [with the company]"). *Id.* at ¶ 16. Although it contained no forum selection clause, the agreement specified that its terms and any disputes arising therefrom would be "governed by and construed in accordance with the laws of Virginia." *Id.* at ¶ 18.[3]

Side worked as a sales agent until March 5, 2019, when GMS Industrial terminated the relationship due to decreasing sales. ECF No. 1 at ¶ 85. Beginning in 2017, the allegedly disloyal sales agent defendants, including Side, unlawfully joined together to form G&S Supply[4] to compete with and injure GMS Industrial. *Id.* at ¶¶ 32, 83, 85. In June 2017, defendant Westly

---

[3] Paragraph 15 of the complaint incorrectly alleges that all defendants, except G&S Supply, agreed "in various contractual agreements" to Virginia as the proper forum for any litigation. ECF No. 1 at ¶ 15; *see id.* at ¶ 44 (specifying that the "exclusive venue" for such litigation was "state or federal courts located in Virginia Beach, Virginia"). It is undisputed that Side's agreement contains no forum selection clause. Side's memorandum of law indicates that he is unique in this regard. ECF No. 59 at 3, 8.

[4] G&S Supply is a Colorado company, with its principal place of business there, owned, controlled, and operated by defendants Westly Greer and Gregory Spires. ECF No. 1 at ¶ 11.

Greer "conspired with [defendant] Greg Spires to form G&S [Supply] . . . through which all of the disloyal Sales Agent Defendants have sold products competitive to GMS [Industrial's] products while still remaining sales agents of [the latter firm]." *Id.* at ¶¶ 46–47, 49 (alleging Westly Greer solicited "and trained and engaged them to sell G&S [Supply's] competitive product line instead of the GMS [Industrial] product line").

Side, acting clandestinely and with the aid of Westly Greer and the other defendants, allegedly violated his contractual obligations:  (1) by participating in forming G&S Supply and soliciting his prior customers to buy its products; (2) by using and disclosing GMS Industrial's trade secrets to solicit its customers to buy G&S Supply products and by acting as a double agent; (3) by soliciting other GMS Industrial sales agents to join G&S Supply; (4) by misrepresenting to GMS Industrial's customers that G&S Supply was a "sister company"; (5) by making fraudulent misrepresentations to, and concealing from, GMS Industrial that the true reason for his decreasing sales in the second half of 2018 and 2019 was his sale of G&S Supply's goods to GMS Industrial's customers; and (6) by disregarding his duty "for one year after termination . . . [,] to not solicit GMS [Industrial] customers . . . and sell them competitive products." *Id.* at ¶ 85.

In conjunction with his memorandum seeking dismissal of the complaint, Side filed a declaration, signed under penalty of perjury, describing his association with GMS Industrial and the nature of his ties to New York and Virginia.  ECF No. 59-1.  Side reports he is a lifelong resident of New York and works full-time on Army helicopters at Fort Drum for an aerospace company.  *Id.* at ¶¶ 4–5.  In addition to that work and after regular work hours, Side reports that he sold products at Fort Drum for GMS Industrial, as a part-time, independent contractor from November 5, 2015, until March 2019.  *Id.* at ¶¶ 10–11, 16.

In 2015, Side's brother (Richard), a sales agent for GMS Industrial working in California, inquired if Side would sell the company's products at Fort Drum. *Id.* at ¶ 7. Thereafter, Westly Greer, GMS Industrial's director of sales, called Side and then flew to New York to meet him, visit Fort Drum, and explain the sales process. *Id.* at ¶ 8. Side agreed to serve as an agent, and received and signed in New York a sales agent agreement (described above) sent to him by GMS Industrial. *Id.* at ¶¶ 8–9.

While moonlighting a few hours per day, Side began selling GMS Industrial products to the Army at Fort Drum in New York, and never in Virginia or to customers located there. *Id.* at ¶¶ 16–18. Side advises he never visited the firm's Virginia Beach office or met with its employees or sales agents located there. *Id.* at ¶ 12–13. Instead, Side mostly communicated with GMS Industrial by e-mail and, on roughly eight to twelve occasions, also spoke to the Virginia Beach office by phone. *Id.* at ¶ 15; *see id.* at ¶ 14 (denying participation in video calls or training). Side denies owning real property in, or maintaining bank accounts or offices in Virginia, as well as having any Virginia address or telephone number. *Id.* at ¶ 6.

