# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

GMS INDUSTRIAL SUPPLY, INC.,

        Plaintiff,

v.                                   Action No. 2:19cv324

G&S SUPPLY, LLC, et al.,

        Defendants.

## UNITED STATE MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

This matter comes before the Court on defendants' motion to dismiss various counts of the complaint for failure to state a claim. ECF No. 60. The motion was referred to the undersigned United States Magistrate Judge on September 12, 2019, pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b). ECF No. 73. For the reasons discussed below, the undersigned recommends that the motion be **GRANTED IN PART** and **DENIED IN PART**.

## I. PROCEDURAL HISTORY

On June 20, 2019, plaintiff, GMS Industrial Supply, Inc. ("GMS Industrial"), a Virginia company, filed a thirteen-count complaint against ten out-of-state defendants, comprised of seven individuals and three entities, reportedly owned and operated by one or more of the individual defendants. ECF No. 1 at 1–5 ("Compl."). The complaint alleges GMS Industrial sells industrial supplies to U.S. government and military entities and has done so, under either its current or a previous business name, since 2001. *Id.* at ¶¶ 2, 17–18. The complaint alleges the individual defendants previously were affiliated with GMS Industrial as sales agents and, in the case of Westly Greer, in other capacities. *Id.* at ¶¶ 34–35, 38, 41, 82. The individual defendants, while

affiliated with GMS Industrial, allegedly secretly worked together to organize and form a new company, defendant G&S Supply, LLC ("G&S Supply"), to compete with and take business from GMS Industrial, misappropriating its trade secrets and confidential information, infringing upon its trademark, and interfering with its contractual relationships. *Id.* at ¶¶ 1–2. By such actions, the defendants allegedly, individually and/or collectively, violated federal and state laws, defrauded GMS Industrial, and violated their fiduciary, common law and contractual duties to the firm, all as set forth in counts one through thirteen of the complaint. *Id.* at 50–76.

Soon after filing the complaint, GMS Industrial moved for the issuance of a temporary restraining order and injunction. ECF No. 2. Following a multi-day hearing in late July 2019, the Court granted in part and denied in part GMS Industrial's motion and issued an order for a preliminary injunction. ECF No. 70.

On August 6, 2019, defendants moved to dismiss counts II, III, VIII, IX, X, and XI of the complaint, as well as all claims against Sky Spires, for failure to state claims, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. ECF No. 60. On August 20, 2019, GMS Industrial filed a response opposing defendants' motion. ECF No. 67. On August 26, 2019, defendants filed a reply in support of the motion to dismiss. ECF No. 69. After review of the parties' submissions, the Court concludes that a hearing is unnecessary and this matter is ready for decision. *See* Local Civil Rule 7(J).

## II. DISCUSSION

**A.  Standards applicable to a motion to dismiss for failure to state a claim.**

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6) provides for the dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

A Rule 12(b)(6) motion tests the legal sufficiency of a complaint; it does "not, however, resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."[1] *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (citations and internal quotation marks omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While plausibility "is not akin to a 'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

When reviewing a motion to dismiss, a court must "assume all [well-pleaded facts] to be true" and "draw all reasonable inferences in favor of the plaintiff," but it need not "accept the legal conclusions drawn from the facts, and [] need not accept as true unwarranted inferences, unreasonable conclusions or arguments." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009) (citations and internal quotation marks omitted); *see also Twombly*, 550 U.S. at 555 (holding that the court is "not bound to accept as true a legal conclusion couched as a factual allegation"). Accordingly, the motion may only be granted if, "after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of [the] claim entitling him to relief." *Edwards v. City of Goldsboro*,

---

[1] Accordingly, a court may only consider the pleadings, which include "exhibits attached to the complaint in addition to the complaint itself." *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir. 2013); *see also Dawson v. Winter*, No. CCB–06–2885, 2007 WL 1610905, at *2 (D. Md. May 21, 2007) (noting that a motion and memorandum are not pleadings).

178 F.3d 231, 244 (4th Cir. 1999) (citation omitted).

When the well-pleaded facts do not permit a court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "show[n]"—"that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679. "[N]aked assertion[s] devoid of further factual enhancement" will not suffice. *Id.* at 678 (internal quotation marks omitted). Without the "heft" of sufficient facts to support his claims, "plaintiff[] . . . cannot establish a valid entitlement to relief, as facts that are 'merely consistent with a defendant's liability,' fail to nudge claims 'across the line from conceivable to plausible.'" *Nemet*, 591 F.3d at 256 (internal citations omitted) (quoting *Iqbal*, 556 U.S. at 678, 680).

**B.    The motion to dismiss count II's contract claims against Westly Greer should be granted in part and denied in part.**

Count II of the complaint alleges defendant Westly Greer ("Westly")[2] breached contractual obligations to GMS Industrial contained in his 2012 employment agreement and 2019 sales agent agreement. Compl. ¶¶ 103–08. Westly began working for GMS Industrial on April 4, 2011. *Id.* at ¶ 35. In November 2012, in conjunction with Westly's promotion to district manager with oversight responsibility over the company's sales agents, GMS Industrial required, and Westly signed, an at-will employment agreement (the "2012 agreement"). *Id.* at ¶ 38. The pertinent terms of this agreement will be discussed below.

In July 2015, GMS Industrial promoted Westly to serve as director of sales, responsible for overseeing the entire sales team and sales managers and working with the marketing department and the company's home office in Virginia Beach. *Id.* at ¶¶ 2, 41. In this capacity, Westly "had

---

[2] Because the complaint also names Sabrina Greer as a defendant, the Court adopts the complaint's convention of referring to these defendants by their first names.

access to GMS[ Industrial's] confidential, proprietary and Trade Secret information" and was responsible for keeping in regular contact with the home office so as to disseminate directives and manage company affairs. *Id.* at ¶ 41.

On January 21, 2019, Westly quit the sales director position and became an independent sales agent for GMS Industrial. *Id.* at ¶ 43. In making this change, GMS Industrial required, and Westly signed, an independent agent agreement (the "2019 agreement"), changing his status from employee to independent contractor for an indefinite term. *Id.* at ¶ 43; ECF No. 3-1 at 4–7. The terms of this agreement will also be discussed below.

Count II alleges that Westly breached his contractual obligations in the 2012 and 2019 agreements. *Id.* at ¶ 106. The acts alleged in support of the breach include conspiring with others to form and organize G&S Supply, soliciting company sales agents to associate themselves with G&S Supply and then solicit and sell its goods to GMS Industrial's customers, using and disclosing the company's confidential information to solicit its customers to buy products from G&S Supply, and continuing to engage in such activities in the one-year period after GMS Industrial terminated their association on April 3, 2019. *Id.* at ¶ 53.

Westly's motion to dismiss contends that the confidentiality and non-solicitation provisions of the 2019 and 2012 agreements are unenforceable restraints on trade in contravention of Virginia law, and that the other alleged violations of the 2012 agreement fail to state a claim upon which relief can be granted. Defs.' Mem. in Supp. of Mot. to Dismiss for Failure to State a Claim ("Defs.' Mem."), ECF No. 61 at 7–8. GMS Industrial's response argues the confidentiality and non-solicitation provisions are lawful, and that it has adequately alleged a claim for breach of the 2012 agreement. Pl.'s Mem. in Opp. to Defs.' Mot. to Dismiss for Failure to State a Claim ("Pl.'s Mem."), ECF No. 67 at 3–12.

To support a claim for breach of contract, GMS Industrial must allege that Westly was subject to a legally enforceable obligation that he violated, which resulted in damage or injury to the company.[3] *See Filak v. George*, 594 S.E.2d 610, 619 (Va. 2004); *see also Knox Energy, LLC v. Gasco Drilling, Inc.*, 738 F. App'x 122, 124 (4th Cir. 2018) (noting plaintiff's burden to establish a binding and enforceable agreement). Thus, if the violation of restrictive covenant claims in count II are to proceed, GMS Industrial must establish that any such covenants are enforceable. *See Brainware, Inc. v. Mahan*, 808 F. Supp. 2d 820, 825 (E.D. Va. 2011). Such a determination presents a question of law. *Cantol, Inc. v. McDaniel*, No. 2:06cv86, 2006 WL 1213992, at *4 (E.D. Va. April 28, 2006).

Virginia law deems restrictive employment covenants to be disfavored restraints on trade and requires they be strictly construed, with any ambiguities interpreted in an employee's favor. *Id.* (citations omitted). Although such covenants may take various forms, covering topics such as confidentiality, competition, and solicitation, the same test applies to evaluating enforceability. *See, e.g., Brainware, Inc.*, 808 F. Supp. 2d at 828; *Nortec Commc'ns, Inc. v. Lee-Llacer*, 548 F. Supp. 2d 226, 230 (E.D. Va. 2008).

The three-part test used by the Supreme Court of Virginia "requires that the employer show that the clause (i) is narrowly drawn to protect the employer's legitimate business interest; (ii) is not unduly burdensome on the employee's ability to earn a living; and (iii) is not against sound public policy." *Lanmark Tech., Inc. v. Canales*, 454 F. Supp. 2d 524, 528 (E.D. Va. 2006) (citing *Richardson v. Paxton Co.*, 127 S.E.2d 113, 117 (Va. 1962)). In applying this test, courts must

---

[3] The parties assume that Virginia law governs the breach of contract claim, consistent with the 2019 agreement's inclusion of a Virginia choice of law and forum selection provision, ECF No. 3-1 at 7, and the complaint's invocation of diversity jurisdiction in Virginia, Compl. ¶ 13.

collectively consider factors such as the function, geographic scope, and duration of the restriction

at issue, *Simmons v. Miller*, 544 S.E.2d 666, 678 (Va. 2001), while remaining cognizant of the

actual business and employment context involved, *Assurance Data, Inc. v. Malyevac*, 747 S.E.2d

804, 808 (Va. 2013).

### 1. The confidentiality paragraph of the 2019 agreement is valid and enforceable as a matter of law.

Paragraph 12 of the 2019 agreement covers confidentiality and provides, in pertinent part:

> Agent will not during the term of this Agreement, or any time thereafter, use, disclose or permit to be known by any other person or entity, any Confidential Information of the Company . . . . The term "Confidential Information" means information relating to the Company's business affairs, proprietary technology, trade secrets, patented processes, research and development data, know-how, market studies and forecasts, competitive analyses, pricing policies, employee lists, employment agreements . . . , personnel policies, the substance of agreements with customers, suppliers and others, marketing arrangements, customer lists, commercial arrangements, or any other information relating to the Company's business that is not generally known to the public or to actual or potential competitors of the Company . . . . This obligation shall continue until such Confidential Information becomes publicly available . . . .

ECF No. 3-1 at 5, ¶ 12.[4]

Westly argues paragraph 12 is unenforceable due to its lack of "any temporal limitation"

and overbreadth. Defs.' Mem. 8–9. Westly contends that, absent such a time limit, the provision

effectively binds him in perpetuity contrary to case law. *Id.* (citing *Darton Envirtl., Inc. v. FJUVO*

*Collections, LLC*, 332 F. Supp. 3d 1022, 1030 (W.D. Va. 2018); *Integrated Direct Mktg., LLC v.*

*May*, 129 F. Supp. 3d 336, 341 (E.D. Va. 2015), *aff'd*, 690 F. App'x 822 (4th Cir. 2017); *Lasership,*

*Inc. v. Watson*, 79 Va. Cir. 205, 2009 WL 7388870, at *8 (Va. Cir. 2009)).

---

[4] The verified complaint for injunctive and legal relief cites to various provisions of both the 2019 and 2012 agreements. For ease of reference, the Court cites to the full agreements, included in an exhibit to GMS Industrial's memorandum in support of its motion for a temporary restraining order and temporary injunction filed on June 21, 2019. *See* ECF Nos. 2, 3-1.

