**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

GMS INDUSTRIAL SUPPLY, INC.

       Plaintiff,

    v.                                Civil Action No. 2:19-cv-324(RCY)

G&S SUPPLY, LLC, ET AL.

       Defendants.

## FINAL PRETRIAL ORDER

In conformance with the Local Rules for the United States District Court for the Eastern District of Virginia relating to pre-trial procedure and the Court's Amended Scheduling Order (ECF No. 255), it is ORDERED that:

## I.    JOINT STIPULATED FACTS

The parties hereto agree upon a stipulation with respect to certain undisputed facts as follows:

1) Plaintiff GMS Industrial Supply, Inc. ("GMS"), is a Virginia corporation with its principal place of business in Virginia Beach, Virginia.

2) GMS is owned by Rachel Gorken, who also serves as GMS's President.

3) Gary Gorken, Rachel Gorken's husband, serves as GMS's Director of Regulatory Compliance.

4) Defendant Westly Greer, during the period relevant to this lawsuit, was a resident of the State of Colorado.  Westly Greer is a former employee and former independent sales agent for GMS.

5) Defendant Sabrina Greer, during the period relevant to this lawsuit, was a resident of the State of Colorado.

6) Defendant Greer Group, LLC, is a Colorado Limited Liability Company.

7) Defendant Gregory K. Spires, during the period relevant to this lawsuit, was a resident of the State of Oklahoma.

8) Defendant County Roads, LLC, is an Oklahoma Limited Liability Company.

9) Defendant Thomas Hayes, during the period relevant to this lawsuit, was a resident of the State of Louisiana.

10) Defendant Mike Welton, during the period relevant to this lawsuit, was a resident of the State of Texas.

11) Defendant HMC Supply, LLC, was an Oklahoma Limited Liability Company.

12) Defendant G&S Supply, LLC, during the period relevant to this lawsuit, was a Colorado Limited Liability Company.

13) Defendant G&S Supply, LLC, was dissolved in October 2019 and WarTech Industries, LLC, a Louisiana Limited Liability Company, was formed in October 2019.

14) Defendant Westly Greer was an employee of GMS from November 2012 to January 21, 2019, and an independent sales agent from January 21, 2019 to April 3, 2019.

15) Defendants Greer Group LLC (through its principal Sabrina Greer), Thomas Hayes, County Roads LLC (through its principal Gregory K. Spires), and Mike Welton were former independent sales agents of GMS.

16) HMC Supply LLC was formed by Gregory K. Spires, Westly Greer, and two other individuals, Howard Barlow and Greg Gorken (Gary Gorken's brother) to sell mechanical and maintenance products.

17) G&S Supply LLC was formed by Gregory K. Spires (through County Roads LLC) and Westly Greer (through Greer Group LLC) in June of 2017.  Later, Thomas Hayes (through Hayes & Associates, LLC) became a member of G&S Supply LLC along with Gregory K. Spires and Westly Greer.

## II.   <u>JOINT LEGAL AND EVIDENTIARY STIPULATIONS</u>

The parties hereto agree upon a stipulation with respect to certain undisputed legal and evidentiary matters as follows:

1)  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332, as the Defendants are residents of different states than GMS.

2)  WarTech Industries is the successor in interest to G&S Supply, LLC.

## III.   <u>PROPOSED WITNESSES</u>

1)  Plaintiff's Witnesses

The names of witnesses whose testimony Plaintiff may present are set forth below. Plaintiff reserves the right to call any witnesses identified by Defendants, to whom it has not objected, and to call witnesses not previously listed or identified for rebuttal or impeachment.

Plaintiff may call the following persons as witnesses in this matter:

a.  Gary Gorken

b.  Rachel Gorken

c.  Christopher Morton

d.  Gregory Naschansky

e.  D. Renee Robichaux

f.  Abraham Salfiti

g.  Eric Shirk, BDO, LLC

h.  Karyl Van Tassel, J.S. Held, LLC

i.  Amber Wenrick

j.  Kristal Miller, CPA

k.  Donna Kline

l.  Westly Greer

m.  Sabrina Greer

n.  Thomas Hayes

o.  Gregory K. Spires

p.  Wayne Side

q.  Michael Welton

r.  County Roads, LLC

s.  Greer Group, LLC

t.  Hayes & Associates, LLC

u.  G&S Supply, LLC

v.  HMC Supply, LLC

w.  McWelton, LLC

x.  WarTech, LLC

y.  Any and all witnesses identified and/or called by the Defendants to which GMS has no objection.

z.  Impeachment and rebuttal witnesses as necessary.

aa. Custodians of records to authenticate documents if necessary (absent agreement regarding authentication of records by counsel).

2) Defendants' witnesses

The names of witnesses whose testimony Defendants may present are set forth below. Defendants reserve the right to call any witnesses identified by Plaintiff, to whom it has not objected, and to call witnesses not previously listed or identified for rebuttal or impeachment.

Defendants expect to present the following witnesses at trial:

    a.  Westly Greer

    b.  Sabrina Greer

    c.  Gregory K. Spires

    d.  Thomas Hayes

    e.  Kristal Miller

Defendants may call the following witnesses at trial:

    f.  Wayne Side

    g.  Joshua Branstetter

    h.  CW2 Kelsey Adams

    i.  Mr. Lawrence Singh

    j.  Gary Gorken

    k.  Rachel Gorken

    l.  D. Renee Robichaux

    m.  Christopher Morton

    n.  Cory Allen[1]

    o.  Jennifer Allen[2]

---

[1] Plaintiff has objected to this witness as being identified after the deadline.
[2] Id.

IV.    **PROSED EXHIBITS**

1)   The following are the exhibits proposed by Plaintiff

The following key sets forth Defendants abbreviations for its Specific Objections:

Key:  C=Cumulative;  IR=Irrelevant;  PI=Personal  Identifier;  NO=No  Objection;

M=Misleading/Misrepresentation; CON=Confusion; F=Foundation; H=Hearsay; S=Calls

for  Speculation;  NR=Not  Responsive;  P=Unduly  Prejudicial;  A=Argumentative;

IN=Incomplete; NP=Not Produced

| Pl's Exh | BATES | BATES (END) | SUBJECT | STATEMENT OF RELEVANCE AND BASIS FOR ADMISSION | OBJ. |
|---|---|---|---|---|---|
| | | | | | |
| 1. | ARV000001 | ARV000118 | Arvest Docs G&S Acct | Evidence of predecessor corporation and damages. | F; PI |
| 2. | GMS000004 | | Westly Termination Ltr 4.3.19 | Evidence of termination from GMS; notice of litigation hold | NO |
| 3. | GMS000007 | GMS000010 | Westly Ind. Sales Agreement 1.21.19 | Evidence of contract terms, breach of contract, breach of fiduciary duty, and agency status and duties. | NO |
| 4. | GMS000011 | | Westly Zone Mgr Addendum 1.12.19 | Evidence of contract terms, breach of contract, breach of fiduciary duty, and agency status and duties. | NO |
| 5. | GMS000015 | | Ltr re Greer's Promotion to Director 7.1.15 | Evidence of contract terms, breach of contract, breach of fiduciary duty, and agency status and duties. | NO |
| 6. | GMS000016 | GMS000017 | W Greer Employment Agreement 11.5.12 | Evidence of employment status and duties. | NO |

| | | | | | |
|---|---|---|---|---|---|
| 7. | GMS000028 | GMS000030 | S Greer Termination Ltr 4.3.19 | Evidence of termination of contract with GMS. | NO |
| 8. | GMS000031 | GMS000034 | S. Greer Ind. Sales Agent Agreement 1.10.17 | Evidence of contract terms, breach of contract, breach of fiduciary duty, and agency status and duties. | NO |
| 9. | GMS000040 | GMS000042 | S. Greer Sales Agent Agreement 5.27.15 | Evidence of agency status and duties. | IR |
| 10. | GMS000043 | GMS000045 | S. Greer Ind. Sales Agent Agreement 5.13.13 | Evidence of agency status and duties. | IR |
| 11. | GMS000046 | GMS000048 | Spires Termination Ltr 4.3.19 | Evidence of termination of contract with GMS. | |
| 12. | GMS000049 | GMS000052 | Spires Ind. Sales Agreement 1.6.17 | Evidence of contract terms, breach of contract, breach of fiduciary duty, and agency status and duties. | NO |
| 13. | GMS000063 | GMS000065 | Hayes Termination Ltr 4.3.19 | Evidence of termination of contract with GMS. | NO |
| 14. | GMS000066 | GMS000069 | Hayes Ind. Sales Agent Agreement 7.27.16 | Evidence of contract terms, breach of contract, breach of fiduciary duty, and agency status and duties. | NO |
| 15. | GMS000074 | | Hayes Commission Info 7.27.16 | Evidence of contract terms. | C |
| 16. | GMS000092 | GMS000095 | Welton Ind. Sales Agreement 6.15.16 | Evidence of contract terms, breach of contract, breach of fiduciary duty, and agency status and duties. | NO |
| 17. | GMS000096 | | Internal Marketing Strategy | GMS internal marketing materials and evidence of trade secrets. | IR; M; F; H; NR |
| 18. | GMS000097 | GMS000098 | GMS Operating Procedures | GMS internal operating materials and evidence of trade secrets. | IR; M; F; H; NR |

| | | | | | |
|---|---|---|---|---|---|
| 19. | GMS000099 | GMS000103 | GMS Training Materials | GMS internal operating and training materials and evidence of trade secrets. | IR; M; F; NR |
| 20. | GMS000106 | GMS000108 | Internal Marketing & Operating Guidelines | GMS internal marketing and operating materials and evidence of trade secrets. | IR; M; NR |
| 21. | GMS000158 | GMS000160 | GMS Internal Marketing & Operating Guidelines | GMS internal marketing and operating materials and evidence of trade secrets. | IR; M; F; NR |
| 22. | GMS000169 | | BDO Sheet Showing Greer USB Usage | Evidence of theft of trade secrets, breach of fiduciary duties, and spoliation. | IR;M; F; H; NR |
| 23. | GMS000170 | GMS000171 | Greer GMS Access Notification 4.3.19 | Evidence of theft of trade secrets | IR; M; F |
| 24. | GMS000173 | | Lascara Second Termination Ltr to Greer 5.24.19 | Evidence of theft of trade secrets and spoliation. | NO |
| 25. | GMS000194 | GMS000215 | G&S Catalog | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
| 26. | GMS000235 | GMS000260 | Catalog Comparisons | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | IR; M; F; CON; S; A; P |
| 27. | GMS000286 | GMS000371 | GMS Catalog 4.20.19 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | IR; M |
| 28. | GMS000390 | | 2017 S Greer Ind. Sales | Evidence of contract terms, breach of contract, breach of | C |

| | | | Agent Agreement | fiduciary duty, and agency status and duties. | |
|---|---|---|---|---|---|
| 29. | GMS000422 | | Side Termination Letter 5.5.19 | Evidence of termination of contract with GMS. | NO |
| 30. | GMS000423 | GMS000425 | Side Sales Agent Agreement 11.5.15 | Evidence of contract terms, breach of contract, breach of fiduciary duty, and agency status and duties. | NO |
| 31. | GMS000462 | GMS000558 | GMS Catalog 4.20.19 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | IR; M; C; CON |
| 32. | GMS000549 | GMS000552 | Spires 2017 Sales Agent Agreement | Evidence of contract terms, breach of contract, breach of fiduciary duty, and agency status and duties. | C |
| 33. | GMS000561 | GMS000570 | GMS Catalog G&S* | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | C |
| 34. | GMS000636 | GMS000641 | DLA Order for G&S Goods 2.15.19 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
| 35. | GMS000750 | | G&S CO Corp Information | Evidence of creation of G&S. | NO |
| 36. | GMS000759 | GMS000762 | Introduction to GMS Army Supply Capabilities | GMS Training and Operating Procedures and evidence of trade secrets. | NO |
| 37. | GMS000763 | GMS000846 | GMS Catalog 7.20.19 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | IR; M |

9

| 38. | GMS000847 | GMS000924 | GMS Catalog 7.20.19-01 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | IR; M |
|---|---|---|---|---|---|
| 39. | GMS000969 | GMS000992 | Tech Data Sheet and Videos | GMS Training and Operating Procedures and evidence of trade secrets. | IR |
| 40. | GMS000995 | | NALCOMIS Ordering Instruction Guide | GMS Training and Operating Procedures and evidence of trade secrets. | IR |
| 41. | GMS000996 | GMS001025 | GMS Hardware Catalog 2.20.29 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
| 42. | GMS001149 | GMS001176 | G&S Catalog (no cover) | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | C; IN |
| 43. | GMS001223 | GMS001244 | G&S Catalog | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | C; IN |
| 44. | GMS001278 | GMS001288 | Westly Travel Expenses 9.8.17 | Evidence of damages. | NO |
| 45. | GMS001307 | | HMC Corporate information | Evidence of creation of competing companies. | F; H |
| 46. | GMS001308 | GMS001310 | HMC Corp. Info from Internet Sources 4.10.19 | Evidence of creation of competing companies. | F; H |

| 47. | GMS001316 | GMS001464 | Greer Travel Expenses 2017 | Evidence of damages. | IR |
|---|---|---|---|---|---|
| 48. | GMS001481 | GMS001482 | Westly Sales Agreement 4.12.11 | Evidence of contract terms, breach of contract, breach of fiduciary duty, and agency status and duties. | IR; PI |
| 49. | GMS001483 | GMS001484 | Westly Non-Compete 4.3.11 | Evidence of contract terms, breach of contract, breach of fiduciary duty, and agency status and duties. | IR |
| 50. | GMS001485 | GMS001487 | Westly Sales Agent Agreement 7.2.12 | Evidence of contract terms, breach of contract, breach of fiduciary duty, and agency status and duties. | IR |
| 51. | GMS001488 | GMS001497 | G&S Catalog | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | C |
| 52. | GMS001498 | GMS001500 | Spires Sales Agreement 1.22.13 | Evidence of contract terms, breach of contract, breach of fiduciary duty, and agency status and duties. | IR |
| 53. | GMS001501 | GMS001503 | GMS CO Corp Filing 6.22.17 G&S* | Evidence of creation and ownership of G&S. | NO |
| 54. | GMS001509 | GMS001516 | HMC OK Corp Doc SOS | Evidence of creation and ownership of HMC. | NO |
| 55. | GMS001517 | GMS001523 | Hayes & Assoc. Articles of Organization | Evidence of creation and ownership of Hayes & Assoc. | NO |
| 56. | GMS001591 | GMS001594 | Spires Ind. Sales Agent Agreement 10.3.16 | Evidence of contract terms, breach of contract, breach of fiduciary duty, and agency status and duties. | NO |

| 57. | | | Westly Employment Agreement 11.5.12 | Evidence of contract terms, breach of contract, breach of fiduciary duty, and agency status and duties. | C |
|---|---|---|---|---|---|
| | GMS001596 | GMS001597 | | | |
| 58. | | | Greer Password Email 5.31.19 | Evidence of trade secret theft and spoliation. | NO |
| | GMS001997 | GMS001998 | | | |
| 59. | | | Service and Survey Forms | GMS Training and Operating Procedures and evidence of trade secrets. | IR |
| | GMS002016 | GMS002018 | | | |
| 60. | | | FedMall Ordering Instructions | GMS Training and Operating Procedures and evidence of trade secrets. | IR |
| | GMS002019 | GMS002020 | | | |
| 61. | | | GMS Biligual Product Labels | GMS Training and Operating Procedures and evidence of trade secrets. | IR; M |
| | GMS002021 | | | | |
| 62. | | | Steps to Providing Excellent Customer Service | GMS Training and Operating Procedures and evidence of trade secrets. | NO |
| | GMS002328 | | | | |
| 63. | | | Steps to the Sale | GMS Training and Operating Procedures and evidence of trade secrets. | NO |
| | GMS002329 | | | | |
| 64. | | | Standard GCSS Input Instructions | GMS Training and Operating Procedures and evidence of trade secrets. | IR |
| | GMS002330 | | | | |
| 65. | | | Training Emails | GMS Training and Operating Procedures and evidence of trade secrets. | IR |
| | GMS002331 | GMS002338 | | | |
| 66. | | | New Account Manager Training Guide | GMS Training and Operating Procedures and evidence of trade secrets. | NO |
| | GMS002339 | GMS002355 | | | |
| 67. | | | Procedural Update Memo for Sales Agents | GMS Training and Operating Procedures and evidence of trade secrets. | NO |
| | GMS002356 | | | | |

| 68. | | | Procedural Update Memo for Sales Agents | GMS Training and Operating Procedures and evidence of trade secrets. | NO |
|---|---|---|---|---|---|
| | GMS002357 | | | | |
| 69. | | | Google Drive Access Instructions | GMS Training and Operating Procedures and evidence of trade secrets. | NO |
| | GMS002358 | GMS002360 | | | |
| 70. | | | List of Part Numbers for Ordering | GMS Training and Operating Procedures and evidence of trade secrets. | NO |
| | GMS002361 | GMS002363 | | | |
| 71. | | | Air Force Ordering Instructions | GMS Training and Operating Procedures and evidence of trade secrets. | IR |
| | GMS002367 | GMS002368 | | | |
| 72. | | | GMS Marketing Strategy Email | GMS internal marketing materials and evidence of trade secrets. | IR; NR |
| | GMS002370 | GMS002373 | | | |
| 73. | | | GMS Training & Operating Guidelines for DOD Email | GMS Training and Operating Procedures and evidence of trade secrets. | IR; CON; M |
| | GMS002374 | GMS002401 | | | |
| 74. | | | Welton Order Showing Confusion 2.26.19 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | H |
| | GMS009201 | GMS009204 | | | |
| 75. | | | Creeper Pictures | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | F |
| | GMS009206 | GMS009207 | | | |
| 76. | | | G&S Checks to Amber | Evidence of breach of contract and fiduciary duty and competitive activity. | NO |
| | GMS009208 | | | | |
| 77. | | | Notes from GMS calls with AW 4.19 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, | H; F |
| | GMS009599 | GMS009600 | | | |

