1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
 2                      Norfolk Division

 3

 4   - - - - - - - - - - - - - - - - - -
                                       )
 5   GMS INDUSTRIAL SUPPLY, INC.        )
                                       )
 6          Plaintiff,                  )   CIVIL ACTION NO.
                                       )   2:19cv324
 7   v.                                 )
                                       )
 8   G&S SUPPLY, LLC, et al,            )
                                       )
 9          Defendants.                 )
                                       )
10                                      )
     - - - - - - - - - - - - - - - - - -
11

12

13                  TRANSCRIPT OF PROCEEDINGS

14                      Norfolk, Virginia

15                      May 19, 2022

16

17   BEFORE:  THE HONORABLE RODERICK C. YOUNG
             United States District Judge
18

19

20   APPEARANCES:

21           PENDER & COWARD PC
             By:  William A. Lascara
22                Jeffrey Dennis Wilson
                  Jesse Brian Gordon
23                Daniel Berger
                  Counsel for Plaintiff
24
             McGuireWoods LLP
25           By:  Robert William McFarland
                  Micaylee Alexa Noreen
                  Counsel for Defendants
```

```
 1              (Hearing commenced at 1:49 p.m.)

 2              THE CLERK:  In the matter of civil case number

 3    2:19cv324, GMS Industrial Supply, Inc. versus G&S Supply,

 4    LLC, et al.  Plaintiff is represented by William Lascara,

 5    Jeffrey Wilson, Jesse Gordon, Daniel Berger.  And defendants

 6    are represented by Robert McFarland and Micaylee Noreen.

 7              Mr. Lascara, is plaintiff ready to proceed?

 8              MR. LASCARA:  We are.  Good afternoon.

 9              THE COURT:  Good afternoon.

10              THE CLERK:  And, Mr. McFarland, are defendants

11    ready to proceed?

12              MR. MCFARLAND:  Good afternoon, Your Honor.  The

13    defendants are ready.

14              THE COURT:  Good afternoon, everyone.

15              So, we are here for a final pretrial conference in

16    this matter.  We're going to -- I'm going to first deal with

17    some of your motions in limine.  We'll then talk about the

18    exhibits and the plan forward for that, and then I will talk

19    about how the trial is going to go.  So that's how we're

20    going to proceed today.

21              So, it's my understanding that you-all had a

22    settlement conference on May 17th, I guess a follow-up

23    settlement conference, and you weren't able to resolve it;

24    is that correct?

25              MR. LASCARA:  Yes, Your Honor.  Just this past
```

```
 1    week, we had a get-together, and we haven't gotten there
 2    yet.
 3              THE COURT:  Okay.  All right.
 4              Okay.  And you agree, Mr. McFarland?
 5              MR. MCFARLAND:  I do agree, Your Honor.  We had a
 6    conference with Judge Krask, and the parties have not
 7    reached a resolution.
 8              THE COURT:  Okay.  Very good.  All right.  Now, let
 9    me ask this, I guess, and I hadn't planned on asking this,
10    but is there any reason you can see that I need to call
11    Judge Krask to see if you-all can get back with him?  If
12    it's not, it's not, and I'm not pushing it, but just on the
13    way you kind of said things, "That we haven't gotten there
14    yet," that's why I'm asking.
15              We're still going to go forward with this today no
16    matter what you say, but...
17              MR. LASCARA:  Yes, Your Honor.  And we are still
18    hopeful that it could settle.  It wasn't possible with where
19    we ended up, but I did have some conversations with Judge
20    Krask and he, you know, gave me his assessment.  And I said,
21    you know, if we could get to that point, there is a chance
22    to settle.  So, we both agreed that it would be worthwhile
23    not to simply look forward only but, you know, to continue
24    keeping that option open.
25              THE COURT:  Right.  I guess I'm asking something
```

```
1    different.  So, I'm going to be in trial next week.  I guess
2    what I'm asking is:  Do I need to place a call to Judge
3    Krask to say, Hey, can you carve out some time for these
4    guys next week?  I don't want to waste anybody's time.  If I
5    don't need to do that, that's fine.  But they have got
6    really busy schedules.  So you just calling them might not
7    get it done.  But if I call them and say, Hey, these guys
8    really need to get back in, you know, he might be able to
9    carve out some time.  I'm not pushing it.  Again, I just
10   want to know where we are.
11            Mr. McFarland.
12            MR. MCFARLAND:  Your Honor, I think what might be
13   most productive, we left with a proposal that I don't think
14   was accepted, obviously, by the plaintiff, but if they want
15   to make a counter proposal and convey that to Judge Krask, I
16   think at this point the parties can work with him just by
17   telephone conference.
18            THE COURT:  Okay.
19            MR. MCFARLAND:  I think we both have the authority
20   of our clients and can interact that way as opposed to
21   trying to bring everyone together when there are more
22   schedules.  And then when he's got ten minutes, he can call
23   me and say, Hey, I've heard from Mr. Lascara, and he's
24   conveyed this offer, you know, get back to me with a
25   proposal or whatnot.  We can talk that way.
```

```
 1              THE COURT:  All right.

 2              MR. MCFARLAND:  It may be the most productive,

 3    efficient way.

 4              THE COURT:  Mr. Lascara, you agree?

 5              MR. LASCARA:  I have no objection with that

 6    approach.

 7              THE COURT:  Okay.  Very good.  All right.  So,

 8    we'll do that, and then I will leave that to you-all.

 9              So, I'm going to start with these motions in

10    limine.  So, the first one -- I'm going to start with

11    defendants' motions in limine first, and I'm going to take

12    them one at a time.

13              Defendants, I want to hear from the defendants on

14    the motion to exclude argument and evidence that the sales

15    agents owed GMS a duty of loyalty.

16              MR. MCFARLAND:  Thank you, Your Honor.  Good

17    afternoon.  Robert McFarland for the defendants.

18              And this motion, Your Honor, with respect to the

19    sales agent -- as the Court is aware, my clients, who are

20    sales agents, are essentially independent contractors.  They

21    are not employees of the plaintiff.  And so as this Court

22    noted in its denial of the plaintiff's motion for summary

23    judgment, any duties that they owe have to be expressed in

24    that sales agreement.  And there is no duty of loyalty in

25    that sale -- in the independent agent sales agreements.
```

1          And I'll note for the record, Your Honor, that
2     pretty much every agent's agreement is -- they're similar in
3     wording.  So it's not that one has some great difference of
4     duties than another.
5          I don't find any duty of loyalty in those sales
6     agreements.  And what we do note is that what the plaintiff
7     argues is, Well, we pled in the complaint this duty rather
8     vaguely about the sales agents.  There is a -- essentially
9     it's -- I may not remember the language exactly, but there
10    is a best efforts clause or a supposed to sell clause.
11    That's not a duty of loyalty.
12         The duty of loyalty that this Court noted with
13    respect to Defendant Greer is a duty that exists because he
14    was an employee for a period of time.  That's different.
15    And both Colorado law and Virginia law recognize that duty
16    of loyalty for an employee.
17         But there is no duty of loyalty.  Unless it's
18    expressed in that sales agreement, there is no duty of
19    loyalty for an independent sales agent.  And the fact that
20    plaintiff may have put in some vague language in the
21    complaint about duties doesn't create that duty of loyalty
22    in the contract.
23         I'll remind the Court that when this claim was
24    first raised by the plaintiff, they tried to argue to this
25    Court that it was an independent duty of loyalty that

1    existed under common law.  Well, that clearly isn't correct.
2    And so now they're trying to say that it exists in the sales
3    agreement, and it doesn't.

4            And there is -- when you read, moreover -- the
5    operative complaint here is the third amended complaint --
6    there is no claim specifically that the sales agents
7    breached any duty of loyalty.  It's not found there.  And we
8    can only defend the claims that have been properly pleaded
9    and that are recognized.  And that one, I think, since it's
10   got to be based on the sales agreement, which says that it's
11   governed by Virginia law, they have to be recognized by
12   Virginia law.  It's not recognized, Your Honor, and it's
13   something that should not be.

14           The prejudice is, is that if they get to make some
15   claim about a duty of loyalty for independent sales
16   agents -- and by the way, not only independent sales agents,
17   but non-exclusive sales agents.  My clients didn't have to
18   only sell GMS products.  They could have sold Laughton
19   products or STIHL products or whatever.  They didn't only
20   have to sell for GMS, which is one of the underlying issues
21   with respect to the G&S issue, but we leave that for another
22   day.

23           But, critically, if it's not in that sales
24   agreement, they shouldn't be up before the jury and trying
25   to argue that, oh, these sales agents, boy, they were

 1   disloyal.  They breached a duty of loyalty that isn't there.

 2   Now, we can get into the facts of what my clients did, and

 3   that's fine, but you can't create -- and I can see the

 4   prejudice right now to my clients in trying to create a duty

 5   of loyalty that does not legally exist.

 6            THE COURT:  Okay.  Thank you very much.

 7            All right.  Plaintiff.

 8            MR. GORDON:  Thank you, Your Honor.  Jesse Gordon

 9   here on behalf of the plaintiff to address the sales agent

10   duty of loyalty motion in limine filed by the defendants.

11            I want to start by saying this was already decided

12   by the Court in its memorandum opinion on GMS's motion for

13   partial summary judgment.  It held that there was no fraud

14   duty because it was precluded by the source of duty rule

15   because there was a source of duty in the contract to be

16   loyal.

17            The Court cited *Augusta Mutual* and *Owen versus*

18   *Shelton*.  And *Owen versus Shelton* is the closest case.  It

19   says that a real estate broker, a contractor, must act in

20   good faith related to its principal, and it said that that

21   duty is incorporated into every contract.  So it could be

22   a -- it doesn't need to be expressed.

23            But as defendants pointed out, it is expressed in

24   this contract "aggressively promote."  The contract says

25   they have a duty to aggressively promote.  Testified at