Side denies being involved in or managing G&S Supply. *Id.* at ¶ 19. He admits selling products for G&S Supply, but only to customers at or formerly based at Fort Drum, and never to Virginia. *Id.* at ¶ 21. Based upon the foregoing, Side states that litigating this case in, and traveling to and from Virginia, would be inconvenient, costly, and burdensome, given his limited, part-time involvement with both GMS Industrial and G&S Supply. *Id.* at ¶ 22.

Responding to Side's motion and declaration, GMS Industrial submitted a counter-declaration from its operations manager, Christopher T. Morton, along with supporting exhibits,

including numerous emails[5] sent from Side and received in Virginia via the company's computer network in Virginia Beach. ECF No. 66-2; ECF No. 66-3. Morton advises that Side's emails "prompted GMS [Industrial] employees in Virginia Beach to gather product information, determine quotes, ship products, input marketing information into the [company's] computer network, issue payments to Wayne Side, and address customer questions about products and product shipments." ECF No. 66-2 at ¶ 3. By way of example, the emails discuss, among other things: (a) the transmission of a sales agreement from Virginia Beach to Side for his review, signature, and return; (b) instructions from GMS Industrial's operations manager in Virginia Beach about how to use Google apps and a Google drive network to view, search, and download GMS Industrial catalogs, brochures, and sales documents, and how to format a request for a quote; (c) numerous requests for quotes submitted by Side to GMS Industrial personnel in Virginia Beach concerning potential sales to customers in his New York territory; and (d) miscellaneous requests for information and/or responses thereto pertaining to quotes and potential sales to New York customers identified by Side. ECF No. 66-3. Further, exhibit two of Morton's affidavit, contains 22 emails sent by Side to GMS Industrial that caused the company to process and pay commissions to Side "in Virginia." ECF 66-2 at ¶ 4; ECF No. 66-4.

---

[5] Exhibit 1 to Morton's affidavit contains numerous emails to/from Side to/from personnel at GMS Industrial, primarily about requests for quotes for potential customers identified by Side. ECF No. 66-3. Exhibit 2 to Morton's affidavit contains approximately 22 emails from Side to GMS Industrial in Virginia Beach, each containing certain paperwork ("ZEDF forms") required by the company for processing and paying sales commissions to agents. ECF No. 66-4; ECF No. 66-2 at ¶¶ 4–5.

## III. DISCUSSION

**A.    General principles for assessing the existence of personal jurisdiction.**

When contesting a motion to dismiss for lack of personal jurisdiction, a plaintiff bears the burden of proving by a preponderance of evidence that the exercise of jurisdiction is proper. *New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 (4th Cir. 2005). When, however, a court addresses a Rule 12(b)(2) motion to dismiss without conducting an evidentiary hearing, a plaintiff can satisfy its burden by making a *prima facie* showing of personal jurisdiction over a defendant.[6] *Combs v. Bakker,* 886 F.2d 673, 676 (4th Cir. 1989).

This involves a two-pronged inquiry into whether the forum's long-arm statute authorizes a court to exercise jurisdiction over a defendant and, if so, whether the exercise of such jurisdiction comports with the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Consulting Engineers Corp. v. Geometric Ltd.*, 561 F.3d 273, 277 (4th Cir. 2009). Because the exercise of personal jurisdiction authorized by Virginia's long-arm statute, *see* Va. Code Ann. § 8.01-328.1, is intended to be co-extensive with that permitted by the Due Process Clause, "the statutory inquiry merges with the constitutional inquiry."[7] *Consulting Engineers Corp.*, 561 F.3d at 277 (citations omitted). Therefore, a court must determine whether an out-of-state defendant has "minimum contacts" with Virginia such that "the maintenance of the suit does

---

[6] A judicial finding that a plaintiff has made a *prima facie* showing of personal jurisdiction is sufficient to enable the claims against a defendant to go forward. *Pinpoint IT Services, L.L.C. v. Atlas IT Export Corp.*, 812 F. Supp. 2d 710, 717 (E.D. Va. 2011) (citation omitted). Eventually, however, a plaintiff must prove the existence of personal jurisdiction by a preponderance of the evidence at trial or a pretrial evidentiary hearing. *New Wellington Fin. Corp.*, 416 F.3d at 294 n.5.