Although Virginia case law tends to frown upon perpetual restrictions, Westly's argument sweeps too broadly and fails to consider the entire provision at issue. While correctly noting the second sentence of paragraph 12 prohibits use or disclosure of confidential information while associated with the company and "any time thereafter," Westly ignores the fourth sentence's limitation specifying "[t]his obligation shall continue until such Confidential Information becomes publicly available . . . ." ECF No. 3-1 at 5–6, ¶ 12. Thus, although indefinitely binding, the provision at issue materially differs from those struck down in *Darton, Integrated Direct Marketing,* and *Lasership. See Darton,* 332 F. Supp. 3d at 1030 (noting the agreement "contains no temporal limitation" and "was not narrowly tailored" to serve "legitimate business interests"); *Integrated Direct Mktg., LLC,* 129 F. Supp. 3d at 341 (discussing earlier bench ruling and noting the clause "would prevent May *from ever disclosing* information such as the identity of IDM's janitor services vendor"); *Lasership, Inc.,* 2009 WL 7388870, at \*1, \*8 (finding the restriction "at any time or in any manner" prohibited the employee "from telling a neighbor for the rest of her life *anything* about Lasership").

Nor does Virginia case law categorically preclude the use of indefinite or perpetual restrictions. For example, in *Brainware, Inc.,* this Court upheld a confidentiality clause barring the unauthorized use of information "during . . . employment and thereafter" that was narrowly designed to ensure that the defendant's "extensive access to confidential information related to [plaintiff's] narrow product line [was] not provided to a competitor." 808 F. Supp. 2d at 823, 828–29 (noting also the restriction applied only to "actual confidential information," unlike that in *Lasership*). Similarly, in *Omnisec Int'l Investigations, Inc. v. Stone,* 101 Va. Cir. 376, 2019 WL 38928939, at \*3, \*6 (Va. Cir. 2019), the court also declined to strike down a confidentiality

provision deemed applicable "in perpetuity," when it did not interfere with an employee's ability to find new gainful employment.

Next, Westly argues that the confidentiality paragraph is overbroad because it lists various items that independent sales agents apparently would not encounter and prohibits disclosure of "what amounts to any and all information related to Plaintiff's business." Defs.' Mem. 9. Both contentions miss the mark.

First, the paragraph's listing of items Westly may not have encountered while associated with GMS Industrial is not, by itself, sufficient reason to deem it insufficiently tailored. For example, a decision by GMS Industrial not to disclose to Westly an invention covered by a process patent provides no basis for declaring paragraph 12's definition of confidential information as overbroad. *Cf. Brainware, Inc.*, 808 F. Supp. 3d at 828 (rejecting overbreadth argument that confidentiality clause protecting more than just trade secrets was contrary to Virginia law). Stated another way, the legitimacy of a company's need to protect truly confidential information exists regardless of whether every employee has access to it.

Second, the proper inquiry is whether the agreement sweeps too broadly in seeking to protect non-confidential information that Westly could otherwise use to earn a living. *See, e.g., Darton*, 332 F. Supp. 3d at 1031 (striking confidentiality clause that prevented defendant company from pursuing the very business it engaged in before signing the clause); *Omnisec*, 2019 WL 38928939, at *6 (striking non-disclosure disclosure clause, with non-competition proviso, as overbroad and unfairly burdening an employee's ability to work). In arguing that paragraph 12 bars disclosure of "any and all information about" GMS Industrial's business, Westly again ignores the proviso conferring protection only upon non-public information. *See* ECF No. 3-1 at 5–6, ¶ 12.

9

GMS Industrial possesses a legitimate business interest in protecting confidential information used to develop and grow its business, so as to protect its relationships with customers and suppliers and to guard against unfair competition. Further, it reportedly took steps to keep such information confidential and out of the hands of its competitors. *See* Compl. ¶¶ 29–30. By virtue of his lengthy employment affiliation and his advancement to managerial roles in the company, Westly allegedly was privy to confidential information about the company's business operations. *Id.* at ¶¶ 27–29, 41. With due regard for the nature of Westly's relationship with GMS Industrial, the Court concludes that, although extensive, paragraph 12 of the 2019 agreement is sufficiently narrowly tailored to protect the company's non-public, confidential information. *See Roanoke Eng'g Sales Co. v. Rosenbaum*, 290 S.E.2d 882, 885 (Va. 1982) (finding covenant enforceable when an employee had access to confidential information and such knowledge "qualified him to be a formidable competitor" to his previous employer). That such information retains protection only so long as it is not made public, reasonably serves to limit both the scope and duration of the confidences Westly must keep, without unduly interfering with his ability to earn a living. Nor is the provision contrary to public policy.

### 2.     The non-solicitation paragraph of 2019 agreement is unenforceable as a matter of law.

Paragraph 14 of the 2019 agreement is titled "Non-Solicitation" and provides, in pertinent part:

> During the term of this Agreement, and for a period of one year thereafter, Agent may not (i) entice, solicit or encourage any Company employee to leave the employ of the Company or any independent contractor to sever its engagement with the Company; and may not (ii) directly or indirectly, entice, solicit or encourage any client or customer or known prospective client or customer of the Company to cease doing business with the Company, reduce its relationship with the Company or refrain from establishing or expanding a relationship with the Company. Agent will not reveal the identity of any supplier to any competitor of Company.

ECF No. 3-1 at 6, ¶ 14.  As Westly challenges three separate restrictions in paragraph 14, the Court will address them one at a time.

### a.      The restraint on customer/client tampering and solicitation.

Westly argues that paragraph 14's limitations upon his interactions with clients and customers is ambiguous and subject to multiple interpretations, contains too many undefined terms, and "effectively prohibits [him] from working for any competitor, anywhere in the world, if that competitor's products might be sold to any client, customer, or prospective client or customer of [GMS Industrial]." Defs.' Mem. 10–11.  Westly's role as a district manager and then as GMS Industrial's director of sales entitled the company to use covenants having a broader scope. Compl. ¶¶ 38, 41.  But, GMS Industrial was also obliged to tailor its covenants carefully to avoid unduly burdening Westly's ability to earn a living.  Because it failed to do so here, this aspect of the non-solicitation clause is unenforceable.

The problems begin with GMS Industrial's failure to include any geographic scope in its non-solicitation clause.  The company operated in and did business both nationally (coast to coast, including in Virginia, California, Florida, Colorado, Louisiana, New York, Oklahoma, and Texas), and internationally (in Europe and Japan).  Pl.'s Mem. 8;  Compl. ¶¶ 2, 17, 18, 20, 185–86; ECF No. 1-9 at 3–5, 7 (describing products as "being stocked in the DLA Depots with an experienced presence at nearly every major DoD Facility in the continental US, Alaska, and Hawaii").  On the other hand, when GMS Industrial severed its relations with Westly, his agency agreement only authorized him to sell the company's products in Colorado and Kansas.  ECF No. 3-1 at 4–5, ¶¶ (B), 1, 8.

GMS Industrial correctly notes that the lack of a geographic scope usually does not, in and of itself, render a restrictive covenant unenforceable.  *See Brainware, Inc.*, 808 F. Supp. at 826–

27 (discussing covenant not to compete); *cf. Cantol, Inc.*, 2006 WL 1213992, at *6 (noting that, when a power disparity exists between the parties to restrictive employment covenants, "the absence of geographic limitation renders the covenants invalid"). But its argument that the non-solicitation clause "is limited to business with GMS's customers and known prospective customers . . . [and] *is inherently limited in geography to the area that GMS does business*" hardly improves matters. Pl.'s Mem. 8 (emphasis added). Given the national and international scope of GMS Industrial's business, such a limitation is mostly devoid of meaning.[5]

Although methods existed for tailoring its non-solicitation clause, such as by limiting it to customers doing business in a particular, pre-termination timeframe and/or to customers actually known to and/or serviced by the employee to be restrained, GMS Industrial mostly failed to use them here.[6] *See, e.g., Update, Inc. v. Samilow*, 311 F. Supp. 3d 784, 789–90 (E.D. Va. 2018); *see also Cantol, Inc.*, 2006 WL 1213992, at *6 (holding "failure to limit the . . . covenants . . . to the areas reasonably related to those in which Defendants functioned as employees . . . is fatal to the covenant's validity"); *Phoenix Renovation Corp. v. Rodriguez*, 439 F. Supp. 2d 510, 520–22 (E.D. Va. 2006) (finding non-solicitation clauses without a geographical scope "were substantially broader than necessary" and covered "anyone in . . . thirty-eight states who might call upon Phoenix in the future to perform . . . pipe replacement," notwithstanding that defendants only

---

[5] Nor does the Court's ruling in *Capital One Fin. Corp. v. Kanas*, 871 F. Supp. 2d 520, 534 (E.D. Va. 2012) support the company's position, as asserted. *See* Pl.'s Mem. 8. In fact, that case involved a non-competition provision limited to three states, notwithstanding that the geographic areas serviced by the departing, high-level, bank executives extended beyond those three states. 871 F. Supp. at 534. That ruling, therefore, does not lend its imprimatur to non-solicitation agreements purportedly limited to the suing company's area of business operations.

[6] Two exceptions to this conclusion include the clause's post-termination, non-solicitation, one-year limit and the restricting of the non-solicitation bar only to customer prospects "known" to Westly. ECF No. 3-1 at 6, ¶ 14.

performed such services in the DC metro area).   In failing to do so, GMS Industrial unduly burdened Westly's ability to earn a living.

Next, the non-solicitation clause precludes Westly from contacting, directly or indirectly, "*any* client or customer" of GMS Industrial, without limitation. *See* ECF No. 3-1 at 6, ¶ 14 (emphasis added).   By its plain language, this clause not only restricts Westly from contacting existing customers of the company, but also prior customers, including:  (a) those who dealt with and severed their relationship with the company prior to Westly's association with it; and (b) those who ceased doing business with the company while Westly was associated with the company, but before he formed G&S Supply.   Rather than narrowly tailoring the clause to serve legitimate interests, GMS Industrial's restriction reaches too far. *See Update, Inc.*, 311 F. Supp. 3d at 789 (restrictive covenants need be "no greater than necessary to protect an employer's legitimate business interest")(citation and internal quotation marks omitted).

The provision here is like that found overbroad and unenforceable in *Lasership, Inc.*, which involved a clause more narrowly drawn than GMS Industrial's. 2009 WL 7388870, at *1, *8. Because the clause in *Lasership* barred "an employee from contacting in *any manner*, for *any purpose*, *any customer* of Lasership that was invoiced in the year before" the employee left, the court held that it placed "an unreasonable burden on the employee to know all customers invoiced in that year period." *Id.*  Here, even accounting for Westly's advancement in the company and his eventual sales' responsibilities, GMS Industrial's clause not only requires he know and remember every customer, national and international, the company dealt with during his eight years there, but also the company's customers in the ten years before he came onboard. Compl. ¶¶ 17, 35, 53.

Thus, the clause at issue is unlike the non-solicitation clause at issue in *TechINT Sols. Grp., LLC v. Sasnett*, No. 5:18-cv-00037, 2018 WL 4655752, at *5 (W.D. Va. Sept. 27, 2018).   There,

the court noted that "[f]ar from applying to any" governmental client to which the company ever marketed, the clause carefully identified clients as including only those entities to which the company provided services during the year before defendant left, as well as those entities "specifically targeted" by the company's marketing and about which the defendant was aware and/or in which he participated. *Id.*

This failure is even more glaring in light of the non-solicitation's clause undefined directive not to solicit a customer to "refrain from establishing or expanding a relationship with the Company." ECF No. 3-1 at 6, ¶ 14. The Court generally agrees a restrictive covenant need not "provide a glossary or serve as a dictionary" and unambiguous terms and phrases should be ascribed their ordinary meaning, *Update, Inc.,* 311 F. Supp. 3d at 792. The foregoing phrase, however, can be interpreted in ways that are overbroad and extend well beyond GMS Industrial's legitimate business needs. For example, it could be construed as prohibiting Westly, while affiliated with another entity, from soliciting a company that he knows GMS Industrial unsuccessfully solicited in the past (a "prospective customer") to buy products or services not competing with GMS Industrial's offerings. Similarly, it could be construed to prevent Westly, while affiliated with another entity, from soliciting the Defense Logistics Agency (a GMS Industrial customer that presumably contracts with large numbers of suppliers, Compl. ¶¶ 23–25) to buy products or services not competing with those sold by GMS Industrial. As the Court previously noted in addressing GMS Industrial's motion for a preliminary injunction, "[t]here is a strong public interest in a competitive market . . . [and] fair competition among businesses which sell products to public customers . . . [that] is not served by determining that any single private business has a 'lock' on selling to public customers . . . ." ECF No. 70 at 8–9. Although such activities do not directly compete with GMS Industrial, they arguably fall within the prohibition

not to solicit existing or prospective customers, thereby causing them to establish a contractual relationship with someone other than GMS Industrial or reducing the prospect, if GMS Industrial expanded its product offerings, of an expanded relationship with that customer.