| | | | | trademark violation, and conspiracy. | |
|---|---|---|---|---|---|
| 78. | GMS009695 | GMS009709 | GMS Contractor and Payroll Payments | Evidence of damages. | IR; CON |
| 79. | GMS009750 | GMS009754 | Email JDW to Van Tassel re Shared Customers | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | H; F; S; A |
| 80. | GMS009779 | GMS009782 | GMS & G&S Kit Comparison Spreadsheet | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | F; CON; S; A Illegible |
| 81. | GMS009795 | GMS009802 | Email Shirk to JDW re Computer Folder Names 10.16.20 | Evidence of theft of trade secrets and spoliation. | H |
| 82. | GMS009805 | GMS009806 | BDO Forensic Imaging Details of Computers | Evidence of forensic examination and chain of custody. | NO |
| 83. | GMS010444 | GMS010457 | BDO Engagement Letter 9.21.20 | Evidence of scope of expert witness retention. | NO |
| 84. | GMS010463 | GMS010476 | BDO Forensic Engagement Ltr 9.23.20 | Evidence of scope of expert witness retention. | NO |
| 85. | GMS010679 | GMS010450 (?) | GSA Contract 7.15 | Evidence of scope of GMS sales and participation in activities competitive to G&S. | IR; NR; M |
| 86. | GMS010913 | | Email to Westly w. Leavenworth Customer Info 9.12.18 | Evidence Westly Greer was aware of GSAA sales by GMS. | IR; M |

| | | | | | |
|---|---|---|---|---|---|
| 87. | GMS010917 | | Westly Email re Credit Card Sales 9.16.16 | Evidence Westly Greer was aware of different methods of sales by GMS. | IN; M |
| 88. | GMS010918 | GMS010919 | W Greer Email to Welton re Item Sourcing 8.21.16 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
| 89. | GMS010921 | GMS010924 | RR Email re GSA Price List 8.11.16 | Evidence Defendants were aware of GMS's different methods of sales.  ??? | IR |
| 90. | GMS010948 | | WW Email to Spires Explaining DLA Markup 1.12.16 | Evidence Westly understood DLA markups.  ??? | NO |
| 91. | GMS010960 | GMS011010 | GMS Welton Commission Reports (2016-19) | Evidence of damages. | IR |
| 92. | GMS011011 | GMS011076 | GMS Hayes Commission Reports | Evidence of damages. | IR |
| 93. | GMS011079 | GMS011131 | GMS Side Commission Reports | Evidence of damages. | IR |
| 94. | GMS011132 | GMS011135 | GMS W Greer Commission Reports (2019) | Evidence of damages. | NO |
| 95. | GMS011136 | GMS011218 | GMS S. Greer Commission Reports (2015-18) | Evidence of damages. | IR |
| 96. | GMS011219 | GMS011222 | GMS S. Greer Commission Reports (2019) | Evidence of damages. | IR |

| | | | | | |
|---|---|---|---|---|---|
| 97. | GMS011223 | GMS011351 | GMS Spires Commission Reports | Evidence of damages. | IR |
| 98. | GMS011352 | GMS011359 | GMS Lost Profits (Final) | Evidence of damages. | IR; M; CON; F; S; P; A |
| 99. | GMS011360 | | DK Text w Hayes Offering to Source Shoes 8.9.18 | Evidence of competitive activities. | IR; M |
| 100. | GMS011371 | GMS011382 | Storm Tactical RFQ 7.18.19 | Evidence of Storm Tactical sales.  ??? | IR; F |
| 101. | GMS011384 | GMS011387 | Storm Tactical RFQ 9.11.17 | Evidence of Storm Tactical sales.  ??? | IR; F |
| 102. | GMS011577 | GMS11578 | GG Email re CCPNs 2.15.18 | Evidence that GMS sold CCPNs in competition with G&S ??? | NO |
| 103. | GMS011614 | GMS011615 | Email to S Greer's GMS Account re G&S Kits | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | H |
| 104. | GMS011616 | GMS011617 | Email to S Greer's GMS Account re G&S Kits 1.30.19 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | H |
| 105. | GMS011618 | GMS011621 | Email to Welton's GMS Account re G&S Parts 2.26.19 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | C; H |
| 106. | GMS011622 | GMS011624 | Email to Welton's GMS Account re G&S Parts 2.27.19 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | H |
| 107. | GMS011625 | GMS011628 | Email to Spires's GMS | Evidence of competitive activities, breach of | H |

| | | | | | |
|---|---|---|---|---|---|
| | | | Account re G&S Parts 1.17.19 | contract, breach of fiduciary duties, trademark violation, and conspiracy. | |
| 108. | GMS011629 | GMS011631 | Email to Spires's GMS Account re G&S & GMS Parts 1.7.19 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | H |
| 109. | GMS011632 | | Email to Spires's GMS Account re G&S Parts 1.29.19 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | H |
| 110. | GMS011646 | GMS011847 | CM email on focusing on kits 3.9.18 | Evidence of GMS's sales of CCPNs | NO |
| 111. | GMS011675 | GMS011676 | CM email re Moratorium on New Kits 1.11.19 | Evidence of GMS's sales of CCPNs | NO |
| 112. | GMS011680 | | CM email no guarantee of fulfillment 6-14-18 | Evidence of GMS's sales of CCPNs | NO |
| 113. | GMS011681 | | Receipt of Company Policy 11.30.17 *Property | Evidence of hardware in W Greer's Possession. | NO |
| 114. | GMS011688 | | GG Msg Re Moratorium on CCPNs 3.18.19 | Evidence of GMS's sales of CCPNs | NO |
| 115. | GMS011820 | | Westly Management Customer Service _ Data Management | Evidence of trade secrets. | NO |
| 116. | GMS011821 | | Amber Wenrick Re Order | Evidence of competitive sales. | F |

| | | | | | |
|---|---|---|---|---|---|
| 117. | GMS011822 | | Billy Miles Customer Service _ Data Management | Evidence of trade secrets. | IR; F |
| 118. | GMS011823 | | Fort Riley G&S Activity | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
| 119. | GMS011824 | | Greg Spires Customer Service _ Data Management (1) | Evidence of trade secrets. | NO |
| 120. | GMS011825 | | Mike Customer Service _ Data Management | Evidence of trade secrets. | NO |
| 121. | GMS011826 | | Mike Welton ORDER DOC NUMBERS | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | C; H; F |
| 122. | GMS011827 | | Mike Welton GMS Motor Pool Order w. G&S kits 2.25.19 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | C; H; F |
| 123. | GMS011828 | | Sabrina 3RD BN I9 NON-STD REQs | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | F; H |
| 124. | GMS011829 | | Sabrina Agent Customer Service _ Data Management | Evidence of trade secrets. | NO |

| | | | | | |
|---|---|---|---|---|---|
| 125. | GMS011830 | | Sabrina Greer Fw Non-Standard Order | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | F; H |
| 126. | GMS011831 | | Sky Spires Customer Service _ Data Management | Evidence of trade secrets. | IR |
| 127. | GMS011832 | | Thomas Customer Data | Evidence of trade secrets. | NO |
| 128. | GMS011833 | | Thomas Customer Service _ Data Management (1) | Evidence of trade secrets. | NO |
| 129. | GMS011834 | | Westly GMS Order | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
| 130. | GMS011835 | | GMS CCPN Activity 2015-2020 Final | Evidence of GMS's sales of CCPNs. | F |
| 131. | GMS011836 | | CCPN Awarded Log as of 7.24.2019 | Evidence of GMS's sales of CCPNs. | F |
| 132. | WT0000043 | | WT Commission Payments | Evidence of damages. ??? | IR |
| 133. | WT0000051 | | G&S QuickBooks | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
| 134. | WT0000064 | WT0000070 | HMC Product Catalog Pgs | Evidence of competitive activities, breach of | NO |

| | | | | | |
|---|---|---|---|---|---|
| | | | | fiduciary duties, trademark violation, and conspiracy. | |
| 135. | WT0000739 | | | W Greer to Welton re Chinese multimeter and DLA markup 2.13.20 | Evidence W. Greer understood DLA markup.  ??? | IR |
| 136. | WT0000777 | | | Greer to Welton re competitors 1.15.20 | Evidence WT sees GMS as a competitor.  ??? | IR; M; S; A |
| 137. | WT0001234 | | | Amber G&S Sales Spreadsheet | Evidence of competitive sales. | F |
| 138. | WT0001235 | | | Amber G&S Sales Spreadsheet 1.25.2019 | Evidence of competitive sales. | F |
| 139. | WT0001804 | | | Greer to Team Kit Pricing 01.14.19 | Evidence of conspiracy. | IR Wrong doc – Burhani RFQ |
| 140. | WT0003549 | | | GCSS Ft Carson Tracking 1.19 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
| 141. | WT0003557 | | | GCSS Tracking 1 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
| 142. | WT0003559 | | | GCSS Tracking 2 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |

| | | | | | |
|---|---|---|---|---|---|
| 143. | WT0012722 | | Hayes to Customers re GMS 5.7.19 | Evidence of competitive sales by G&S. | IR |
| 144. | WT0014221 | | Welton to Cust re updated catalog 4.4.19 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
| 145. | WT0014367 | WT0014368 | Email with Side Commission Report 4.4.19 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, conspiracy, and damages. | NO |
| 146. | WT0014673 | WT0014702 | G&S Product Catalog | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | C |
| 147. | WT0014912 | | Kennedy Orders Combined 4.3.19 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | IR Wrong doc – 3/28/19 Email to A. Watt |
| 148. | WT0014948 | WT0014949 | Hayes to Kennedy re G&S Products 3.30.19 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
| 149. | WT0014950 | | Welton to W Greer re Requesting Operating Instructions 4.3.19 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
| 150. | WT0015865 | WT0015866 | Email with Side Commission Report 3.2.19 *3.12.19 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |

| 151. | | | S Greer to W Greer Amazon Receipt for Case 3.6.19 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
|---|---|---|---|---|---|
| | WT0016298 | WT0016299 | | | |
| 152. | WT0016464 | | Spires to Customer re G&S Catalog 2.27.19 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
| 153. | WT0016576 | | Spires to Customer re Sales Order 3.25.19 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
| 154. | WT0017112 | WT0017114 | Ft Polk Awards Spreadsheet | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, conspiracy, and damages. | NO |
| 155. | WT0017383 | | 2018 G&S Amber Paid Commissions | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
| 156. | WT0018039 | | W Greer to Spires re Sourcing Products 4.27.18 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | IR |
| 157. | WT0018058 | | Welton to W Greer re Expanding G&S 3.13.19 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
| 158. | WT0018804 | | Greer Kit Pricing to | Evidence of competitive activities, breach of contract, breach of | NO |

| | | | | fiduciary duties, trademark violation, and conspiracy. | |
|---|---|---|---|---|---|
| 159. | WT0019829 | | G&S Amber 2018 Christmas Bonus | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
| 160. | WT0020407 | WT0020409 | Email with Side Commission Report 12.19.18 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, conspiracy, and damages. | NO |
| 161. | WT0020511 | | S Greer to W Greer Requesting New Part Number 12.11.18 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
| 162. | WT0020772 | | W Greer to Welton re Part Shipment 12.20.18 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
| 163. | WT0021541 | | W Greer to Welton re Part Shipment 11.2.18 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | IR Wrong Doc – Spam from CleanItSupply 11.13.19 |
| 164. | WT0021856 | | W Greer to DLA re Expedited Sale 10.23.18 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
| 165. | WT0021952 | WT21955 | W Greer to Welton re G&S Sale 9.25.18 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, | H |

| | | | | |
|---|---|---|---|---|
| | | | trademark violation, and conspiracy. | |
| 166. | WT0021988 | WT0021990 | Email with Side Commission Report 10.30.18 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, conspiracy, and damages. | NO |
| 167. | WT0022125 | | Spires to Customer re G&S Catalog 11.2.18 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
| 168. | WT0022547 | WT0022548 | W Greer to Welton re issued check 9.15.18 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, conspiracy, and damages. | NO |
| 169. | WT0023295 | WT0023296 | G&S Invoice (hose connectors) 8.21.18 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
| 170. | WT0023317 | WT0023319 | Email with Side Commission Report 1.25.19 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, conspiracy, and damages. | NO |
| 171. | WT0023536 | | Spires to Customer re Catalog & Kit Creation | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
| 172. | WT0023829 | WT0023831 | Email with Side Commission Report 7.24.18 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, | NO |

| | | | | conspiracy, and damages. | |
|---|---|---|---|---|---|
| 173. | WT0024359 | | W Greer to Welton re G&S Sale 7.11.18 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
| 174. | WT0024452 | WT0024454 | Email with Side Commission Report 6.21.18 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, conspiracy, and damages. | NO |
| 175. | WT0024599 | WT0024600 | Email with Side Commission Report 6.20.18 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, conspiracy, and damages. | NO |
| 176. | WT0025053 | | Invoice from Zoro for G&S Order 6.11.18 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | IR |
| 177. | WT0025119 | WT0025121 | Email with Side Commission Report 5.23.18 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, conspiracy, and damages. | NO |
| 178. | WT0025480 | | Spires to Customer re G&S Catalog 5.11.18 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
| 179. | WT0025754 | | Spires to Customer re G&S Catalog 5.16.18 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, | NO |

| | | | | trademark violation, and conspiracy. | |
|---|---|---|---|---|---|
| 180. | WT0025892 | | Spires to Customer re G&S Catalog 5.14.18 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
| 181. | WT0026310 | WT0026321 | G&S Email w GMS Part 4.11.18 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
| 182. | WT0026391 | | G&S to S Greer w G&S & GMS parts 4.3.18 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
| 183. | WT0026825 | WT0026839 | Spires Operating Agreement 6.2.17 *G&S | Evidence of ownership and operating policies of G&S. | NO |
| 184. | WT0027725 | WT0027726 | Spires to Customer re GMS "NSN Catalog" 3.5.18 | Evidence that Defendants were selling only NSNs for GMS and not kits. | NO |
| 185. | WT0027464 | | G&S Email re NonStandard Order 4.12.18 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
| 186. | WT0027485 | | Spires to Customer re Sales Info 3.7.18 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
| 187. | WT0027777 | | W Greer to HMC re Quickbooks | Evidence of competitive activities, breach of contract, breach of fiduciary duties, | NO |

| | | | access 6.23.17 | trademark violation, and conspiracy. | |
|---|---|---|---|---|---|
| 188. | WT0028002 | WT0028011 | W Greer to Welton re G&S Catalog & Commissions 3.1.18 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
| 189. | WT0028111 | WT0028121 | Spires to Customer re G&S Catalog 3.5.18 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
| 190. | WT0028246 | | Spires to Customer re GMS Catalog from G&S Acct 3.7.18 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | C |
| 191. | WT0028256 | WT0028257 | Spires to Customer re GMS Catalog 5.15.18 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
| 192. | WT0028932 | | W Greer to DLA re Expedited Request 4.25.18 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
| 193. | WT0029235 | WT0029244 | G&S email to Side w Product Catalog 2.24.18 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
| 194. | WT0029540 | WT0029541 | Email with Side Commission Report 8.29.18 | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, conspiracy, and damages. | NO |

| 195. | WT0030426 | WT0030429 | Welton Termination Letter 4.4.19 | Evidence of termination of contract with GMS. | NO |
|---|---|---|---|---|---|
| 196. | WT0031326 | WT0031371 | 2018 G&S Tax Return | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, conspiracy, and damages. | NO |
| 197. | WT0031372 | WT0031425 | G&S 2019 Tax Return | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, conspiracy, and damages. | NO |
| 198. | WT0031426 | | GMS 2018 1099 to Greer Group | Evidence of damages. | IR |
| 199. | WT0031468 | | 2018 G&S Balance Sheet | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, conspiracy, and damages. | NO |
| 200. | WT0031469 | WT0031478 | 2018 G&S General Ledger | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, conspiracy, and damages. | NO |
| 201. | WT0031479 | | 2018 G&S P&L Statement | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, conspiracy, and damages. | NO |
| 202. | WT0031481 | | 2019 G&S Balance Sheet | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, | NO |

| | | | | |
|---|---|---|---|---|
| | | | conspiracy, and damages. | |
| 203. | WT0031482 | WT0031491 | 2019 G&S General Ledger | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, conspiracy, and damages. | NO |
| 204. | WT0031492 | | 2019 G&S P&L Statement | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, conspiracy, and damages. | NO |
| 205. | WT0031493 | | 2019 Side Misc. Income | Evidence of damages. | IR; PI |
| 206. | WT0031494 | | 2018 G&S Contractor Payments | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, conspiracy, and damages. | C |
| 207. | WT0031495 | WT0031501 | 2019 G&S Checking Transaction List | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, conspiracy, and damages. | NO |
| 208. | WT0031503 | WT0031512 | 2018 AMEX Year-End Summary | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, conspiracy, and damages. | NO |
| 209. | WT0031513 | | 2016 HMC Expenses | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |

| | | | | | |
|---|---|---|---|---|---|
| 210. | WT0031514 | | 2016 HMC 1040 Sch C | Evidence of damages and timing of competitive activities. | NO |
| 211. | WT0036710 | WT0036711 | G&S Texts With Amber about orders for G&S and GMS | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
| 212. | WT0036727 | | CO Cert. of Good Standing G&S | Evidence of G&S corporate existence. | NO |
| 213. | WT0036747 | | Spires to KM re HMC status 11.1.16 | Evidence of conspiracy. | NO |
| 214. | WT0036756 | WT0036755 | G&S 2018 AMEX Summary | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, conspiracy, and damages. | C |
| 215. | WT0036771 | WT0036776 | Spires to KM w 2019 G&S Comm Payments 5.29.20 | Evidence of damages. | NO |
| 216. | WT0036789 | WT0036791 | KM to Spires Explaining Info for Taxes 3.4.20 | Evidence of damages and how accountant calculated expenses. | H |
| 217. | WT0036806 | WT0036825 | 2018 KM Tax Preparation Materials | Evidence of damages and how accountant calculated expenses. | H |
| 218. | WT0036826 | WT0036865 | 2019 KM Tax Preparation Materials | Evidence of damages and how accountant calculated expenses. | C; H |
| 219. | WT0036844 | WT0036845 | Spires to KM w 2019 G&S & WT Owner Draws 1.2.20 | Evidence of damages. | NO |

| | | | | | |
|---|---|---|---|---|---|
| 220. | WT0036864 | WT0036865 | Amendment to G&S Op Agreement 1.15.19 | Evidence of ownership and operating policies of G&S. | NO |
| 221. | WT0036866 | | KM Notes re HMC Expenses | Evidence of damages and how accountant calculated expenses. | H |
| 222. | WT0036867 | WT0036877 | HMC Bank Docs 2016 | Evidence of damages. | NO |
| 223. | WT0036878 | | G&S Certificate of Reinstatement 9.18.19 | Evidence of G&S corporate existence. | IR |
| 224. | CM/ECF 43-2 | | Declaration of W Greer | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
| 225. | CM/ECF 43-3 | | Declaration of Spires | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
| 226. | CM/ECF 43-4 | | Declaration of Hayes | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
| 227. | CM/ECF 43-5 | | Declaration of Welton | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
| 228. | CM/ECF 43-6 | | Declaration of Side | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, and conspiracy. | NO |
| 229. | CM/ECF 43-7 | | Declaration of Sky Spires | Evidence of competitive activities, breach of | NO |

| | | | | fiduciary duties, trademark violation, and conspiracy. | |
|---|---|---|---|---|---|
| 230. | CM/ECF 43-8 | | GMS Catalog | Evidence of GMS products. | NO |
| 231. | CM/ECF 43-9 | | Declaration of S Greer | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, conspiracy, and damages. | NO |
| 232. | CM/ECF 72-1 | | WarTech Corporate Documents | Evidence of successor liability. | NO |
| 233. | CM/ECF 196-6 | | G&S Sales and GMS Comparison | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, conspiracy, and damages. | M; F; CON; S; A; P |
| 234. | CM/ECF 196-7 | | Comparison of G&S and GMS Products | Evidence of competitive activities, breach of contract, breach of fiduciary duties, trademark violation, conspiracy, and damages. | M; F; CON; S; A; P |

The following exhibits are all DLA Awards documents:

| Pl's Exh. | BATES | BATES (end) | AWARD | Objections |
|---|---|---|---|---|
| | - | | SPE7L718P5045 | NP; F |
| 235. | WT0031572 | WT0031576 | SPE7L119P0075 | NO |
| 236. | WT0031732 | WT0031736 | SPE7L119P3630 | NO |
| 237. | - | | SPE7L718P5979 | NP; F |
| 238. | WT0031637 | WT0031640 | SPE7L119P0784 | NO |

| 239. | - | | SPE7L119P1589 | NP; F |
|---|---|---|---|---|
| 240. | - | | SPE7L118P2512 | NP; F |
| 241. | DLA000125 | DLA000129 | SPE7L118P3228 | F |
| 242. | DLA000945 | DLA000949 | SPE7L118P3235 | F |
| 243. | DLA000950 | DLA000954 | SPE7L118P3244 | F |
| 244. | DLA001014 | DLA001019 | SPE7L118P3298 | F |
| 245. | DLA001495 | DLA001500 | SPE7L718P4924 | F |
| 246. | WT0031577 | WT0031581 | SPE7L119P0087 | NO |
| 247. | DLA000006 | DLA000011 | SPE7L718P1031 | F |
| 248. | DLA000955 | DLA000959 | SPE7L118P3261 | F |
| 249. | - | | SPE7L119P0250 | NP; F |
| 250. | DLA001245 | DLA001249 | SPE7L119P0248 | F |
| 251. | WT0031662 | WT0031667 | SPE7L119P2103 | NO |
| 252. | - | | SPE7L119P2281 | NP; F |
| 253. | - | | SPE7L119P2280 | NP; F |
| 254. | - | | SPE7L119P2836 | NP; F |
| 255. | DLA000338 | DLA000343 | SPE7L118P2661 | F |
| 256. | WT0031632 | WT0031636 | SPE7L119P0779 | NO |
| 257. | WT0031641 | WT0031645 | SPE7L119P1043 | NO |
| 258. | WT0031722 | WT0031726 | SPE7L119P3556 | IR Post-termination |
| 259. | DLA001053 | DLA001056 | SPE7L118P3506 | F |
| 260. | DLA001489 | DLA001494 | SPE7L718P4816 | F |
| 261. | - | | SPE7L119P2841 | NP; F |
| 262. | WT0036247 | WT0036254 | SPE7L119V4121 | NO |
| 263. | WT0036295 | WT36302 | SPE7L119V4394 | NO |
| 264. | | | SPE7L119V2739 | NP; F |
| 265. | - | | SPE7L119V2773 | NP; F |
| 266. | WT0036006 | WT0036010 | SPE7L119P0600 | NO |

| 267. | DLA000241 | DLA000246 | SPE7L118P3049 | F |
|---|---|---|---|---|
| 268. | DLA001047 | DLA001052 | SPE7L118P3490 | F |
| 269. | - | | SPE7L118P3068 | NP; F |
| 270. | - | | SPE7L119V2742 | NP; F |
| 271. | - | | SPE7L119V2765 | NP; F |
| 272. | - | | SPE7L119P2838 | NP; F |
| 273. | | | SPE7L119V1891 | NP; F |
| 274. | - | | SPE7L118P3032 | NP; F |
| 275. | | | SPE7L118P3080 | NP; F |
| 276. | - | | SPE7L119P2835 | NP; F |
| 277. | WT0031651 | WT0031655 | SPE7L119P1292 | NO |
| 278. | WT0036367 | WT0036374 | SPE7L119V4626 | NO |
| 279. | WT0036463 | WT0036470 | SPE7L119V5820 | IR Post-termination |
| 280. | - | | SPE7L119P2850 | NP; F |
| 281. | WT0031727 | WT0031731 | SPE7L119P3560 | IR Post-termination |
| 282. | - | | SPE7L118P3624 | NP; F |
| 283. | - | | SPE7L118P4127 | NP; F |
| 284. | WT0031622 | WT0031626 | SPE7L119P0407 | NO |
| 285. | WT0035880 | WT0035887 | SPE7L119V2234 | NO |
| 286. | - | | SPE7L119V1906 | NP; F |
| 287. | - | | SPE7L118P3438 | NP; F |
| 288. | - | | SPE7L118P3628 | NP; F |
| 289. | WT0035824 | WT0035831 | SPE7L119V0051 | NO |
| 290. | WT0036046 | WT0036051 | SPE7L119P3320 | NO |
| 291. | DLA001303 | DLA001307 | SPE7L119P0698 | F |
| 292. | DLA001308 | DLA001312 | SPE7L119P0700 | F |

| | | | | |
|---|---|---|---|---|
| 293. | DLA001313 | DLA001317 | SPE7L119P0704 | F |
| 294. | DLA001318 | DLA001322 | SPE7L119P0706 | F |
| 295. | DLA001298 | DLA001302 | SPE7L119P0678 | F |
| 296. | WT0036231 | WT0036238 | SPE7L119V4090 | NO |
| 297. | WT0036319 | WT0036326 | SPE7L119V4406 | NO |
| 298. | WT0036335 | WT0036342 | SPE7L119V4421 | NO |
| 299. | WT0036577 | WT0036582 | SPE7L719P2922 | NO |
| 300. | DLA001026 | DLA001031 | SPE7L118P3439 | F |
| 301. | - | | SPE7L119P2844 | NP; F |
| 302. | WT0036343 | WT0036350 | SPE7L119V4429 | NO |
| 303. | | | SPE7L119V1947 | NP; F |
| 304. | WT0036423 | WT0036430 | SPE7L119V5700 | IR Post-termination |
| 305. | DLA001151 | DLA001155 | SPE7L118P4604 | F |
| 306. | DLA001171 | DLA001176 | SPE7L118P5253 | F |
| 307. | - | | SPE7L119V3081 | NP; F |
| 308. | WT0035928 | WT0035935 | SPE7L119V3141 | NO |
| 309. | - | | SPE7L118P3361 | NP; F |
| 310. | - | | SPE7L118P3370 | NP; F |
| 311. | DLA001057 | DLA001061 | SPE7L118P3507 | F |
| 312. | DLA000542 | DLA000549 | SPE7L118V5413 | F |
| 313. | DLA000523 | DLA000528 | SPE7L118P4147 | F |
| 314. | DLA000507 | DLA000514 | SPE7L119V1858 | F |
| 315. | DLA001161 | DLA001165 | SPE7L118P4642 | F |
| 316. | DLA001166 | DLA001170 | SPE7L118P4644 | F |
| 317. | DLA001183 | DLA001188 | SPE7L118P5401 | F |
| 318. | WT0035986 | WT0035990 | SPE7L119P0403 | NO |
| 319. | WT0031617 | WT0031621 | SPE7L119P0404 | NO |

| 320. | DLA001420 | DLA001427 | SPE7L119V2091 | F |
| 321. | DLA001340 | DLA001345 | SPE7L119P2200 | F |
| 322. | - | | SPE7L119V2730 | NP; F |
| 323. | - | | SPE7L119P2845 | NP; F |
| 324. | WT0036263 | WT0036270 | SPE7L119V4189 | NO |
| 325. | WT0036271 | WT0036278 | SPE7L119V4379 | NO |
| 326. | - | | SPE7L119V4487 | NP; F |
| 327. | - | | SPE7L119P3322 | NP; F |
| 328. | WT0031703 | WT0031708 | SPE7L119P3486 | IR Post-termination |
| 329. | WT0035991 | WT0035995 | SPE7L119P0412 | NO |
| 330. | - | | SPE7L719P3218 | NP; F |
| 331. | DLA000529 | DLA000536 | SPE7L118V4149 | F |
| 332. | DLA000302 | DLA000307 | SPE7L118P2952 | F |
| 333. | DLA000066 | DLA000073 | SPE7L118V5060 | F |
| 334. | DLA000960 | DLA000965 | SPE7L118P3287 | F |
| 335. | DLA001032 | DLA001036 | SPE7L118P3458 | F |
| 336. | DLA001042 | DLA001046 | SPE7L118P3472 | F |
| 337. | DLA001501 | DLA001506 | SPE7L718P4970 | F |
| 338. | DLA000537 | DLA000541 | SPE7L118P5217 | IN; F |
| 339. | WT0035996 | WT0036000 | SPE7L119P0432 | NO |
| 340. | WT0036016 | WT0036020 | SPE7L119P0444 | NO |
| 341. | WT0031709 | WT0031712 | SPE7L119P3534 | NO |
| 342. | WT0036598 | WT0036602 | SPE7L719P3219 | IR Post-termination |
| 343. | DLA000992 | DLA000997 | SPE7L118P3440 | F |
| 344. | DLA001037 | DLA001041 | SPE7L118P3471 | F |
| 345. | - | | SPE7L119V1489 | NP; F |

| | | | | |
|------|------------|------------|----------------|------------------|
| 346. | DLA000966 | DLA000970 | SPE7L118P3348 | F |
| 347. | DLA000971 | DLA000975 | SPE7L118P3352 | F |
| 348. | DLA001068 | DLA001073 | SPE7L118P3626 | F |
| 349. | DLA001085 | DLA001090 | SPE7L118P4119 | F |
| 350. | DLA001127 | DLA001132 | SPE7L118P4150 | F |
| 351. | DLA001133 | DLA001138 | SPE7L118P4152 | F |
| 352. | DLA001109 | DLA001114 | SPE7L118P4146 | F |
| 353. | DLA001097 | DLA001102 | SPE7L118P4144 | F |
| 354. | DLA001484 | DLA001488 | SPE7L718P4740 | F |
| 355. | WT0036588 | WT0036592 | SPE7L719P3196 | IR Post-termination |
| 356. | WT0036001 | WT0036005 | SPE7L119P0486 | NO |
| 357. | - | | SPE7L119V4400 | NP; F |
| 358. | WT0031627 | WT0031631 | SPE7L119P0439 | NO |
| 359. | DLA001145 | DLA001150 | SPE7L118P4318 | F |
| 360. | DLA001139 | DLA001144 | SPE7L118P4304 | F |
| 361. | WT0031656 | WT0031661 | SPE7L119P2101 | NO |
| 362. | DLA000986 | DLA000991 | SPE7L118P3437 | F |
| 363. | DLA001115 | DLA001120 | SPE7L118P4148 | F |
| 364. | DLA001121 | DLA001126 | SPE7L118P4149 | F |
| 365. | DLA001156 | DLA001160 | SPE7L118P4640 | F |
| 366. | | | SPE7L119V4278 | NP; F |
| 367. | DLA001288 | DLA001292 | SPE7L119P0616 | F |
| 368. | WT0031686 | WT0031691 | SPE7L119P2248 | NO |
| 369. | DLA001177 | DLA001182 | SPE7L118P5395 | F |
| 370. | DLA001080 | DLA001084 | SPE7L118P4087 | F |
| 371. | DLA001293 | DLA001297 | SPE7L119P0618 | F |
| 372. | WT0035864 | WT0035871 | SPE7L119V2229 | NO |

| | | | |
|---|---|---|---|
| 373. | WT0035912 | WT0035919 | SPE7L119V3111 | NO |
| 374. | - | | SPE7L119V3166 | NP; F |
| 375. | WT0036167 | WT0036174 | SPE7L119V3846 | NO |
| 376. | - | | SPE7L119V5459 | NP; F |
| 377. | WT0036479 | WT0036486 | SPE7L119V5839 | IR Post-termination |
| 378. | DLA001103 | DLA001108 | SPE7L118P4145 | F |
| 379. | DLA001346 | DLA001351 | SPE7L119P2201 | F |
| 380. | DLA001255 | DLA001259 | SPE7L119P0453 | F |
| 381. | WT0036021 | WT0036025 | SPE7L119P0449 | NO |
| 382. | DLA001388 | DLA001395 | SPE7L119V1518 | F |
| 383. | WT0035856 | WT0035863 | SPE7L119V1997 | NO |
| 384. | DLA001404 | DLA001411 | SPE7L119V2070 | F |
| 385. | DLA001334 | DLA001339 | SPE7L119P2199 | F |
| 386. | - | | SPE7L119V2797 | NP; F |
| 387. | DLA001274 | DLA001278 | SPE7L119P0485 | F |
| 388. | WT0035872 | WT0035879 | SPE7L119V2233 | NO |
| 389. | - | | SPE7L119V6271 | NP; F |
| 390. | DLA001265 | DLA001268 | SPE7L119P0466 | F |
| 391. | DLA001260 | DLA001264 | SPE7L119P0463 | F |
| 392. | - | | SPE7L119P2237 | NP; F |
| 393. | WT0031680 | WT0031685 | SPE7L119P2247 | NO |
| 394. | | | SPE7L119V1913 | NP; F |
| 395. | - | | SPE7L119V2800 | NP; F |
| 396. | WT0036175 | WT0036182 | SPE7L119V3989 | NO |
| 397. | WT0031717 | WT0031721 | SPE7L119P3548 | IR Post-termination |
| 398. | DLA001229 | DLA001236 | SPE7L119V7949 | F |

| 399. | WT0031592 | WT0031596 | SPE7L119P0109 | NO |
|------|-----------|-----------|---------------|-------|
| 400. | WT0031597 | WT0031601 | SPE7L119P0112 | NO |
| 401. | WT0031587 | WT0031591 | SPE7L119P0106 | NO |
| 402. | - | | SPE7L119P2839 | NP; F |
| 403. | DLA001189 | DLA001196 | SPE7L118V7366 | F |
| 404. | DLA001205 | DLA001212 | SPE7L118V7374 | F |
| 405. | DLA001197 | DLA001204 | SPE7L118V7367 | F |
| 406. | DLA001213 | DLA001220 | SPE7L118V7377 | F |
| 407. | DLA001221 | DLA001228 | SPE7L118V7861 | F |
| 408. | - | | SPE7L119V3374 | NP; F |
| 409. | WT0031607 | WT0031611 | SPE7L119P0140 | NO |
| 410. | WT0031602 | WT0031606 | SPE7L119P0124 | NO |
| 411. | WT0031612 | WT0031616 | SPE7L119P0141 | NO |
| 412. | WT0035981 | WT0035985 | SPE7L119P0125 | NO |
| 413. | WT0035976 | WT0035980 | SPE7L119P0115 | NO |
| 414. | - | | SPE7L119P2842 | NP; F |
| 415. | WT0036207 | WT0036214 | SPE7L119V4074 | NO |
| 416. | WT0036279 | WT0036286 | SPE7L119V4383 | NO |
| 417. | DLA001468 | DLA001475 | SPE7L119V4535 | F |
| 418. | - | | SPE7L119P2843 | NP; F |
| 419. | DLA001237 | DLA001244 | SPE7L118V8214 | F |
| 420. | DLA001396 | DLA001403 | SPE7L119V1928 | F |
| 421. | WT0035896 | WT0035903 | SPE7L119V3012 | NO |
| 422. | WT0035920 | WT0035927 | SPE7L119V3137 | NO |
| 423. | WT0035944 | WT0035951 | SPE7L119V3204 | NO |
| 424. | - | | SPE7L119V3389 | NP; F |
| 425. | WT0036183 | WT0036190 | SPE7L119V3991 | NO |
| 426. | DLA001370 | DLA001375 | SPE7L119P2206 | F |
| 427. | WT0035952 | WT0035959 | SPE7L119V3222 | NO |