```
 1    depositions aggressively promote meant best efforts.  If you
 2    are aggressively promoting and using your best efforts to
 3    sell GMS products, then you can't be on that same sales call
 4    selling competing products.  So, it's expressed in the
 5    contract.  It can be implied under the law.
 6           So, the pleading, defendants raised that in our
 7    opposition we said it was pled.  Well, in the original
 8    motion in limine it claimed that this was something new,
 9    that it hadn't been brought to the Court's attention.  So,
10    that's when we went back and looked at the pleadings.  There
11    is no prejudice here that they weren't able to conduct
12    discovery.
13           In the first complaint, June of 2019, and the third
14    amended complaint, they both state the sales agent
15    defendants were under contracts with GMS that required their
16    loyalty, prohibited competitive conduct and solicitation of
17    GMS customers.  So, there is no claim that this is new.  It
18    was in both complaints.  It goes back to 2019.
19           And finally, Your Honor, we had this -- at the top
20    of the motion in limine, this is not a proper purpose for a
21    motion in limine.  This is essentially a motion for summary
22    judgment.  It's not an evidentiary decision that the Court
23    needs to make in advance of trial.  So, we would request on
24    those bases that the motion be denied and the evidence be
25    admitted of the duty of loyalty of the sales agent
```

1    defendants.

2              THE COURT:  All right.

3              Mr. McFarland, anything else on this?

4              MR. MCFARLAND:  Yes, Your Honor.

5              We agree that the language and the duty to

6    aggressively promote and what that means and what my clients

7    did, that's fair game.  But the duty of loyalty that they're

8    trying to create is otherwise nowhere to be found in the

9    sales agreement.  And we note that the allegations that had

10   to do with non-solicitation and confidentiality provisions

11   that supposedly the sales agents owed were dismissed and

12   dropped from the original complaint when the third amended

13   complaint was filed.  The only thing that is found in the

14   third amended complaint is that the sales agent defendants

15   failed to aggressively promote the sale of GMS products in

16   his/her territory as required by the sales agreements.

17   That's at paragraph 120 of the third amended complaint.

18   That's it.  That claim, again, we'll defend that.  That was

19   pled.  I think they're going to have a very difficult time

20   on it, since my clients were the leading sales agents for

21   this company, including after G&S was started, but that's

22   fine.  We will defend that.  That is pleaded.  What isn't

23   pleaded is this nebulous duty of loyalty that is for a sales

24   agent non-existent as compared to an actual employee, Your

25   Honor.

1          And we would ask that this is a proper motion in

2   limine, because otherwise the plaintiff is going to try and

3   create duties and make arguments about terrible things that

4   my clients did, when there is no legal basis for it, and the

5   jury shouldn't hear that.

6          THE COURT:  Okay.  Thank you very much.

7          I think it would have been best to have dealt with

8   this on a motion for summary judgment, but we'll deal with

9   it on a motion in limine.

10          So, I'm going to overrule the defendants' motion.

11   I think under the low threshold of relevancy under Rule 402

12   that it comes in, and not that it's not prejudicial.  I

13   mean, everything that is going to come in against both sides

14   is prejudicial.  It's whether the prejudice substantially

15   outweighs any probative value, and so, you know, based on

16   that -- and I don't find that that's the case.  So, based on

17   that, I'm going to overrule that motion.

18          All right.  So, defendants' second motion in limine

19   is to exclude testimony or argument about GMS witness Amber

20   Wenrick.  And so before I hear from you on that,

21   Mr. McFarland, is that the witness that you filed the motion

22   about last night about using the deposition?

23          MR. LASCARA:  Yes, Your Honor.

24          THE COURT:  Okay.

25          MR. LASCARA:  A full deposition was taken, and we

```
 1   did have agreements to present her through de bene esse
 2   deposition --
 3              THE COURT:  Yeah.
 4              MR. LASCARA:  -- for subsequent testimony.  Then
 5   she deployed, and then they filed this.
 6              THE COURT:  Okay.  Very good.
 7              All right, Mr. McFarland.  I'll hear from you.
 8              MR. MCFARLAND:  Thank you, Your Honor.  Actually,
 9   my colleague, Ms. Noreen, is going to argue that one, Your
10   Honor.
11              THE COURT:  Okay.  Very good.
12              MS. NOREEN:  Good afternoon, Your Honor.
13              THE COURT:  Good afternoon.
14              MS. NOREEN:  I think the first issue that this
15   Court needs to address that was raised in GMS's opposition
16   brief is which standard this should be resolved under.  I
17   don't see any significant difference between the standard
18   under Virginia law versus the standard under Federal Rule
19   604.  They both require that the witness be able to recall
20   things that should be within their personal knowledge.  And
21   in this case, Miss Wenrick does not have the capacity to
22   recall, which is required under both Virginia law for
23   competency and required under the Federal Rules for
24   competency, and I think that's pretty well laid out within
25   the briefing, Your Honor.
```

```
 1              THE COURT:  You said 604 or 601?
 2              MS. NOREEN:  I believe it's 604.  601, I apologize.
 3              THE COURT:  601?
 4              MS. NOREEN:  Yes, Your Honor.
 5              THE COURT:  That's what I thought.
 6              MS. NOREEN:  Yes, Your Honor.  I apologize for
 7      that.  Yes.
 8              THE COURT:  Looking at my evidence book just to
 9      make sure.  Go ahead.
10              MS. NOREEN:  It is 601.
11              And under both of those standards, again, a witness
12      must be able to have the capacity to recall and testify
13      truthfully about things within their personal knowledge, and
14      they have to have personal knowledge of that.
15              Miss Wenrick testified during her deposition that
16      she suffers from both short and long-term memory loss and
17      that she was seeking medical treatment for that.  And of
18      course, for HIPAA reasons we didn't probe further -- probe
19      her further on that issue.  But that comes after about
20      75 percent of her deposition had already been taken, and she
21      had indicated at the very beginning of her deposition that
22      there was nothing that would prevent her from testifying
23      fully and accurately.  And we learned that later that that
24      was not quite the case.
25              I think it's also worth noting --
```

1          THE COURT:  Did you cross her about her memory when

2    you were taking her deposition, when you had the deposition?

3          MS. NOREEN:  When we followed up with her -- and I

4    believe Your Honor has the deposition transcript, and

5    certainly you're more than welcome to look and see for

6    yourself, but about a little bit between halfway and

7    three-quarters of the way through her deposition, we stopped

8    the deposition and questioned her about her inability to

9    recall --

10          THE COURT:  Okay.

11          MS. NOREEN:  -- because it was so apparent that she

12   was having difficulty in that area.  So many of her

13   responses were that she could not recall.

14          THE COURT:  Okay.

15          MS. NOREEN:  And it was at that time, late in her

16   deposition, that she disclosed her short-term and long-term

17   memory loss.  And, again, for HIPAA reasons the questioning

18   on that issue was fairly brief about her medical history

19   related to that.

20          She was asked issues significant to this case and

21   many of which she could not recall were extremely important

22   and central to this case.  Whether or not she signed an

23   employment for GMS is a fundamental basic fact that she

24   should know.  Whether or not she got paid a bonus from G&S.

25   What types of sales she made for GMS.  These are all things

1    that she testified that she could not recall.

2         I will also note for the Court that before we were

3    aware of her memory loss, most of the questions were

4    phrased, Do you recall, ma'am?  And of course, if she

5    answers no to one of those questions, in hindsight we know

6    now that it could be that her answer is no because that is

7    the true and correct answer, or the answer is no because she

8    could not recall.

9         I think it's also worth noting for the Court the

10   case -- one of the cases that plaintiff had cited to,

11   *Turnbull*, I think is directly on point to this issue.  In

12   *Turnbull*, Mr. Tolley testified in court.  He testified to

13   significant facts around the same time of the issues at

14   issue in that case of events that had happened approximately

15   18 months before.  He testified extensively on direct

16   examination, the Court said.  And there were certain things

17   that he was not able to recall, and the Court voir dired him

18   on those issues and precluded his testimony further.  And I

19   think that is very similar to the circumstance we have here

20   and something that the Court should take very close note of.

21        There are significant issues with her testimony.

22   Certain things she could recall and, like in *Turnbull*,

23   certain things she could not recall, all things that are

24   extremely relevant and important to this case.  And, again,

25   like in *Turnbull*, the witness was presented with a document

JILL H. TRAIL, Official Court Reporter

1   that they had written and could not recall having penned,

2   and that is true with Ms. Wenrick's testimony.  She was

3   presented with text messages between her and one of the

4   defendants, and she couldn't recall ever having written,

5   received, or anything about those messages.  She was also

6   presented with notes of conversations that she had with the

7   plaintiff, and she couldn't recall any of those

8   conversations or details of those conversations.

9          And I think, Your Honor, in light of the

10  unavailability of the witness, that just makes her

11  deposition testimony even more prejudicial to the

12  defendants, because this Court, unlike in the *Turnbull* case,

13  is not going to have the opportunity to voir dire her or

14  question her further about the issues in this case.

15         Her testimony on many of the issues is questionable

16  at best.  There are many things that she cannot recall, and

17  she is not going to be questioned further, and I think that

18  creates a really big problem.  So we ask that this Court

19  exclude her testimony because she is not a competent

20  witness.

21         THE COURT:  All right.

22         MS. NOREEN:  Thank you, Your Honor.

23         THE COURT:  Thank you very much.

24         Plaintiff, I'll hear from you.

25         MR. LASCARA:  Yes, Bill Lascara for plaintiffs.

1              Your Honor, I think that, as we indicated in our
2    response, the key issue here is that she didn't admit that
3    she had a memory loss that was constant, that it was
4    irretrievable, that didn't allow her to recall.  So, the
5    first point I want to make is that they've stated
6    Miss Wenrick's memory loss prevents her from recalling
7    dates, numbers, faces, events, and details of events.  But
8    what she actually said was, "But, yes, I do have long-term"
9    -- this is a quote -- "But, yes, I do have long-term and
10   short-term memory loss, so that would prevent me from giving
11   you dates if I can't remember them.  It can prevent me from
12   dates, numbers, and details of events."
13             So, it is not a pervasive and all -- she never
14   testified it was pervasive or all encompassing short-term
15   and long-term memory loss.  And in fact that's proved by the
16   deposition transcript itself.  They gave an example.  I
17   think they took 110 times that they said she was, quote,
18   "either was unable to recall, or did not know the answer to
19   questions posed to her."  So they went through the
20   transcript, and they counted 110 times where she said either
21   I don't recall, or I do not know.  They haven't broken it
22   down.  I couldn't break it down by going through it.  So, we
23   know that the 110 times includes irrelevant information,
24   because if you don't know, you don't know.  It's not a
25   matter of recalling.  They gave 25 examples.  And, you know,

1    as we went through the examples, many of them were about

2    minute details that occurred over two years ago.

3            Now, I'm getting on in years, and I know that it's

4    difficult for me to remember whether I communicated with

5    someone in a phone call or a text message or email that

6    occurred two years ago, but in fact that's one of their

7    examples, and we cite that on page 7 of our brief.

8            The question that was asked was referring to an

9    answer by Miss Wenrick of "I don't recall."

10           Miss Wenrick was asked, quote, "How did you convey

11   that?  Did you call Miss Robichaux or email her?"

12           And she didn't recall, but it's because that

13   occurred over a long time ago.  So, many of these are de

14   minimus.

15           Probably more importantly, taking the scope,

16   because I believe, Your Honor, the jury that sits in that

17   jury panel are the best people to determine what credibility

18   to provide to this witness who may not recall everything.

19   But if you look at the questions that were asked, 709

20   questions, and 110 times, even if you assign all 110 times

21   as being "I don't recall" as opposed to "I don't know,"

22   that's still a recall rate of 84.5 percent.  And it's kind

23   of throwing the baby out with the bath.  You have a witness

24   who can answer 85 percent of the questions, and the jury can

25   determine whether those were credible answers, or because

1    she didn't answer the other 15 percent, they're not

2    credible.  And, again, I would assert that 15 percent is

3    probably a wrong number since that included "I don't recall"

4    and "I don't know."

5            There is really, I think, a clear motive here, Your

6    Honor.  She said some very damaging things to the

7    defendants' case.  And it will be demonstrated that her only

8    contact, her supervisor, the only person that ever

9    supervised her -- she was brand new to this field.  She had

10   never done this before.  And Westly Greer was the one that

11   taught her everything.  Westly Greer is the mastermind

12   behind all of this case, all of the hidden concepts.  And so

13   there is testimony in that transcript, and we mention this

14   in the brief, that he basically told her, Yeah, you can sell

15   for GMS.  These are NSNs.  And the sister company has non

16   NSNs, individual parts that don't come in these NSN form,

17   and those get sold through the sister company.  He then also

18   told her in the end, Well, if you think that they're going

19   to read your emails or texts, you should destroy them.

20   That's part of the transcript.  It's a text message.  It's

21   one of the exhibits to the transcript.  So there is some

22   very damaging information that she testifies about in there,

23   and I think that's the real reason that they are asking you

24   to keep a great deal of factual information away from the

25   jury.

1              The application of law, we do see that there is a

2     basis for the application of Virginia law, and there is a

3     slight difference under the Virginia law.  The standard is a

4     witness has the capacity to testify if he or she understands

5     the question posed, is able to formulate intelligent

6     responses, and understands his or her responsibility to tell

7     the truth.  That is a case, *Helge versus Carr*, 212 Va. 485,

8     a 1971 case.

9              There are comments in the Charles E. Friend, Law of

10    Evidence in Virginia that we cite where there is reference,

11    "A witness must understand the questions posed, be able to

12    formulate" --

13              THE REPORTER:  I'm sorry.

14              THE COURT:  You've got to slow down.  My court

15    reporter can't keep up with that.

16              MR. LASCARA:  I apologize.

17              THE REPORTER:  Thank you.

18              MR. LASCARA:  I started reading and that's...

19              So there is some indication that the ability to

20    recall is included in the Virginia standard.  So I'm not

21    sure there is a big difference there, but we believe that

22    clearly she meets both standards.  And we would ask, Your

23    Honor, that the jury in this case be the decision maker as

24    to her credibility and that this motion in limine be denied.

25              THE COURT:  All right.

1          Defense, Ms. Noreen, I'll give you the last word if
2    you want to add anything.
3          MS. NOREEN:  Thank you, Your Honor.
4          And I'll note for the Court that Miss Wenrick has
5    some testimony that's quite favorable to our side, but first
6    she needs to be competent to testify, and that's really what
7    is at issue here today.  Mr. Lascara cited to some
8    percentages and numbers, and, frankly, whether Miss Wenrick
9    stated specifically 110 times she didn't know or could not
10   recall doesn't quite encapsulate the breadth of her
11   testimony which indicates that she doesn't have any memory.
12         And I hate to go back to the *Turnbull* case, but in
13   that case, his testimony came two years after the events
14   that occurred, and he was unable to recall because of memory
15   loss, exactly the same issues and exactly the same period of
16   time at issue for Miss Wenrick.  And your inability to
17   recall if you have memory loss is affected, even --
18   especially over a period of time, whether that be
19   short-term, long-term, or both.
20         And I'll also note for the Court, or I guess remind
21   the Court from our briefing, that Miss Wenrick testified
22   that she couldn't recall things that had happened the week
23   before.  She couldn't recall what day of the week she had
24   prepared for her deposition, which is something, you know,
25   that certainly time isn't going to have quite as big an