[7] Virginia's long-arm statute authorizes the exercise of personal jurisdiction in certain enumerated circumstances, including over a person: (1) who "acts directly . . . , as to a cause of action arising from the person's [] [t]ransacting any business in" or who contracts "to supply services or things in this Commonwealth," Va. Code. Ann. § 8.01-328.1(A)(1) & (A)(2); or (2) who uses "a computer or computer network located in the Commonwealth," Va. Code Ann. § 8.01-328.1(B).

not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). This due process inquiry seeks to ensure that a person is not brought to court and bound by judgments in a state where he lacks significant "contacts, ties, or relations." *Id.* at 319.

A court's exercise of jurisdiction over a defendant may be general or specific, based upon the nature of a defendant's contacts with the forum state. *See Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414 (1984). General personal jurisdiction over a defendant exists when his contacts "are so continuous and systematic as to render [the defendant] essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (internal quotations omitted); *see also ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 715 (4th Cir. 2002) (noting that "the threshold level of minimum contacts sufficient to confer general jurisdiction is significantly higher than for specific jurisdiction"). Due to the extensive nature of such contacts, courts forego inquiring into whether the current lawsuit "aris[es] out of or relat[es] to the defendant's contacts with the forum." *Helicopteros Nacionales*, 466 U.S. at 411 n.9.

In the absence of contacts giving rise to general jurisdiction, courts examine whether specific jurisdiction exists by looking to whether the claims "arise out of or relate to" a defendant's contacts with the forum state. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472–73 (1985) (citation omitted); *see also Walden v. Fiore*, 571 U.S. 277, 283–84 (2014) (evaluating the interconnection among the defendant, the forum, and the litigation in assessing specific jurisdiction). To determine whether the exercise of specific jurisdiction is consistent with due process, a court must consider: "(1) the extent to which the defendant purposefully availed [himself] of the privilege of conducting activities in the forum state; (2) whether the plaintiff's

claims [arose] out of those activities; and (3) whether the exercise of personal jurisdiction is constitutionally reasonable." *Universal Leather, LLC v. Koro AR, S.A.,* 773 F.3d 553, 559 (4th Cir. 2014) (citation and internal quotation marks omitted).

Factors to be considered in assessing the flexible, purposeful availment inquiry include:

- whether the defendant maintains offices or agents in the forum state;
- whether the defendant owns property in the forum state;
- whether the defendant reached into the forum state to solicit or initiate business;
- whether the defendant deliberately engaged in significant or long-term business activities in the forum state;
- whether the parties contractually agreed that the law of the forum state would govern disputes;
- whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship;
- the nature, quality and extent of the parties' communications about the business being transacted; and
- whether the performance of contractual duties was to occur within the forum.

*Consulting Engineers Corp.*, 561 F.3d at 278 (citations omitted).

If a defendant has availed himself of the privilege of conducting business in a forum state, then a court must next determine at the second step whether a "defendant's contacts with the forum state form the basis of the suit." *Id.* at 278–79.

Finally, the constitutional reasonableness of the exercise of personal jurisdiction is assessed by looking at whether a "defendant's activities or contacts with the forum are such that he would 'reasonably anticipate being haled into court' in the forum state." *New Venture Holdings, L.L.C. v. DeVito Verdi, Inc.,* 376 F. Supp. 3d 683, 691 (E.D. Va. 2019) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)); *see also Consulting Engineers Corp.*, 561 F.3d at 279 (listing five non-exclusive factors to be considered, including the burden on the defendant, the plaintiff's interest, and the interests of the forum and other affected states).

**B.      Side lacks sufficient minimum contacts with Virginia to support
the exercise of specific personal jurisdiction over him.**

   **1.      Side did not purposefully avail himself of the privilege of conducting
business in Virginia.**

The assessment of whether the Court may exercise specific personal jurisdiction over Side

begins with analysis of the factors guiding the purposeful availment inquiry.[8] *See Consulting*

*Engineers Corp.*, 561 F.3d at 278.  It is undisputed that Side:  (1) while living and working full-

time in New York for another employer, sold GMS Industrial's products, on a part-time basis, to

customers in New York; (2) never sold GMS Industrial or G&S Supply's products in Virginia or

to customers in Virginia; (3) owns no property in and has never lived in Virginia; (4) maintains no

offices, agents, addresses, bank accounts, or telephone numbers in Virginia; (5) never traveled to

GMS Industrial's office in Virginia; (6); never met with GMS Industrial personnel in Virginia;

and (7) never attended or remotely participated in video-teleconference calls and/or training

conducted by GMS Industrial. *See* ECF No. 59-1.