In response, GMS Industrial argues the clause only prevents Westly from "directly competing with GMS by soliciting its customers *to purchase similar goods* or to otherwise refrain from doing business with GMS." Pl.'s Mem. 9 (emphasis added); *see Assurance Data, Inc.*, 747 S.E.2d at 808 (emphasizing that the factual context must factor into the analysis). The Court, however, cannot cure an improper clause by adding terms it does not contain. Because restrictive covenants must be strictly construed in favor of the person restrained, modification by implication or selective editing is not allowed to cure overbreadth.[7] *See Alston Studios, Inc. v. Lloyd V. Gress & Assoc.*, 492 F.2d 279, 284–85 (4th Cir. 1974) (construing non-competition clause literally and rejecting employer's argument to add implicit geographic restriction in the absence of an explicit one); *Update, Inc.*, 311 F. Supp. 3d at 788 ("where a non-compete clause is ambiguous, susceptible to two or more differing interpretations, one of which is overbroad and unenforceable, the entire clause fails").

Nor does the context here give GMS Industrial license to enforce a clause substantially burdening Westly's right to earn a living, and also negatively impacting the market for the sale of goods not otherwise supplied by the company. Non-solicitation agreements, like this one, that unduly restrict a former employee from legitimately earning a living independent of his former employer are unenforceable. *See TechINT Sols. Grp., LLC*, 2018 WL 4655752, at *5 (distinguishing between valid provisions preventing an employee from performing acts that

---

[7] The absence of provisions like that suggested by GMS Industrial above supports the conclusion that the clause is overbroad.

actually or potentially compete with his former employer and invalid ones preventing an employee from working for a competitor while engaged in acts that do not compete with a former employer) (citing *Home Paramount Pest Control Co. v. Shaffer*, 718 S.E.2d 762, 764 (Va. 2011)).  They are also contrary to public policy.

> ### b.    The restraint on disclosure of suppliers.

GMS Industrial's non-solicitation paragraph also contains a confidentiality-like sentence prohibiting Westly from revealing "the identity of any supplier to any competitor of Company." ECF No. 3-1 at 6, ¶ 14.  This sentence specifies neither a geographic scope, which is immaterial here, nor any temporal limitation upon Westly's obligation.  *Id.*  Although the bar on revealing "any supplier" to any competitor could be read to preclude Westly from ever suggesting that a competing employer use any and all suppliers, regardless of whether they supply GMS Industrial, the Court is mindful that absurd and unreasonable contract constructions should be avoided.  *See Update, Inc.*, 311 F. Supp. 3d at 793, 797 n.14.  Accordingly, the Court construes the clause to prohibit Westly's disclosure to competitors of suppliers used by GMS Industrial.

Even so construed, this restriction is overbroad for other reasons.  First, as it purports to bind Westly for all times, it is not narrowly tailored to serve legitimate business interests.  For example, it would bar Westly from forever suggesting that any future, competing employer(s) use a former supplier of GMS Industrial, even if Westly knew that supplier ceased doing business with the company years before.  Second, the sentence is overbroad because it precludes identification of companies supplying goods to GMS Industrial, even to obtain goods that do not compete with those sold by the company.  For example, if GMS Industrial obtained certain industrial cleaning products from Amazon, the restriction in question arguably precludes Westly from suggesting that

a future, competing employer buy widgets from Amazon, notwithstanding that GMS Industrial has never bought and sold widgets.[8]

In response, it may also be argued the restriction at issue only seeks to prevent Westly, in substance, from identifying to a competitor the suppliers from whom GMS Industrial buys. If so, it is far from clear that GMS Industrial meant to authorize Westly to disclose the names of its suppliers, so long as he never discloses that they are also used by GMS Industrial. When examined in light of the factual circumstances that could easily arise, these ambiguities, coupled with the overbroad nature of the supplier confidentiality bar, are fatal. As with the others discussed above, this restriction also diminishes Westly's utility to future employers, unduly burdens his ability to earn a living, and is contrary to public policy.

####     c.     The restraint on tampering with and soliciting employees and contractors.

Finally, Westly also attacks the anti-tampering provision of the non-solicitation paragraph that prevents him from seeking to cause ("entice, solicit or encourage") GMS Industrial employees and independent contractors to leave their jobs or sever ties to the company. *See* ECF No. 3-1 at 6, ¶ 14. Westly argues this aspect of paragraph 14 is "so vaguely worded" that he would violate it simply by encouraging an employee or independent contractor to end her relationship with company due to serious illness or a desire to attend college. Defs.' Mem. 11.

This restriction seeks to prevent Westly from tampering with the company's employees and contractors. It applies, without geographic restriction (and none is needed), during Westly's association with the company and for one year thereafter. Although serving a legitimate company

---

[8] Alternatively, the restriction might also have the practical effect of preventing Westly from forming a new company and using the same suppliers used by GMS Industrial to buy the same goods for sale to Asian countries where GMS Industrial does no business.

interest, the restriction is not so much vague as it is possibly overbroad. Nevertheless, whether Westly counsels GMS Industrial's personnel to separate from the company for competitive reasons or for personal reasons having nothing to do with business, GMS Industrial has a significant interest in retaining existing personnel in whom it has invested time and resources and entrusted with information vital to its business.[9] Therefore, the argument that it need be more narrowly drawn is not compelling.

While the restriction may limit Westly's ability to give former colleagues life advice touching upon their present occupations, that is of no moment to the restraint's validity. Instead, what matters is that it in no way appears to affect Westly's ability to pursue new, gainful occupations. Because it is also not contrary to public policy, the anti-tampering provision is not, in and of itself, unenforceable.

In spite of this conclusion, because the Court has found the confidentiality and anti-customer tampering provisions contained in the same paragraph invalid, the entirety of paragraph 14 of the 2019 agreement must be deemed unenforceable. *See Update, Inc.*, 311 F. Supp. 3d at 788 (specifying that courts have no authority under Virginia law to "blue pencil" or otherwise rewrite a faulty restrictive covenant) (citation omitted); *Lanmark Tech., Inc.*, 454 F. Supp. 2d at 529 (same); *Roto-Die Co. v. Lesser*, 899 F. Supp. 1515, 1523 (W.D. Va. 1995) (same).

---

[9] As cited in GMS Industrial's brief, Defs.' Mem. at 11, a Virginia circuit court struck down as overbroad a non-competition clause that similarly precluded a former employee from soliciting former colleagues to leave the plaintiff insurer's employ, without regard to the reason therefor. *BB&T Ins. Svcs., Inc. v. Thomas Rutherford, Inc.*, No. CL09-4550, 2010 WL 7373709, at *4 (Va. Cir. Feb. 9, 2010). For the reasons discussed above, and in light of the lack of a burden on Westly here, the Court declines to reach the same conclusion.

In conclusion, the confidentiality restriction contained in paragraph 12 of the 2019 agreement is enforceable. Paragraph 14's non-solicitation restrictions in that same agreement are unenforceable.

### 3.   The confidentiality provision of the 2012 agreement is unenforceable as a matter of law.

Westly also challenges the enforceability of the confidentiality restriction in the 2012 agreement. That restraint provides, in pertinent part:

> GMS Industrial . . . may impart, to me, confidential information, including, without limitation, designs, pricing, financial information, personnel information, real estate information, marketing strategies, customer profiles, and the like (collectively "confidential information"). I hereby acknowledge GMS Industrial['s] . . . exclusive ownership of such confidential information.

> **I agree:** (1) only to use the confidential business information to provide services or goods to GMS Industrial . . . ; (2) only to communicate the confidential information to fellow employees on a need-to-know basis; and (3) not to otherwise disclose or use, at any time, any confidential information. . . . Upon demand of GMS Industrial . . . or termination of my employment, I will deliver to GMS Industrial . . . all blueprints, manuals, designs, photographs, recordings, and any other medium by which, through which, or on which confidential information has been recorded or stored, which are in my possession, custody, or control.

ECF No. 3-1 at 2.

Westly argues that the 2012 confidentiality agreement is unenforceable because it contains no time limit and is overbroad, particularly in incorporating confidential information as identified in the employee handbook, such that the provision amounts to an unrestricted post-employment covenant not to compete. Defs.' Mem. 12–13. GMS Industrial does not respond to these arguments other than to state that it relies on its "prior defenses" to Westly's duplicative arguments. Pl.'s Mem. 11.

The Court rejects Westly's argument that the terminology used to identify confidential items in the 2012 agreement renders it unenforceable. The 2012 listing is more narrowly focused

than its 2019 counterpart, using terms such as "pricing," "financial information," "marketing strategies," and "customer profiles."[10]  ECF No. 3-1 at 2.  That the 2012 listing is incomplete, as indicated by the terms "without limitation" and "and the like," does not, in and of itself, require striking the provision.  Such language merely recognizes the reality that no employment agreement could identify every conceivable item of confidential information.  Nor, in this context, is the absence of a geographic restriction of any significance.  Nor does the 2012 agreement's requirement that, upon termination, Westly return certain items subject to his possession, custody, or control, including any media used to record or store confidential information, compel the conclusion that it is overbroad and insufficiently tailored.  That Westly purportedly never received items such as blueprints and designs fails to establish that the company unreasonably required the return of confidential information upon separation, contrary to public policy or an employee's interest in future employment.

Unlike the 2019 agreement, however, the 2012 confidentiality provision is perpetual.  *See* ECF No. 3-1 at 2 (prohibiting disclosure or use "at any time").  For example, should GMS Industrial's confidential bid on a government contract be publicly disclosed following a contract award, this restriction would prohibit Westly from ever otherwise disclosing or using such information.  In contrast, the more narrowly tailored 2019 covenant only restricts disclosure until

---

[10] Further, as the 2012 agreement expressly details the kinds of confidential information covered by the restrictive covenant, the Court declines Westly's invitation to read into it a wholly separate listing of confidential information contained in the employee handbook.  Defs.' Reply at 9 (discussing ¶ 40(a) of the complaint).  Although the Court discusses the parties' dispute about the possible incorporation of the handbook into the 2012 agreement below, the employee handbook indicates that the company "requires all employees to sign a confidentiality agreement as a condition of employment . . . ."  Compl. ¶ 40(a).  This language indicates that the 2012 agreement (and its confidentiality covenant) is the operative agreement, not the handbook.

the information becomes publicly available.  In forbidding disclosure after GMS Industrial's legitimate interest in confidentiality has dissipated, the 2012 agreement is overbroad.

This perpetual restriction, when coupled with a definition of confidential information that includes other information not identified for the employee, leaves the outer boundaries of the 2012 agreement ill-defined.  *See* ECF No. 3-1 at 2 (specifying confidential information "includ[es], *without limitation*") (emphasis added).  This lack of tailoring necessarily creates the risk that, post-separation, the 2012 agreement would not only prevent Westly from using information that enters the public domain, but also impact his use of the knowledge and skills he developed while affiliated with GMS Industrial, in a manner that courts have found objectionable and contrary to public policy.  *See Darton*, 332 F. Supp. 3d at 1030 (noting the agreement "contains no temporal limitation" and "was not narrowly tailored" to serve legitimate business interests"); *Integrated Direct Mktg., LLC*, 129 F. Supp. 3d at 341 (discussing earlier bench ruling and noting the clause "would prevent May *from ever disclosing* information such as the identity of IDM's janitor services vendor"); *Lasership, Inc.*, 2009 WL 7388870, at *1, *8 (finding the restriction "at any time or in any manner" prohibited the employee "from telling a neighbor for the rest of her life *anything* about Lasership").

> **4.     The complaint states a claim for breach of the 2012 agreement's restriction on supplier disclosure, but fails to state a claim for breach of the employee recruiting and the handbook's outside employment restrictions.**

Westly also argues that count II "fails to state a claim for the other supposed breaches of the 2012 Employment Agreement."  Defs.' Mem. 14; *see* Compl. ¶¶ 104, 106 (detailing breaches of the 2012 agreement).  The Court addresses these one at a time.