| 428. | WT0035960 | WT0035967 | SPE7L119V3257 | NO |
| 429. | DLA001279 | DLA001283 | SPE7L119P0607 | F |
| 430. | DLA001269 | DLA001273 | SPE7L119P0482 | F |
| 431. | WT0031674 | WT0031679 | SPE7L119P2244 | NO |
| 432. | - | | SPE7L119P2837 | NP; F |
| 433. | - | | SPE7L119V6274 | NP; F |
| 434. | - | | SPE7L119P2848 | NP; F |
| 435. | DLA0001428 | DLA001435 | SPE7L119V3867 | F |
| 436. | DLA001436 | DLA001443 | SPE7L119V3877 | F |
| 437. | DLA001323 | DLA001327 | SPE7L119P1557 | F |
| 438. | WT0036215 | WT0036222 | SPE7L119V4080 | NO |
| 439. | DLA001250 | DLA001254 | SPE7L119P0258 | F |
| 440. | DLA001352 | DLA001357 | SPE7L119P2202 | F |
| 441. | WT0031582 | WT0031586 | SPE7L119P0102 | NO |
| 442. | WT0036223 | WT0036230 | SPE7L119V4084 | NO |
| 443. | DLA001452 | DLA001459 | SPE7L119V4438 | F |
| 444. | WT0036583 | WT0036587 | SPE7L719P3117 | NO |
| 445. | WT0036399 | WT0036406 | SPE7L119V5325 | NO |
| 446. | WT0036255 | WT0036262 | SPE7L119V4145 | NO |
| 447. | DLA001412 | DLA001419 | SPE7L119V2072 | F |
| 448. | WT0035888 | WT0035895 | SPE7L119V2827 | NO |
| 449. | - | | SPE7L719P3220 | NP; F |
| 450. | | | SPE7L119V2002 | NP; F |
| 451. | WT0036495 | WT0036502 | SPE7L119V5858 | IR Post-termination |
| 452. | - | | SPE7L119P4034 | NP; F |
| 453. | - | | SPE7L119P4029 | NP; F |
| 454. | WT0035840 | WT0035847 | SPE7L119V1982 | NO |

| 455. | WT0036191 | WT0036198 | SPE7L119V3994 | NO |
|------|-----------|-----------|---------------|-----|
| 456. | WT0036199 | WT0036206 | SPE7L119V4040 | NO |
| 457. | WT0036471 | WT0036478 | SPE7L119V5829 | IR Post-termination |
| 458. | WT0036375 | WT0036382 | SPE7L119V4721 | NO |
| 459. | WT0036035 | WT0036040 | SPE7L119P2092 | NO |
| 460. | WT0036603 | WT0036610 | SPE7L719V0810 | NO |
| 461. | WT0036439 | WT0036446 | SPE7L119V5756 | IR Post-termination |
| 462. | WT0035832 | WT0035839 | SPE7L119V1971 | NO |
| 463. | WT0036303 | WT0036310 | SPE7L119V4396 | NO |
| 464. | WT0036543 | WT0036550 | SPE7L119V6284 | IR Post-termination |
| 465. |           |           | SPE7L119V1987 | NP; F |
| 466. | -         |           | SPE7L119V3061 | NP; F |
| 467. | WT0036143 | WT0036150 | SPE7L119V3291 | NO |
| 468. | WT0035968 | WT0035975 | SPE7L119V3288 | NO |
| 469. | WT0035848 | WT0035855 | SPE7L119V1994 | NO |
| 470. | -         |           | SPE7L119V3545 | NP; F |
| 471. | WT0031713 | WT0031716 | SPE7L119V3536 | NO |
| 472. | WT0036239 | WT0036246 | SPE7L119V4095 | NO |
| 473. | WT0036287 | WT0036294 | SPE7L119V4388 | NO |
| 474. | -         |           | SPE7L119V4531 | NP; F |
| 475. | -         |           | SPE7L119V6272 | NP; F |
| 476. | WT0036011 | WT0036015 | SPE7L119P0602 | NO |
| 477. | WT0036026 | WT0036030 | SPE7L119P0606 | NO |
| 478. | DLA001364 | DLA001369 | SPE7L119P2205 | F |
| 479. | DLA001358 | DLA001363 | SPE7L119P2204 | F |

| 480. | DLA001284 | DLA001287 | SPE7L119P0613 | F |
|---|---|---|---|---|
| 481. | WT0036031 | WT0036034 | SPE7L119P1516 | NO |
| 482. | DLA001382 | DLA001387 | SPE7L119P2208 | F |
| 483. | DLA001376 | DLA001381 | SPE7L119P2207 | F |
| 484. | - | | SPE7L119P2255 | NP; F |
| 485. | - | | SPE7L119P2254 | NP; F |
| 486. | WT0036383 | WT0036390 | SPE7L119V5297 | NO |
| 487. | - | | SPE7L119P2277 | NP; F |
| 488. | - | | SPE7L119P2273 | NP; F |
| 489. | - | | SPE7L119P2279 | NP; F |
| 490. | DLA001460 | DLA001467 | SPE7L119V4527 | F |
| 491. | WT0036407 | WT0036414 | SPE7L119V5350 | NO |
| 492. | WT0036359 | WT0036366 | SPE7L119V4590 | NO |
| 493. | WT0031713 | WT0031716 | SPE7L119P3536 | NO |
| 494. | WT0036447 | WT0036454 | SPE7L119V5778 | IR Post-termination |
| 495. | WT0036327 | WT0036334 | SPE7L119V4409 | NO |
| 496. | DLA001444 | DLA001451 | SPE7L119V3897 | F |
| 497. | - | | SPE7L119V3359 | NP; F |
| 498. | WT0036455 | WT0036462 | SPE7L119V5787 | IR Post-termination |
| 499. | DLA001476 | DLA001483 | SPE7L119V4568 | F |
| 500. | WT0036351 | WT0036358 | SPE7L119V4457 | NO |
| 501. | WT0036431 | WT0036438 | SPE7L119V5750 | IR Post-termination |
| 502. | - | | SPE7L119V6286 | NP; F |
| 503. | - | | SPE7L119V6275 | NP; F |
| 504. | | | SPE7L120P0166 | NP; F |

| 505. | WT0036391 | WT0036398 | SPE7L119V5320 | NO |
| 506. | - | | SPE7L119V6288 | NP |
| 507. | WT0036487 | WT0036494 | SPE7L119V5854 | IR<br>Post-termination |
| 508. | WT0036503 | WT0036510 | SPE7L119V5864 | C; IR<br>Post-termination |
| 509. | - | | SPE7L119P2253 | NP; F |
| 510. | | | SPE7L119V1866 | NP; F |
| 511. | | | SPE7L120P0169 | NP; F |
| 512. | | | SPE7L120P0165 | NP; F |
| 513. | - | | SPE7L119P2840 | NP; F |
| 514. | WT0036159 | WT0036166 | SPE7L119V3780 | NO |
| 515. | WT0036415 | WT0036422 | SPE7L119V5568 | IR<br>Post-termination |
| 516. | WT0031646 | WT0031650 | SPE7L119P1277 | NO |

2)  The following are the exhibits proposed by Defendant:

The following chart sets forth GMS's abbreviations for its Specific Objections:

| Abbreviation | Objection |
| --- | --- |
| A | Authentication |
| AC | Attorney-client privilege / work product |
| C | Composite / not a single document |
| CD | Corrupt document; document altered by counsel; integrity of document lost |
| CM | Cumulative; duplicative of other exhibit(s) on exhibit list |
| DNP | Not produced during discovery |
| DH | Double hearsay |
| E | Improper expert opinion |
| F | Foundation |
| H | Hearsay |
| ID | Exhibit list contains insufficient identification for the use of this exhibit at trial |

| IE | Improper exhibit |
|---|---|
| INC | Incomplete document |
| IO | Incompetent, incomplete, irrelevant, or improper legal opinion |
| IQ | Illegible / poor quality |
| None | No objection |
| OR | Objection reserved |
| p | Prejudicial |
| PSO | See prior stated objections in the exhibit |
| R | Relevance |
| u | Untimely produced |

| Def. Ex. No. | Description | Bates Begin | Bates End | Conf. | Obj. |
|---|---|---|---|---|---|
| D1. | 2021.04.16 R. McFarland letter to W. Lascara encl Notice of 30(b)(6) Deposition of Plaintiff GMS Industrial Supply, Inc. | | | | None |
| D2. | 2012.11.05 W. Greer Employment Agreement | GMS 0016 | GMS 0017 | | None |
| D3. | 2019.01.21 W. Greer Independent Agent Agreement | GMS 0007 | GMS 0010 | | None |
| D4. | 2019.01.12 W. Greer Zone Manager Addendum/Bonus Override | GMS 000399 | | | None |
| D5. | 2019.01.11 GMS' Agreement to transition W. Greer to Independent Account Manager (W. Greer signed 2019.01.12) | GMS 000400 | | | None |

| D6. | GMS Gross Revenue and Profit from 2015 to 2019/GMS's Annual CCPN sales for 2015 through 2019 | GMS 009601 | | AEO | None |
|---|---|---|---|---|---|
| D7. | 2015 S-Corporation Return for GMS Industrial Supply, Inc | GMS 008918 | GMS 008994 | AEO | None |
| D8. | 2017 S-Corporation Return for GMS Industrial Supply, Inc | GMS 008997 | GMS 009067 | AEO | None |
| D9. | 2018 S-Corporation Return for GMS Industrial Supply, Inc | GMS 009110 | GMS 009180 | AEO | None |
| D10. | 2020.08.05 Plaintiff GMS Industrial Supply, Inc.'s Responses to Defendant G&S Supply LLC's First Set of Interrogatories | | | | F, INC |
| D11. | 2020.08.05 Plaintiff GMS Industrial Supply, Inc.'s Responses to Defendant G&S Supply, LLC's First Set of Requests for Production | | | | F, INC |

| | | | | | |
|---|---|---|---|---|---|
| D12. | 2021.01.27 Plaintiff GMS Industrial Supply, Inc.'s First Supplemental Responses to Defendant G&S Supply, LLC's First Set of Interrogatories | | | | F, INC |
| D13. | 2021.01.27 Plaintiff GMS Industrial Supply, Inc.'s First Supplemental Responses to Defendant G&S Supply, LLC's First Set of Requests for Production | | | | F, INC |
| D14. | 2021.02.18 Plaintiff GMS Industrial Supply, Inc's Second Supplemental Responses to Defendant G&S Supply, LLC's First Set of Requests for Production | | | | F, INC |
| D15. | 2021.04.23 W. Lascara letter to R. McFarland re: document production (GMS 010679 to 010959) | | | | INC, R |
| D16. | 2021.04.23 Plaintiff GMS Industrial Supply, Inc.'s Supplemental Responses 04.23.21 to Defendant G&S Supply, LLC's First Requests for Production | | | | F, INC |
| D17. | 2021.04.30 T. Berkley letter to R. McFarland re: document production (GMS 010960 - 011351) | | | | INC, R |

| | | | | | |
|---|---|---|---|---|---|
| D18. | 2021.05.04 Plaintiff GMS Industrial Supply, Inc.'s Second Supplemental Responses to Defendant G&S Supply, LLC's First Set of Requests for Production | | | | F, INC |
| D19. | 2017.04.13 R. Robichaux email to Agents, ccing salesmgmt re: Non- Core/Sourced Items | GMS 011679 | | Confidential | None |
| D20. | 2007.12.03 Complaint with exhibits, Gary B. Gorken, G Cubed, Inc., GMS Industrial Supply, Inc., (formerly, Gorkens Maintenance Specialists, Inc.), and Rachel Gorken v. Drummond American Corporation, Civil Action No.: 2:07- cv-560 | | | | DNP, F, P, R, U |
| D21. | 2020.07.05 Text Messages between W. Greer and G. Gorken | | | | INC, P, R |
| D22. | Text messages from G. Gorken to M. Welton | | | | INC, P, R |
| D23. | 2019.05.03 G. Gorken email to S. Greer re: next time you are looking through your wedding album, try not to cry | WT0031311 | WT0031312 | Confidential | P, R |

| D24. | G. Gorken notes prepared during the week of 2021.05.10 | GMS 012168 | GMS 012172 | | F, P, R |
|---|---|---|---|---|---|
| D25. | 2019.04.02 Text Message between W. Greer and A. Wenrick | WT0036673 | | Confidential | INC, P, R |
| D26. | 2018.06.14 C. Morton Email to Agents, ccing Marketing re: Procedure for CCPN Kit Creation | GMS 011680 | | Confidential | None |
| D27. | 2018.03.09 C. Morton email to Agents and Sales Management re: Green Oger Call Highlights 2/16/18 | GMS 011646 | GMS 011647 | | None |
| D28. | 2019.01.09 C. Morton Email to Agents, ccing Marketing re: Moratorium on New CCPN Kits | GMS 011675 | | Confidential | None |
| D29. | From the Desk of the Green Oger January 11, 2019 | GMS 011537 | | Confidential | None |
| D30. | 2019.03.18 G. Gorken Email to Westly, Jennifer, me, Jeff, Greg, Donna, Chris.morton, Ken re: All Sales Management | GMS 011688 | | Confidential | None |
| D31. | 2016 HMC Bank Recap with handwritten notes | WT0031513 WT0036866 | | Confidential | None |
| D32. | 2016 HMC Supply LLC Profit or Loss From Business | WT0031514 | | Confidential | INC |
| D33. | G&S Supply LLC Profit & Loss January through December 2018 with handwritten notes | WT0036808 | | Confidential | None |
| D34. | G&S Supply LLC Profit & Loss January through December 2018 | WT0031479 | | Confidential | F, H, DH |
| D35. | 2020.01.02 G. Spires Emails to K. Miller re: Numbers | WT0036844 | WT0036845 | Confidential | F, INC, H, DH |

| | | | | | |
|---|---|---|---|---|---|
| D36. | 2016.06.15 Sales Agent Expectations between M. Welton and GMS Industrial Supply, Inc. | GMS 000439 | | | None |
| D37. | 2019.05.03 Email Chain between wg@supplygs.com, gssupplyllc@gmail. com, M. Welton, J. Hermann re: Fwd: Meeting follow-up | WT0012950 | WT0012951 | Confidential | INC, H, DH |
| D38. | 2019.04.08 M. Welton letter to R. Gorken re: return of GMS Property | WT0000695 | | Confidential | INC, H, DH |
| D39. | G&S Supply, LLC Catalog (Doc.156- 3) | | | | None |
| D40. | 2018.01.01 V: 3c GCSS-Army Transaction Guide | WT0006780 | WT0006789 | | A |
| D41. | Non-Standard Ordering Instructions | GMS 012187 | GMS 012193 | | None |
| D42. | GMS Sales according to DIBBS from Jan 1 - Apr, 2019 | WT0000055 | | Confidential | A |
| D43. | 2016.12.09 S. Greer Email re: FW: Emailing: How to Create a Non Standard Customer attaching How to Create a Non Standard Customer | | | | None |
| D44. | NSN Kit Commission Codes 2.2016 | WT0000455 | | | None |
| D45. | Drummond Answer and Counterclaim (ECF No. 13), Drummond Am. Corp., 2:07cv560- JBF-FBS | | | | DNP, F, P, R, U |
| D46. | Mike Welton GMS 2019 Commissions | | | | DNP, U, IQ |

## V.     FACTUAL CONTENTIONS

1)  Plaintiff's factual contentions are as follows:

### PARTIES

1.      GMS incorporates the Joint Stipulation (ECF #265) herein as if restated.

2.      In 2001, Gorken's Maintenance Specialists started in a small warehouse in Virginia Beach, VA with one employee and developed a specialty line of industrial maintenance products for the US Navy.

### GENERAL FACTS

3.       The company name was changed to GMS Industrial Supply, Inc. (GMS) in October 2007. GMS is a small, women-owned business, owned 100% by Rachel Gorken. In the beginning, the small team of three worked with the Navy installations in the Hampton Roads area.  Over the next five years, GMS grew into a larger operations facility in Virginia Beach with over 10 internal employees. GMS expanded sales into areas of Oklahoma, Florida and Texas and hired several traveling sales managers. The new technology available allowed GMS to dictate very meticulous planning, methods of execution, and specialized communications procedures which GMS incorporated into its operations and required its sales force to participate in. All of GMS' business was, and is, controlled, originated and distributed from the Virginia Beach office, but the customers benefit from GMS' on-site sales representatives in all of the different geographical areas GMS serves due to GMS' ability to be nimble and proactive to the customers' needs. This business model enabled GMS to grow as one of the preferred suppliers to the Army, Navy and Marine Corps bases. Over years GMS investment in meticulously doing the right thing, selling materials that were in full compliance of all of the federal regulations, and management of its General Services Administration ("GSA") and Defense Logistics Agency ("DLA") contracts resulted in

the awards of larger contracts in the supply of industrial products to these defined segments of the federal government.