```
1    effect on.  She was able to recall certain things from the
2    period of time specifically at issue in this case, but there
3    was plenty that she was not able to recall about that exact
4    same time period, and that's really the issue.  And the
5    Turnbull case speaks to that.
6           And her deposition testimony is more difficult, I
7    think is made more difficult to use that testimony because
8    she is not going to come to court, and she is not going to
9    testify live here based off of her memory now, and that
10   creates a significant problem.
11          The standard under Virginia law, just to touch on
12   that again for one moment, the Turnbull case, again, makes
13   it clear that the inability of a witness to recall testimony
14   falls within their ability to formulate intelligent
15   responses.  Under that standard, again, I think we largely
16   agree that the standards are the same, but under both
17   Federal Rule 601 and under the Virginia rules there must be
18   the ability to recall, and Miss Wenrick just simply does not
19   have that as a result of her medically diagnosed short and
20   long-term memory loss.  So we ask that she be precluded as
21   incompetent, Your Honor.
22          Thank you.
23          THE COURT:  All right.  Thank you.
24          All right.  I am going to overrule the motion.  I
25   did look at the testimony.  I did believe that you have
```

1    crossed her on this issue of her memory.  And she admits

2    having short and long-term memory loss and has some problems

3    with dates, numbers, and faces.  But I also viewed that she

4    answered various questions regarding her work with the

5    defendants and even leading up to some of the events in the

6    complaint.  So, from my standpoint, I think it's proper

7    impeachment, which it seems like you did, and would be

8    proper argument to the jury about whether or not any of her

9    testimony should be believed.  So, from that standpoint, I'm

10   going to overrule your motion.

11        All right.  Defendants' third motion in limine,

12   motion to limit GMS's unfair competition claims to the CCPN

13   kits displayed in its October 2017 catalog.

14        So, Mr. McFarland or Ms. Noreen, I'll hear from you

15   on that.

16        MR. MCFARLAND:  Thank you, Your Honor.

17        This, Your Honor, in this motion we're asking that

18   what the jury hear in terms of evidence be for the unfair

19   competition claim those products that allegedly were in

20   competition.

21        The Court has heard that there are really two types

22   of sales that can be made here, or two types of products,

23   the NSN, which are the National Stock Number sales, which

24   are the vast majority of the plaintiff's revenues and

25   profits.  Those are not at issue in this case.  My client

1   has never sold NSNs.  It doesn't have an NSN number.

2         But from what we've seen through the pleadings

3   recently and some deposition testimony, notwithstanding that

4   Mr. Gorken admitted in the preliminary injunction hearing

5   that his case was not about NSNs -- Judge Smith asked him

6   pointedly, and he said nope.  When asked directly by Judge

7   Smith at the preliminary injunction hearing whether the

8   intrusion into GMS's business model was about CCPN sales and

9   not NSN sales, Mr. Gorken confirmed NSNs are a different

10  entity altogether.

11        So what we're saying is the evidence here needs to

12  be limited to allegedly competing CCPN sales.  And in that

13  respect, what it needs to be is what CCPNs was GMS really

14  offering customers for sale?  And the way you determine that

15  is what's in its product catalogs.  And the relevant product

16  catalog is the product catalog that came out in 2017, that

17  was in effect up through the time of my clients' termination

18  in April of 2019.  So what's in there that they were

19  offering their customers is fair game.  That is something

20  that they can allege.  I'm not sure how they're going to

21  prove it, but they can allege and try to put on evidence

22  that those products were -- they made them available to

23  their customers and could have sold them.

24        What they should not be able to do is:  A, try and

25  say that somehow my clients' CCPN sales affected NSN sales,

1    because they clearly don't -- they're entirely different --

2    and try and use catalogs that they created after they

3    terminated my clients, and then they deliberately put in

4    things that they weren't offering for sale because of my

5    clients.  That is absolutely misleading.  And I know, as

6    Your Honor noted, evidence is usually going to be

7    prejudicial to the party who didn't put it in, but that's

8    unfairly prejudicial because it's misleading and confusing.

9         What this claim needs to be limited to, the unfair

10   competition claim, is:  What were you, GMS, offering as

11   CCPNs to your customers that you could have sold?  I mean,

12   it got to the point where Miss Robichaux in her deposition

13   testified, Well, we could have offered anything.  It doesn't

14   matter if it's in our catalog.  It doesn't matter if we've

15   never offered it before.  Well, that can't be the standard.

16   That's not a proper evidentiary basis.  It really needs to

17   be limited to:  What is it you were offering that the

18   defendants are also selling?  That's all we're asking for

19   here, Your Honor, and I think it needs to be granted in that

20   respect.

21        THE COURT:  All right.  Thank you.

22        Okay, Plaintiffs.

23        MR. GORDON:  Thank you, Your Honor.

24        We've got kind of a few issues kind of all swimming

25   together here.  The first one I see is -- objection, at

1    least by the defendants -- is can G&S offer evidence of

2    competition between these NSNs and the CCPNs.  And in terms

3    of jury confusion, waste of time, or unfair prejudice, we

4    are going to cross this bridge anyway.

5         The defendants have a defense that they were

6    rightfully selling the NSNs and then selling CCPNs that were

7    non-conforming.  So this is all going to get explained to

8    the jury.  It's part of everyone's case.  So, to the extent

9    that anyone is worried about the jury, they're going to hear

10   it.

11        G&S recognizes -- I'm sorry -- GMS Industrial, the

12   plaintiff, recognizes that the defendant did not have these

13   NSNs.  They weren't selling them.  They didn't have them

14   during their existence.  But that's not the only way that

15   something can compete.  If GMS, if the plaintiff has an NSN

16   that has three paper towels, and G&S, the defendant, is

17   selling one individual roll of paper towels as a CCPN, those

18   could be competitive items, and that I think is something

19   for the jury to decide.  It's also relevant to the trade

20   secrets.  G&S, the defendant, was creating kits that were

21   modeled on the NSNs.  So they used the trade secrets there

22   to compete.  So, again, the evidence is going to come in.

23   It is relevant to those factors.  Because it is relevant,

24   because it is not unfairly prejudicial, that should come in.

25        The second issue that I hear here is about the

1   catalogs and when the catalogs come out.  And, again, we

2   resolved this with Judge Smith at the TRO hearing.  This

3   same objection was lodged.  Now, it was only to one April

4   catalog, not to two later catalogs.  And she held that that

5   would be proper cross-examination, that the plaintiffs could

6   explain when the catalogs came out, if the items shifted.

7   For example, the later catalogs show that GMS, the

8   plaintiff, could sell through FedMall, so that they could

9   sell individual items, which is what the defendants were

10  just talking about, about Miss Robichaux saying they could

11  sell more things than just what was in the catalog.

12          So there could be testimony, yes.  Does it say that

13  there is FedMall in the later catalog?  Yes.  Was that

14  always a capability?  Yes.  So, it doesn't bar the

15  testimony.

16          And everyone, I believe, recognizes that the GMS

17  sales force had the ability to sell items that were outside

18  of the catalog.  That's not a disputed item.  So, how can

19  they be limited to the items that were in the catalog?

20          In the motion in limine, there was an argument

21  about a failure of disclosure, that what was in the catalog

22  and when things were sold wasn't disclosed.  Again, this was

23  an issue that Judge Smith solved.  That Exhibit 13 from the

24  TRO hearing, it was revised to include when the items were

25  sold, or when GMS began selling the items, what the item

1    number was.  And it even disclosed what items were in the

2    catalog.  So, again, there is no reason to exclude these

3    catalogs.  Everything has been disclosed.  There is no

4    unfair prejudice.  And we believe defendant's motion in

5    limine should be denied.

6              THE COURT:  All right.

7              Mr. McFarland, I'll give you the last word.

8              MR. MCFARLAND:  Thank you, Your Honor.

9              Your Honor, with respect to the catalogs, we start

10   with relevance.  There is simply no relevance in what GMS

11   has in its catalogs after my clients were terminated.  Judge

12   Smith held that my clients could absolutely sell and compete

13   as long as they didn't do so using improper means and with

14   trade secrets.  So, what is in a catalog after April 2019 is

15   totally irrelevant.  And the fact is that GMS deliberately

16   put things in its catalog after April 2019 that it didn't

17   have in there before to try and make the argument they are

18   making now, that is, Oh, no.  We're really competing on

19   these things.

20             What is at issue here is:  What was GMS selling as

21   to CCPNs?  It doesn't matter if they could sell it.  They

22   could sell rocket ships.  That isn't what is at issue in

23   this case.

24             What this jury -- and this is going to be confusing

25   to a jury.  A jury can certainly be told on what is an NSN

1    sale and what is a CCPN.  And they are going to get that, I

2    have no doubt, very easily.

3          But NSN sales are simply not at issue in this case.

4    My client can't sell NSNs.  What is at issue in this case,

5    in the best scenario for the plaintiff, is what CCPNs it had

6    in its catalogs that its customers could buy, and that's

7    what this motion is asking this Court to limit to.

8          I'll also note this idea, Well, we ought to be able

9    to talk about our NSNs and what's in the NSN, because if the

10   NSN has -- to use Mr. Gordon's example -- if the NSN has

11   three paper towels, and the customer only wants one, maybe

12   that is competitive.  No.  As a practical matter, I don't

13   think it is.  But more importantly no one, not a fact

14   witness, and critically not an expert has testified that

15   NSNs compete with CCPNs, or that CCPNs compete with NSNs.

16         There is no -- no expert is going to come in and

17   say, I've done a market study.  I've analyzed these

18   products.  I've looked at the military industrial goods

19   sales issue and, yes, NSNs really do compete with CCPNs.

20   It's not there.  And this would be presentation of pure

21   speculation.  There is no evidence to support it.

22         This client still, the plaintiff still can't point

23   to a single sale that it actually lost because of my

24   clients, not a one.  And at the least what I'm asking this

25   Court to do is to make sure that we have the jury hear the

1    actual evidence of what was at issue in this case, CCPN
2    versus CCPN, and CCPN that was in the catalog when my
3    clients were still sales agents for the plaintiffs.
4            THE COURT:  All right.  Okay.  There is something I
5    want to read before I decide this, so I'm just going to take
6    this one under advisement and then come back to it.
7            All right.  Defendants' motion to exclude evidence
8    and argument of GMS's damages with one exception.
9            MR. MCFARLAND:  Thank you, Your Honor.
10           This goes to what damages should the plaintiff be
11   able to present to the jury.  And at this point here is what
12   I think, based on the Court's rulings and the claims that
13   are actually pleaded and the law, here is what I understand
14   and what we've asked the Court to limit the plaintiff to.
15           With respect to Mr. Gorken, there is a claim in
16   Count 1 that he breached his duty of loyalty, and the Court
17   has held so far that under Colorado law, Colorado law does
18   permit the employer to try and recoup what has been paid for
19   salary and bonuses and that, so that's fine.  What isn't