Notwithstanding these facts, GMS Industrial contends that Side purposefully availed

himself of the privilege of doing business in Virginia by:  (1) endorsing a sales agent agreement

with a Virginia company and specifying the agreement would be governed by Virginia law; (2)

engaging in "repeated electronic and telephonic communications" with GMS Industrial personnel

pertaining to sales and using the company's computer network in Virginia; (3) emailing

information to Virginia to facilitate the company's payment of his sales commissions; (4)

breaching his agent agreement and misappropriating proprietary company information

electronically supplied to him from Virginia; and (5) associating himself with the firm from

---

[8] GMS Industrial neither argues for nor do the facts support a claim of general personal jurisdiction
over Side.

November 2015 through March 2019.[9]  Pl.'s Mem. in Opp. to Def.'s Mot. to Dismiss for Lack of

Pers'l Juris. ("Pl.'s Mem."), ECF No. 66 at 1–2, 6–13, 15–16; ECF No. 66-3 at 81.  For the reasons

stated below, the Court disagrees.

First, with respect to the formation of the parties' relationship, GMS Industrial sought out

Side's services in New York. *Compare New Venture Holdings, L.L.C.*, 376 F. Supp. 3d at 692

(noting "[t]he Fourth Circuit has given great weight to the question of who initiated the contact

between the parties") (citations and internal quotation marks omitted) *with Burger King*, 471 U.S.

at 480–81 (noting franchisee found to be subject to jurisdiction in Florida reached out to Burger

King's headquarters in Florida in setting up a 20-year franchise agreement).  After Side's brother

in California sounded him out, GMS Industrial's director of sales both called and visited Side in

New York to solicit him to become a sales agent and Side agreed.  ECF No. 59-1 at ¶¶ 7–8.  This

apparently was the sole instance of physical contact between Side and a representative of GMS

Industrial.  Rather than having Side travel to Virginia to consummate the relationship, GMS

Industrial prepared and emailed the sales agreement to Side in New York, where Side accepted the

proposal and signed it. *Id.* at ¶ 9; ECF No. 66-3 at 1–2.  Although Side's entry into a single contract

with a Virginia business merits consideration, GMS Industrial's initiation of the negotiations in

New York and Side's execution of the contract there fail to support the conclusion that Side

deliberately decided to engage in business in Virginia.[10] *See Eagle Paper Intern., Inc. v. Expolink,*

---

[9] Because the inquiries under prongs one and two overlap substantially as to Side's alleged breaches of contract, federal and state laws, and common law duties, the Court will address such matters under prong two.

[10] Because GMS Industrial initiated contact with Side in New York, and he signed and accepted the contract there, this case differs from two cases cited to the Court, Pl.'s Mem. at 14, in support of the exercise of jurisdiction. *See CFA Institute v. Institute of Chartered Financial Analysts of India*, 551 F.3d 285, 295–96 n.17 (4th Cir. 2009) (noting "special weight" accorded to the fact that the foreign party defendant initiated contact with the plaintiff entity in Virginia, which contact

*Ltd.*, No. 2:07cv160, 2008 WL 170506, at *4 (E.D. Va. Jan. 17, 2008) (considering "the mere existence of a contract," but attributing more weight to who initiated it and where it was negotiated and signed) (citations omitted).

Second, turning to the language of the contract, Side's agreement that Virginia law would govern the contract supports a finding he knowingly decided to do business in Virginia. ECF No. 59-2 at ¶ 18. In the absence of a clause selecting Virginia as the forum for any disputes, however, "[t]he inclusion of a choice of law clause is one factor [to be considered], but it is no more than that." *Consulting Engineers Corp.*, 561 F.3d at 281 n.11 (noting also that a valid forum selection clause "may act as a waiver to objections to personal jurisdiction") (citations omitted).