First, Westly argues that the company fails to state a claim he violated the covenant "not to recruit and not to assist any other entity in recruiting any other employees who worked for GMS

Industrial [] during the last twelve (12) months, in which [Westly] worked for GMS Industrial . . . ." ECF No. 3-1 at 3; Compl. ¶ 104(iii). Westly argues that, other than defendant Gregory S. "Sky" Spires (hereinafter "Sky Spires"), all other individually-named defendants worked as independent contractors for GMS Industrial when they became involved with G&S Supply.[11] Defs.' Mem. 14. Noting the absence of allegations of recruitment of persons actually employed with GMS Industrial, Westly argues the complaint fails to state a claim for violation of this aspect of the contract. GMS Industrial did not respond to this argument.

The complaint alleges that Westly "solicited the other six individual Defendants, and their related limited liability Defendants, *while they were independent sales agents with GMS* [Industrial], and trained and engaged them to sell G&S[ Supply's] competitive product line . . . ." Compl. ¶ 49 (emphasis added); *see also id.* at ¶ 53(c). The 2012 agreement, however, does not bar Westly from recruiting independent contractor, non-employee personnel, associated with GMS Industrial.   Because the complaint nowhere alleges that Westly recruited GMS Industrial employees, the allegation that he violated the 2012 agreement by recruiting company employees fails to state a claim upon which relief can be granted.[12]

---

[11] Notwithstanding Westly's suggestion to the contrary, the complaint also alleges that Sky Spires was affiliated with GMS Industrial as an independent sales agent, *see* Compl. ¶ 92, rather than as an employee.

[12] Although the complaint alleges disloyal acts generally by persons "employed by, and/or under independent sales agent contract[s] with GMS [Industrial,]" that such persons had access to company trade secrets "by virtue of their employment or independent contractor contractual relationship," and that the "Sales Agent Defendants" hid their disloyal acts from company officials "to perpetuate their employment with" the company, these general allegations nowhere identify any of the sales agent defendants, other than Westly, as a company employee. *See* Compl. ¶¶ 1, 21, 28, 35–43. The complaint also alleges that defendant Michael Welton originally signed an independent sales agent agreement, and on April 1, 2019, signed a "Statutory Employee Agreement which appointed him as an independent, non-exclusive sales agent . . . ." *Id.* at ¶¶ 77–78. Status as a "statutory employee" differs from that of an ordinary employee and GMS Industrial makes no argument to the contrary. *See, e.g., Evans v. B.F. Perkins Co.,* 166 F.3d 642, 649–53

Second, Westly argues that, as the complaint contains no allegations that G&S Supply "uses the same product supplier/vendors" as GMS Industrial, count II fails to state a claim for breach of the 2012 agreement's restriction not to disclose the company's suppliers to a competitor. Defs.' Mem. 14. GMS Industrial does not respond to this argument either.

In the 2012 agreement, Westly agreed that he would "not reveal the identity of any supplier to any competitor of GMS Industrial," while employed there and for 12 months after such employment ended. ECF No. 3-1 at 2. Count II alleges that Westly breached this agreement, but nowhere specifically alleges that Westly revealed the company's suppliers to G&S Supply or other competitors or identifies which suppliers were allegedly disclosed. Compl. ¶¶ 104, 106. Westly suggests that the absence of such details is consistent with the complaint's allegations that the products sold by GMS Industrial and G&S Supply "are similar." Defs.' Mem. 14; Compl. ¶ 1 (discussing how defendants sell "mostly substantially similar, but in notable cases, substandard, illegal products to GMS[ Industrial]s customers").

The complaint alleges:

(1) the company sells materials compliant with federal regulations and the rules of the Trade Agreements Act; Compl. ¶¶ 18–19;

(2) the company has received national stock numbers ("NSNs") for 57 separate products (and/or product kits); *id.* at ¶ 24;

(3) the company sells cage code part number ("CCPN") items; *id.* at ¶ 24;

---

(4th Cir. 1999) (discussing statutory employees under Virginia law). Finally, even if the company actually employed Welton as of April 1, 2019, the complaint alleges that his involvement with Westly and G&S Supply began nearly two years earlier in June 2017. Compl. ¶ 80. Thus, taking the facts in the light most favorable to GMS Industrial, these allegations are insufficient to push the company's claims on this point "across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 674, 680.

(4) G&S Supply is unlawfully competing to sell the U.S. Army CCPN items and working towards obtaining NSNs for its own product line; *id.* at ¶ 24;

(5) the company has developed a database of trusted, reliable suppliers, able to satisfy regulatory requirements and customer needs; *id.* at ¶ 26;

(6) Westly and other sales agent defendants obtained access to the company trade secrets and confidential information, including its "Product Source List," via their association with it; *id.* at ¶¶ 27–28, 31–32;

(7) the sales agent defendants solicited the company's customers for their competing company and G&S Supply received contract awards and shipped orders to those customers of products (and/or product kits) competing with and/or identical to those sold by the company; *id.* at ¶ 33, 46, 47, 49, 51–53, 64;

(8) the sale of such products by G&S Supply, including those non-compliant with the Trade Agreements Act, confused and damaged the company's customer base; *id.* at ¶ 52;

(9) the defendants' sale of substantially similar product kits, using catalogues mimicking those used by the company, showed that Westly and Gregory Spires had misappropriated the company's trade secrets, including its "Products Source List;" *id.* at ¶ 51; and

(10) the company was directly and proximately damaged by Westly's breach of his obligations in the 2012 agreement, including the obligation not to reveal company suppliers; *id.* at ¶¶ 104, 106–08.

Accepting the above allegations as true and drawing all reasonable factual inferences in GMS Industrial's favor, the Court cannot say with certainty that the company will be unable to prove any set of facts establishing that Westly breached his agreement not to reveal GMS Industrial's suppliers to a competitor and thereby damaged the company. *See Edwards,* 178 F.3d

24

at 244. Accordingly, Westly's motion to dismiss this aspect of count II for failure to state a claim should be denied.

Third, Westly argues that any alleged breach predicated on the 2012 agreement's incorporation of terms of the GMS Industrial's employee handbook fails to state a claim upon which relief can be granted. Defs.' Mem. 14. Specifically, Westly seeks dismissal of that portion of count II alleging he violated any obligation set forth in the employee handbook precluding outside employment with a competing business. *Id.*

The complaint alleges that GMS Industrial's employee handbook permitted employees, such as Westly, only to "hold outside jobs in unrelated businesses or occupations as long as the employee meets the performance standards of [his current] position with GMS [Industrial.]" Compl. ¶ 40(b). While employed with the company and before he became an independent contractor, Westly allegedly formed G&S Supply in June 2017 to sell products competing with the company's product line. *Id.* at ¶¶ 46–47, 49. Westly also allegedly engaged in such activities on behalf of G&S Supply while on the clock and employed by GMS Industrial. *Id.* at ¶ 48. GMS Industrial alleges that these activities violated the terms of the employee handbook, as incorporated into Westly's 2012 employment agreement. *Id.* at ¶¶ 104, 106; *see also* Pl.'s Mem. 11.

The 2012 agreement provides, in pertinent part, that Westly has:

received the GMS Industrial . . . employee handbook, and agree[s] to comply with its provisions and any other rules. Neither the handbook, practices, nor any communications create an employment contract or term. I understand that the policies and benefits communicated to me are subject to change, interpretation, and review by GMS Industrial . . . at any time.

ECF No. 3-1 at 2 at ¶ 2. Alternately relying on the first and second sentences of this provision, the parties dispute whether the 2012 agreement incorporates the handbook's concurrent

employment restriction. Pl.'s Mem. 11–12; Defs.' Mem. 14. Elsewhere, the agreement also provides:

> that neither this document nor any other communication shall bind GMS Industrial . . . , to employ me now or in the future, that no consideration has been furnished to GMS Industrial . . . for my employment, other than my services, and that my employment may be terminated by GMS Industrial . . . or me, with or without notice, at any time.

ECF No. 3-1 at 2.

The proper interpretation of a contract presents a question of law. *Bentley Funding Grp., L.L.C. v. SK & R Grp., L.L.C.*, 609 S.E.2d 49, 53 (Va. 2005) (citation omitted). Contract construction looks to the terms agreed upon by the parties, without adding terms they did not include. *See Wilson v. Holyfield*, 313 S.E.2d 396, 398 (Va. 1984) (citations omitted). When a contract's terms are clear and unambiguous, a court must construe it in accord with its plain meaning. *Bridgestone/Firestone, Inc. v. Prince William Square Assocs.*, 463 S.E.2d 661, 664 (Va. 1995). Thus, "[w]ords that the parties used are normally given their usual, ordinary, and popular meaning. No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly." *D.C. McClain, Inc. v. Arlington Cty.*, 452 S.E.2d 659, 662 (Va. 1995).

A contract is ambiguous when its language may be reasonably interpreted in alternative ways given the context. *Salzi v. Va. Farm Bureau Mut. Ins. Co.*, 556 S.E.2d 758, 760 (Va. 2002); *see Granite State Ins. Co. v. Bottoms,* 415 S.E.2d 131, 134 (Va. 1992) (describing a contract as ambiguous "when it may be understood in more than one way or when it refers to two or more things at the same time"). If a contract provision is ambiguous, a "fundamental tenet of contract law [is] that [the] ambiguity is construed against the drafter." *Cent. Tel. Co. of Va. v. Sprint*

*Commc'ns Co. of Va.*, 759 F. Supp. 2d 789, 804 (E.D. Va. 2011), *aff'd*, 715 F.3d 501 (4th Cir. 2013).

In arguing Westly violated the concurrent employment limitation, GMS Industrial only discusses his agreement to comply with the handbook's provisions and rules, without addressing the significance, if any, of the ensuing sentence that the handbook does not create any terms of employment. Pl.'s Mem. 11–12. Westly, on the other hand, focuses on the ensuing sentence and cites two cases for the proposition that employee handbooks containing similar disclaimers "'cannot, as a matter of law, support a breach of contract claim.'" Defs.' Reply 9 (quoting *Meade v. Appalachian Power Co.*, 11 Va. Cir. 235, 1988 WL 619179, at *4 (Va. Cir. 1988); *see also Innovative Sys. & Sols., Inc. v. Hannah*, 75 Va. Cir. 363, 2008 Va. Cir. LEXIS 270, at *8 (Va. Cir. 2008)). Although the Court has no quarrel with that proposition, the cases in question addressed whether the terms of an employee handbook constituted a contract, not whether an employment agreement purporting to incorporate terms from a handbook is enforceable, in the presence of this sort of handbook disclaimer.

Having reviewed the 2012 agreement in its entirety, the Court concludes that the disputed paragraph is ambiguous. After identifying Westly's job title and start date, the paragraph recites that he not only received the company's employee handbook, but also his agreement to abide by its "provisions and any other rules," including the concurrent employment limitation described in the complaint. ECF No. 3-1 at 2, ¶ 2; Compl. ¶ 40(b). This much is undisputed.

The question here is the proper interpretation of the contract in light of the next sentence's statement that "[n]either the handbook, practices, nor any communications create an employment contract or term." ECF No. 3-1 at 2. Several potential interpretations exist, but two predominate. First, the sentence could reasonably be construed to mean that GMS Industrial is undertaking no

additional contractual obligations to Westly, arguably arising via its employee handbook or due to its practices or other communications, and otherwise at odds with an at-will contract. Thus, any obligations arising from the employee handbook run only one-way, from Westly to GMS Industrial. Although this approach arguably harmonizes these two sentences of paragraph 2, it also effectively supplies terms to the disputed sentence not contained therein. *Wilson*, 313 S.E.2d at 398 (noting a court's function is "to construe," rather than "to make" the parties' contract and that a court "cannot read into [it] language which will add to or take away from the meaning of the words already contained therein") (citations omitted).

Alternatively, the disputed sentence also could reasonably and literally be read, in pertinent part, to mean that nothing in the employee handbook gives rise to any employment contract or any contract terms, running to or from either party. This approach follows the logic of the *Innovative Systems* and *Meade* cases cited by Westly and effectively recognizes such language is purposefully used to evince the parties' intent not to be bound with respect to any statements in the employee handbook.