4.      GMS expanded to the West Coast in 2010, but retained its headquarters any in Virginia Beach, Virginia.

5.       GMS' headquarters, central office many operating functions remain in Virginia Beach, Virginia, including: i) all corporate planning and administration; ii) all accounting; iii) contracts and sales orders are submitted by sales personnel, developed and processed iv) the marketing department functions of marketing and sales planning, product development, sales analysis, bonus and goal achievement planning; v) weekly hosting of sales manager meetings and quarterly meetings of sales personnel are hosted via video chat and recorded; vi) sales personnel travel arrangements are submitted and responded to and sales personnel reimbursement requests are made, reviewed and paid; vii) sales personnel payroll and other commission requests are submitted, reviewed and paid viii) most all of product sourcing requests are processed, and all vendors accounts are based in the Virginia office, where all accounting and banking is conducted. The 7 non-corporate Defendant sales representatives and their related limited liability companies (the "Sales Agent Defendants") engaged in constant contact, communication and interaction with GMS' Virginia Beach headquarters with respect to the foregoing functions relating to products and sales, as well as administrative and financial transactions.

6.      GMS was granted its first national stock number ("NSN") items in 2012 due to the volume and continuous ordering of GMS' unique material.  A NSN is a unique identifier that recognizes "standardized material items of supply" by NATO countries, including the United States Department of Defense.  This is the preferred method of procuring material by the military because the material has been verified to meet compliance standards, past performance

characteristics, shipping data, special handling and other relevant information. It is a very difficult, costly and lengthy process for a company to be assigned NSNs, and GMS developed confidential processes and procedures to seek and be awarded NSNs, which are included among GMS' Trade Secrets. The ability to develop and obtain assignment of NSN products provides GMS a competitive advantage to sell more product to military bases because it is easier for them to order.

7.     In 2013, due to GMS' continued good standing, volume, and demand, DLA began to stock GMS NSN items in the depots to ensure prompt delivery to the customer. To meet the depot stocking requirement, there are strict packaging and shipping guidelines that must be adhered to.

8.     Over the years, GMS has been awarded several coveted government contracts from GSA and DLA. These contracts continue to be renewed by GMS' customers due to GMS' excellent past performance and service, continually meeting strict government standards, and very consistent demand for these GMS NSN products for many years. Due to the 18 years of its performance being excellent and passing annual audits and every other type of evaluation process used by GMS' customers, GMS was awarded national stock numbers ("NSNs") for 57 separate products, and 22 of 57 of GMS' NSNs are product kits. Product kits are combinations of several products often used in combination with each other by customers combined together in a kit, and are created by GMS using knowledge, research and experience with its customers and their purchasing needs and preferences. These NSN materials make up between 20% and 35% of GMS' customers' needs, since 65% to 90% of the customer requests are for special-order, non-NSN items, referred to as cage code part number ("CCPN") items. In the instant case, G&S is unlawfully competing with GMS in selling CCPN items, specifically to the U.S. Army at various Army bases, and due to its misappropriation of GMS' Trade Secrets, G&S is using the misappropriated GMS Trade Secrets

to work toward being assigned NSNs of its own to unlawfully compete with GMS by selling NSNs of its own.

9.      In January 2018, GMS received the award of a Long Term Contract (LTC) for DLA to process direct awards for the 22 NSN stocked product kit items without having to go through the solicitation (bidding) process.  This is an added benefit to the end user because it eliminates delay of long lead times to receive material.

10.     GMS' success is due, in large part, to its development of confidential, proprietary and trade secret processes, procedures, means, methods, protocols, techniques and plans, including:

        a.      customer contacts lists with specific names and contact information ("Customer Lists");

        b.      customer purchasing preferences, identified and constantly honed and memorialized by GMS in confidential records ("Customer Preference Data");

        c.      developed database of trusted, reliable sources of products that are TAA compliant and meet customer preferences ("Products Source List");

        d.      developed protocol to simplify the complex process of inputting products and materials with the proper information into the Army's automated internet based purchase systems named Global Combat Support System-Army (GCSS-Army) and Army Enterprise Systems Integration Program (AESIP) to ensure products and materials are properly input into the correct class and category so that the customer can easily and efficiently order GMS' products ("Load Sheet Protocol");

        e.      sales personnel training based upon detailed protocols intended to gain trust and respect of GMS by the customer purchasing agents, engender loyalty between the customer

and GMS and demonstrate delivery upon customer needs at competitive prices ("Sales Agent Training Protocol");

      f.    models and methods for pricing of supplies ("Pricing Methods"); and

      g.    marketing methods of creating kits of industrial materials based upon Customer Preference Data, creating names for the kits and techniques of marketing such kits and other products to the customer, including means and methods of obtaining assignment of NSNs for products and product kits ("Marketing Techniques").

11.    GMS' confidential and proprietary Customer Lists, Customer Preference Data, Products Source List, Load Sheet Protocol, Sales Agent Training Protocol, Pricing Methods and Marketing Techniques constitute "trade secrets".

12.    GMS' Trade Secrets are available to GMS' sales agents only by virtue of their employment or independent contractor contractual relationship with GMS, and GMS Sales Agents are able to use the Trade Secrets solely to further GMS' business, customer sales and goodwill, by virtue of the policies and procedures, employee handbook and contractual agreements of GMS with its employees and independent contractors limiting the use and disclosure of such proprietary, confidential and Trade Secret information, and the solicitation of GMS' customers and employees. A competitor who had access to this proprietary, confidential, Trade Secret data and analysis would have an unfair competitive advantage that could enable them, as an example, to use GMS' own data and analysis to underprice GMS' price quotes to its customers, to divert GMS' customers and/or to serve GMS' customers as well as GMS.

13.    GMS has taken reasonable measures to protect its proprietary, confidential and Trade Secret information, including the following: i) use of confidentiality, non-disclosure and non-solicitation agreements with all sales employees and independent sales agents; ii) employee

handbook policies and provisions which include confidentiality, non-disclosure and non-solicitation requirements; iii) conducting on the job training regarding its confidential, proprietary and Trade Secret information with employees and agents; iv) requiring password protected access to company data and Trade Secret information; and v) employing physical security measures, such as placing locks on offices and doors and by securing sensitive data in file cabinets.

14. GMS' confidential, proprietary and Trade Secret information has independent economic value in that it consists of information that is neither generally known nor readily ascertainable within the industry through lawful means. GMS has made reasonable efforts to ensure the secrecy of its confidential, proprietary and Trade Secret information, and its confidential, proprietary and Trade Secret information constitute "trade secrets" under applicable laws cited herein that merit legal protection from unauthorized disclosure, misappropriation and dissemination and/or use.

15. During all times relevant herein, training and communication with Sales Account Managers and Sales Agents occurred regularly at GMS, hosted from the Virginia Beach Headquarters Office.  Every Friday afternoon sales account managers, including the Sales Agent Defendants, participated in management video call meetings hosted from the Virginia Beach Headquarters Office.  The sales Account Managers were responsible for, and provided, the information received in the meetings to their sales agent teams, including the Sales Agents Defendants. In early 2018, GMS also started having quarterly Account Manager video calls with the entire sales force, including the Sales Agent Defendants, during which GMS Management, Marketing and Regulatory Compliance Department representatives and the Sales Agent Defendants discussed new developments, new products, share marketing and sales strategies, discussed customer accounts and preferences, exchanged sales tips, provided demonstrations and

techniques to the sales team to help them be successful.  Through these meetings, all Sales Agent Defendants gained knowledge of and became familiar with, and knowledgeable of all customers of GMS, and the GMS Trade Secrets.

16.     On October 22, 2015, Greer and Spires incorporated HMC Supply, LLC in the state of Oklahoma using Spires' home address as the address for the registered agent.  Spires joined together with Westly ("Westly" or "Greer") through criminal and unlawful means to establish HMC as a business competing with GMS. At the time, Westly was an employee of GMS and Spires was under contract with GMS as a sales agent.  During this time, Westly and Spires concealed HMC so that they could use the company to steal GMS' corporate opportunities while having GMS pay them to do so.  HMC created catalogs containing products that directly competed with products sold by GMS.  HMC also began using the same product suppliers as GMS to provide goods it was selling to GMS clients.

17.     HMC created a list of industrial products to sell for HMC and the products were of such a nature that they could be sold to Motor Pools at military bases.

18.     Greer obtained a cage code number for HMC.

19.     HMC sold industrial products to the same military bases to which GMS sold its products.

20.     Spires never told GMS about HMC while he was a Sales Agent for GMS.

21.     Commencing in or about 2017, the disloyal Sales Agent Defendants and HMC joined together through criminal or unlawful means to establish G&S as their undisclosed principal and a competing business of GMS that has injured GMS.  HMC provided the initial "seed money" to help get G&S up and running.  During this time, the Sales Agent Defendants were under contracts with GMS that required their loyalty, prohibited competitive conduct and solicitation of

GMS' customers or sales representatives, and their disclosure or use of proprietary information and Trade Secrets.  The Sales Agent Defendants concealed their disloyal and unlawful acts from GMS by telling lies to GMS and its owners and officers, and, at other times, remaining silent when they had a duty to speak.  They did so to perpetuate their employment with GMS over a period of many months, and with some, up to two (2) years, so they could continue to draw GMS paychecks while they conspired to, and actually, misappropriated GMS' Trade Secrets, solicited GMS' sales personnel to leave GMS, solicited GMS' current and ongoing customers to abandon GMS in favor of their new business, G&S, and misappropriate GMS' name recognition, goodwill and trade name in the marketplace.

22.     The G&S name was intentionally created to sound identical to GMS, and the Sales Agent Defendants misrepresented it as a "sister company" of GMS, so they could profit from GMS' name recognition in the unsuspecting customer base.

23.     As a new startup company fueled by the unlawful misconduct of the Defendants, between November 2017 and April 2019, G&S secured nearly $1,000,000 in awarded and shipped orders to GMS' customers, of products that compete with GMS' competing products, causing GMS lost profits of $195,872.95.  G&S awarded and pending orders were placed through the US Army using DLA as the purchasing method during this 18 month period by the Defendant's soliciting GMS' customers and selling them competitive products to those offered by GMS. In the process, the Defendants misappropriated GMS' proprietary, confidential and Trade Secret information and data, thereby causing GMS further reparable and irreparable damages.

24.     Each of the Sales Agent Defendants that were previously sales agents of GMS were sent a cease and desist letter dated April 3, 2019, terminating their relationships with GMS for cause and demanding they quit soliciting GMS' customers and sales representatives, and preserve

all documents and evidence of their actions. They have nevertheless continued to siphon substantial amounts in sales awards and in solicitations (pending awards) from GMS to G&S since the April 3, 2019 cease and desist letters were sent.

**Westly Greer**

25.     Gary Gorken, Rachel Gorken's husband and GMS' Director of Regulatory Compliance, hired Westly on April 4, 2011. At the time, Westly was living in Oklahoma.

26.     Over the course of the next few years, Westly came to work every day and seemed content. GMS rewarded his efforts frequently with pay increases and gave him more responsibilities.  Throughout his time with GMS, GMS and the Gorken family treated Westly like a son.  In November 2012, during an annual company trip, Westly proposed to Sabrina in front of his GMS Family.  In 2013, the Gorkens paid for Westly's and Sabrina's destination wedding in the Dominican Republic.

27.     Westly continuously learned how GMS' business worked and continued to gain experience as GMS continued to invest in him by training him, purchasing and providing him every state of the art piece of equipment Westly desired, including phone, desktop computer, laptop computer and tablet computer, sending people to work with him, and sending him to places to learn from the work of others as well.

28.     In November 2012, Westly was promoted to the position of District Manager to oversee the sales agents to be certain that they were doing things in accordance with GMS' high standards of taking care of the customers and working to grow business opportunities for GMS. In order to protect its business interests, including GMS' Trade Secrets, loyal customer base and a stable sales force, GMS required Westly to sign an at will Employment Agreement on or about November 1, 2012 (the "Westly 2012 Employment Agreement").

29.     As an employee, and as set forth in the Westly 2012 Employment Agreement, Westly was provided the GMS employee handbook and Westly agreed to "comply with its provisions and any other rules." Included among those rules are requirements:

a.      to not disclose company proprietary, confidential and trade secret information, as set forth below:

> GMS Industrial Supply Inc. requires all employees to sign a confidentiality agreement as a condition of employment due to employees' potential access to information that is confidential and/or intended for company use only. All employees are required to maintain such information in strict confidence. This policy benefits employees by protecting the interests of GMS Industrial Supply Inc. and protecting confidential, unique and valuable information from competitors or others.
>
> Should an occasion arise in which an employee is unsure of his or her obligations under this policy, he or she must consult a supervisor. Failure to comply with this policy could result in disciplinary action, up to and including termination of employment.
>
> The protection of confidential business information and trade secrets is vital to the success of GMS Industrial Supply Inc. Such confidential information includes, but is not limited to, the following examples:
>
> ☐ Any material developed using company resources and/or time
> ☐ Compensation data
> ☐ Computer processes
> ☐ Computer programs and codes
> ☐ Conversations between any persons associated with the company
> ☐ Customer lists
> ☐ Customer preferences
> ☐ Financial information
> ☐ Marketing strategies
> ☐ New materials research
> ☐ Pending projects and proposals
> ☐ Proprietary production processes
> ☐ Personnel/payroll records
> ☐ Research and development strategies
> ☐ Scientific data
> ☐ Scientific formulae
> ☐ Scientific prototypes

☐ Technological data
☐ Technological prototypes

Employees who improperly use or disclose any type of confidential business
information will be subject to disciplinary action and/or legal action, even if they
do not personally benefit from the disclosure of such information.

b.      to not simultaneously hold a competing job, by limiting outside
employment by providing that "Employees may hold outside jobs in unrelated businesses or
occupations as long as the employee meets the performance standards of the position with GMS";

c.      to preclude "insubordination" and "unauthorized disclosure on any
confidential information"; and

d.      to require "immediate suspension" or "termination of employment" for
"[d]ivulging GMS Industrial Supply Inc.'s business practices or and confidential information" or
for "[a]ny misrepresentation of GMS Industrial Supply Inc. to a customer, a prospective customer,
the general public, or any employee."

30.     In July 2015, Westly was promoted to Director of Sales, the head of the entire sales
team, overseeing the other Sales Managers and working directly with GMS' Marketing
Department and corporate home office in Virginia, while remaining under the terms of the Westly
2012 Employment Agreement and the GMS employee handbook. As Director of Sales, Westly's
primary responsibility was to communicate with GMS' Virginia office daily, sometimes even
hourly to disseminate and communicate all directives and managing all activities for GMS' best
interest.  As the Director of Sales, Westly had access to GMS' confidential, proprietary and Trade
Secret information.

31.     Commencing on or about October 2015, Westly joined with Spires to create HMC
to be a company that they could use to directly compete with GMS while remaining, respectively,
as an employee and sales agent of GMS.  On behalf of HMC, Westly and Spires began using GMS'

proprietary information and trade secrets to build a catalog and sales kits for HMC, contact and build relationships with GMS' suppliers, and sell competing goods to GMS' customers. Westly and Spires were working with GMS, they were instead letting GMS pay their expenses while they sold goods on behalf of HMC to GMS customers. In doing so, Westly, Spires, and HMC wrongfully misappropriated GMS' trade secrets and other proprietary information for their own use.

32.   Effective January 21, 2019, Westly abruptly quit his position of Director of Sales and decided to become a GMS independent sales agent. In order to protect its business interests, including GMS' Trade Secrets, loyal customer base and a stable sales force, and unaware of the true facts, concealed by Westly from GMS, that Westly had been soliciting GMS' customers and sales agents and competing against GMS since June 2017 through the G&S competitor that Westly and others created and operated, GMS required Westly to sign an Independent Sales Agent Agreement on or about January 21, 2019 (the "Westly 2019 Sales Agent Agreement").

33.   Commencing in or about January 2017, Gary Gorken was diagnosed with cancer with an uncertain prognosis and requiring surgery and many months of recovery. Gary Gorken conveyed this unfortunate news to Westly and emphasized the importance of his good faith, loyal service in Gary Gorken's and GMS' time of need and Westly responded that Gary and GMS could count on him.

34.   Commencing in or about June 2017, Westly conspired with Greg Spires to form G&S as a competitive company to GMS through which all of the disloyal Sales Agent Defendants have sold products competitive to GMS products while still remaining sales agents of GMS. Acting in concert, they funded G&S' bank account with money from HMC and began using G&S as the primary vehicle for competing unlawfully against GMS.

35.     Commencing in or about June 2017, and throughout his remaining tenure at GMS through April 3, 2019, Westly continued to sell the GMS NSN items and deceived, and conspired with and directed the other disloyal Sales Agent Defendants to deceive, GMS' customers into ordering non-standard (CCPN) items from G&S by falsely stating G&S was a sister company to GMS, and by having G&S sell identical products to GMS' customers. This deceit not only deprived GMS of revenue, but has injured GMS' good reputation with its customers as G&S has provided materials, including a Creeper from China to GMS' customers that are non-compliant with the TAA and caused confusion and uncertainty in GMS' customer base.

36.     Furthermore, Westly intentionally, with the help of Defendants Greg Spires and Thomas Hayes, impeded and prevented the ordering of GMS materials in the AESIP portal (this portal is for non-standard non NSN cage code part number kits to be entered for purchase), by intentionally having GMS' products entered incorrectly in AESIP. Once it was discovered that the GMS product kits were entered incorrectly into that system, GMS management demanded that Westly get GMS' incorrectly entered kits fixed in AESIP. Instead Westly, Greg Spires and Thomas Hayes used the company's time they were being paid for to input their G&S competitive system part numbers into the AESIP system and had their competitive G&S product line entered in the correct way, therefore impeding and preventing the ability of GMS' products to be ordered by GMS' customers, while at the same time facilitating the purchase of G&S' products.