20   acceptable under Virginia law is the idea that they can
21   recoup the commissions that were paid to the sales agents
22   for GMS sales.  Number one, Virginia law does not recognize
23   any such type of recoupment, and particularly when what
24   we're talking about is not trying to recoup commissions for
25   the clients' -- my clients' competing sales.  They're for

1   sales that they made for GMS that GMS received the revenues

2   for.  That's the only reason my clients got the commissions.

3   And under the law, you can't recoup those.

4           The plaintiff tries to argue that it's permitted

5   under this great principle and agency doctrine and fiduciary

6   duty, but, again, any such claim would have to be governed

7   by their sales agent agreements, which apply Virginia law.

8   And the cases that the plaintiff cites to are all real

9   estate cases where a real estate broker is representing a

10  client and does something improper, and in that sense has to

11  disgorge a commission.

12          My clients are independent non-exclusive sales

13  agents.  The only duties they owe are those duties that are

14  expressed in their written sales agents' agreements.  And

15  the idea that you can claw back the commissions that have

16  been earned for sales for you is unsupported factually,

17  practically, and by the law, Your Honor.  So that's an

18  element of damages, and we don't think it should ever be

19  presented to the jury as even a possibility.

20          Then, Your Honor, what the plaintiffs are entitled

21  to in terms of compensatory damages is what they can prove

22  are the losses that they sustained because of my clients'

23  sales that were unfair competition or through the

24  misappropriation of trade secrets.  I think there is going

25  to be a tremendous, tremendous evidentiary problem with

 1    that.  But I will say, sitting here now, before we start the
 2    trial, what they can establish for compensatory damages for
 3    misappropriation of trade secrets or unfair competition is
 4    fine.  What you look to there is:  What were my clients'
 5    sales?  And they have that evidence.  They know what G&S
 6    Supply sold during its short existence.  It's about
 7    $500,000.  But then what they have to do is they have to
 8    prove, it is their burden to prove that but for some
 9    tortious conduct by my clients, they would have had those
10    sales, and that's where I think there is going to be a real
11    evidentiary issue.  But I will acknowledge that at this
12    point in time that's an element of damages.
13            That's it, Your Honor.  The rest of these nebulous
14    things that are out there are just not permissible under the
15    law and shouldn't be presented to the jury.
16            THE COURT:  Thank you, Mr. McFarland.
17            All right, Plaintiff.
18            MR. LASCARA:  Thank you, Your Honor.
19            As it relates to damages in a motion in limine
20    context, I just want to review the standard, and it comes
21    out of the *Intelligent Verification Systems, LLC versus*
22    *Microsoft* case, finding a motion in limine is not an
23    appropriate vehicle for addressing the strength of evidence
24    and the substance of a complaint.  I think Your Honor
25    recognized this in a recent opinion in the *Gonzalez versus*

1    *SeaWorld Parks* matter and cited for that proposition, but

2    also, and I think importantly, Your Honor, for the

3    proposition that a motion in limine should be granted only

4    when the evidence is clearly inadmissible on all potential

5    grounds.

6            And here, Your Honor, we do believe that

7    disgorgement is appropriate under certain circumstances, and

8    I think you've already found that with respect to Mr. Greer,

9    but we also believe that it extends beyond Mr. Greer.  And

10   we're thankful for the opportunity to have submitted sur

11   reply, and I'll get into that in a moment.

12           But it seems very clear that G&S's position is

13   that, quote, "GMS failed to produce any evidence that it

14   sustained actual losses as a result of the defendants'

15   wrongdoing."  And that statement is simply not true, and we

16   have identified, I think, clearly while there are many

17   counts, and it can get confusing because there are different

18   methods of recovery for the counts that still remain in this

19   case, our position is very clear that disgorgement is an

20   appropriate remedy under the Virginia law.  And we have set

21   this forth, I think, pretty clearly in the five-page

22   memorandum first starting with the *Augusta Mutual* case, I

23   believe that Your Honor had cited, and the *Owen versus*

24   *Shelton* case, the price -- I quote, "The price of violation

25   of the duty to disclose is forfeiture of the broker's right

1    to compensation.  This rule illustrates the high regard the

2    law holds for the fiduciary relationship founded, founded as

3    it is upon one man's trust in the integrity and fidelity of

4    another.  The purpose of the rule is more prophylactic than

5    remedial.  It is designed not to compensate the principal

6    for injury, but rather to discipline the fiduciary in the

7    conduct of the office entrusted to him."  So, Your Honor,

8    that case was a 2007 case, but Virginia law -- in Virginia

9    law, this principle is well established.

10           We cite to a 1919 case, *Schmidt versus Wallinger*.

11   There the Virginia Supreme Court noted, quote, "The broker,

12   who in disregard of his duty, conceals adverse interests or

13   secretly enters into the service of, or himself becomes an

14   adverse party forfeits his right to commission."

15           And that's where we are in this case.  These folks

16   were going out there into the marketplace.  They had a list

17   of products with GMS in one catalog.  Frankly, they could

18   sell anything that the government wanted, but the first

19   opportunity for sale is:  Here is our catalog.  Look at what

20   you want, and we'll get it to you.  And here is the G&S

21   catalog.  When they offer both of those catalogs as their

22   method of marketing, they violate their duty to aggressively

23   promote and their duty of loyalty.

24           And this long string of cases starting in -- with

25   at least 1919, in *Schmidt versus Wallinger*, says under

1   Virginia law you can be penalized as well as the plaintiff

2   can be remunerated by a clawing back of the commissions.

3        There is also a case, *Bell versus Routh Robbins*

4   *Real Estate.*  It is a 1966 case.  And the Supreme Court then

5   noted, "The crucial question presented in this appeal is

6   essentially whether the evidence establish as a matter of

7   law the defendant salesman and agent breached his fiduciary

8   duty which a broker owes to his client, thereby causing a

9   forfeiture of the real estate commission."

10       The distinction that Mr. McFarland tries to make

11  that, oh, well, these were real estate cases, I think it is

12  a distinction without a difference.  There is no limiting

13  factor in there.  And so we believe that there is good law,

14  and that there is reason for Your Honor to follow it in that

15  line of cases.

16       They have cited the *Geneva Enterprises versus*

17  *Bavely* case.  That's a Virginia Circuit Court case that's

18  not binding.  The position entirely ignores the purpose of

19  the agent commission forfeiture as a prophylactic result.

20  But even if the case did apply, Your Honor, we point out

21  that specific bad acts here did lead to the damages.   In

22  other words, they went in.  They sold competitively every

23  time they went in to make a sale.  And they had the

24  obligation, when they were going to get paid for sales they

25  made for us, to write out the information that resulted in

1    their sale and their entitlement to commission.  And there

2    was the perfect opportunity to reveal to us, yeah, we made

3    this sale, but we also made this competitive sale over here,

4    and they failed to do that every time they asked us for a

5    payment.

6           So the failure to disclose the competitive sales is

7    critical and a breach of the duty of loyalty that we say

8    applies not only to Westly Greer, but to all of the sales

9    agents who Your Honor has found have that duty of loyalty

10   implied into their contract and as the reason for the source

11   of duty rule decision Your Honor made in eliminating the

12   fraud charges.  And so that finding dictates, I believe,

13   that this rule of damages applies.

14          There is some discussion that Ms. Van Tassel, the

15   expert, withdrew it, withdrew this measure of damages, but

16   that's not true at all.  Miss Robichaux, who is lay expert

17   witness, is prepared to testify about all of those

18   commissions paid to them, and the details of how they

19   responded with their forms talking about and receiving the

20   entitlement to payment without disclosure that they were

21   selling competitively each time.  And that testimony was not

22   coming in through Ms. Van Tassel, who will be here and will

23   testify about damages, but not about this specific set of

24   damages.

25          So, Your Honor, we believe that the law entitles us

JILL H. TRAIL, Official Court Reporter

1    to the disgorgement, and we ask that their motion in limine

2    be denied.

3            THE COURT:  All right.

4            Mr. McFarland, I'll give you the last word on this.

5            MR. MCFARLAND:  Thank you, Your Honor.

6            The huge distinction between the real estate broker

7    cases that Mr. Lascara relies upon and this situation is

8    there is no fiduciary relationship between the independent

9    non-exclusive sales agents and the plaintiff.  So there is

10   no -- there is no fiduciary duty there, and so you can't

11   claw back.  I mean, it's almost mind boggling the concept

12   here.

13           They're claiming that my clients, the one duty that

14   they have is to aggressively promote.  I acknowledge that.

15   That's what's in their sales agent agreements.  My client --

16   so the claim is:  You didn't aggressively promote.  But yet

17   what you're trying to take away are the sales that they

18   made, the commissions for the sales that they made.  That is

19   just diametrically opposite, Your Honor.  Moreover, legally

20   it is unfounded.  There is no legal principle under Virginia

21   law that would let you claw back a commission you have

22   already paid for a sale that the person made to you in this

23   relationship as an independent non-exclusive sales agent.

24   And their own damages expert originally posited that

25   contention or that theory and withdrew it.

1         And now what I hear Mr. Lascara saying is, oh,

2    we're going to put it on through Ms. Robichaux, who he

3    called a "lay expert witness."  I don't think such a

4    creature exists under the evidentiary rules.  You can be a

5    lay witness --

6         THE COURT:  We'll see when we get to trial if he

7    can make that under Rule 701.

8         MR. MCFARLAND:  Well, she hasn't been identified as

9    an expert, Your Honor.

10        THE COURT:  Okay.

11        MR. MCFARLAND:  I understand she can be a fact -- I

12   understand she can be a fact witness.

13        THE COURT:  Right.

14        MR. MCFARLAND:  And I will acknowledge there are

15   certain opinions a fact witness can do, but I'm pretty sure

16   there is no hybrid fact/expert witness.

17        So, this one, Your Honor, is a matter of law that

18   these commissions are out, should not even be presented to

19   the jury.  And this goes to what my concern is about this

20   trying to create a duty of loyalty that doesn't exist.

21        This Court acknowledged the only duty of loyalty

22   for that independent sales agent is in the contract.  I

23   understand the Court's ruling earlier on my first motion in

24   terms of relevancy.  But I'm very concerned.  What is the

25   plaintiff going to present?  I mean, duties are duties, and

1    duties are either legally created by common law and so
2    recognized, or duties are created by contract and so stated.
3    And I have real concerns that we're going to be proffering
4    duties that this Court has said can only be found in the
5    contract.

6          But in terms of this, Your Honor, in terms of
7    damages, the commissions, uh-uh, they should not be
8    permitted to even argue to the jury that they can claw back
9    those commissions.

10         Thank you, Your Honor.

11         THE COURT:  All right.  So, as it relates to this
12   motion in limine, the motion will be denied.

13         So I've reviewed these opinions.  And the 2021
14   opinion that's cited for the proposition that Virginia law
15   rejects recoupment of salary paid to disloyal employees is a