Other language in the contract counsels against the finding sought by GMS Industrial. Notably, the contract recitals state that Side "wishes to become the non-exclusive sales agent of [GMS Industrial] for the products in the state(s) of New York (the 'Territory')." ECF No. 59-2 at 1. Contrary to the company's assertion that Side agreed "to aggressively provide [requests for quote]s to GMS [Industrial] in Virginia Beach," Pl.'s Mem. at 15, the contract provides that he agreed "to aggressively promote the sales of the Products in the Territory" and to call upon and provide good service to customers located there. ECF No. 59-2 at ¶ 6.

This is significant because, in assessing whether a party purposefully availed and directed its conduct at Virginia sufficient to satisfy due process, courts in this circuit look to where the bulk of contract performance was to occur. *See, e.g., Diamond Healthcare of Ohio, Inc. v. Humility of*

---

"sparked ongoing business transactions," including two agreements giving rise to the lawsuit, an additional visit by the defendant's representative to Virginia, and correspondence and collaboration spanning a 13-year period); *see also English & Smith v. Metzger*, 901 F.2d 36, 39–40 (4th Cir. 1990) (holding the exercise of jurisdiction comported with due process when the out-of-state defendant initiated contact with the plaintiff lawyer in Virginia, their contract came into being "by virtue of action taken in Virginia," and the defendant thereafter actively collaborated with plaintiff who performed his contract work in Virginia).

*Mary Health Partners*, 229 F.3d 448, 451–52 (4th Cir. 2000) (noting, among other factors, the fact that "virtually all of the [defendant's] performance was required" in Ohio undercut plaintiff's argument that the defendant "deliberately exercised the privilege of undertaking contractual activity in Virginia"); *New Venture Holdings, L.L.C.*, 376 F. Supp. 3d at 694 (focusing upon the defendant's connection to the forum and noting "the fact that a contract envisions one party discharging its obligations in the forum state cannot, standing along, justify the exercise of jurisdiction over another party to the contract"). Here, the contract not only expressly contemplated Side would make sales in New York, but also precluded him from selling elsewhere.[11] ECF No. 59-2 at ¶ 6–7. It also specified Side's status as an independent contractor for no fixed term, subject to immediate termination by either party. ECF No. 59-2 at ¶¶ 6–7, 10, 15. Although the agreement also required compliance with company sales policies and operating procedures and contained competition clauses (precluding personal use or disclosure of confidential and supplier information, recruiting of company employees and agents, and work for competitors), the nature and content of Side's relatively bare-boned agreement with GMS Industrial is a far cry from the "carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts" found by the Supreme Court to confer personal jurisdiction in *Burger King*. 471 U.S. at 480; *see also* 471 U.S. at 465–66 (discussing provisions for paying franchise fees, monthly royalties, advertising fees, sales promotion fees, and rent to Burger King in Florida, as well as the franchisee's submission to extensive regulation from Florida).

---

[11] In contrast, although the Court may plausibly infer that some or possibly all of GMS Industrial's contract performance would occur in Virginia based upon the contract's listing of the company and its Virginia Beach address, the contract is mostly silent about where GMS Industrial will perform, what it will do (other than paying agent commissions), and primarily focuses upon the obligations of the sales agent. *See* ECF No. 59-2.

Third, beyond the agreement itself, the Court must also examine the nature, quality, and extent of Side's contacts with Virginia, in addition to those contacts found wanting noted above. *Consulting Engineers Corp.*, 561 F.3d at 278–79.   The Court must consider whether Side's contacts were meaningful, frequent, and wide-ranging. *See id.* at 277–78 (noting the contacts must be "so substantial that they amount to a surrogate for presence and thus render the exercise of sovereignty just") (citation and internal quotation marks omitted); *Walden*, 571 U.S. at 284–85 (describing *Burger King* as ruling that jurisdiction exists when a defendant purposefully reaches beyond his state and enters into a contract calling for continuous and wide-ranging contacts) (citation omitted).  As noted in *Walden*, however, the Court must be careful to focus mainly upon the defendant's contacts with the forum, rather than the plaintiff's contacts or the defendant's contacts with persons who reside in the forum. *Walden*, 571 U.S. at 284–85 (noting "the plaintiff cannot be the only link between the defendant and the forum").