Because the contract may reasonably be interpreted in more than one way, it is ambiguous.[13] Where, as here, GMS Industrial required Westly to sign the 2012 agreement, *see* Compl. ¶ 38, the ambiguous provision must be construed against it and in Westly's favor. Accordingly, the Court construes the 2012 employment agreement as not incorporating the terms of the employee handbook. Therefore, GMS Industrial's claim in count II that Westly breached his contract by working for a competitor fails to state a claim upon which relief can be granted.

---

[13] Because this ambiguity is apparent from the face of the contract, it is a patent ambiguity. *Lott v. Scottsdale Ins. Co.*, 827 F. Supp. 2d 626, 631 (E.D. Va. 2011) (citation omitted). As such, parol evidence may not be considered to explain an understanding not reflected in the language of the parties' agreement. *Galloway Corp. v. S.B. Ballard Constr. Co.*, 464 S.E.2d 349, 354 (Va. 1995).

**C.     The motion to dismiss Count III's breach of contract claims against the remaining sales agent defendants (other than Westly Greer), and their associated LLCs, should be granted in part and denied in part.**

Defendants (other than Westly and G&S Supply) move to dismiss count III's breach of contract claims for failure to state a claim. With the exception of two other contracts involving defendants Michael Welton ("Welton") and Wayne Side ("Side"), the contracts at issue are certain "Independent Sales Agent Agreement[s]," between such defendants and GMS Industrial. Compl. ¶¶ 63, 65–66, 70, 72–73, 75, 77, 80, 87, 89–90, 92, 94–95. Aside from the exceptions discussed below, and the date, name of the independent contractor, and sales territory assigned, these agreements are, in pertinent part, identical to Westly's 2019 agreement reviewed by the Court above. *See* ECF No. 3-1 at 4–7.

**1.     Only the confidentiality restraints in the sales agent agreements that are essentially identical to Westly's 2019 agreement are enforceable.**

The sales agent defendants (not including Westly), along with Greer Group, LLC, and County Roads, LLC, argue that the confidentiality and non-solicitation paragraphs in these agreements are unenforceable, primarily for the reasons discussed above. Defs.' Mem. 15–16. GMS Industrial's response brief does not address this argument. Pl.'s Mem. 12–13. For the reasons stated above, the Court concludes that the confidentiality paragraphs in the independent sales agent agreements for Gregory Spires/County Roads, LLC, Sabrina Greer ("Sabrina")/Greer Group, LLC, Welton (2016 agreement), Thomas Hayes ("Hayes"), and Sky Spires are enforceable.

For the reasons stated above, the Court also concludes that the non-solicitation paragraphs in the independent sales agent agreements for defendants Gregory Spires/County Roads, LLC, Sabrina/Greer Group, LLC, Welton (2016 agreement), Hayes, and Sky Spires are unenforceable. Buttressing this latter conclusion is the fact that, unlike Westly, these remaining individual sales

agent defendants' alleged association with GMS Industrial was neither as lengthy nor as substantial as Westly's. Therefore, the company's use of the same restraints found unenforceable above are even less justified, are more burdensome on earning a living, and are contrary to public policy.

### 2. Only the confidentiality restraint in Michael Welton's 2019 agreement is enforceable.

Defendants Welton and Side also move to dismiss count III as to the breach of contract claims seeking to enforce the restrictive covenants in Welton's 2019 statutory employee agreement, Compl. ¶ 78–79, and Side's 2015 sales agent agreement, *id.* at ¶ 82.[14] Because the restrictive covenants in these agreements vary in several respect from those above, the Court will address them one at a time. Other than as noted below, GMS Industrial has again failed to respond to Welton and Side's arguments about the enforceability of these covenants.

Paragraph 11 of Welton's 2019 agreement contains a confidentiality provision similar to that used in Westly's 2019 agreement, with two additions.[15] Compl. ¶ 79; *see* ECF No. 3-1 at 27, ¶ 11. First, it limits the term of the restriction to "the term of this Agreement, or for three (3) years thereafter," *id.*, rather than requiring confidentiality until the information "becomes publicly available," ECF No. 3-1 at 6, ¶ 12. Second, after listing the various types of confidential information, the paragraph limits the definition to that "used or employed by the Company in the actual performance of its business operations." ECF No. 3-1 at 28, ¶ 11. As both of these

---

[14] Although the undersigned recommended the dismissal of all claims against Side for lack of personal jurisdiction, ECF No. 90, those claims, and GMS Industrial's objection to that report, ECF No. 91, remain pending. Therefore, this report addresses Side's other arguments for dismissal in the pending motion to dismiss.

[15] GMS Industrial instituted these changes, which attempt to tailor the restriction, days before terminating Welton and the other sales agent defendants. *See, e.g.,* Compl. ¶¶ 60, 67, 80.

provisions tend to narrow and tailor the confidentiality restriction previously deemed enforceable, the Court rejects Welton's argument that this paragraph is unenforceable.

Paragraph 13 of Welton's agreement also changes and narrows the non-solicitation restriction. *Id.* at 28, ¶ 13. First, it limits the solicitation of employees to leave the company *to work for a competing business* or *for a business owned, run, or at which Welton works. Id.* Second, it limits the solicitation of independent contractors to part from the company only to those contractors Welton "had contact with . . . or learned of" due to his affiliation with the company. *Id.* As these changes narrow and tailor aspects of the non-solicitation restriction previously deemed valid, no reason exists to diverge from the prior analysis.

Paragraph 13 also changed another aspect of the non-solicitation provision the Court did find objectionable. Specifically, the revised restraint on customer/client tampering and solicitation provides that Welton may not "directly or indirectly, entice, solicit or encourage any client or customer *with whom [Welton] had contact or became aware of as a result of [his] work with the Company or any known (during the Term) prospective client or customer of the Company* to cease doing business with the Company, reduce its relationship with the Company or refrain from establishing or expanding a relationship with the Company." *Id.* (emphasis added). Although these changes address some of the concerns discussed above, including problems of customer identification and geographic scope, the vagueness of the unchanged, last clause continues to sweep too broadly for the reasons previously discussed. Also, the restraint on supplier disclosure remains unchanged and is objectionable for the reasons previously discussed. Accordingly, the entire non-solicitation paragraph of Welton's 2019 agreement is unenforceable.

### 3. Only the confidentiality restraint in Wayne Side's 2015 agreement is enforceable.

Defendant Side challenges the enforceability of the confidentiality, non-compete, and non-solicitation provisions of his 2015 sales agent agreement. Defs.' Mem. 16–17. Paragraph 13 addresses confidential information and defines that term to include, "without limitation," several kinds of business information. ECF No. 3-1 at 31, ¶ 13. The paragraph further restricts Side from disclosing such information "to any other person" or using it "for personal gain . . . at any time during or after the Agreement Term, unless the Seller grants express, written consent of such a disclosure." *Id.* The restriction also excludes protection for "information that is in the public domain," so long as not attributable to Side's "unauthorized actions." *Id.* Although somewhat overbroad, paragraph 13 is drawn to protect the company's legitimate business interest, does not unduly burden Side's ability to earn a living, and is not contrary to public policy. Like the restriction previously upheld by the Court, this one also lifts the restriction once the information is in the public domain. The use and disclosure restriction is also tempered somewhat by Side's ability to communicate with the company and seek its consent for the same. Accordingly, the confidentiality covenant in Side's 2015 agreement is enforceable.

Paragraph 16 of Side's agreement contains a non-solicitation clause with restraints on tampering with company employees and agents, on revealing the identity of company suppliers, and on competing with the company. *Id.* at 32, ¶ 16. Because this non-solicitation paragraph uses a supplier non-disclosure covenant substantially similar to the one the Court deemed invalid above, the entire paragraph is unenforceable.[16] *See, e.g., Update, Inc.*, 311 F. Supp. 3d at 788.

---

[16] Unlike Westly's 2019 supplier restraint, Side's supplier restraint applies only during his term of "employment" and for 12 months thereafter. ECF No. 3-1 at 32, ¶ 16. While narrower in this respect, Side's restraint is still significantly overbroad for the same reasons previously discussed

4.  **Count III does not allege a failure to use "best efforts" to sell and
to "aggressively promote" the sale of GMS Industrial products.**

Rather than addressing defendants' arguments seeking dismissal of count III, GMS

Industrial instead argues the defendants (other than Westly and G&S Supply) breached their

agreement "to use their 'best efforts' to promote the sale of GMS [Industrial's] products or

'aggressively promote' [their] sale[] . . . ." Pl.'s Mem. 12. Such duties arise, the company argues,

by virtue of Welton's agreement,[17] which "actually uses the term 'best efforts,'" and by the

remaining defendants' agreement "to aggressively promote the sale of the [company's] Products .

. . and to service the customers of the Company in a manner consistent with good sales procedure

and customer relations." *Id.* at 12 n.1 (citing ECF No. 3-1).

As the defendants other than Westly and G&S Supply correctly note, however, the

complaint nowhere alleges in count III, or in the paragraphs incorporated therein, that they violated

such an obligation. *See* Compl. ¶¶ 1–112; Defs.' Reply 10.  Nor do the complaint's paragraphs

identifying the actual contractual obligations allegedly breached refer to any failure to use "best

efforts" to promote sales or to "aggressively promote" the company's products.  Compl. ¶¶ 61–96;

*but see* Compl. ¶ 84 (quoting, among other things, Side's agreement to "use his/her best efforts to

prevent" disclosure of confidential information).  Also, contrary to GMS Industrial's claim, the

2019 Welton statutory employee agreement provides only that Welton "shall use [his] best efforts

to provide direct personal support and contact to all Company customers." ECF No. 3-1 at 25, ¶

1(b).  Because GMS Industrial may not amend its complaint via a brief in opposition to a motion

---

above.  Due to the invalidity of supplier restraint, no need exists to address the validity of the non-
compete restraint contained in the same unenforceable paragraph.

[17] The company does not indicate whether it refers to Welton's 2016 sales agent agreement or his
2019 statutory employee agreement.  Pl.'s Mem. 12 n.1; ECF No. 3-1 at 21–29.

to dismiss, its assertions of a "best efforts" breach are not before the Court and will not be considered. *See Katz v. Odin, Feldman & Pittleman, P.C.*, 332 F. Supp. 2d 909, 917 n.9 (E.D. Va. 2004) (noting "that a complaint may not be amended by the briefs in opposition to a motion to dismiss") (quotation and citations omitted); *see also Marsh v. Va. DOT*, No. 6:14-cv-00006, 2014 U.S. Dist. LEXIS 167333, at *25–26 (W.D. Va. Dec. 3, 2014) (specifying that a party seeking to add claims must pursue leave to amend, rather than attempting to "slip them into an opposition brief").[18]

### D.   Count VIII states claims for violation of the computer fraud and computer trespass provisions of the Virginia Computer Crimes Act.

Count VIII alleges that all defendants violated the computer fraud and computer trespass provisions of the Virginia Computer Crimes Act ("VCCA"), Va. Code. Ann. §§ 18.2-152.1–152.15.[19]  Defendants Gregory Spires, Sabrina, Hayes, Welton, Side, and Sky Spires seek dismissal of count VIII for failure to state claims upon which relief can be granted. Defs.' Mem. 19–21. The same defendants also argue that, to the extent count VIII is premised solely upon the misappropriation of trade secrets, it is preempted by the Virginia Uniform Trade Secrets Act, Va. Code Ann. §§ 59.1-336–343. *Id.* at 21.

To support a claim of computer fraud in violation of the VCCA, a plaintiff must allege:  (1) a person used a computer or computer network; (2) without authority; and (3) to obtain property

---

[18] Defendants Sabrina, Hayes, Welton, Side, and Sky Spires also briefly argue that count III's allegations are "speculative and conclusory" and lack sufficient facts to state a claim for any breach of contract against them. Defs.' Mem. 18. Reviewing the complaint in the light most favorable to, and drawing reasonable inferences in favor of, GMS Industrial, the Court concludes the complaint contains sufficient factual matter to state a plausible claim for relief for breach of the surviving confidentiality provisions.