37.     Westly thereby started sales and distribution of G&S' product line by substituting it in place of GMS' product lines with GMS' customers for non-NSN products.  Unbeknownst to GMS, Westly also solicited the other six individual Defendants, and their related limited liability Defendants, while they were independent sales agents with GMS, and trained and engaged them to sell G&S' competitive product line instead of the GMS product line on all non-NSN purchases,

which they all have done to GMS' detriment. In addition to soliciting and concerting these six

disloyal GMS sales agents to G&S, Westly solicited GMS sales agent Billy Miles who, rejected

the recruitment by Westly at Fort Hood Texas. Westly upon his disappointment with Billy's

decision to not switch companies or at least sell the G&S products in November 2018 trumped up

false accusations of bad performance against Billy that led to his termination. Westly then quickly,

with Mike Welton's help, converted, all of GMS' customers serviced by Billy Miles to G&S.

38.     Westly and G&S, unlawfully using the GMS Trade Secrets which were

misappropriated from GMS, attempted to use the Trade Secrets to apply for and to obtain its own

NSNs to further compete with GMS.  With Westly's personal knowledge and experience with

GMS' misappropriated Trade Secrets, the process for G&S to obtain NSNs, which took GMS 12

years, at great expense to GMS, is unlawfully shortened significantly, to G&S' benefit, and GMS'

competitive detriment.

39.     In addition, G&S, at Westly's direction, and with the assistance of the other

Defendants' knowledge of the GMS customer base and preferences, created G&S product kits

intended to be identical to the proprietary product kits prepared and sold by GMS. Their catalogue

mimics GMS catalogue as can be seen by comparison of GMS' catalogue and G&S' catalog.

Many of the product kits are substantially similar, demonstrating that Westly and Greg Spires

misappropriated GMS' Trade Secret Customer Preference Data, Products Source List and Pricing

Methods.

40.     However, some of G&S' product kits have supplies and products that are not TAA

compliant supplies as are GMS'. As customers are being told by the Defendants that G&S is a

sister company of GMS, and the fact that some products they are selling are not TAA compliant,

GMS' valuable goodwill is being injured.

41.     For approximately three and one-half years (3 1/2) years, from in or about October 2015 to April 3, 2019, when Westly was terminated as a GMS sales agent for cause, and continuing thereafter, in combination with, and with the aid and assistance of, Greg Spires and the other Defendants, Westly, individually, clandestinely, in violation of his and its contractual duties,

a.      participated with Greg Spires in the creation and organization of HMC  and G&S and worked with Greg Spires and the other Defendants to have HMC and G&S solicit GMS' customers and sales representatives;

b.      used and disclosed GMS' Trade Secrets to solicit GMS' customers, serving as a duel agent soliciting GMS' customers for HMC and G&S sales, and selling GMS', HMC's and G&S' products to GMS' customers;

c.      solicited GMS' sales representatives, including the Defendants other than HMC and G&S, to join with he and Greg Spires at G&S, to take customers and sales away from GMS for his and their personal benefit, and disclosed GMS' Trade Secrets to the other Defendants for use in soliciting GMS' customers;

d.      misrepresented to GMS' customers that G&S was a sister company of GMS; and

e.      disregarded his on-going duty for one year after termination of his sales agent position with GMS to not solicit GMS customers, and continues to solicit GMS customers and sell them competitive products, thereby causing GMS both monetary damages and irreparable damages, including the permanent loss of customers and the loss of GMS' goodwill.

42.     On April 3, 2019, GMS sent Westly a cease and desist termination letter terminating his sales agent contract and directing Westly to cease all activities on behalf of GMS and to return all GMS property and materials, which included the three (3) GMS computing devices (a desktop,

a laptop and a tablet computer) in Westly's possession on April 3, 2019 and to cease and desist from using or disclosing GMS confidential information.

43.     On April 3, 2019, after the cease and desist termination letter was sent to Westly by GMS' counsel, without authorization or authority, Westly accessed one of the GMS computer devices in his possession and attempted to download GMS' Google Data, but GMS' IT Department was able to re-route it away from Westly and avoided the piracy of that data as of that date, but caused GMS to conduct a computer forensic analysis of what occurred by this conduct and to incur computer forensic analysis and related costs.

44.     Without authority or authorization, and despite his termination as a sales agent of GMS, the revocation of his authority to use the GMS computer devices or use or disclose GMS confidential information, Westly retained and accessed GMS' computers for nineteen (19) additional days during the period April 3, 2019 to April 22, 2019, and downloaded, and used a File Shredder program to delete and/or destroy, thousands of documents resident on the several computing devices owned by GMS and provided by GMS to Westly for use in GMS' business.

45.     By letter dated April 17, 2019, from GMS' counsel to Westly, GMS again demanded that Westly cease and desist from soliciting GMS' customers, employees and independent contractors for his own personal benefit and that of G&S which he formed to compete with GMS, and to again demanded return of three (3) computing devices which were GMS' property that Westly had been given to use in conducting GMS' business.  The computer devices were not shipped to GMS by Westly until April 22, 2019, and were received by GMS on April 25, 2019. BDO was engaged by Pender & Cowards, PC to perform digital forensics and e-discovery with respect to the misappropriation of trade secrets, intellectual property theft, violation of trademarks and to recover stolen or deleted data from various computers and other devices.

46.     A forensic examination of the desktop computer returned by Westly demonstrates that on April 1, 2019, the date GMS and Gary Gorken first learned from a GMS sales representative of the existence of G&S as a competitor and of the existence of nearly two (2) years of misappropriation of sales agents and customers by the Defendants, Westly, who was informed of GMS' knowledge that same day, April 1, 2019, attached a USB device to GMS' desktop computer assigned to Westly and began to download GMS' data. Again, on April 2, 2019, after Westly received two text messages from Gary Gorken on April 1, 2019, the first advising that he needed to talk to Westly "right away" and the second stating "We have a major problem. We need to talk ASAP", on April 2, 2019, Westly attached a USB device to GMS' desktop computer assigned to Westly and downloaded GMS' data. Again, on April 19, 2019, after Westly had received both the April 3, 2019 and April 17, 2019 Cease and Desist letters and demand for return of the GMS computers, Westly again attached a USB to the desktop computer and downloaded GMS' data.

47.     Defendants never produced any USB drive that they contained files related to GMS or G&S, or that that contained documents that were destroyed by Westly's use of the file shredding program

48.     A review of data on the two of the three computing devices returned by Westly to GMS indicate that from April 3, 2019 to April 22, 2019, the computers were accessed by Westly, during which access GMS data was downloaded, and over 19,000 files were deleted from GMS' computing devices between April 3, 2019 to April 22, 2019. The history on the laptop and desktop computers also revealed that a program called File Shredder, which can permanently destroy files and Windows Registry entries, was installed and used on these computers to destroy GMS' files, documents and data that were resident on the computers that GMS owned. These actions were intentional acts by Westly to cover up his unlawful acts of misappropriation of GMS' confidential,

proprietary and Trade Secret information, and destruction of its data, all of which caused, and continues to cause, damages to GMS.

49.      GMS requested the password to the tablet computer from Westly.

50.      Greer responded that the password was simply a comma (,) which did not work.

51.      Defendants never produced the correct password to access the GMS-owned tablet computer Westly Greer used while working for the company.

52.      Over 43,000 files and folders were deleted from the laptop computer, 7,075 of which were deleted after Greer was terminated and received the litigation hold letter from Haden. Per industry averages, this compares to over 330 bankers' boxes of documents.

53.      Over 24,000 files and folders were deleted from the desktop computer, 11,791 of which were deleted after Greer was terminated and received the litigation hold letter from Haden. Per industry averages, this compares to over 820 bankers' boxes of documents.

54.      Beginning in May 2017, seven unique data storage devices had been attached to the laptop computer;

55.      On April 19, 2019, over two weeks after being terminated as a sales agent by GMS, Greer connected a USB data storage device to the desktop computer.

56.      After googling "fileshredder", Greer then went to the website http//:fileshredder.org and downloaded and installed a "file shredding" program.

57.      After the installation of the file shredder program was completed, Greer ran the file shredding program, permanently deleting 3,397 files from the computer – which he has admitted.

58.      Once the files were deleted, Greer then attempted to cover his tracks by uninstalling the shredding program.

59.     After running the file shredder program, Greer sent the stripped computer back to GMS.

60.     All user created files had been deleted from the desktop computer.

61.     Greer contacted Amber Wenrick, one of his GMS sales agent trainees who he had convinced to sell G&S goods, and instructed her to delete all of her emails and text messages concerning G&S.  She followed his instructions

62.     A password or pin code is required to access Westly's tablet, and due to Westly's refusal to provide the correct access code to the tablet computer it cannot be accessed.

63.     Westly Greer sold products for GMS between June 2017 until he was terminated on April 3, 2019.

64.     Westly breached his fiduciary duty of loyalty to GMS by misappropriating Trade Secrets for his, HMC's and G&S' financial benefit, conspiring with other individual Defendants to injure GMS in its trade or business, misusing and disseminating GMS' confidential information for his, HMC's, and G&S' financial benefit, organizing, outfitting, leading and managing HMC and G&S to directly compete against GMS while still employed by and working for GMS and failing to disclose the truth to GMS.

65.     Greer asked Greg Naschansky to sell G&S products in April of 2018.

66.     Naschansky turned Greer down because he thought G&S was a competitor to GMS.

67.     Naschansky reviewed the G&S catalog and thought that the goods were competitive.

68.     Greer told Naschansky that he would be fired if he told Gary Gorken about G&S.

69.     Greer asked Ibrahim Salfiti, a GMS sales agent to sell G&S goods.

70.     Greer told Salfiti that G&S was a sister company of GMS.

71.     GMS part numbers started with GMS and G&S part numbers started with GS.

72.     When Salfiti told Greer that the SMS & G&S good were competing, Greer said that the G&S good were better.

73.     Greer told Amber Wenrick that G&S was a sister company of GMS.

74.     Only later did Wenrick find out that GMS and G&S were not sister companies.

75.     Greer failed to train Wenrick on FedMall or credit card sales.

76.     Greer trained Wenrick that non-NSN sales were made through G&S that was a sister company of GMS.

77.     If a customer of Wenrick's wanted a nonstandard item, she would call Westley to get a quote.

78.     Wenrick made sales of G&S products.

79.     Wenrick informed Gary Gorken that she sold G&S products while working for GMS.

80.     A comparison of GMS catalogs and G&S catalogs show competing goods.

81.     Westly Greer was paid a salary and was eligible for quarterly bonuses in 2018.

82.     Thomas Hayes,  Gregory K. Spires, and Michael Welton were on Westly Greer's sales team in 2018.

83.     Greer's salary and bonus from June 30, 2017 to January 25, 2019 was $422,816.67.

84.     On August 2, 2019, Greer, Spires and Hayes started WarTech Industries LLC.

85.     Greer never asked Gary Gorken whether it was okay to start G&S and sell industrial products to military bases during his employment or his agency with GMS.

86.     The desktop computer GMS provided to Westly is a "protected computer" under the CFAA because it was used to conduct interstate and foreign commerce and communication.

87.     The laptop computer GMS provided to Westly is a "protected computer" under the CFAA because it was used to conduct interstate and foreign commerce and communication.

88.     The tablet computer GMS provided to Westly is a "protected computer" under the CFAA because it was used to conduct interstate and foreign commerce and communication.

89.     Neither Westly nor G&S were authorized to permanently delete GMS' documents and data before or after his termination of Westly's employment and/or as sales agent of GMS.

**Gregory K. Spires/County Roads, LLC**

90.     Greg Spires, who is a full-time government employee at the ROTC at Fort Sill, Oklahoma, was a GMS customer serviced by Westly. In January 2013 he came on board as a sales representative with GMS.  Unbeknownst to GMS prior to his termination on April 3, 2019, Greg Spires has been to numerous Army bases selling G&S' competitive product line for at least the last two years, while he was a G&S sales agent selling GMS products. This is evidenced by his multiple trips to Fort Bliss, Texas, and Fort Sill Oklahoma area bases in addition to the G&S sales data attributable to Greg Spires that GMS has learned about since April 3, 2019.

91.     On January 22, 2013, Greg Spires signed a Sales Agent Agreement with GMS which appointed him as an independent, non-exclusive sales agent of GMS products in Oklahoma (the "Greg Spires 2013 Sales Agent Agreement"). The Greg Spires 2013 Sales Agent Agreement included a nondisclosure provision intended to protect GMS' confidential, proprietary and trade secret information by which Greg Spires agreed not to disclose or use for personal gain any of GMS' confidential, proprietary and trade secret information during the term of the agreement.

92.     The Greg Spires 2013 Sales Agent Agreement included a clause requiring him to "aggressively promote the sale of [GMS' products] in [his sales] Territory…."

93.     Commencing on or about October 2015, Spires joined with Westly to create HMC to be a company that they could use to directly compete with GMS while remaining, respectively, as an employee and sales agent of GMS.  On behalf of HMC, Westly and Spires began using GMS' proprietary information and trade secrets to build a catalog and sales kits for HMC, contact and build relationships with GMS' suppliers, and sell competing goods to GMS' customers.

94.     On January 6, 2017, Greg Spires signed an Independent Sales Agent Agreement with GMS which appointed him individually and his limited liability company, County Roads, LLC, of which he is the sole agent, as an independent, non-exclusive sales agent of GMS products in Oklahoma and Texas (the "Greg Spires 2017 Sales Agent Agreement"). The Greg Spires 2017 Sales Agent Agreement defines the Agent as "Country [sic] Roads, LLC (Greg Spires) (the "Agent")" and he signed it in his individual capacity, with his personal signature under the heading "AGENT:".

95.     Greg Spires assisted, cooperated and conspired with Westly to organize and create G&S to compete against GMS, and to solicit GMS' customers to buy competitive products from G&S and solicit GMS' sales agents who are named as Defendants herein to sell competitive products for G&S.  Greg Spires has also used his status as a veteran to falsely portray G&S as a veteran owned business. As part of the mandatory sams.gov website registration, G&S and its cage code are listed as a veteran-owned business. Wesley has no past service with the US government.

96.     For approximately three and one-half (3 1/2) years, from in or about October  2015 to April 3, 2019, when he was terminated as a GMS sales agent for cause, and continuing thereafter, in combination with, and with the aid and assistance of, Westly and the other Defendants, Greg Spires, individually, and as agent for County Roads, LLC, clandestinely, in violation of his and its contractual duties,

a.     participated with Westly in the creation and organization of HMC and G&S and worked with Westly and the other Defendants to have HMC and G&S solicit GMS' customers and sales representatives;

b.     used and disclosed GMS' Trade Secrets to solicit GMS' customers, serving as a duel agent soliciting GMS' customers for HMC and G&S sales, and selling GMS', HMC's, and G&S' products to GMS' customers;

c.     solicited GMS' sales representatives, including his son, Gregory S. Spires, to join with he and Westly at G&S, to take customers and sales away from GMS for his and their personal benefit;

d.     misrepresented to GMS' customers that G&S was a sister company of GMS; and

e.     disregarded his on-going duty for one year after termination of his sales agent position with GMS to not solicit GMS customers, and continues to solicit GMS customers and sell them competitive products, thereby causing GMS both monetary damages and irreparable damages, including the permanent loss of customers and the loss of GMS' goodwill.

97.     Before April 1, 2019, neither Greer nor Spires ever told Gary or Rachel Gorken about G&S.

98.     Spires/County Roads was the only individual selling G&S goods at Fort Sill.

99.     Spires/County Roads sold products for G&S at Fort Bliss.

100.     Westly Greer recruited Gregory K. Spires to serve as a sales agent for GMS.

101.     Spires sought from Greer the knowledge about how to print shipping labels, a process only performed by GMS employees, so that he could be more useful for G&S.

102.     GMS paid for a vacation for Gregory K. Spires to Mexico in 2018.

103.    GMS paid Spires $296,534.10 in commission between June 22, 2017 and April 03, 2017.

**Sabrina Greer/Greer Group, LLC**

104.    On or about May 13, 2013, Sabrina Greer, then Sabrina Stricklin and living in Missouri, joined the GMS sales team by signing a Sales Agent Agreement which appointed her as an independent, non-exclusive sales agent of GMS products in Missouri (the "Sabrina Greer 2013 Sales Agent Agreement"). The Sabrina Greer 2013 Sales Agent Agreement included a nondisclosure provision at paragraph 13. intended to protect GMS' confidential, proprietary and trade secret information by which Sabrina Greer agreed not to disclose or use for personal gain any of GMS' confidential, proprietary and trade secret information during the term of the agreement.

105.    In 2013, Sabrina Strickland married Westly Greer.

106.    On or about May 27, 2015, Sabrina Greer, then married to Westly and living in Colorado, signed a Sales Agent Agreement which appointed her as an independent, non-exclusive sales agent of GMS products in Colorado (the "Sabrina Greer 2015 Sales Agent Agreement"). The Sabrina Greer 2015 Sales Agent Agreement included a nondisclosure provision at paragraph 13. intended to protect GMS' confidential, proprietary and trade secret information by which Sabrina Greer agreed not to disclose or use for personal gain any of GMS' confidential, proprietary and trade secret information during the term of the agreement.