16   Virginia Circuit Court decision, but not a Virginia Supreme
17   Court decision.  There are other cases from the Virginia
18   Supreme Court that support the denial of this motion in
19   limine based on the relationship between the agents and the
20   principals.  Also, the Virginia Circuit Court opinion deals
21   with an employer/employee relationship as opposed to what we
22   have in this matter, which is an independent sales agent is
23   not an employee.  So that motion is overruled.

24         So, now we get to plaintiff's motion in limine, and
25   plaintiff has a motion in limine to preclude defendants from

1   presenting evidence related to a 2007 lawsuit, I believe,

2   *Gorken, et al versus Drummond.*  So I'll hear from you on

3   that.

4          MR. GORDON:  Yeah.  Thank you, Your Honor.

5          You know, in about ten days we're going to come

6   down here.  We have eight days to try one case.  If *Drummond*

7   is coming in, we're going to have to try two.  *Drummond* is

8   not relevant under 401.  It doesn't have a tendency to make

9   the existence of a fact or consequence more or less

10  probable, because *Drummond* was different.

11         After the termination, GMS and Mr. Gorken were

12  plaintiffs in a lawsuit for a dec action.  It alleged

13  breaches by *Drummond,* and it sought to determine their

14  rights.  The agreement was different from the agreement in

15  this case.  There may be similarities, but to the extent

16  that they're different -- and we're talking about

17  *Drummond* -- are we going to have to take time to show both

18  agreements to the jury?  This is what's at issue here.  This

19  is why this is different.  These are the facts from the

20  *Drummond* case.  These are the facts from the present case.

21         The defendants say that it's relevant to the

22  contention that G&S sales would not have gone to GMS, but

23  GMS admitted that -- G&S, the defendant, admitted that all

24  of its sales were to GMS customers.  So if all of its sales

25  were to GMS customers -- and that was Mr. Greer's response

1    to interrogatory 15 -- if all of those were sales, then it's

2    really not relevant as to whether those sales would have

3    gone to a third-party.  There is no allegation that some

4    third-party would have gotten these sales.  They would have

5    either gone to GMS or G&S.  The salesman showed up and gave

6    them the two catalogs.  It went to one of the two salesmen

7    that he went to sell for.

8            So the defendants are going to look for admissions

9    in the pleadings that they claim are relevant and try to

10   make the plaintiffs look like hippocrates.  You know, you

11   did this 12 years ago.  You left your company.

12           And, again, we're going to have to spend more time

13   going into the facts of the *Drummond* case and explaining

14   why, why it's not applicable.  That could lead to jury

15   confusion.

16           This is a complex industry.  I think the Court has

17   already recognized that.  So the unfair prejudice would

18   outweigh it.

19           We cited in the brief the *Bland* case.  There, there

20   was an excluded allegation of harassment outside of the

21   workplace.  So it was a similar allegation, but since it

22   didn't happen in the workplace, it was unfairly prejudicial.

23   We think that's similar.

24           There also is a request that the counterclaim by

25   *Drummond* be admitted, and clearly that would be unfairly

1  prejudicial.  *Drummond* is not here to be crossed.  It's
2  going to come in.  It's going to be in that ECF format with
3  the Court's header on the top.  Clearly, the jury is going
4  to consider this as more persuasive than other, other
5  issues.
6        There is a block quote in the opposition to the
7  motion in limine filed by the defendants, and I think if we
8  look at it, we can understand why *Drummond* was different or
9  why it's not probative.  So the quote -- it's on page 4,
10 Document 257.  It says, "Drummond is engaged in a highly
11 competitive industry selling common chemical and industrial
12 cleaning products."
13        Whether the issue is highly competitive or not or
14 the industry, it doesn't matter.  You would want to have a
15 non-compete in an industry that's highly competitive.  I
16 don't think that's an issue in this case.
17        Common chemicals.  You can compete whether the
18 product is common or complex.  You can still have
19 competition.  It's just a question:  Are they the same?
20        Products that are readily available from other
21 suppliers.  The products may be available from other
22 suppliers, but our issue here is:  Did you use the
23 confidential supplier list to acquire your products?  So,
24 just because the products are widely available, this
25 statement in *Drummond* isn't relevant to the current case.

1          Then it says the products were state -- the

2    customers were state and federal government entities.

3    That's broader than we've got in this case.  It also says

4    that some of these customers could be made from reviewing

5    public documents of solicitations from state and local

6    entities.  And that's not what we have here.  What we have

7    here is in-person sales, not bid items.

8          So, again, this block quote that they are saying is

9    relevant and would be an impeachment or evidence that would

10   be relevant to this case clearly is different.  It's

11   inapplicable.  It's not relevant under 401.  It doesn't make

12   any of the facts in our case more relevant, and it is

13   prejudicial.  Its probative value is substantially

14   outweighed by the prejudice.  It's not just that it's

15   harmful, but that the prejudice outweighs it.

16         THE COURT:  All right.

17         All right, Defense, either Mr. McFarland or

18   Ms. Noreen.

19         MR. MCFARLAND:  Your Honor, the statements from the

20   *Drummond* case are directly relevant to this matter.

21   Fourteen years ago the plaintiff in this case, GMS, and Gary

22   Gorken and Rachel Gorken, in pleadings that are filed in

23   this court, made statements to the effect of -- and it's the

24   same industry, Your Honor.  Mr. Gordon is trying to

25   distinguish because he says, Well, there is word about state

1    and local governments.

2         We took Gary Gorken's deposition.  He acknowledged

3    *Drummond* sells the same products that GMS sells to the same

4    customers.  And so what happened?  In 2007, Mr. Gorken

5    wanted to go out on his own, and so he filed a dec action

6    because he was concerned, and sure enough he had actually

7    received a cease and desist non-compete letter from

8    *Drummond*, his former employer, and accusing him of doing

9    certain things.

10        And what does he say?  In 2007, when it suited his

11   needs he said, This industry, you're selling basic products.

12   What matters is the customer's relationship with the

13   salesperson.  There is no trade secrets.

14        Things he is literally saying to this Court now

15   that are supposedly trade secrets and aren't, but that he

16   represents are, he said in 2007 were not trade secrets.

17        This jury absolutely needs to hear in assessing

18   this gentleman's credibility and his wife's what he said in

19   2007 to this Court in a different case, and we are entitled

20   to absolutely present that evidence, Your Honor.  It also

21   does go to the damages --

22        THE COURT:  Well, what out of the lawsuit do you

23   want to present?  Are you asking can you cross on him on

24   this or --

25        MR. MCFARLAND:  Yes.  We can take the complaint

1    that is a public document that was filed in this court and

2    cross-examine him on it.

3           THE COURT:  Right.  But do you want to -- are you

4    asking the Court to cross him on it?  Or are you asking the

5    Court to affirmatively present this evidence in your case in

6    chief?

7           MR. MCFARLAND:  I am saying that I get to use the

8    statements in the complaint.

9           THE COURT:  Right.  I'm asking you something

10   different.

11          Are you asking can you cross him on what he said,

12   as it relates to this industry in 2007?

13          MR. MCFARLAND:  Yes.

14          THE COURT:  Or are you asking can --

15          So that's yes.

16          Are you also asking can you affirmatively put

17   evidence of this 2007 case into evidence apart from

18   cross-examining him?

19          MR. MCFARLAND:  The complaint should come into

20   evidence, yes, Your Honor.

21          THE COURT:  So that's yes.  Okay.  Go on.

22          MR. MCFARLAND:  That's a yes.

23          The complaint in which he made these statements,

24   which are clearly statements against interest now, because

25   they wholly contradict what he's saying in this case, should

1   come in.  They also do go to the issue of damages because
2   they refute the idea that every sale that my clients made
3   would have been made by GMS.
4           In fact, Mr. Gordon wholly overlooks what the
5   evidence shows is that the sales that G&S made were sales
6   that GMS would never have made, because they didn't want to
7   be engaged in selling one-off-type products.  So -- and I'm
8   saying that to the Court, because I think there is going to
9   be a real issue that as opposed to having to put on proof of
10  evidence of sales and competition, they're just going to
11  want to brush over that and assume it.
12          But it is relevant when Mr. Gorken has testified or
13  stated under oath in a verified complaint that these things,
14  no competition in terms of -- the competition occurs through
15  the sales agents, no trade secrets, not using confidential
16  information; that the jury gets to hear.  Now, the jury may
17  think there is a difference here, and he may be able to
18  explain it.
19          And this is not going to be trying two cases.  I
20  wholly disagree with that.
21          THE COURT:  I can guarantee you that we're not
22  going to try two cases.
23          MR. MCFARLAND:  And I agree, Your Honor.
24          THE COURT:  Everybody can take -- if there is one
25  thing you can take away from this hearing, we will not under

1    any circumstances try two cases.

2        Go ahead.

3        MR. MCFARLAND:  And I agree, Your Honor.  It is not

4    my position that we are going to be trying two cases.

5        What we do get to do is to test this gentleman's

6    credibility and veracity with what he is claiming in this

7    case that 14 years ago he told this Court were not trade

8    secrets, competition is good, I ought to be able to compete

9    and do whatever I've done.

10        And the case law absolutely supports us on this,

11   Your Honor.  In fact, the case that I'm fairly familiar

12   with, because it was tried by my partners up in Richmond

13   before Judge Payne, the *DuPont* case addresses this.  With

14   reluctance the Fourth Circuit reverses and says that they

15   should have been -- the defendant should have been able to

16   put on evidence of trade secrets that are public nature,

17   which is part of what will happen here with Mr. Gorken.

18        THE COURT:  All right, Plaintiff.

19        I'm sorry.  Is that all, Mr. McFarland?

20        MR. MCFARLAND:  I think that will cover it, Your

21   Honor.

22        THE COURT:  Okay.  Thank you very much.

23        Plaintiff, I'll give you the last word.

24        So why can't he cross your client based on those

25   statements made back in 2007?

1          MR. GORDON:  Why can't he?  Again, it's the
2     prejudice issue, Your Honor, that this is --
3          THE COURT:  Right.  It's all prejudicial.  I'm
4     saying why can't he cross him on statements, if the
5     statements have relevance to what he may have said about
6     things in this industry at another time?
7          MR. GORDON:  Right.
8          THE COURT:  Why isn't that proper
9     cross-examination?
10          MR. GORDON:  Well, for starters, it was 14 years
11     ago.  So, do statements made 14 years ago about an issue --
12     the complaint says that they could find the customers in the
13     phone book.
14          THE COURT:  What Rule of Evidence says you can't
15     use statements from 14 years ago, or 10 years ago, or 5
16     years ago?  Point me to that rule.
17          MR. GORDON:  I mean, I guess we would argue that it
18     was 402, that the probative value is substantially
19     outweighed by the prejudicial effect; that would be the
20     issue.  And then the issue that it's not relevant.  It
21     doesn't show -- it's just different.
22          As counsel said, he said --
23          THE COURT:  I understand that the case may be
24     different.  I guess I'm saying something different about --
25          MR. GORDON:  Right.