For example, the statement in Christopher Morton's affidavit that GMS Industrial processed and paid Side's commissions "in Virginia," ECF No. 66-2 at ¶ 4, standing alone, falls into the category of a plaintiff's contact with a forum state.  Because Side's declaration indicates he has no bank accounts in Virginia and works and lives in New York, ECF No. 59-1 at ¶¶ 4–5, 6, the Court may reasonably infer that such payments traveled outside of Virginia to Side. *See* Pl.'s Mem. at 11 (discussing "the wiring of funds . . . to Side's account").  Thus, GMS Industrial's issuance of commission payments to Side, in and of itself, carries little weight.  The same holds true for the activities of the company's Virginia Beach employees in operating a computer network, responding to request for quotes, addressing customer questions, and shipping products on completed orders to customers.  As stated in *Walden*, "[p]ut simply, however significant the plaintiff's contacts with the forum may be, those contacts cannot be decisive in determining

whether the defendant's due process rights are violated." 571 U.S. at 285 (citation and internal quotation marks omitted).

This leaves the question whether Side's electronic and telephonic communications with GMS Industrial personnel in Virginia, and his alleged tortious and other activities in breach of the contract, federal and state law, and common law duties, constitute purposeful availment of conducting business in Virginia. The Court concludes they do not.

The sales emails supplied to the Court by GMS Industrial reflect the conclusion noted above that Side's primary duty under the contract was to find customers in New York for the company's products. Upon doing so, the sales emails reflect that, as directed by GMS Industrial, Side typically sent a request for quote to GMS Industrial's employees in Virginia identifying the command or entity involved, its location, the buying point of contact (including email and phone number), and the products/part numbers covered by the quote.[12] *See, e.g.,* ECF No. 66-3 at 4–5, 7–8. As noted in an email sent to Side by the company's operations manager, typically once the customer received a quote from GMS Industrial, the customer then called the company to place an order. *Id.* at 4–5 (noting also that, if the customer was ready to buy when speaking with the sale agent, the agent or the customer could simply call in the order). Occasionally, when seeking information about products and the status of orders and quotes or requesting a product sample, Side also emailed GMS Industrial in Virginia Beach. *See, e.g., id.* at 8–9, 13–14, 17–18, 25. To perform these various functions, Side apparently accessed GMS Industrial's catalogs and brochures and obtained and/or supplied other data to GMS Industrial via its computer network in Virginia and/or its Google drive. *See, e.g., id.* at 3–4; ECF No. 66-2 at ¶ 3.

---

[12] From November 2015 through November 2018, Side's emails appear to reflect that he submitted approximately two dozen requests for quotes to GMS Industrial for customers in his territory. *See* ECF No. 66-3.

16

Side also submitted approximately 22 commission emails during 2017 and 2018, with supporting information attached, to GMS Industrial in Virginia Beach seeking commission payments. *See* ECF No. 66-4. Finally, Side admits to calling GMS Industrial personnel in Virginia on eight to twelve occasions during their association. ECF No. 59-1 at ¶ 15.

GMS Industrial argues these communications over a three-year period suffice to show that Side purposefully availed himself of the privilege of doing business in Virginia. The Court disagrees. As the Court noted in *Eagle Paper Intern., Inc.,* where the plaintiff similarly asserted that a three-year exchange of calls and emails to and from plaintiff's Virginia office supported the exercise of personal jurisdiction, "it is well settled that mere telephone calls and electronic communications in furtherance of a transaction are insufficient to constitute purposeful activity." 2008 WL 170506, at *5 (citations omitted); *see also Consulting Engineers Corp.*, 561 F.3d at 279–82 (holding that where the defendants' other contacts with Virginia were little to non-existent, the mere exchange of emails and phone calls (28 with one defendant and approximately 7 with the other) with plaintiff in Virginia were "too attenuated to justify the exercise of personal jurisdiction"); *New Venture Holdings, L.L.C.*, 376 F. Supp. 3d at 695 (noting that email "communications alone typically are insufficient to establish jurisdiction") (citation omitted); *cf. Superfos Investments Ltd. v. FirstMiss Fertilizer, Inc.,* 774 F. Supp. 393, 396, 398 (E.D. Va. 1991) (finding that neither pre-contract electronic communications to and from Virginia nor post-contract delivery of forecasts, instructions, and certain payments to Virginia by defendant were sufficient to support personal jurisdiction in the absence of other meaningful contacts).