[19] Although denominated as "crimes," Virginia law also permits a private person to institute a civil action for damages and injuries resulting from a violation of the VCCA. *See* Va. Code Ann. § 18.2-152.12(A).

or services by false pretenses, or to engage in embezzlement or larceny, or to convert the property of another.  Va. Code Ann. § 18.2-152.3; *State Analysis, Inc. v. Am. Fin. Servs. Assoc.*, 621 F. Supp. 2d 309, 319 (E.D. Va. 2009).  A person acts "without authority" in using a computer or computer network when she knew or reasonably should have known she had no right, agreement, or permission to do so, or acted in a manner that knowingly exceeded such right, agreement, or permission.  Va. Code Ann. § 18.2-152.2.

The VCCA also prohibits eight types of computer trespass.  Va. Code Ann. § 18.2-152.4(A).  Count VIII of the complaint focuses upon trespass involving the unauthorized copying of data.  *See id.* at § 152.4(A)(6); Pl.'s Mem. 13.  Such a claim must allege:  (1) a person used a computer or computer network; (2) to make or cause to be made; (3) an unauthorized copy, in any form; and (4) of computer data,  programs, or software residing in, communicated by, or produced by such computer or network.[20]  Va. Code Ann. § 18.2-152.4(A)(6).

### 1.   Count VIII states claims for violations of the VCCA against the individual defendants (other than Westly).

The individual defendants contend that count VIII's computer fraud and computer trespass claims contain only a "formulaic recitation" of the statutory elements, which lack the needed factual predicates identifying, for example, their access to the company's computers, the property allegedly obtained by false pretenses, the nature of any copies made and by whom, any downloads or information taken, any transfers of protected information, and details about when and how such activities occurred. Defs.' Mem. 19–20.

---

[20] Proof of the criminal counterpart of this civil claim also requires proof of "malicious intent." Va. Code. Ann. § 18.2-152.4(A).  The VCCA also provides, however, that a civil violation of section 18.2-152.4(A) may be proven "regardless of whether such act is committed with malicious intent . . . ." Va. Code Ann. § 18.2-152.12(A).

The Court disagrees.  The complaint alleges that the pertinent defendants entered into agreements with GMS Industrial, pursuant to which they received access to assorted protected information belonging to the company.  *See, e.g.,* Compl. ¶ 28, 72.  This protected information allegedly included customers lists, customer preference data, products source list, pricing methods, marketing techniques, and assorted protocols for conducting business.  *Id.* at ¶¶ 26–27.  To safeguard its protected information, the company allegedly used restrictive covenants, adopted policies noted in an employee handbook, trained its personnel about the same, adopted password-protected access to its protected data and information, and used physical security measures.  *Id.* at ¶ 29.  These defendants, none of whom resided in Virginia, allegedly constantly communicated and interacted with the company's headquarters in Virginia Beach, including in weekly and quarterly "video call meetings" during which they "gained knowledge of" protected and other information, including customer accounts and preferences, marketing and sales strategies and techniques, and company trade secrets.  *Id.* at ¶¶ 3–10, 18, 21, 31.

Beginning in 2017, these defendants, along with Westly, allegedly unlawfully joined together to create and provide services to G&S Supply, a company set up to compete with GMS Industrial and to siphon off its customers and sales.  *See, e.g., id.* at ¶¶ 32, 67, 74, 81.  To facilitate these efforts, the defendants reportedly hid their activities from GMS Industrial and its owners, used and disclosed the company's protected information, and misled potential customers about any relation between G&S Supply and GMS Industrial, all while continuing to associate with the latter firm.  *See, e.g., id.* at ¶¶ 32, 73 (discussing clandestine and dual agent role of Sabrina), 137 (discussing defendants' agreement to keep their plan and sales activities a secret).  In spite of having no authority to use GMS Industrial's computers or network and its protected information for the malign purposes described above, the defendants allegedly did just that and used the

company's protected information to compete against the company, including "by soliciting and selling the same or similar industrial supply products to [the company's] customers on behalf of G&S [Supply]." *Id.* at ¶¶ 158–59.  As part of these efforts, Westly allegedly secretly downloaded the company's protected information and copied it for himself and for the benefit of G&S Supply. *Id.* at ¶ 148; *see also id.* at ¶¶ 53, 55, 58–59.  Westly also allegedly shared this protected information with the other sales agent defendants for use in diverting GMS Industrial's business to G&S Supply.  *Id.* at ¶¶ 53, 148.

Construing these allegations as true and drawing reasonable inferences in favor of GMS Industrial, the Court finds them sufficient to state claims for computer fraud and computer trespass in violation of the VCCA.  The defendants allegedly had access to and used the company's computers and network, including by means of regular video teleconferences.  By such means, the defendants allegedly received the company's protected information (including password-protected data) knowing, due to restrictive covenants and other means, its nature and the permissible uses and disclosures thereof.  Notwithstanding this, the defendants allegedly accessed the company's computers and network to obtain and convert the company's valuable protected information for their secret and fraudulent purposes, to injure GMS Industrial, and to enrich themselves.  Due to their alleged, unlawful and concerted activity in forming and joining G&S Supply to compete with GMS Industrial and to steal its customers, the individual defendants also allegedly caused Westly to make unauthorized copies of the company's protected data and information to facilitate their scheme.  The facts alleged in the complaint and exhibits attached thereto are sufficient to "state a claim to relief that is plausible on its face." *Iqbal,* 556 U.S. at 678 (citation and internal quotation marks omitted).

2. **Count VIII's computer fraud and trespass claims are not preempted by Count V's claim for violation of the Virginia Uniform Trade Secrets Act.**

In a single sentence in their motion to dismiss, all defendants argue that "to the extent the VCCA claim is premised on the Defendants' alleged misappropriation of trade secrets, it is preempted by the Virginia Uniform Trade Secrets Act ('VUTSA')." Defs.' Mem. 21. GMS Industrial argues in response that its VCCA claims are not "premised solely upon Defendants' misappropriation of Trade Secrets" and, therefore, preemption does not apply. Pl.'s Mem. 17.

Count V of the complaint alleges that all defendants violated the VUTSA, Va. Code Ann. §§ 59.1-336–343, by misappropriating and misusing GMS Industrial's trade secrets. Compl. ¶¶ 123–32. The VUTSA provides, in pertinent part, that:

> A. Except as provided in subsection B of this section, this chapter displaces conflicting tort, restitutionary, and other laws of this Commonwealth providing civil remedies for misappropriation of a trade secret.
>
> B. This chapter does not affect:
>
> 1. Contractual remedies whether or not based upon misappropriation of a trade secret; or
>
> 2. Other civil remedies that are not based upon misappropriation of a trade secret; or
>
> 3. Criminal remedies, whether or not based upon misappropriation of a trade secret.

Va. Code Ann. § 59.1–341. As noted in *MicroStrategy Inc. v. Bus. Objects, S.A.,* 429 F.3d 1344, 1363–64 (Fed Cir. 2005), paragraph A and B of this section "preempt *all* claims for relief, including both common law *and* statutory causes of action, if they provide a civil remedy for misappropriation of trade secrets *unless* they are contractual or criminal in nature." *See also Smithfield Ham and Prods. Co. v. Portion Pac, Inc.,* 905 F. Supp. 346, 348 (E.D. Va. 1995) (declaring "the [VUTSA] was intended to prevent inconsistent theories of relief for the same

underlying harm by eliminating alternative theories of common law recovery which are premised on the misappropriation of a trade secret"). The VUTSA's preemption only applies, however, when a non-VUTSA claim for relief rests solely upon the fact of the misappropriation of trade secrets. *See id.* at 348–49 (finding that VUTSA preemption applies, with respect to related common law claims, unless the plaintiff can show that such claims "are supported by facts unrelated to the misappropriation of the trade secret"). To avoid the preemptive effect of the VUTSA, the claims in count VIII "can go forward only if they state a claim absent the misappropriation [of trade secret] allegations." *See id.* at 349; *cf. Stone Castle Fin'l, Inc. v. Friedman, Billings, Ramsey & Co.*, 191 F. Supp. 2d 652, 659 (E.D. Va. 2002) (denying a motion to dismiss a claim as preempted because, "unless it can be clearly discerned that the information in question constitutes a trade secret, the Court cannot dismiss alternative theories of relief as preempted by the VUTSA").

Both count VIII and the allegations incorporated therein repeatedly, in referring to the company's protected information, use the phrase "GMS [Industrial's] confidential, proprietary, and Trade Secret information." *See, e.g.,* Compl. ¶¶ 1, 30, 158–59. Although such terminology is imprecise, at a minimum its usage reasonably indicates that the protected information reportedly obtained, misused, and copied includes more than just the company's trade secrets. This conclusion is supported by other allegations in the complaint that specifically designate certain items as company trade secrets. *Id.* at ¶ 27 (identifying "Customer Lists, Customer Preference Data, Products Source List, Load Sheet Protocol, Sales Agent Training Protocol, Pricing Methods and Marketing Techniques" as trade secrets). Elsewhere, the complaint alleges that items extending beyond these categories constitute, for example, protected confidential information. *See, e.g., id.* at ¶ 39 (identifying confidential information as including "designs, . . . financial

information, personal information, real estate information," etc.); ¶ 40 (identifying confidential information as including compensation data, conversations between/among company personnel, personnel/payroll records, pending projects and proposals, etc.); ¶ 44 (identifying confidential information as including trade secrets, as well as business affairs, know-how, market studies and forecasts, competitive analyses, employee lists, employment agreements, agreements with customers and suppliers, and other company business information not generally known to the public). Further, the complaint alleges that Westly not only copied and downloaded trade secrets, but also "sensitive, confidential, [and] proprietary" information belonging to GMS Industrial. *Id.* at ¶ 148.

Because count VIII's VCCA claims are predicated upon factual allegations extending beyond trade secrets to other kinds of protected information, the Court declines to dismiss count VIII due to preemption under the VUTSA.

### E.   Count IX's claim that all defendants tortiously interfered with a contract or contract expectancy fails to state a claim for relief.

Count IX of the complaint asserts that all defendants tortiously interfered with GMS Industrial's contractual relations and business expectancy via the conduct described above. Compl. ¶¶ 163–70. Defendants seek dismissal of count IX arguing the complaint fails to allege facts: (1) supporting a finding the company possessed any contract or business expectancy that was lost; and (2) showing defendants interfered with any such contract or expectancy. Defs.' Mem. 21–22; Defs.' Reply 15. GMS Industrial responds arguing that the trade secrets disclosed to defendants were used by G&S Supply to gain an unfair advantage in the bidding process and enabled it to obtain contract awards and divert sales from customers who previously bought, and would have otherwise continued to buy, from GMS Industrial. Pl.'s Mem. 18–20.

The Supreme Court of Virginia has identified the elements of a claim for tortious interference with a contract or business expectancy as:

> (1) the existence of a business relationship or expectancy, with a probability of future economic benefit to plaintiff; (2) defendant's knowledge of the relationship or expectancy; (3) a reasonable certainty that absent defendant's intentional misconduct, plaintiff would have continued in the relationship or realized the expectancy; and (4) damage to plaintiff.

*Glass v. Glass*, 321 S.E.2d 69, 77 (Va. 1984). If the contract giving rise to the claim is terminable at will or plaintiff asserts only a business expectancy, a plaintiff must also establish a defendant used improper means or methods when engaging in the intentional, interfering misconduct. *Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313, 318 (Va. 2014). Methods deemed improper include unfair competition, unethical conduct, sharp dealing, misuse of confidential information, and the breach of a fiduciary relationship. *Buffalo Wings Factory, Inc. v. Mohd*, 622 F. Supp. 2d 325, 337 (E.D. Va. 2007) (citations omitted); *Smithfield Ham and Prods. Co.*, 905 F. Supp. at 349.

The complaint alleges that GMS Industrial sells and has sold industrial supplies to government purchasers and, in doing so, has obtained certain coveted national stock numbers for "'standardized material items of supply,'" which facilitates orders of the items so identified. Compl. ¶¶ 22 (noting "the material has been verified to meet compliance standards, past performance characteristics, shipping data, special handling and other relevant information"), 24. Having such NSNs has given GMS Industrial "a competitive advantage to sell more product to military bases because it is easier for them to order." *Id.* at ¶ 22; *see also id.* at ¶ 23 (noting "DLA began to stock [the company's] NSN items in depots to ensure prompt delivery to the customer").