107.    On January 10, 2017, Sabrina Greer signed an Independent Sales Agent Agreement with GMS which appointed her individually and her limited liability company, Greer Group, LLC, of which she is the sole agent, as an independent, non-exclusive sales agent of GMS products in Colorado (the "Sabrina Greer 2017 Sales Agent Agreement"). The Sabrina Greer 2017 Sales Agent

Agreement defines the Agent as "Greer Group, LLC (Sabrina Greer) (the "Agent")" and she signed it in her individual capacity, with her personal signature under the heading "AGENT:"

108.    Sabrina Greer assisted and conspired with Westly to organize and create G&S to compete against GMS, and to solicit GMS' customers to buy competitive products from G&S and solicit GMS' sales agents who are named as Defendants herein to sell competitive products for G&S.

109.    For approximately three and one-half (3 1/2) years, from in or about June 2017 to April 3, 2019, when she was terminated as a GMS sales agent for cause, and continuing thereafter, in combination with, and with the aid and assistance of, Westly and the other Defendants, Sabrina Greer, individually, and as agent for Greer Group, LLC, clandestinely, in violation of her and its contractual duties.

a.    participated with Westly in the creation and organization of HMC and G&S and worked with Westly and the other Defendants to have HMC and G&S solicit GMS' customers and sales representatives;

b.    used and disclosed GMS' Trade Secrets to solicit GMS' customers, serving as a duel agent soliciting GMS' customers for HMC and G&S sales, and selling GMS', HMC's, and G&S' products to GMS' customers;

c.    solicited GMS' sales representatives to join with she and Westly at G&S, to take customers and sales away from GMS for her and their personal benefit;

d.    misrepresented to GMS' customers that G&S was a sister company of GMS; and

e.      disregarded her on-going duty for one year after termination of her sales agent position with GMS to not solicit GMS customers, and continues to solicit GMS customers and sell them competitive products.

110.    Westly Greer recruited Sabrina Strickland for a sales agent position with GMS.

111.    Sabrina Greer often made sales calls with Greer to customers.

112.    Sabrina Greer understood that to "aggressively promote" the sale of GMS products meant to use her "best efforts" and to not sell competing products.

113.    After becoming a sales agent for G&S, Sabrina Greer made sales calls by showing both the GMS catalog and the G&S catalog to customers.

114.    Sabrina Greer attended the company vacation to Mexico in 2018.

115.    GMS paid for Westly Greer to take a vacation to Mexico in 2018.

116.    Sabrina Greer worked with G&S from no later than August 22, 2017 through the dissolution of G&S in 2019.

117.    Sabrina Greer never discussed her involvement with G&S with Rachel or Gary Gorken.

118.    GMS paid Sabrina Greer $182,013.57 in commissions between August 21, 2017 and April 03, 2019.

**<u>Michael Welton</u>**

119.    On or about June 15, 2016, Welton joined the GMS sales team by signing an Independent Sales Agent Agreement which appointed him as an independent, non-exclusive sales agent of GMS products in Texas (the "Welton 2016 Sales Agent Agreement"). The Welton 2016 Sales Agent Agreement defines the Agent as "Michael Welton (the "Agent")" and he signed it in his individual capacity, with his personal signature under the heading "AGENT:"

120.    Welton assisted, cooperated and conspired with Westly to organize and create G&S to compete against GMS, and to solicit GMS' customers to buy competitive products from G&S and solicit GMS' sales agents who are named as Defendants herein to sell competitive products for G&S.

121.    On or about April 1, 2019, Welton signed a Statutory Employee Agreement which appointed him as an independent, non-exclusive sales agent of GMS products (the "Welton 2019 Sales Agent Agreement").

85.    From in or about February 2018 to April 3, 2019, when he was terminated as a GMS sales agent for cause, and continuing thereafter, in combination with, and with the aid and assistance of, Westly and the other Defendants, Welton clandestinely, in violation of his contractual duties,

    a.    participated with Westly in the creation and organization of G&S and worked with Westly and the other Defendants to have G&S solicit GMS' customers and sales representatives;

    b.    used and disclosed GMS' Trade Secrets to solicit GMS' customers, serving as a duel agent soliciting GMS' customers for G&S sales, and selling GMS' and G&S' products to GMS' customers;

    c.    solicited GMS' sales representatives to join with he and Westly at G&S, to take customers and sales away from GMS for his and their personal benefit;

    d.    misrepresented to GMS' customers that G&S was a sister company of GMS; and

e.      disregarded his on-going duty for one year after termination of his sales agent position with GMS to not solicit GMS customers, and continues to solicit GMS customers and sell them competitive products.

86.      On June 15, 2016, Welton signed a sales agent agreement with GMS to "aggressively promote" the sale of products in Texas. Welton understood language in the sales agent agreements requiring him to "aggressively promote" the sales of GMS products to mean he had to use his best efforts to aggressively promote sales for GMS.

87.      Greer and Howard Barlow first introduced Welton to the GMS business model.

88.      Welton had no knowledge of the customer base for GMS before he was hired and trained by Greer.

89.      Welton made his first sale for G&S in February 2018.

90.      Welton was the only individual selling G&S goods at Fort Hood.

91.      Welton began emailing G&S catalogs to customers "very soon after" starting with G&S.

92.      After joining Greer and Spires to make sales for G&S, Welton would use GMS sales calls as the means to introduce G&S and to offer its products for sale.

93.      Welton conducted sales calls knowing the customers he contacted would place the orders using either the GMS or G&S catalogs.

94.      Before April 1, 2019, Welton chose to never tell Gary or Rachel Gorken about G&S.

95.      Welton understood from his conversations with Greer that he should not tell Gary Gorken about the existence of G&S.

96.     GMS paid Welton $58,545.60 in commissions between March 1, 2018 and April 03, 2019.

**Thomas Hayes**

97.     On or about June 27, 2016, Hayes joined the GMS sales team by signing an Independent Sales Agent Agreement which appointed him as an independent, non-exclusive sales agent of GMS products in Louisiana (the "Hayes 2016 Sales Agent Agreement"). The Hayes 2016 Sales Agent Agreement defines the Agent as "Thomas Hayes (the "Agent")" and he signed it in his individual capacity, with his personal signature under the heading "AGENT:"

98.     Hayes assisted, cooperated and conspired with Westly to organize and create G&S to compete against GMS, and to solicit GMS' customers to buy competitive products from G&S and solicit GMS' sales agents who are named as Defendants herein to sell competitive products for G&S.

99.     For approximately two (2) years, from in or about June 2017 to April 3, 2019, when he was terminated as a GMS sales agent for cause, and continuing thereafter, in combination with, and with the aid and assistance of, Westly and the other Defendants, Hayes clandestinely, in violation of his contractual duties,

         a.      participated with Westly in the creation and organization of G&S and worked with Westly and the other Defendants to have G&S solicit GMS' customers and sales representatives;

         b.      used and disclosed GMS' Trade Secrets to solicit GMS' customers, serving as a duel agent soliciting GMS' customers for G&S, and selling GMS' and G&S' products to GMS' customers;

      c.      solicited GMS' sales representatives to join with he and Westly at G&S, to take customers and sales away from GMS for his and their personal benefit;

      d.      misrepresented to GMS' customers that G&S was a sister company of GMS; and

      e.      disregarded his on-going duty for one year after termination of his sales agent position with GMS to not solicit GMS customers, and continues to solicit GMS customers and sell them competitive products.

100.    When Hayes signed his sales agent agreement with GMS, Greer became his sales manager.

101.    Howard Barlow first trained Hayes how GMS talked to customers.

102.    Greer instructed Hayes not to sell CCPN products for GMS in October or November of 2018.

103.    Hayes first learned about G&S from Greer during a sales call trip with Greer in December of 2018.

104.    Hayes received his first G&S product catalog from Greer in December 2018 during a joint sales call trip.

105.    Hayes first began promoting sales for G&S in December 2018.

106.    Hayes chose to sell goods for G&S while he was a sales agent for GMS.

107.    Hayes did not tell Rachel or Gary Gorken about G&S before April 1, 2019.

108.    Hayes had sold CCPN products for both GMS and G&S to Fort Polk before his termination by GMS.

109.    Hayes was the only individual selling G&S goods at Fort Polk.

110.    No later than May 7, 2019, Hayes understood GMS and G&S were competitors.

111.    Hayes relied upon a G&S product catalog and his tablet computer to make sales for G&S.

112.    GMS paid Hayes $12,087.78 in commissions between December 21, 2018 and April 03, 2019.

**WarTech Industries, LLC and G&S Supply, LLC**

113.    On August 30, 2019, this Court issued an order on Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction.  In that order, the Court required that Greer, Hayes, and Spires "change the name of their limited liability company, ''G&S Supply, LLC'… [and] provide the [C]ourt evidence that the new entity has been properly registered in the chosen states as of September 30, 2019…[and] that G&S Supply, LLC has been terminated as a corporate entity in all the states of its registration as of [that date]."

114.    G&S was dissolved by the State of Colorado on October 1, 2019.

115.    In order to comply with the Court's Order, Westly, Spires, and Hayes created WarTech and incorporated the company in the State of Louisiana on August 2, 2019.  They each own and operate the company through other corporate entities they own and control.

116.    WarTech has continued the business of G&S and is its successor corporation.

**Damages**

117.    GMS is entitled to the following damages:

     a. Lost Profits in the amount of $195,872.95 recoverable by operation of business conspiracy, trade secret misappropriation and breach of contract.
     b. Unjust enrichment damages in the amount of $592,074 recoverable by operation of VUTSA and DETSA.
     c. Duty of loyalty damages in the amount of $422,816.67 recoverable by operation of court's ruling.
     d.  Breach of contract damages in the amount of $549,181.05 for paid commissions.

e. Trebling of lost profits and unjust enrichment in the amount of $2,363,840.85 as allowed by operation of business conspiracy statute.

f. Punitive damages in the amount of $350,000 for defendants' willful misappropriation of trade secrets and as allowed by statute.

g.  Spoliation awarded by Court for fees and costs incurred in connection with Spoliation Motion in the total amount of almost $250,000.00, to be submitted to Court on May 13, 2022.

h.   TOTAL DAMAGES $3,935,838.57, Plus appropriate attorneys' fees and costs of as allowed by statute.

118.    GMS reviewed G&S sales to determine its lost profits.

119.    GMS determined what sales G&S made that GMS could have made, in part, by using G&S catalogs and GMS catalogs.

120.    GMS subtracted its product costs from the lower sales price from G&S or GMS to determine its lost profits.

**<u>All Defendants</u>**

121.    GMS performed all duties required by its contracts with the Defendants.

122.    G&S sold the same or similar products as GMS to the same customers as GMS.

123.    The Defendants committed the first material breach of the relevant contracts.

124.    The language in the contract requiring the Defendants to aggressively promote required them to use their best efforts.

125.    From June 2017 through April 2019, GMS was consistently selling CCPN items.

126.    GMS' Trade Secrets were disclosed to the individual Defendants, and their respective Defendant limited liability companies other than HMC and G&S, while in a confidential relationship with GMS, and for a nearly three and one-half (3 1/2) year period from in or about October 2015, when they created HMC, through April 3, 2019, when they were terminated from GMS, while the individual Defendants were surreptitiously acting as undisclosed dual agents of HMC and G&S, companies formed and used by Defendants to compete against GMS while the

Defendants were employed by, or under sales agent agreements with, GMS. The Defendant's use of GMS' Trade Secrets is causing injury to GMS.

127.    Defendants other than G&S concealed from GMS several material facts:

a.      that in October 2015, Westly, then an employee of GMS, along with Greg Spires, then an independent sales agent of GMS, formed a plan to establish a competing industrial supply business to sell the same or similar products to GMS' customers;

b.      That on October 22, 2015, Spires, with the consent and assistance of Westly, formed and incorporated HMC as a competing company to GMS and thereafter, until the formation of G&S as described herein, Spire, Westly, and Sabrina Greer used HMC to sell the same or similar products to GMS' customers to GMS' detriment.

c.      That on June 22, 2017, Westly, with the consent and assistance of Greg Spires, formed G&S as a competing company to GMS and thereafter, to present, the Defendants other than G&S used G&S to sell the same or similar products to GMS' customers, to GMS' detriment;

d.      that Defendants were all irretrievably committed to, and agreed to, keeping the plan, and all sales activities in accordance with the plan, secret from GMS, while remaining in the duel employment and/or independent sales agent capacity at GMS, with the purpose and intent of generating as much revenue as they could for themselves while serving in the capacity as sales agents for HMC and G&S, soliciting away GMS' customers to HMC and G&S; and

e.      that Westly and the other Defendants other than HMC and G&S had misappropriated GMS' Trade Secrets and has implemented them in HMC and G&S' new competing businesses, and were using GMS' Trade Secrets to compete against GMS.

f.      The fiduciary duty of loyalty that Westly owed to GMS included a duty of disclosure, but Westly intentionally and knowingly concealed these material facts even as he knew that GMS was acting upon the assumption that these facts did not exist.

128.    Defendants other than HMC and G&S were conscious of their conduct in intentionally concealing the foregoing facts from GMS, and conscious from his knowledge of existing conditions and GMS' business, that injury to GMS would result from such Defendants'

129.    The Defendants, individually, and in their capacity as agents for HMC and G&S, had no authority to access GMS' computer server system, computer networks, computer programs and software to make unauthorized copies of, or use, GMS' confidential, proprietary and Trade Secret information for purposes of using it in a competitive business, such as G&S, which they did.

130.    Since GMS changed its name in October 2007 and began operating and marketing goods as "GMS Industrial Supply, Inc.," it used and the acronym "GMS" to identify itself in the marketplace, and since that time, GMS has continuously used its GMS trade name and mark (collectively, "trademark") in the marketplace. GMS has sold $67,200,000, worth of product to GMS customers using that trademark from October 2007 to April 30, 2019.

131.    GMS began marketing and selling supply goods to military bases in the in the following states and at the following dates using the GMS trademark: Oklahoma in 2011; Texas in 2012; Colorado in 2015; New York in 2015; and Louisiana in 2016.

132.    GMS has used the GMS trademark continuously in these states since October 2007 to refer to its brand of industrial supplies, and has extensively marketed its goods under the GMS trademark to its military customers in these States, as well as and in Japan and Europe. GMS prominently displays such trademark on its marketing materials, catalogues, stationary, e-mails,

website, sales personnel clothing and correspondence, and the trademark is well-known within the procurement community of military bases located within each of these States.

133.    GMS prides itself on its quality industrial goods and customer service and expends considerable time and effort in marketing and advertising to cultivate the goodwill and reputation that it has developed with its clients.

134.    As part of its promotion and advertisement of its products and services, GMS has used the GMS trademark continuously in DLA, GSA and Department of Defense sales and marketing to identify its industrial supply products for more almost 12 years.  During that time, the GMS trademark has become imbued with goodwill and renown, which is exclusively associated with GMS, and has become famous in the DLA, GSA and Department of Defense industrial product market.

135.    GMS has extensively advertised using its trademark to customers and potential customers, including by doing the following:

   a.      Creating catalogues containing GMS industrial products and product kits, with some materials and products acquired from confidential suppliers and maintaining a sales force who are trained to market to these customers using the GMS catalogues;
   b.      Maintaining a website designed to market GMS' industrial products its client and potential clients;
   c.      Creating, distributing, and maintaining a free web application that allows customers to review and purchase GMS industrial products directly;
   d.      E-mail links to product purchase websites and catalogues.

136.    In October 2015, Spires and Westly created HMC as a vehicle to directly compete against GMS.  Despite the months of effort put forth by Spires and Westly to market and sell goods through HMC they suddenly abandoned the company name, created an entirely new company under the name "G&S," and transferred $5,000 of assets from HMC to GMS.

137.    G&S began operating in 2017, and its founders were at that time Plaintiffs' employees or independent sales agents.  At that time and at all times since, Defendants have

misappropriated the GMS trademark by using the infringing designation "G&S" (the "Infringing Designation) in the marketplace.

138.    Defendants' market and sell industrial products similar, and in some cases identical, to those sold by GMS.  As part of its marketing, Defendant G&S and its Defendant sales agents fraudulently informed GMS' customers that the two organizations were "sister companies."

139.    Defendants operated and marketed goods similar to those marketed by GMS under the Infringing Designation that was and is intended to be similar to the GMS trademark, and has done so as to confuse potential customers into thinking that Defendant is GMS or is otherwise affiliated with GMS.

140.    Defendants have used the G&S designation to market its competing industrial products to the same client base as GMS in the states of Colorado, Louisiana, New York, Oklahoma, and Texas, and through the AESIP portal.  Defendants have marketed G&S products using the G&S designation through catalogues similar to those used by GMS.  In its catalogues, Defendant G&S' products that not only be identical to those marketed in GMS', but which contain the same product identification numbers.

141.    Defendants chose the Infringing Designation to confuse and deceive GMS' customers that their products were associated with, approved by, or sponsored by GMS.

142.    While working as employees or contractors of GMS, the Sales Agent Defendants marketed products from both GMS and G&S to GMS' clients, which was intended to further confuse GMS' clients into believing that Defendant G&S' products were the same as or affiliated with GMS' products.

143.    Defendants' activities have and continue to create confusion among customers and potential customers of GMS, thus depriving GMS of the business opportunities and sales that otherwise should have benefitted it.

144.    The products offered by Defendants in connection with the Infringing Designation are highly similar to and directly competitive with the products offered by GMS under its GMS trademark, except in those instances when the sell products that violate the TAA.