```
1           THE COURT:  -- not that the case is not different,
2   I agree with you on that, which is why I made my statement
3   we're not going to try two cases.  I'm talking about
4   statements that may have been related to the industry that
5   may Venn diagram itself over onto this case, where I may
6   have said something about how a certain widget performs
7   14 years ago, and that I should be able to be crossed on
8   that.
9           MR. GORDON:  That's where I get into the two cases.
10  Mr. McFarland is going to get up here and give the
11  10,000-foot view and the snippets out of the pleading, and
12  then we're going to have to spend the time giving it the
13  context.  And we're going to have to unwind it.  You know,
14  you said in this pleading that these are common cleaning
15  products.  All right.  Well, what were the -- in 2007, 2009,
16  whatever year, 14 years ago, what were the products of GMS?
17  What were the products of Drummond?  What were the sales
18  methods?  What, trade secrets did they have?  What trade
19  secrets do you have?  How was it different?
20          So it's going to be a waste of time.  The jury is
21  going to be hearing about two different cases, and it's
22  going to be used to try and shame the plaintiffs.
23          THE COURT:  What about what Mr. McFarland says
24  about the *DuPont* case?
25          MR. GORDON:  Yeah.  So if you read *DuPont,* my
```

1   understanding, the facts are a little cursory in the
2   opinion.   In the second trial, they asserted that there were
3   trade secrets that were stolen, and in the first trial they
4   disclosed the trade secrets.  So in the second trial, they
5   said, Well, you haven't protected your trade secrets.  You
6   offered them into the public record, and you put them on
7   PACER or ECF, so you've waived any protection.  So, in that
8   case there was an issue in case number two that was directly
9   relevant to the first case.  It wasn't some habit evidence
10  or that you acted the same way that you acted in the prior
11  case.  And there also was an expert witness that had been an
12  expert in the prior case, so they wanted to ask him about
13  his testimony in the prior case.  So that's what happened in
14  *DuPont*.  So *DuPont* is different from here, where we've got
15  two cases 14 years apart.
16          Additionally, defendants stated that GMS didn't
17  want these sales.  That's why we're coming down here.  I
18  mean, if we're going to spend days on who wanted these sales
19  and whether GMS could make those sales, what products it
20  offered, what products it wanted its salespeople to sell,
21  what percentage of its sales were NSNs versus CCPNs -- so,
22  to just argue and state that this should be excluded because
23  GMS didn't want these sales is putting the cart before the
24  horse.
25          THE COURT:  All right.

1          MR. GORDON:  Thank you, Your Honor.

2          THE COURT:  Thank you.

3          So, I'm going to take this one under advisement

4    until the trial, and we're going to see how the trial

5    unfolds and whether it's proper impeachment or not.  But,

6    you know, I will say this.  Even if I decide that there is a

7    statement from the 2007 case that is proper impeachment,

8    it's going to be limited.  We're not going all into this

9    other case and what may have happened or what.  It's going

10   to be, you know, very limited.  Like, you know, I kind of

11   said if I made a statement about this YETI cup in 2007, that

12   this YETI cup was purple, and now I'm saying in, you know,

13   2020 that the cup is bronze, I think that's proper

14   impeachment.  But we're not going to get into when did I get

15   the YETI cup, and who is YETI manufactured by.  We're not

16   going there.  So, you know, I say that in an advisory sort

17   of way.  I'm not making my mind up on the impeachment part

18   of it or on it coming in, in the defendants' case in chief

19   or for their counterclaim, but I will take it under

20   advisement right now.  I will see how the trial unfolds.

21          Let me look at one thing, and then we'll go

22   forward.  One moment.

23          All right.  So I've ruled on everything except the

24   plaintiff's motion in limine, which I'm just tabling until

25   we actually get to trial, and then on this issue that deals

1    with the CCPNs and the NSNs, and I will get back to you on

2    that one before trial, but there is a thing or two I want to

3    look at.  So, that's that.

4              So, now I think that deals with all of the motions

5    in limine that were filed.  Is that correct, Plaintiff?

6              MR. LASCARA:  Yes, Your Honor, we believe so.

7              THE COURT:  Mr. McFarland, is that correct?

8              MR. MCFARLAND:  Yes, Your Honor.

9              THE COURT:  Okay.  All right.  Okay.  So I've

10   looked over the pleadings, and I noticed that there are a

11   number of objections to exhibits, designations, witness

12   testimony, et cetera.  So, here is how I'm going to handle

13   that.  I'm not going to listen to each one of those today,

14   but I'm going to issue an order that will probably come out

15   either later today or tomorrow that's going to say the

16   following.  I'm going to order that you-all meet and confer

17   on all of these objections in person and see if you can

18   resolve any of them, because it's been my experience in the

19   last three or four trials that I have had that a number of

20   these get resolved as they go along.  So rather than kind of

21   wasting everyone's time, mine, I want you-all to sit down

22   and try to work these things out.

23             Now, if you're not -- what you're able to work out,

24   that's great.  And I'm going to have you file a joint

25   memorandum saying defendants' objection to Plaintiff's

1    Exhibit 6 is hereby resolved and, you know, it either comes

2    in, or plaintiff is not offering it.

3            For those that you're not able to resolve, and this

4    will be in my order, I want you to identify the exhibit by

5    exhibit number, identify what the exhibit is, you know, if

6    this exhibit, Plaintiff's Exhibit 6 is a contract between

7    John Doe and Jane Doe.  We'll just use defendant as an

8    example here.  What defendants' basis for the objection is,

9    and not just relevance, hearsay.  Relevance under 403 and

10   what prong under relevance is not met, or what prong under

11   the business record exception is not met.

12           And then, Plaintiff, you respond with why you think

13   it comes in.  It does meet the business record exception,

14   because we have a certificate under Rule 90, whatever, 1

15   that, you know, that meet all of the elements of the test of

16   803(6).

17           And all of that should be in a paragraph.  That's

18   not like a three-page thing.  That's a paragraph stating

19   exhibit number.  This is what the exhibit is.  This is why

20   we object to it under this Federal Rule.  This is the

21   element that's not met under that rule.  This is why we say

22   it comes in, Judge, because it meets the test, and this is

23   why that element that they're objecting to is met.  That's

24   what I need for all of the objections going forward, and I'm

25   going to rule on them.  All right.  And this will all be

1    laid out in my order.

2           Plaintiff, any questions about what I'm expecting?

3           MR. LASCARA:  No, Your Honor.

4           THE COURT:  Mr. McFarland?

5           MR. MCFARLAND:  No, Your Honor.  I believe we

6    understand well.

7           THE COURT:  All right.  Very good.  Very good.  And

8    I'm going to give you-all until Wednesday at noon to have

9    that done.

10          All right.  So, let me spend a few minutes just

11   talking about how the trial is going to go.  So, we're

12   scheduled to start the Tuesday after Memorial Day, May 31st,

13   2022, at 9:30.  You-all should be here at 9:00 o'clock just

14   in case there is something, I need to take the bench and,

15   you know, we need to discuss before I bring the jury in,

16   because I don't want to keep the jury waiting.

17          All right.  So, once I bring the jury in, I will

18   welcome them with a few introductory remarks.  My courtroom

19   deputy will then call the roll.

20          I'm in the process of reviewing your voir dire, and

21   it's my intention to cover all of the areas that you-all

22   raise.  I may not ask the question the way you posed it,

23   because there is a standard voir dire I have that covers

24   many matters, but then there will be a section in my voir

25   dire that deals with some case specific things, which is

1    really what I'm looking to your voir dire for to do that.
2    So, that's that.
3          So, after voir dire, you-all will do your strikes.
4    It will be three for the plaintiff and three for the
5    defense.  And so I do strikes a little bit different than
6    what you may have been used to in Norfolk before.  So, it's
7    my understanding that when it gets to strikes, what would
8    happen is the courtroom deputy would put the names on the
9    board.  You-all would get the board and switch the board
10   back and forth.  That will still happen.  But what I'm used
11   to, and what I'm going to do is when it gets to the point of
12   selecting the jury, she's going to select those nine names
13   out of the hat or the bucket or whatever, because we're
14   going to have nine jurors, and those nine will come to the
15   jury box.  And then you-all will do the same thing with your
16   board.  Start with plaintiff.  You will do your strike.  You
17   might strike one, you know, plaintiff's one.  Goes to
18   Mr. McFarland.  Let's say you strike one, all right.  So
19   you-all have struck two jurors.  The seven that you did not
20   strike are on the jury.  There is no back-striking.  So then
21   those two will be removed from the panel, and she'll call up
22   two more names, John Doe and Jane Doe, and they'll come in
23   the box.  You'll get the board back.
24         Plaintiff, if you pass on them, they're on the
25   jury.

1          The board comes to you.  If you strike one of them
2    or both of them, they both come out, and we'll put two more
3    in.  And then it's the same thing until we have got our
4    nine.
5          So, really it's the same thing you-all have done in
6    Norfolk before, except in Norfolk you-all typically don't
7    call the nine to the jury box.  I call the nine to the jury
8    box because I like to keep up with who is in there and, you
9    know, based on some things that have come out in voir dire.
10   That's what I've done in Richmond over my career as a trial
11   lawyer, and that's what I'm comfortable with, so that's what
12   we're going to do.
13         So, again, no back-striking.  I think that's the
14   same as you-all have always done it.
15         While you-all are doing the strikes, I'm going to
16   give preliminary instructions.  I like to do that for two
17   reasons.  One, so that we don't waste time with a lot of
18   dead space.  And, two, it doesn't keep the jurors focussing
19   on you so much when you're going over your paperwork and
20   conducting your strikes.  That's the standard opening
21   statement, closing statement, rules of evidence, objections,
22   closing argument, that sort of thing.
23         Right now I am not going to require that people
24   wear masks, but this is a day-by-day thing with the numbers
25   going up in COVID.  By the time we get to your trial, it may

1   be that I require everyone to wear a mask.  It could be a

2   situation where, you know, the Chief Judge makes a call

3   about you can't just use one courtroom anymore, and that may

4   have an effect on whether we are even able to go forward.

5   But right now we are able to go forward.  We are able to use

6   one courtroom.  Right now I'm not making everyone wear a

7   mask, but I could change my mind about that depending on

8   where we are with the COVID numbers.

9           Any of you -- I know there is, at least for the

10  young lady with the memory issue, I know that that's a

11  deposition de bene esse where she's not going to be present.

12  Any depositions or any type of video evidence that you want

13  to use for somebody speaking, you should have a transcript

14  of that as well to hand out to the jury so that they can

15  follow the testimony.  It will be entered as an exhibit, but

16  it will not go back to the jury room, because the evidence

17  will be what is played on the videotape, but it's just an

18  aid so that the jury can follow along with the testimony.

19  And I have you enter it so that if there is an issue on

20  appeal, it's been entered into evidence, and the Court of

21  Appeals can consider it.  And I don't make my court reporter

22  try to transcribe when the video is playing, so that way

23  there is some record of it.  All right.

24          What I typically do is on closing argument, I let

25  you-all have the last word since you've been fighting it

1    out.  So, I will read the instructions at the close of

2    evidence, except the last jury instruction.  Then I'll let

3    you-all make your arguments.  And then after your arguments

4    are concluded, I will read the last instruction, which will

5    be, Now, ladies and gentlemen, it's your duty to go back to

6    the jury room, and your first order of business will be to

7    select a foreperson.  And so I will read that jury

8    instruction.

9          Another thing I do different, which is something I

10   learned during COVID, and I'm sticking with this policy, is

11   that I give each juror a copy of the instructions.  That way

12   they're not trying to pass them around and know what

13   negligence means or something.  Everybody has a copy of the

14   instruction, and they can look at it, and it aids their

15   deliberations.

16         All right.  So, that's how I think the trial is

17   going to go.

18         Plaintiff, any questions about anything I've said?

19         MR. LASCARA:  Your Honor, do we need nine copies,

20   or can we put it up on a screen that they will see?

21         THE COURT:  Nine copies.  You know, and I guess

22   I'll say -- and I have seen this in another trial that I

23   had -- if you have closed caption of what the person is

24   saying, then you don't need the transcripts.  It's just so

25   they can follow along and hear what somebody is saying, but