This is particularly true when, as here, such communications were incidental and ancillary to a defendant's primary obligation and role under a contract to perform acts outside the forum state, and when such electronic contacts were generated by plaintiff. *See Eagle Paper Intern., Inc.,*

17

2008 WL 170506, at *5 (rejecting claim of personal jurisdiction, in part, because the contract required the defendant to engage in acts outside the United States and the exchanged emails and calls touching upon Virginia were ancillary to the contract and generated by the plaintiff); *Diamond Healthcare of Ohio, Inc.*, 229 F.3d at 451–52 (noting exchange of calls, letters, and faxes between Ohio defendant and Virginia plaintiff, characterizing monthly payments to Virginia plaintiff as "incidental to [defendant's] role under the contract," and describing mailings and notifications to plaintiff as "ancillary and isolated" and too attenuated to support exercise of personal jurisdiction).  Side's primary contractual obligation was to find customers for GMS Industrial's products in his New York territory.  Both incident and ancillary to that obligation, GMS Industrial instructed Side, in the absence of an immediate telephonic sale, to submit request for quotes by email to Virginia, and to submit request for commission payments in the same manner.  *See* Pl.'s Mem. at 8.  When, as here, most of the remaining purposeful availment factors conclusively show that Side did not deliberately engage in significant or long-term business activities in Virginia, the telephonic and electronic communications GMS Industrial relies upon are insufficient to support a finding of purposeful availment.  *See New Venture Holdings, L.L.C.,* 376 F. Supp. 3d at 696 (finding that, notwithstanding defendant's solicitation of the Virginia plaintiff and the post-contract exchange of emails between them, such matters were "too attenuated to overcome the factors that indicate personal jurisdiction does not exist").  As discussed below, this conclusion is further buttressed by the absence of facts indicating that Side or his alleged confederates, in allegedly breaching contractual, legal, and common law duties to GMS Industrial, acted in Virginia.

2. **GMS Industrial's claims do not arise out of Side's contacts with Virginia.**

Assuming for the sake of argument that Side had purposefully availed himself of the privilege of conducting business in Virginia, the next step requires analysis of whether GMS Industrial's claims arise out Side's contacts with Virginia.[13] *See Consulting Engineers Corp.*, 561 F.3d at 278. Stated another way, this factor "requires that the defendant's contact with the forum state form the basis of the suit." *Id.* at 278–79 (citations omitted). GMS Industrial cannot satisfy this requirement either.

GMS Industrial has not presented the Court with facts indicating that Side engaged in conduct in Virginia when allegedly breaching the contract, committing torts, and violating federal, state, and common law duties. *See* ECF No. 1 at ¶ 85; *see also Gillison v. Lead Express, Inc.*, No. 3:16cv41, 2018 WL 6537151, at *4 (E.D. Va. Dec. 12, 2018) (carrying the burden of "establishing jurisdictional facts" requires a plaintiff to do more than merely rely upon allegations, such as by responding with actual proof based upon affidavits and competent evidence). Indeed, Side's alleged misconduct giving rise to such claims is wholly independent of his only apparent contacts with Virginia; namely, the electronic and telephonic communications about requests for quotes and the payment of commissions. If, for example, Side breached the confidentiality and non-competition clauses of his contract, such activity apparently occurred in New York, where Side lives and works and where he sold products for G&S Supply. *See* ECF No. 59-1 at ¶¶ 4–5, 20–21; *see also Perdue Foods, LLC, v. BRF S.A.*, 814 F.3d 185, 189 (4th Cir. 2016) (noting as pertinent to the finding of no personal jurisdiction that the defendant's alleged breach of contract occurred abroad).

---

[13] Technically, the second and third factors for assessing minimum contacts need not be addressed due to GMS Industrial's failure to satisfy the first. *Consulting Engineers Corp.*, 561 F.3d at 278.

Also, if Side's alleged misdeeds visited injury upon GMS Industrial in Virginia, *see* ECF No. 1 at ¶ 16, such injury cannot serve as a proxy for personal jurisdiction over a non-resident defendant without meaningful forum contacts and whose alleged misconduct focused upon obtaining business outside Virginia. *See Walden,* 571 U.S. at 289–90 (noting that "mere injury to a forum resident is not a sufficient connection to the forum . . . [as] an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State . . . in a meaningful way"); *see also Consulting Engineers Corp.,* 561 F.3d at 280 (explaining that a plaintiff asserting jurisdiction based upon the effects of an intentional tort felt in the forum state must "establish that the defendant expressly aimed his tortious conduct at the forum, *such that the forum can be said to be the focal point of the tortious activity*") (citation and internal quotation marks omitted). When, as here, GMS Industrial has failed to supply the Court with facts demonstrating Side formed meaningful contacts with or expressly targeted his alleged misconduct at Virginia, the mere fact that the company was injured is an insufficient predicate for jurisdiction.