GMS Industrial has received contract awards from the GSA and DLA "[o]ver the years," and such contracts "continue to be renewed" due to the company's success in meeting all

requirements and the "very consistent demand for [its] NSN products for many years." *Id.* at ¶ 24; *see also id.* at ¶ 25 (noting the January 2018 award of a long-term contract "for DLA to process direct awards for . . . 22 NSN stocked product kit items without having to go through the solicitation (bidding) process"). While the sale of the NSN items "make[s] up between 20% and 35% of [its] customers' needs," reportedly "65% to 90% of the customer requests are for special-order, non-NSN items, referred to as cage code part number ('CCPN') items." *Id.* at ¶ 24.

Taking advantage of GMS Industrial's protected information procured by the individual defendants, G&S Supply reportedly is "unlawfully competing with GMS [Industrial] in selling CCPN items, specifically to the U.S. Army at various Army bases" and is "work[ing] toward being assigned NSNs of its own to unlawfully compete . . . by selling NSNs of its own." *Id.* G&S Supply allegedly intentionally interfered with GMS Industrial's contractual relationships and business expectancy with its customers, including by improper means, and "converted many sales from GMS [Industrial] to G&S [Supply]." *Id.* at ¶¶ 166–67; *see also id.* at ¶¶ 28, 34 (alleging the defendants "continue[] to siphon substantial amounts in sales awards and in solicitations (pending awards) from GMS [Industrial]," after April 3, 2019), 164. "[F]ueled by [such] misconduct," G&S Supply "secured nearly $1,000,000 in awarded and shipped orders to GMS [Industrial's] customers" of products competing with those sold by the latter firm and has another $1,035,000.00 in pending orders. *Id.* at ¶ 33 (noting "[t]hese awarded and pending orders were placed through US Army using DLA as the purchasing method").

Finally, the complaint alleges that the defendants engaged in the foregoing activities knowing of GMS Industrial's contractual relationships and business expectancy. *Id.* at ¶ 165. Further, it alleges a reasonable certainty exists that, absent the defendants' acts that led to a breach or termination, GMS would have maintained its contractual relationships with and realized

expected future business with its customers. *Id.* at ¶¶ 166, 168. And, as a result, GMS Industrial suffered damages. *Id.* at ¶ 170.

This is the backdrop against which to consider defendants' challenge to the sufficiency of the complaint's allegations with respect to the first and third elements of a tortious interference claim. As to the first element, GMS Industrial must allege facts about the existence of a contract or business expectancy, along with a probability of a future economic benefit. *See Glass*, 321 S.E.2d at 77; *Patriot Contract Servs., LLC v. Am. Overseas Marine Corp.*, No. 4:06cv36, 2006 U.S. Dist. LEXIS 98575, at *35–36 (E.D. Va. Oct. 13, 2006) (noting this element requires "objective evidence" of the business expectancy, rather than mere "subjective expectations," and the expectancy must be shown to be "probable," not merely possible) (citations omitted). Because the complaint alleges that G&S Supply is working towards, but apparently has yet to obtain NSNs, the Court agrees with defendants that the existence of any contract or business expectancy revolves around special-order, CCPN items. Defs.' Mem. 21–22; Compl. ¶¶ 24 (alleging unlawful competition "in selling CCPN items" to the U.S. Army), 49.

Although alleging that "65% to 90% of the customer requests are for" CCPN items, the complaint nowhere alleges, and GMS Industrial's briefing nowhere sheds light upon, the existence of any specific, existing or prospective Army contract or contracts pertaining to such items. *See* Compl. ¶ 24; Pl.'s Mem. 18–19. Instead, the company's brief merely states "[i]n the present case, the closed bid allowed for G&S[ Supply's] tortious inference because [it] utilized its improperly acquired . . . Trade Secrets to get an advantage in the bidding process." Pl.'s Mem. 18. The bid in question, however, is also not specifically identified in the complaint.[21] While the complaint

---

[21] Nor, despite GMS Industrial's citation to it, may evidence or comments made during the injunction hearing be considered in deciding this motion. *See* Pl.'s Mem. 19 n.6.

also generally alleges interference with the company's business expectancy with its customers, it similarly lacks details about the nature of that expectancy or the customers, aside from the reference to the "U.S[.] Army at various Army bases." Compl. ¶¶ 24, 166. The complaint also contains no allegation that GMS Industrial is the only company selling CCPN items.

Nor do the complaint's mostly conclusory allegations about consummated "awards" and "solicitations (pending awards)" to G&S Supply adequately fill the gap. Compl. ¶¶ 33–34 (stating that such awards and orders "were placed through the US Army using DLA as the purchasing method"). In fact, the complaint's reference to awards received, and government solicitations bid upon, by G&S Supply, suggests the absence of an actual, ongoing business relationship or agreement between GMS Industrial and its customers likely to have continued without interruption but for the defendants' actions. *See Mobile Shelter Sys. USA, Inc. v. Grate Pallet Sols., LLC*, 845 F. Supp. 2d 1241, 1259 (M.D. Fl. 2012) (noting a military solicitation is "a request for offers from all interested parties" and "is not a contract" and rejecting assertion that plaintiff's past sales of goods to military customers sufficed to establish a contract or a business expectancy); *see also Patriot Contract Servs., LLC*, 2006 U.S. Dist. LEXIS 98575, at *41 (noting that "no one has a right to a Government contract" and a plaintiff asserting a business expectancy with respect to a bid solicitation "conducted under full and open competition" "bears an even greater burden") (citation omitted).

Simply stated, the complaint fails to include more than conclusory and formulaic allegations to support the existence of the claimed contracts and business expectancy regarding CCPN items sold by GMS Industrial. Such details are necessary, particularly in the context of an entity whose business revolves around government contracting. Thus, GMS Industrial has failed to allege facts sufficient to show its entitlement to relief with respect to the first element of its

tortious interference claim. This finding also obviates the need to address defendants' arguments about the sufficiency of allegations pertaining to the defendants' interference. Defs.' Mem. 21. In the absence of a contractual or business expectancy context to consider such facts, the complaint's allegations about defendants' use of improper methods to compete with GMS Industrial need not be addressed at this time.

## F. Count X and XI's conspiracy claims state claims for relief.

The complaint asserts that all of the individual defendants conspired with one another to harm GMS Industrial in violation of Virginia law prohibiting business conspiracies (count X) and common law conspiracies (count XI). Compl. ¶¶ 171–81. The individual defendants argue count X's statutory business conspiracy claim is preempted by VUTSA because it "is entirely premised on the use of purported trade secrets, and the alleged violations of the trade secrets statutes." Defs.' Mem. 23. The individual defendants also argue that both conspiracy claims are barred by the doctrine of intra-corporate immunity and also fail to satisfy the heightened pleading standard applicable to such claims. *Id.* at 24–26.

### 1. VUTSA does not preempt the claim for statutory business conspiracy.

The Court discussed VUTSA above and need not repeat that discussion, other than to note the prior analysis applies with equal force here. Preemption only applies to count X if GMS Industrial's business conspiracy claim is predicated solely upon allegations of misappropriation of trade secrets. *See Smithfield Ham and Prods. Co*, 905 F. Supp. at 348–49. Count X, however, not only incorporates all of the prior allegations of the complaint (including those noted in the preemption discussion above), but also expressly alleges in paragraphs 172 and 174 facts indicating the conspiracy involved more than just trade secret misappropriation. Compl. ¶¶ 171, 172 (alleging "a conspiracy for the purpose of using GMS[ Industrial's] proprietary, confidential

and Trade Secret information"), 174 (alleging unfair competition facts relating to the adoption and use of a company name designed to sow confusion in the marketplace). As alleged, such a claim incorporates and rests not only upon the other claims this report recommends survive the motion to dismiss, but also upon Westly's alleged tortious breach of his fiduciary duty of loyalty to GMS Industrial and his obtaining and misusing the company's protected information in furtherance of the conspiracy. Compl. ¶¶ 42, 136; *see also* Compl. ¶ 179; *see Combined Ins. Co. of Am. v. Wiest*, 578 F. Supp. 2d 822, 832–33 (W.D. Va. 2008) (noting that "Virginia law recognizes the tort of breach of fiduciary duties in the employment context").[22]  Accordingly, count X is not preempted by VUTSA.

### 2.    Each conspiracy count states a claim for relief.

The individual defendants next assert that counts X and XI should be dismissed for failure to state claims for relief. They contend that application of the intracorporate immunity doctrine precludes a finding that at least two persons agreed to take concerted action, a required element for both conspiracy claims. Defs.' Mem. 24–25. They also contend that GMS Industrial has failed to satisfy the heightened pleading standard applicable to conspiracy claims, "especially with respect to Defendants Sabrina, Hayes, Welton, Side, and Sky Spires." *Id.* at 25–26.[23]

The elements of a statutory business conspiracy claim and a common law conspiracy claim are similar. The elements of the former are:  (1) a combination of two or more persons; (2) with

---

[22] Defendants' memorandum in support of their motion initially argues that preemption only applies to count X's business conspiracy claim. Defs.' Mem. 22–24. Later in the same filing, in arguing both conspiracy counts fail to state claims, they assert count XI is also preempted by VUTSA. *Id.* at 26. For the reasons described above, count XI is also not preempted by VUTSA.

[23] Assuming the full success of their motion to dismiss, defendants Sabrina, Hayes, Welton, Side, and Sky Spires also assert GMS Industrial failed "to allege an unlawful act or unlawful purpose." Defs.' Mem. 26. The Court will not address this argument as this report recommends the survival of portions of the claims for breach of contract and claims for violation of the VCCA.

the purpose of injuring plaintiff, willfully and maliciously; and (3) resulting damage to plaintiff. Va. Code Ann. § 18.2-499; *see Allen Realty Corp. v. Holbert*, 318 S.E.2d 592, 596 (Va. 1984). The elements of a common law conspiracy claim are: (1) an agreement between two or more persons; (2) to achieve an unlawful purpose or to achieve a lawful purpose by unlawful means; and (3) resulting damage to plaintiff. *William v. AES Corp.*, 28 F. Supp. 3d 553, 574 (E.D. Va. 2014).

A plaintiff alleging a claim of statutory business conspiracy must do more than just recite the language of the conspiracy statute. As noted by this Court in *Gov't Employees Ins. Co. v. Google, Inc.*, 330 F. Supp. 2d 700, 706 (E.D. Va. 2004), such a claim, "like fraud, must be pleaded with particularity . . . [to] prevent[] every business dispute over unfair competition becoming a business conspiracy claim." *See also Schlegel v. Bank of America, N.A.*, 505 F. Supp. 2d 321, 329 (W.D. Va. 2007). Similarly, a common law conspiracy claim requires moving beyond conclusory allegations to "some details of time and place and the alleged effect of the conspiracy." *William*, 28 F. Supp. 3d at 574 (citation and internal quotation marks omitted).

The claims alleged in counts X and XI state a plausible claim for relief and provide sufficient details about the conspiracy and its participants. Although no need exists to walk through each page of the seventy-eight page complaint, it alleges in June 2017 Westly and Gregory Spires hatched a plan to form a company to compete with GMS Industrial and sell like products to its customers. Compl. ¶ 137(a). Thereafter, on June 22, 2017, they formed G&S Supply, *id.* at ¶ 137(b), so named to sow confusion and to trade on GMS Industrial's name and reputation, *id.* at ¶¶ 32, 53(d), 174, recruited and solicited other sales agent defendants to join the scheme, *id.* at ¶¶ 46–49, and trained and instructed them on how to misrepresent G&S Supply as a sister company and seek sales and other confederates, *id.* at ¶ 53.

To facilitate the conspiracy,  Westly allegedly secretly downloaded the company's protected information and copied it for himself and for the benefit of G&S Supply. *Id.* at ¶ 148; *see also id.* at ¶¶ 53, 55, 58–59. Westly also shared this protected information with the other sales agent defendants for use in diverting GMS Industrial's business to G&S Supply. *Id.* at ¶¶ 53, 148. As discussed above, the complaint specifically alleges the specific employment and independent contractor agreements linked to each defendant and covenants agreed to and allegedly violated therein.