145.    GMS has no association, affiliation, sponsorship, or any other connection to Defendant G&S.

146.    Customers of GMS are experiencing actual confusion caused by Defendants' use of the Infringing Mark, including, among others, the following instances:

a.      On January 10, 2019, GMS sales agent Amber Wenrick, a GMS sales agent, received an emailed order from a GMS customer that contained requests for materials he thought were being purchased from GMS, but used Defendant G&S' product numbers for nine (9) of the eleven items being ordered.  The G&S products were designated by the same numerals, but preceded with "GS" instead of GMS, demonstrating the customers' confusion between the two companies and their products;

b.      On May 19, 2019, GMS sales agent Greg Naschansky visited a GMS customer at Fort Polk in Louisiana on a sales call.  While there, the Army procurement officer stated that one of GMS' salespersons, referring to Thomas Hayes, who had been terminated by GMS on April 3, 2019, due to his sales made on behalf of G&S, had visited with him the day before. Further discussion revealed that it was a G&S salesperson who had visited, and the procurement officer was confused with the difference between GMS and G&S, believing they were sister companies.

147.    Defendants' use in commerce of the Infringing Designation on and in connection with the sale of its products, without permission or consent of GMS, has caused and is likely to cause confusion, or to cause mistake, or to deceive and mislead customers and potential customers as to the origin, source, sponsorship or approval of Defendants' products and commercial activities, or to believe that Defendants' products and services are associated with, authorized, sponsored or supported by GMS, all in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

148.    Defendants know or should have known of GMS' ownership of the GMS trademark and its use of the GMS trademark in the marketplace at all times herein, and the aforesaid infringement by Defendants was committed willfully, knowingly, maliciously, and in conscious disregard of GMS' rights.

149.    Defendant has not registered the Infringing Mark or any similar trademark with the United States Patent and Trademark office.

150.    By making unauthorized use, in interstate commerce, of the GMS trademark, by actively and directly misrepresenting to customers of GMS that G&S is a "sister company" of GMS, and by using the same or similar product invoice numbers and images of GMS on their own products, the Defendants have used a "false designation of origin" that is likely to cause confusion, mistake or deception as to the affiliation or connection of the Defendants with GMS and as to the origin, sponsorship, association or approval of the Defendants' services and goods by GMS, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

151.    Defendants are knowingly and intentionally misrepresenting and falsely designating to GMS' customers and potential customers the affiliation, connection, association, origin, source, endorsement, sponsorship, and approval of Defendants' products so as to create a

likelihood of confusion by the public as to the affiliation, connection, association, origin, source endorsement, sponsorship, and approval of Defendants' products.

152.    Through its palming off of GMS' products, the Defendants have willfully misappropriated and trade off of the strength and goodwill associated with GMS' trademarks for its inferior products.  In doing so, Defendants harm GMS' goodwill and misappropriate its business opportunities.

153.    The Defendants' sold infringing products and misrepresented that its products were the products of GMS which was willful and intentional.

154.    GMS could sell non-NSN products, competitive to those sold by G&S through FedMall and credit card sales.

155.    The defendant sales agents did not submit records to GMS for the commissions claimed in the their counterclaims until after their termination from GMS.

2)   Defendant's factual contentions are as follows:

1.   As independent non-exclusive sales agents, Defendants Westly Greer, Thomas Hayes, Gregory K. Spires, Sabrina Greer and Mike Welton owed GMS no legal duties other than those specifically set forth in their Independent Sales Agent Agreements.

2.   From 2015 through April 3, 2019, GMS concentrated on NSN kit sales and discouraged its sales agents to sell individual CCPNs.  G&S sold only CCPN products during its existence; it was not authorized to sell NSNs.

3.   Since its inception in 2007, GMS has permitted G Cubed to operate and sell products to the military which could be sold by GMS.  For at least the last several years GMS

has also permitted two of its competitors, Grainger and Coastal Products, to sell products through GMS, depriving GMS's sales agents of commissions.

4.   GMS's employees and officers were aware of G&S Supply and its operations by 2018.

5.   Neither GMS nor G&S manufactured any of the goods they sold from 2017 through 2019.

6.   GMS cannot identify what trade secrets and/or proprietary information Defendants misappropriated and used to further their own interests.

7.   GMS had record financial years in 2019 and 2020, after it terminated its Agreements with the individual Defendants.

8.   Defendants Westly Greer, Thomas Hayes and Gregory K. Spires were among GMS's very best producers in 2017 and 2018.

## VI.    Triable Issues

1)   Plaintiff's triable issues are as follows:

Duty of Loyalty

1.   Did any of the defendants breach their common law duty of loyalty to GMS Industrial by selling competing products on behalf of HMC or G&S Supply?

2.   Did any of the defendants breach their contractual duty of loyalty to GMS Industrial by selling competing products on behalf of HMC or G&S Supply?

3.   Did Westly Greer directly compete with GMS Industrial while still employed by the company?

4.  Did any of the defendants breach their common law or contractual duty of loyalty to GMS Industrial by misappropriating the company's trade secrets?

5.  Did any of the defendants breach their common law or contractual duty of loyalty to GMS Industrial by misusing the company's confidential information?

6.  Did Sabrina Greer, Gregory K. Spires, Thomas Hayes, or Michael Welton directly compete with GMS Industrial while under contract with GMS Industrial as a sales agent?

7.  Did any of the defendants take any other action that breached their common law or contractual duty of loyalty to GMS Industrial?

8.  How much was GMS Industrial damaged by each individual's breach of their duty of loyalty?

<u>Breach of Employment Agreement (Westly Greer)</u>

9.  Did Westly Greer breach his 2012 Employment Agreement with GMS Industrial?

10. Did Westly Greer breach his 2019 Sales Agent Agreement with GMS Industrial?

11. How much was GMS Industrial damaged by Westly Greer's breach of his 2012 Employment Agreement?

12. How much was GMS Industrial damaged by Westly Greer's breach of his 2019 Sales Agent Agreement?

<u>Breach of Sales Agent Agreement</u> (All but Westly Greer and G&S Supply)

13. Did Westly Greer, Sabrina Greer, Gregory K. Spires, Thomas Hayes, or Michael Welton fail to "aggressively promote" GMS Industrial's goods and services by selling competing goods while still under a sales agent agreement with GMS Industrial?

14. Did Westly Greer, Sabrina Greer, Gregory K. Spires, Thomas Hayes, or Michael Welton, either individually or through a third-party company, breach any of their Sales Agent Agreements with GMS Industrial?

15. How much was GMS Industrial damaged by Westly Greer, Sabrina Greer, Gregory K. Spires, Thomas Hayes, or Michael Welton's breach of each respective sales agent agreements?

16. Did Sabrina Greer, Gregory K. Spires, Thomas Hayes, or Michael Welton directly compete with GMS Industrial while under contract with GMS Industrial as a sales agent?

Misappropriation under the Defend Trade Secrets Act

17. Did any defendant improperly acquire, use, or disclose any of GMS Industrial's financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes?

18. If so, did that acquisition, use, or disclosure implicate interstate or foreign commerce?

19. How much was GMS Industrial damaged by each defendant's misappropriation of its trade secrets under the Defend Trade Secrets Act?

20. Did any defendant willfully and maliciously or in bad faith misappropriate GMS Industrial's trade secrets?

Misappropriation under the Uniform Trade Secrets Act

21. Did any defendant acquire a trade secret of GMS Industrial by an improper means?

22. Did any defendant disclose or use a trade secret of GMS Industrial without the company's consent?

23. What, if any, trade secrets did each defendant misappropriate?

24. Did any defendant disclose a trade secret of GMS Industrial that was derived from or through a person who used improper means to acquire it?

25. Did any defendant disclose a trade secret of GMS Industrial that was acquired under circumstances giving rise to a duty to maintain its secrecy?

26. Did any defendant disclose a trade secret of GMS Industrial that was derived from or through a person who owed a duty to GMS Industrial to maintain its secrecy or limit its use?

27. Did any defendant disclose a trade secret of GMS Industrial that was acquired by mistake?

28. Did any defendant misappropriate information from GMS Industrial that derived independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use?

29. Did any defendant misappropriate information from GMS Industrial that was the subject of efforts by the company that were reasonable under the circumstances to maintain its secrecy?

30. How much was GMS Industrial damaged by each defendant's misappropriation of its trade secrets under the Uniform Trade Secrets Act?

31. Did any defendant willfully and maliciously or in bad faith misappropriate GMS Industrial's trade secrets?

Federal Computer Fraud and Abuse Act

32. Did Westly or G&S Supply intentionally accesses a computer of GMS Industrial without authorization or exceed authorized access, and thereby obtain information from any protected computer in violation of 18 U.S.C. § 1030(a)(2)(C)?

33. Did Westly Greer or G&S Supply knowingly and with intent to defraud, accesses a protected computer of GMS Industrial without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, in violation of 18 U.S.C. § 1030(a)(4)?

34. Did Westly Greer or G&S Supply intentionally accesses a protected computer of GMS Industrial without authorization, and as a result of such conduct, recklessly causes damage[,] or . . . causes damage and loss," in violation of § 1030(a)(5)(B)-(C)?

35. How much was GMS Industrial damaged by Westly Greer and G&S Industrial's violation of the Federal Computer Fraud and Abuse Act?

Virginia Computer Crimes Act

36. Did any defendant use a computer or computer network of GMS Industrial without authority and with the intent to obtain property or services by false pretenses; embezzle or commit larceny; or convert the property of GMS Industrial?

37. How much was GMS Industrial damaged by defendants' violation of the Virginia Computer Crimes Act?

Business Conspiracy in Violation of Va. Code § 18.2-499

38. Did any two or more of the defendants combine, associate, agree, mutually undertake or concert together for the purpose of willfully and maliciously injuring GMS Industrial by any means whatever?

39. Has Plaintiff proven with clear and convincing evidence that the defendants acted with legal malice, that is, proof that the defendants acted intentionally, purposefully, and without lawful justification, and that such actions injured the plaintiff's business?

40. Has Plaintiff proven that two or more defendants acted together to harm GMS Industrial by breaching their fiduciary duty or assisting someone to breach their fiduciary duty?

41. How much has GMS Industrial been damaged by the defendant's violations of Va. Code § 18.2-499?

42. Did any two or more defendants mutually undertake or concert together for the purpose of willfully and maliciously injuring the reputation, trade, or business of GMS Industrial by any means whatever?

<u>Common Law Conspiracy</u>

43. Did any two or more defendants combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means?

44. If so, how much has GMS Industrial been damaged by the defendant's concerted actions?

<u>Trademark Infringement</u>

45. Has GMS Industrial proven that it owns a valid mark?

46. Has GMS Industrial proven that defendants used its mark in commerce without its authorization?

47. Has GMS Industrial proven that any defendant used its mark (or an imitation of it) in connection with the sale, offering for sale, distribution, or advertising of goods or services?

48. Has GMS Industrial proven that any defendant's use of its mark is likely to confuse consumers?

49. How much has GMS Industrial been damaged by the defendants' infringement of its trademark?

<u>Trade Dress Infringement</u>

50. Has any defendant, in connection with any goods or services, used in commerce any word or name or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation,

connection, or association of G&S Supply with GMS Industrial, or as to the origin, sponsorship, or approval of G&S Supply's goods, services, or commercial activities by GMS Industrial?

51. Has plaintiff proven a claim for trade dress infringement, unfair competition, or false designation of origin?

52. Is GMS's trade dress primarily non-functional?

53. Is GMS's trade dress inherently distinctive or has acquired a secondary meaning to customers?

54. Did defendants infringement creates a likelihood of confusion among customers as to a product's source?

55. How much has GMS Industrial been damaged by the defendants' trade dress infringement, unfair competition, or false designation of origin?

Affirmative Defenses

56. Are the counterclaims of the defendants barred by the doctrine of estoppel?

57. Are the counterclaims of the defendants barred by the doctrine of waiver?

58. Are the counterclaims of the defendants barred by the doctrine of unclean hands?

59. Are the counterclaims of the defendants barred because the defendants committed the first material breach of their respective contracts with GMS Industrial?

60. Were the damages and actions complained of by defendants in their counterclaims caused by their own action or inaction?

Other Issues

61. While employed by or under contract with GMS Industrial, did defendants sell products that were the same or similar to products sold by GMS Industrial to customers or potential customers of GMS Industrial.

62. How has Plaintiffs ability to prove its claims been affected by the intentional spoliation of Westly Greer and G&S Supply?

63. Should GMS Industrial be awarded reasonable attorneys' fees and costs for claims upon which it has substantially prevailed?[3]

64. Should GMS Industrial receive permanent injunctive relief restraining defendants from misappropriating its trade secrets, infringing on its trademarks and trade dress, or disclosing the company's confidential information?

65. Did any of the defendants act willfully, maliciously, or in bad faith in violating any cause of action?

2) Defendant's triable issues are as follows:

1. Whether any Defendants committed their alleged tortious conduct in Virginia such as to permit a verdict on Counts V, VIII, X, and XI of Plaintiff's Third Amended Verified Complaint?

2. Whether Defendant Westly Greer breached his employment agreement with Plaintiff before he resigned from his employment in January, 2019; and, if so, how?

---

[3] The parties have agreed to bifurcate the matter and reserve any determination of attorneys' fees for after liability is determined.  The parties have filed a joint motion requesting bifurcation.

3.  Whether as an employee Defendant Westly Greer breached his duty of loyalty to Plaintiff before his resignation in January, 2019; and, if so, how?

4.  Whether any of the individual Defendants breached their Independent Sales Agent Agreements with Plaintiff and, if so, how?

5.  Whether Plaintiff has proven by a preponderance of the evidence that it had and made available to Defendants certain trade secrets and if so, what they were.  If Plaintiff has proven by a preponderance of the evidence such trade secrets, did it take reasonable means to protect them from improper use and misappropriation?

6.  Did any of the individual Defendants misappropriate and/or use for an improper purpose any of Plaintiff's trade secrets?

7.  Did Defendant Westly Greer violate the Federal Computer Fraud and Abuse Act by improperly copying and/or deleting GMS's trade secrets and/or proprietary information on a protected computer?

8.  Did Defendants commit trademark infringement as to GMS Industrial Supply, Inc. through their use of the name "G&S Supply?"

9.  Does Plaintiff have a protected trademark in the names "GMS Industrial Supply, Inc." and/or "GMS?"

10. Did Defendants infringe Plaintiff's trade dress or unfairly complete with Plaintiff by the use of the name "G&S Supply LLC" and/or in their sale of products for G&S?

11. Has GMS proven by a preponderance of the evidence that it lost to G&S Supply sales it would otherwise have made because of G&S Supply's misappropriation of trade secrets?

12. If GMS proved by a preponderance of the evidence that it suffered damages as a result of any of the Defendants misappropriation of its trade secrets, what damages is GMS entitled to receive as proximately caused by that misappropriation?

13. If GMS has proven by a preponderance of the evidence that Westly Greer breached his duty of loyalty, what damages is GMS entitled to receive for that breach?

14. What damages are Defendants Westly Greer, Sabrina Greer and Greer Group LLC entitled to on their counterclaim?

15. What damages are Defendants Gregory K. Spires and County Roads entitled to receive on their counterclaim?

16. What damages is Defendant Thomas Hayes entitled to receive on his counterclaim?

17. What damages is Defendant Mike Welton entitled to receive on his counterclaim?

Date:  May 12, 2022                    Respectfully submitted,
                                       **GMS Industrial Supply, Inc.**
                                       *By Counsel*


                                       */s/ Jeffrey D. Wilson*

William A. Lascara, Esq., VSB #23118
Thomas S. Berkley, Esq., VSB #40124
Jeffrey D. Wilson, Esq., VSB #75734
Jesse B. Gordon, Esq. VSB 68187
PENDER & COWARD, P.C.
222 Central Park Avenue #400
Virginia Beach, VA 23462
(757) 502-7326 Direct Dial
(757) 502-7372 Facsimile
wlascara@pendercoward.com
tberkley@pendercoward.com
jwilson@pendercoward.com
jgordon@pendercoward.com
Counsel for Plaintiff,
GMS Industrial Supply, Inc.


SEEN AND AGREED


**G&S SUPPLY, LLC, WESTLY L. GREER, SABRINA GREER, GREER GROUP, LLC, GREGORY K. SPIRES, COUNTY ROADS, LLC, THOMAS HAYES, MIKE WELTON, WARTECH INDUSTRIES, LLC AND HMC SUPPLY, LLC**


By: */s/ Robert W. McFarland*
Robert W. McFarland (VSB # 24021)
V. Kathleen Dougherty (VSB # 77294)
Micaylee A. Noreen (VSB # 92433)
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Ste. 9000
Norfolk, Virginia 23510
Phone:  (757) 640-3716
Fax:  (757) 640-3966
rmcfarland@mcguirewoods.com
vkdougherty@mcguirewoods.com

100

mnoreen@mcguirewoods.com

*Counsel for Defendants and Counterclaim Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2022, I filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all counsel of record, including the following:

Robert W. McFarland, Esquire
V. Kathleen Dougherty, Esquire
Micaylee A. Noreen, Esquire
McGuireWoods, LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, VA 23510
rmcfarland@mcguirewoods.com
vkdougherty@mcguirewoods.com
*Counsel for Defendants and Counterclaim*
*Plaintiffs G&S Supply, LLC, et al.*

_____/s/_____
William A. Lascara, Esq., VSB #23118
Thomas S. Berkley, Esq., VSB #40124
Jeffrey D. Wilson, Esq., VSB #75734
Jesse B. Gordon, Esq. VSB 68187
PENDER & COWARD, P.C.
222 Central Park Avenue #400
Virginia Beach, VA 23462
(757) 502-7326 Direct Dial
(757) 502-7372 Facsimile
wlascara@pendercoward.com
tberkley@pendercoward.com
jwilson@pendercoward.com
jgordon@pendercoward.com
*Counsel for Plaintiff,*
*GMS Industrial Supply, Inc.*