```
 1    if it's not closed captioned on the actual video, then you
 2    need nine copies, a copy for each juror.
 3              MR. LASCARA:  All right.  Thank you.
 4              THE COURT:  Okay.  Mr. McFarland, anything?
 5              MR. MCFARLAND:  Yes, Your Honor, thank you.
 6              Two questions.  I want to make sure I understand
 7    the strikes.
 8              THE COURT:  Yes.
 9              MR. MCFARLAND:  So you're going to put nine names
10    on the board?
11              THE COURT:  Yes.
12              MR. MCFARLAND:  And the Court's intention is to
13    seat nine?
14              THE COURT:  Yes.
15              MR. MCFARLAND:  And there are no alternates.  If
16    all nine are here at the end of the trial, they will all
17    deliberate?
18              THE COURT:  Yes.
19              MR. MCFARLAND:  So when it goes to the plaintiff,
20    and let's say that there is someone initially that he wants
21    to strike, so it's P1?
22              THE COURT:  Yes.
23              MR. MCFARLAND:  And then it comes to me?
24              THE COURT:  Yes.
25              MR. MCFARLAND:  Do I -- let's say there is two
```

1   people that I am inclined to strike.

2          THE COURT:  Yes.

3          MR. MCFARLAND:  Do I do both at the same time, or

4   do I do one and then give it back to the plaintiff, and then

5   I'll get another chance to strike?

6          THE COURT:  Right.  No.  So you will -- if there is

7   two you want to strike, you strike them then.

8          MR. MCFARLAND:  Okay.

9          THE COURT:  Because the board will go back to the

10  plaintiff just so he can see who you struck.  And then it

11  comes to Ms. Jones.  She will remove those three from the

12  panel and put three new ones.

13         MR. MCFARLAND:  Okay.  So I could theoretically

14  then need -- if I thought these were folks for whatever

15  reason I didn't want on the jury, I might need to use all of

16  my three strikes before I see the plaintiff strike his

17  second or third person?

18         THE COURT:  Yes.  So the plaintiff will have to

19  do -- when the plaintiff gets the board initially, he has to

20  do all strikes on that nine that's in the --

21         MR. MCFARLAND:  Oh, he's going to have to do all?

22         THE COURT:  Yes.

23         MR. MCFARLAND:  Okay.

24         THE COURT:  So anybody that's of the nine, he's

25  going to have to strike right then, okay.  Then it will go

1    to you.  Let's say he strikes one.  Then it will go to you,
2    and you strike two, but you don't strike somebody that he
3    would have struck, that person is on now.  So he has to
4    exercise his strikes on that nine when he gets the board.
5              Do you understand what I'm saying?
6              MR. MCFARLAND:  I do now, yes.
7              THE COURT:  Yes.
8              MR. MCFARLAND:  Yes.  Okay.  Thank you, Your Honor.
9              And with respect to the use of deposition
10   testimony, both parties have designated deposition testimony
11   that they want to play to the jury.
12             THE COURT:  Yes.
13             MR. MCFARLAND:  Mostly I think it's -- well,
14   Miss Wenrick aside, and we're using a discovery deposition.
15   I don't know that that's video.
16             Is it?
17             MR. LASCARA:  Yeah.  It was, Rob.
18             MR. MCFARLAND:  Okay.
19             MR. LASCARA:  We didn't present the video to the
20   Court yet, just the hard copy.
21             MR. MCFARLAND:  But there are objections that both
22   sides have, and I take it that those need to be resolved as
23   well, Your Honor?
24             THE COURT:  Yes.
25             MR. MCFARLAND:  Before the trial?