This same reasoning applies to GMS Industrial's allegations that Side conspired with Westly Greer and other defendants in Virginia and with the goal of injuring the company. ECF No. 1 at ¶¶ 16, 83, 85, 171–77. Counts ten and eleven of the complaint allege that Westly Greer and Greg Spires conspired to use GMS Industrial's information and sales methods to form a competing business and recruited other sales agent defendants to join the conspiracy and sell this competitor's goods to GMS Industrial's customers. *Id.* at ¶¶ 172–74, 179–80; *see id.* at ¶¶ 83, 85 (alleging Side conspired with Westly Greer in organizing and creating G&S Supply and in soliciting GMS Industrial's customers and sale agents). With respect to Side, the complaint also alleges he, along with Westly Greer and Thomas Hayes, "engaged . . . in fraudulent misrepresentations to GMS [Industrial]" to conceal his solicitation of, and sales to, the company's

customers of products sold by G&S Supply. *Id.* at ¶ 85(e). As part of this deception, Westly Greer, "in combination with Hays [sic] and Side," supplied false information to GMS Industrial about why Hayes and Side's sales were decreasing. *Id.*

When a defendant asserts the existence of specific personal jurisdiction based upon a conspiracy, a court may look beyond the acts of a single conspirator to the acts committed by his alleged confederates. *See Galustian v. Peter*, 750 F. Supp. 2d 670, 674 (E.D. Va. 2010). In appropriate cases, "a defendant who joins a conspiracy knowing that acts in furtherance of the conspiracy have taken or will take place in the forum state . . . has purposefully availed himself of the privileges of that state and should reasonably expect to be haled into court there." *Id.* (citations and internal quotation marks omitted).

What is missing here, however, are factual allegations indicating that acts in furtherance of the alleged conspiracy occurred in Virginia. Instead, the complaint alleges Westly Greer resides in Colorado, Gregory Spires resides in Oklahoma, and Thomas Hayes resides in Louisiana. ECF No. 1 at ¶¶ 3, 5, 7. The complaint also alleges G&S Supply is a Colorado company, with its principal place of business there, owned, controlled, and operated by defendants Westly Greer and Gregory Spires. *Id.* at ¶ 11. Although it alternately alleges Westly Greer and Gregory Spires conspired to form G&S Supply (¶ 46), and elsewhere that Side also conspired with Westly Greer "to organize and create G&S [Supply]" (¶ 83), the complaint nowhere alleges that the acts involved in forming and operating the company occurred in Virginia. The complaint also contains no allegations that the alleged conspirators, in recruiting other non-resident sales agents to work for G&S Supply, or in making sales or solicitations to GMS Industrial's former customers, performed any such acts in Virginia. *See, e.g.,* ECF No. 1 at ¶ 194. The complaint also does not indicate how or where any misrepresentations made to GMS Industrial were communicated to the company.

21

Mostly, the complaint alleges that the conspirators breached their prior contractual, legal, and common law obligations to GMS Industrial by forming a conspiracy *after* previously agreeing to serve as sales agents, and by misappropriating confidential information, practices, and business previously supplied by the company.  These mere allegations are simply insufficient to show that Side, through the acts of his alleged confederates, directed activities at Virginia that form the basis for GMS Industrial's claims against him.

Accordingly, because GMS Industrial has failed to satisfy either the first or second prongs of due process analysis, it likewise has failed to make a *prima facie* showing of specific personal jurisdiction over Side.  The Court, therefore, has no reason to address whether the exercise of personal jurisdiction over Side is constitutionally reasonable under the third prong.

## IV.    RECOMMENDATION

For the foregoing reasons, the Court recommends that Side's motion to dismiss the claims against him for lack of personal jurisdiction, ECF No. 58, be **GRANTED**.

## V.    REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.    Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within 14 days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail.  A party may respond to any other party's objections within 14 days after being served with a copy thereof. *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.    A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

/s/

Robert J. Krask
United States Magistrate Judge

Robert J.  Krask
United States Magistrate Judge

Norfolk, Virginia
November 14, 2019

23