Due to the conspirators' agreement to keep the plan a secret and to lie about and conceal their activities from GMS Industrial, their competitive activities apparently went mostly unnoticed from June 2017 until in or about April 2019, while they remained either employed and/or affiliated with the company and conducted sabotage and competing activities on company time. *Id.* at ¶¶ 32, 46, 48 (referring to Westly, Gregory Spires, and Hayes), 73 (referring to Sabrina's role as a dual agent), 137.  Such activities included Westly, Hayes, and Sides' effort to conceal the true reason for the drop-off in Sides' sales in 2018 and 2019.  *Id.* at ¶ 85(e).  The complaint also alleges sales and profits lost to GMS Industrial, attributable to each individual defendant's activities.  *Id.* at ¶¶ 60, 67, 74, 81, 86, 91; *but see* ¶ 96 (noting presently unknown lost profits attributable to Sky Spires, but alleging upon information belief "his sales . . . were combined into Greg Spires['] sales").

These allegations, along with reasonable inferences drawn therefrom, suffice to set forth an agreement or combination among more than two persons, with the goal of deliberately injuring GMS Industrial, including by means of tortious and other conduct in violation of statutory law, along with resulting damage to the company. *See CaterCorp, Inc. v. Catering Concepts, Inc.,* 431 S.E.2d 277, 281–82 (Va. 1993) (holding that allegations accusing employees of forming a

combination to breach their contractual, employment, fiduciary and other duties to the employer, including unlawfully converting employer's protected information, stated sufficient unlawful purposes); *Cf. TechINT Sols. Grp., LLC v. Sasnett,* No. 5:18cv00037, 2019 WL 2619539, at *3–4 (W.D. Va. June 26, 2019) (denying motion to dismiss and noting that "[g]iven the clandestine nature of a conspiracy . . . often the evidence of agreement or concerted action may be inferred from the things actually done") (citation and internal quotation marks omitted).

The individual defendants further argue the intracorporate immunity doctrine short-circuits GMS Industrial's ability to establish the existence of a combination of persons required for conspiracy. As noted in *Griffith v. Electrolux Corp.*, 454 F. Supp. 29, 32 (E.D. Va. 1978), because a conspiracy requires at least two legally distinct persons, "[a] corporation . . . cannot conspire with itself, any more than an individual" could do so. The intracorporate immunity doctrine provides that employees and agents working for the same company are generally immune from conspiracy claims when acting within the scope of their employment or agency. *Buffalo Wings Factory, Inc.*, 622 F. Supp. 2d at 335; *see ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 179 (4th Cir. 2002) (discussing the doctrine generally and noting that "corporate employees cannot conspire with each other or with the corporation") (citing *Bowman v. State Bank of Keysville,* 331 S.E.2d 797, 801 (Va. 1985)). Because a company acts through its agents, their actions within the scope of employment effectively constitute the company's actions. *See TechINT Sols. Grp., LLC*, 2019 WL 2619539, at *3 (finding alleged "co-conspirators . . . all working for [defendant company] and within the scope of their employment . . . cannot have conspired").

In several situations, the intracorporate immunity doctrine does not apply. First, the Fourth Circuit Court of Appeals has ruled the doctrine does not apply where an alleged, conspiring corporate agent "has an independent personal stake in achieving the corporation's illegal

49

objectives.'" *ePlus Tech., Inc.*, 313 F.3d at 179 (quoting *Greenville Pub. Co., Inc. v. Daily Reflector, Inc.*, 496 F.2d 391, 399 (4th Cir. 1974)). This "personal stake exception" to immunity only applies when "a co-conspirator possesses a personal stake independent of his relationship to the corporation." *Id.* (citation omitted).

Second, the intracorporate immunity doctrine does not preclude the existence of a conspiracy when the conspirators acted in concert before forming and joining a competing corporate entity. *See, e.g., Buffalo Wings Factory, Inc.*, 622 F. Supp. 2d at 335–36.

Third, the doctrine does not preclude the existence of a conspiracy, even after the formation of a competing business, when a conspirator in that business "acted in concert with third parties" who were not then employees or agents of the competing business. *Id.* at 336; *Griffith*, 454 F. Supp. at 32 (noting that "an action for conspiracy to induce the breach of a contract cannot be maintained unless at least one participant in the alleged conspiracy is not a party to the contract"). GMS Industrial contends each of these circumstances apply here.

The company argues that intracorporate immunity does not bar the conspiracy claims because it has pled that each individual defendant "solicited GMS[ Industrial's] sales representatives . . . to join [other confederates] at G&S [Supply], to take customers and sales away from GMS [Industrial] for his and their *personal benefit* . . . ." Compl. ¶ 53(c) (emphasis added); *see also id.* at ¶¶ 66(c), 73(c), 80(c), 85(c), 95(c). GMS Industrial asserts the Court may reasonably infer that this personal benefit also includes continued employment and commission income from GMS Industrial, while the individual defendants acted as double agents. Pl.'s Mem. 25; *see, e.g.,* Compl. ¶¶ 73(b), 137, 140. The company further asserts that defendants Westly and Gregory Spires, in forming and owning G&S Supply, *id.* at ¶¶ 11, 46, stand "to benefit the most personally as they . . . received [its] profit." Pl.'s Mem. 24.

GMS Industrial's invocation of the personal stake exception, to the extent it is based upon benefits the individual defendants arrived from associating with and/or owning G&S Supply, is misplaced.  The exception only applies when the "conspirator gained a direct personal benefit from the conspiracy, a benefit wholly separable from the more general and indirect corporate benefit always present under the circumstances surrounding virtually any alleged corporate conspiracy." *Selman v. Am. Sports Underwriters, Inc.*, 697 F. Supp. 225, 239 (W.D. Va. 1988); *see also ePlus Tech., Inc.*, 313 F.3d at 179 (noting recent narrowing of the application of exception); *Douty v. Irwin Mortg. Corp.*, 70 F. Supp. 2d 626, 632–33 (E.D. Va. 1999) (declining to find personal stake where plaintiff claimed individual defendants had a personal interest in increased commissions); *but see Flexible Benefits Council v. Feltman*, No. 1:08cv371, 2008 WL 2465457, at *7 (E.D. Va. 2008) (denying motion to dismiss and refusing to find immunity because the two individual defendants stood to benefit from stealing plaintiff's corporate identity and because the conspiracy predated the formation of the competing enterprise).

Nevertheless, because the complaint also alleges that each individual defendant personally benefitted from the diversion of sales from GMS Industrial and that the company was fraudulently induced as part of the conspiracy to continue its relationship with the individual defendants, who derived financial benefits therefrom (count VI), the intracorporate immunity doctrine does not preclude the existence of a conspiracy at this stage of the case.

Moreover, accepting the allegations of the complaint as true and drawing reasonable inferences in GMS Industrial's favor, the conspiracy began, at least as to Westly and Gregory Spires, before the formation of G&S Supply.  Paragraph 137(a) of the complaint indicates that "in June 2017" those two defendants "formed a plan" to compete with GMS Industrial by selling like industrial products to its customers.  Compl. ¶ 137(a); *see also id.* at ¶ 172 ("[n]o later than June

2017"). After agreeing to this, on June 22, 2017, Westly, aided by Gregory Spires formed G&S Supply. *Id.* at ¶ 137(b). Accordingly, the intracorporate immunity doctrine does not preclude a finding the conspiracy began before June 22, 2017.

Finally, the complaint lacks details about the timing and effect of efforts to recruit sales agent defendants to join the conspiracy and affiliate themselves with G&S Supply. This prevents the Court from accepting GMS Industrial's argument that, when so recruited, GMS Industrial's sales agents qualified as third parties who conspired with G&S Supply insiders before joining the company. *See Buffalo Wings Factory, Inc.*, 622 F. Supp. 2d at 330, 336 (noting that defendants' recruitment of plaintiff company's general manager to join their new business supported claim of conspiring with third party).

Accordingly, the conspiracy claims in counts X and XI state claims for relief.

## G. Defendant Sky Spires' motion to dismiss the remaining counts against him should be denied.

With respect to Sky Spires, the complaint alleges that "[t]he known lost profits suffered by GMS [Industrial] and attributable at this time to [his] individual competitive sales through G&S [Supply], are unknown at this time, but upon information and belief his sales . . . were combined into Greg Spires['] sales for G&S [Supply], as it is believed he assisted Greg Spires in sales for G&S [Supply] much as he did in sales for GMS [Industrial]." Compl. ¶ 96. Elsewhere, the complaint pegs Gregory Spires' sales through G&S Supply as "at least $572,000" and the resulting lost profits for GMS Industrial as "at least $200,200." *Id.* at ¶ 67. Based primarily upon the complaint's failure to supply this specific sales/profit information for Sky Spires and a claimed lack of particularity, Sky Spires argues for dismissal of counts IV and V (misappropriation of trade secrets), count VI (fraudulent inducement of performance of contract), count XII (trademark), and

count XIII (Lanham Act).  Defs.' Mem. 27–28 (noting such claims require facts alleging Sky Spires sold something for G&S Supply).

As this argument is presented in conclusory and summary fashion, without even a discussion of the legal elements of the counts in question, it is not sufficiently presented for the Court to address.  Further, as noted by GMS Industrial, pleading upon information and belief is permitted under the pleading rules when a plaintiff "is in a position of uncertainty because the necessary evidence is controlled by the defendant." *Ridenour v. Multi-Color Corp.*, 147 F. Supp. 3d 452, 456 (E.D. Va. 2015) (citation omitted).  Here, GMS Industrial plausibly asserts that to be the case.  Moreover, Sky Spires is fairly on notice that the sales and lost profits attributable to him are some subset of those alleged for his father, Gregory Spires.  Having reviewed the complaint, the Court is satisfied that it includes sufficient details, including the specific allegations about Sky Spires' agreement with and work for GMS Industrial, his double-agent status and competing work with G&S Supply, his later termination for cause, and his confederation with other defendants, to provide fair notice of the claims against him and the bases upon which they rest.  *Bell Atlantic Corp.*, 550 U.S. at 555.

## III.   RECOMMENDATION

For the foregoing reasons, the Court recommends that defendant's motion to dismiss, ECF No. 60, be **GRANTED IN PART** and **DENIED IN PART,** such that:

(1)   count II's breach of contract claim against Westly states a claim for breach of the 2019 agreement's confidentiality restriction, but fails to state a claim for breach of its non-solicitation restriction;

(2)   count II's breach of contract claim against Westly states a claim for breach of the 2012 agreement's supplier restriction, but fails to state a claim for breach of its confidentiality

53

restriction, employee recruitment restriction, and any outside employment restriction in the employee handbook;

(3)      count III's breach of contract claims against Gregory Spires/County Roads, LLC, Sabrina/Greer Group, LLC, Welton (2016 agreement), Hayes, and Sky Spires state a claim for breach of confidentiality restrictions in their sales agent agreements, but fail to state a claim for breach of the non-solicitation restrictions contained therein;

(4)      count III's breach of contract claim against Welton states a claim for breach of the 2019 agreement's confidentiality restriction, but fails to state a claim for breach of its non-solicitation restriction;

(5)      count III's breach of contract claim against Side states a claim for breach of the 2015 agreement's confidentiality restriction, but fails to state a claim for breach of its non-solicitation restriction;

(6)      count III does not allege a failure to use "best efforts" to sell and "aggressively promote" the sale of GMS Industrial products;

(7)      count VIII's claims for violation of the Virginia Computer Crimes Act state claims for relief against all defendants and are not preempted by the Virginia Uniform Trade Secrets Act;

(8)      count IX's claim for tortious interference with a contract and business expectancy against all defendants fails to state a claim for relief;

(9)      count X and XI's claims for statutory business conspiracy and common law conspiracy against defendants Westly, Gregory Spires, Sabrina, Welton, Hayes, Side, and Sky Spires state claims for relief, are not preempted by the Virginia Uniform Trade Secrets Act, and are not precluded by the intracorporate immunity doctrine;

(10)     counts IV, V, VI, XII, and XIII against Sky Spires should not be dismissed; and

(11)    plaintiff be **PROVIDED** with leave to amend the complaint within 14 days of the entry of the final order addressing the motion to dismiss.

## IV.    REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.    Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within 14 days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail.  A party may respond to any other party's objections within 14 days after being served with a copy thereof. *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.    A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

/s/

Robert J. Krask
United States Magistrate Judge

Robert J.  Krask
United States Magistrate Judge

Norfolk, Virginia
December 18, 2019