```
 1              THE COURT:  Yes.  That's part of the objections and
 2    the exhibits, right, part of the objections that you've laid
 3    out in objections for me to rule on?
 4              MR. MCFARLAND:  We did.  I mean, they are there in
 5    the -- I think we have the objections to the use of
 6    discovery, but we don't have the Court's rulings yet.
 7              THE COURT:  Right.
 8              MR. MCFARLAND:  So, I guess what I was going to
 9    ask, do you want us to contact Magistrate Judge Leonard for
10    him to try and hold a hearing on those and do it, or does
11    Your Honor want to...
12              THE COURT:  So those are part of the objections
13    that you have before me today, correct?  Yes.  So that's
14    what I'm ordering you to meet and confer about.
15              MR. MCFARLAND:  Okay.  Not just exhibits?
16              THE COURT:  Right.  Not just exhibits.  Everything
17    that's in those tables.
18              MR. MCFARLAND:  All right.
19              THE COURT:  All of that.
20              MR. MCFARLAND:  And then we will come back to you
21    and say --
22              THE COURT:  Yes.  We resolved this.  This we
23    haven't resolved.
24              MR. MCFARLAND:  Okay.
25              THE COURT:  Okay.  Anything else?
```

1          MR. MCFARLAND:  I think that does it, Your Honor.

2          THE COURT:  Okay.  Very good.  All right.

3          MR. LASCARA:  We had one clarification as to

4    whether that included jury instructions as well.

5          THE COURT:  Not for Wednesday.  I may have you meet

6    and confer on that, but I'm most concerned right now about

7    the exhibits for the obvious reasons that the jury

8    instructions come at the end.

9          MR. LASCARA:  All right.  Thank you.

10         THE COURT:  All right.  Okay.

11         MR. LASCARA:  Thanks.

12         MR. MCFARLAND:  I'm sorry, Your Honor, there was

13   one more.

14         THE COURT:  Okay.

15         MR. MCFARLAND:  And I appreciate the Court's

16   patience.  We have -- this one trial is scheduled for eight

17   days.

18         THE COURT:  Yes.

19         MR. MCFARLAND:  Does the Court intend to split that

20   time evenly, or put parties on the clock, or are we just

21   going to see how it goes and...

22         THE COURT:  Do you think you will need more than

23   eight days?

24         MR. MCFARLAND:  No.

25         THE COURT:  Okay.

1          MR. MCFARLAND:  I don't from the defendants'

2    standpoint, Your Honor.

3          THE COURT:  Right.

4          MR. MCFARLAND:  But eight days is eight days.  I am

5    a little concerned that the plaintiff runs -- so let me

6    rephrase my last answer, if I may for the Court.

7          THE COURT:  Sure.

8          MR. MCFARLAND:  The Court has allotted eight days.

9    If the plaintiff takes seven, that's going to be problematic

10   for me.

11         THE COURT:  Right.

12         MR. MCFARLAND:  So that's why I asked, you know,

13   does the Court intend to split it evenly 4/4, or put people

14   on the clock with the same amount of hours, which I've seen,

15   you know, done in longer trials?  I am just -- I am

16   concerned that the plaintiff could take five, six days, and

17   I'm scrambling.  You know, if we're only going to go eight,

18   then I'm scrambling to try to get my evidence in, in two.

19         THE COURT:  Understood.

20         Plaintiff, how long do you think you need to put

21   your case on?

22         MR. LASCARA:  Well, Your Honor, I think that we

23   having the burden of proof -- and I know there are some

24   counter claims, but they're very small and not nearly as

25   complicated as our case.  So it wouldn't surprise me that we

1    take five days, you know, in other words, more than half,

2    one extra day because we have an awful lot of counts still

3    out there.  And there is eight -- how many defendants?

4    There is a good number of defendants, so -- and we have the

5    burden.  So, to me dividing it evenly wouldn't really work

6    or make sense, because we have so much more to do.

7              THE COURT:  Mr. McFarland, do you think you need

8    equal time?  I mean, your counterclaims aren't the same

9    as --

10             MR. MCFARLAND:  No.  I agree on the counterclaims,

11   Your Honor.  They could be covered very quickly.  I don't

12   know that I need equal, Your Honor, but I'm going to say it,

13   and maybe we just wait and see how things go.

14             I will note for the Court that we went three days

15   on a preliminary injunction hearing, which is maybe a little

16   unusual.  I'm just concerned, again, that we get to day six,

17   and I still haven't started my defense.  And I appreciate

18   Mr. Lascara saying he has got the burden of proof, but

19   justice is equal for both sides.  I mean, I've got to defend

20   a case in which they are seeking millions and millions of

21   dollars against my, clients, Your Honor, and it's obviously

22   very important to them --

23             THE COURT:  Certainly.

24             MR. MCFARLAND:  -- and I just want to make sure

25   that we have an opportunity to do all we can for our clients

1   to represent them and put on a full case for the jury.

2           THE COURT:  Right.  So let me say this.  I think

3   the best thing is to let's see how it goes, but I have all

4   sorts of creative ways to make sure that we move along.

5           MR. MCFARLAND:  Okay.

6           THE COURT:  So I don't think it will be a problem.

7           MR. MCFARLAND:  Thank you, Your Honor.

8           THE COURT:  Thank you.

9           Okay.  Anything else?

10          All right.  Very good.  You'll be getting my order.

11  So, you'll be getting my order to meet and confer, so I

12  suggest you-all jump on that right away so that you can get

13  it done, because it seems like there were a lot of

14  objections.

15          Again, you know, I'll say I'm, you know, more than

16  happy to try this.  That's why I became a trial judge.  But,

17  again, like I said, it seems like in a lot of ways this is a

18  business decision.  So, I'm not really pushing you but, you

19  know, based on what you-all said at the beginning, you know,

20  if you think it's productive to, you know, talk some more or

21  you need my assistance in getting back before Judge Krask,

22  let me know that.  If not, that's fine.  Keep your foot on

23  the gas, and we'll get this train on the tracks on May 31st.

24  All right.

25          MR. LASCARA:  Thank you, Your Honor.

JILL H. TRAIL, Official Court Reporter

```
 1              MR. MCFARLAND:  Thank you, Your Honor.

 2              THE COURT:  All right, Ms. Jones.  Do we have

 3    anything else today?

 4              THE CLERK:  No, this is it.

 5              THE COURT:  Right.  It's been a long day.  All

 6    right.  Let's close court.

 7              (Court was adjourned at 3:27 p.m.)

 8

 9                        CERTIFICATION

10

11       I certify that the foregoing is a correct transcript

12    from the record of proceedings in the above-entitled matter.

13

14

15       _____/s/_____

16                 Jill H. Trail

17                 May 23, 2022

18

19

20

21

22

23

24

25
```

JILL H. TRAIL, Official Court Reporter