```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
 2                      Norfolk Division

 3

 4    - - - - - - - - - - - - - - - - - -
                                        )
 5    GMS INDUSTRIAL SUPPLY, INC.        )
                                        )
 6            Plaintiff,                 )   CIVIL ACTION NO.
                                        )   2:19cv324
 7    v.                                 )
                                        )
 8    G&S SUPPLY, LLC, et al,            )
                                        )
 9            Defendants.                )
                                        )
10    - - - - - - - - - - - - - - - - - -

11

12

13                 TRANSCRIPT OF JURY TRIAL
                   (EXCERPT OF PROCEEDINGS)
14                    Norfolk, Virginia

                      June 2, 2022
15

16

17    BEFORE:  THE HONORABLE RODERICK C. YOUNG
             United States District Judge
18

19    APPEARANCES:

20            PENDER & COWARD PC
              By:  William A. Lascara
21                 Jeffrey Dennis Wilson
                   Jesse Brian Gordon
22                 Thomas S. Berkley
                   Counsel for Plaintiff
23
              McGuireWoods LLP
24            By:  Robert William McFarland
                   Micaylee Alexa Noreen
25                 Jeanne E. Noonan
                   Counsel for Defendants
```

1                          I N D E X

2    PLAINTIFF'S
     WITNESSES                                          PAGE
3
       DONNA GRACE RUPLEY
4          Direct Examination By Mr. Gordon               4
           Cross-Examination By Mr. McFarland            46
5          Redirect Examination By Mr. Gordon            54
       DANIELLE RENEE ROBICHAUX
6          Direct Examination By Mr. Berkley             57

7

     DEFENDANT'S
8    WITNESSES                                          PAGE

9

10

11

12                       E X H I B I T S

13
     PLAINTIFF'S
14   NO.              DESCRIPTION                       PAGE

15     115                                                6
       119                                               11
16     120                                               13
       124                                               14
17     117                                               20
       258                                               39
18     63                                                65
       65                                                69
19     62                                                71
       64                                                86
20     66                                                88
       67                                                91
21     68                                                93
       89                                                98
22     73                                               103
       49                                               114
23     48                                               117
       6                                                120
24     5                                                122
       28                                               124

25

JILL H. TRAIL, Official Court Reporter

```
 1    DEFENDANT'S
      NO.          DESCRIPTION                      PAGE
 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Excerpt of proceedings.)

2          THE COURT:  All right.  Ladies and gentlemen, I

3   hope you had a nice lunch.

4          So, Plaintiff's Counsel, you may continue with your

5   examination.

6          MR. GORDON:  Thank you.

7          DONNA GRACE RUPLEY, called by the Plaintiff, having

8   been first duly sworn, was examined and testified as

9   follows:

10                    EXCERPT OF

11                  DIRECT EXAMINATION

12   BY MR. GORDON:

13   Q.  Ms. Rupley, we looked before we took our break at 128.

14   It was those plans.  Do you recall that?

15   A.  Yes.

16   Q.  All right.  And that was the plan for Mr. Hayes?

17   A.  Yes.

18   Q.  Okay.  And that would be saved in his portal in the

19   Google drive?

20   A.  His portal would be saved in the Google drive.

21   Q.  Okay.  And who else would have access to Mr. Hayes'

22   portal in the Google drive?

23   A.  Westly.

24   Q.  All right.  Anyone else?

25   A.  Renee, Chris, anybody from planning that would work to

```
 1   support.
 2   Q.  And why did Westly have access to the portal?
 3   A.  Because he was part of our executive staff.
 4   Q.  All right.  Thank you.
 5          If I could have you turn to 115 now, which should be
 6   another one of these oversized ones that you have on the
 7   desk.  And are you with me on 115?
 8   A.  I believe so.  The numbers are a little bit cut off here
 9   on the end.  I think it's 115, yes.
10   Q.  And can you identify what this document is?
11   A.  This is the plan for -- with a variety of bases for
12   Westly Greer.
13   Q.  And so you should have a green sheet in there which
14   corresponds to the tab on the digital version.
15          What do you see behind the first green tab there?
16   A.  Is there a page number?
17   Q.  It's just one page.  It starts with base name in the
18   upper left-hand corner.
19   A.  Okay.  I'm not there.
20          So it's not the first page that you're referring to?
21   Q.  No.  So first, it starts with what you just identified as
22   the plan.
23   A.  Yes.
24   Q.  Oh, you know what?  I think I missed a divider.  I
25   apologize.
```

```
 1              All right.  And then behind the plan, what's behind
 2     the next green slip sheet there?
 3     A.   The next sheet would be the order sheet.
 4     Q.   Okay.  And, again, that's Mr. Greer's order sheet?
 5     A.   Yes.
 6     Q.   And if we keep going behind that, let's just skip all the
 7     way to the last -- last document in the back.  The tab is
 8     data in the digital version.
 9     A.   Uh-huh.
10     Q.   What is that?
11     A.   That would be the POC information.
12     Q.   All right.  And do you recognize this Exhibit 115 to be
13     Mr. Greer's portal?
14     A.   Yes.
15              MR. WILSON:  We would move for the admission of
16     115.
17              THE COURT:  Any objection?
18              MR. MCFARLAND:  No, Your Honor.
19              THE COURT:  All right.  It will be admitted.
20              MR. GORDON:  All right.  If we could publish that
21     to the jury, please?
22              THE COURT:  All right.  You may publish.
23              (Plaintiff's Exhibit 115 received in evidence.)
24     BY MR. GORDON:
25     Q.   All right.  And I would like to start with you talking
```

1   about that tab that we have got up on the screen, the data
2   tab.  Do you see that?
3   A.  Yes.
4   Q.  All right.  And it's named data on the digital version,
5   but what do we see present in this chart?
6   A.  We were working on the lookup table.  It's geek speak.
7   I'm sorry.  So you would have another spreadsheet with all of
8   the information that you're looking at right here with all of
9   the part numbers, the kit names.  The idea was -- is that the
10  account managers wouldn't have to go through the process of
11  typing things over and over and over again.  They would just
12  be able to put in a part name, and then the rest would
13  populate.
14  Q.  And how is it selected what part names would go into the
15  V lookup table?
16  A.  These, in particular, are for -- I see a couple of them
17  here for non-standards.  Most of these are -- about half of
18  them are NSNs.  Half of them are non-standards.
19  Q.  Were these items that were frequently sold?
20  A.  Some of them.  I believe it was more of a test sheet than
21  actual physical use, but that's my recollection.
22  Q.  All right.  And in the left-hand side, left-hand column,
23  you see a number of contacts; is that correct?
24  A.  Yes.
25  Q.  All right.  And if we could just scan down so that

1   everyone could see how -- or just see the length of that

2   list.

3          All right.  It looks like there is approximately 162

4   contacts there in Mr. Greer's portal?

5   A.  161 plus the header, yes.

6   Q.  Yes.  Okay.  And if we go to the first page, the plan,

7   the left-hand column, we looked at this before, this is the

8   same form that we looked at for Mr. Hayes, correct?

9   A.  Correct.  And you will see the different base names

10  there, which is why we added that column.

11  Q.  All right.  And was Mr. Greer limited to Fort Carson?

12  A.  Oh, no.

13  Q.  And if we would scan down, are the other base names in A,

14  bases where he sold on behalf of GMS Industrial?

15  A.  Yeah.  He was basically -- being in his position, he was

16  there to break open territory, to assess places.  So he went

17  to multiple bases.

18  Q.  Okay.  And there is a final column that's off the

19  monitor; if we could take it all the way to the right edge.

20          So, we see 2016, and then when we skip -- we scan

21  down.  We get to a break where it jumps from 2016 to 2019.

22  Do you understand why there is that break in his plan between

23  2016 and 2019?

24  A.  Yes.  At some point in -- I don't know the exact date,

25  but he became a manager of people, and so the rest of the

```
 1    account managers were handling the customers and the
 2    territory.  He was managing them.  And then, in 2019, his
 3    agreement changed, and he was back to the regular account
 4    manager role.
 5    Q.  All right.  If you could now take out 119, please.
 6    A.  Is that another?
 7    Q.  Yeah.  It should be.  If I organized them well, it would
 8    be the next one in your pile.
 9    A.  Okay.  And you did.
10    Q.  All right.  Do you have it in front of you?
11    A.  Yes, I do.
12    Q.  All right.  If you could just take a look at it quickly.
13    I know it's rather large.  Do you recognize this document?
14    A.  I have to get to -- because you started with the order
15    sheet, I don't have the base name on here.  This is Greg
16    Spires.
17    Q.  Greg Spires, okay.
18         And the first document behind the cover sheet, that
19    is the sales tracking that we've discussed?
20    A.  Yes.
21    Q.  All right.  And then behind the first sheet is some
22    contacts?
23    A.  Where am I looking at it now?
24    Q.  So, in the paper copy --
25    A.  Uh-huh.
```

1  Q.  -- so, we have these green sheets in here.  So, you just
2  identified that the first one was the sales tracking, and
3  then we've got a green sheet.  And I'm just asking you what
4  document you've got behind that.
5  A.  So, we went to the sale tracking.  Now we're at the POC
6  information.
7  Q.  Yes.  Exactly.  Thank you.
8        All right.  And then --
9  A.  This is actually -- no, no, no.  This is the plan because
10  we've got the notes to include the sale on here.
11  Q.  Okay.  And what -- the plan, what's the -- the top left,
12  what do you see?
13  A.  Fort Sill.
14  Q.  Fort Sill, okay.
15        And in that packet, do you also have a POC?
16  A.  Let me see.  I've never seen them printed out like this
17  before.  You'll have to bear with me.
18  Q.  Sure.  And we can look on the screen as well.
19  A.  They're huge.
20        I can look on the screen?
21  Q.  Yeah.
22  A.  Okay.  Wonderful.  Yes, that's the POC information.
23  Q.  Okay.  So, what you've just reviewed, is that the portal
24  for Mr. Spires?
25  A.  Yes, it is.

1          MR. GORDON:  Your Honor, we move for the admission

2     of Exhibit 119.

3          THE COURT:  Any objection?

4          MR. MCFARLAND:  No objection, Your Honor.

5          THE COURT:  All right.  It will be admitted, and

6     you may publish.

7          (Plaintiff's Exhibit 119 received in evidence.)

8          MR. GORDON:  All right.  Publish to the jury,

9     please.

10    BY MR. GORDON:

11    Q.  I want you to go ahead and flip to the plan tab for me.

12    And if we could scan all the way to the right, to the notes

13    column.

14         All right.  As we look down in the third and fourth

15    boxes down, it says "no funding."  Why would that be helpful

16    to have that information for GMS?

17    A.  Because that particular unit didn't have funds available

18    to them to purchase materials.

19    Q.  All right.  And how could the sales agents use that

20    information?

21    A.  They would find out when the funding would be coming in.

22    They would continue to meet with the customer, build a needs

23    list, and they just know that they wouldn't be able to fund

24    an order.

25    Q.  And again, if we scan across, we can see that this

1    information is also in a row that has the point of contact's

2    name and their base?

3    A.   Some of our account managers are not the best at filling

4    out the data.

5    Q.   Let's move on to 120.

6         If you could take a look at 120 for me.

7    A.   Yes.  Got it.

8    Q.   And do you recognize Plaintiff's Exhibit 120?

9    A.   Yes.  This is Fort Hood.  This is going to be Mike

10   Welton.

11   Q.   And was he good at keeping his records?

12   A.   He was unique at keeping his records.

13   Q.   And if you just look through here, does this include the

14   plan and his contact list --

15   A.   Yes.

16   Q.   -- and the sales tracking?

17   A.   Yeah.

18   Q.   All right.  And you recognize this?

19   A.   (Witness nodded.)

20        MR. GORDON:  All right.  Move for the admission of

21   Plaintiff's Exhibit 120.

22        THE COURT:  Any objection?

23        MR. MCFARLAND:  No objection, Your Honor.

24        THE COURT:  All right.  It will be entered.

25        You may publish.

```
 1            MR. GORDON:  All right.  If we could publish it.
 2            (Plaintiff's Exhibit 120 received in evidence.)
 3  BY MR. GORDON:
 4  Q.  And let's bring up -- we've got the first map up.  Let's
 5  scan all the way to the right.
 6            Did Mr. Welton track an area that not all of the
 7  other sales agents did?
 8  A.  Some of them do.  He kept track of what products were in
 9  use, and that's awesome.
10  Q.  All right.  And why is that information helpful to GMS?
11  A.  That's very helpful because not only do customers change,
12  they're deployed to other areas, but that unit itself uses
13  that same material whether that person is there or not.
14  Q.  And that information is contained here in GMS' Google
15  drive?
16  A.  Yes.  That's in our Google drive.
17  Q.  And what fort did Mr. Welton sell at?
18  A.  He was at Fort Hood.
19  Q.  All right.  If you could go to Exhibit 124.
20  A.  Okay.
21  Q.  And if you could just take a look through what you've got
22  there.  Do you recognize this to be another sales agent
23  portal?
24  A.  Yeah.  This is Sabrina Greer.
25  Q.  Okay.  Sabrina Greer?
```

```
 1   A.   Uh-huh.
 2   Q.   All right.  It includes her plan, her contact list, and
 3   her sales history?
 4   A.   Yes.
 5            MR. GORDON:  Move for the admission of 124.
 6            THE COURT:  Any objection?
 7            MR. MCFARLAND:  No objection, Your Honor.
 8            THE COURT:  All right.  It will be admitted.
 9            You may publish.
10            (Plaintiff's Exhibit 124 received in evidence.)
11            MR. GORDON:  Thank you for publishing it, Madam
12   Clerk.
13   BY MR. GORDON:
14   Q.   What -- based on this, what fort did Ms. Greer mainly
15   sell at?
16   A.   Fort Carson, Colorado.
17   Q.   And if we could go to the sales tab SMS GCS Fort Carson.
18   And again, this lists the sales price of every sale that she
19   reported?
20   A.   Yes.
21   Q.   And if this information became public, the sales price of
22   every sale she made would be available?
23   A.   Yeah.
24   Q.   And this POC name, those were the chiefs that she sold
25   to?
```

```
 1    A.  Excuse me?
 2    Q.  The POC name, the column D, those were the contacts that
 3    she sold to?
 4    A.  Yes.
 5    Q.  All right.  And do you see a Chief Oyola in that column?
 6    A.  Yes.  Right there, uh-huh, 162.
 7    Q.  If we go over to the POC tab, those would be her
 8    contacts?
 9    A.  Yes.
10    Q.  All right.  And if we go down about halfway -- actually,
11    I think we need the info tab.
12         Didn't we see the same on Mr. Greer's?  He had an
13    info tab that had names --
14    A.  He had a desktop.
15    Q.  -- and contacts, and then the POC that was largely empty?
16    A.  They always have the freedom to add another tab or so if
17    they want to.  I just need to have the ones that are standard
18    to stay.
19    Q.  And if we go scan down to the bottom of that, about how
20    many --
21         THE COURT:  We're going to have a hard time hearing
22    you over there.
23         MR. GORDON:  I'm sorry, Your Honor.
24    BY MR. GORDON:
25    Q.  Yes.  If we scan down to the bottom, about how many
```

1   contacts do we see there for Ms. Greer?

2   A.   So 146.

3   Q.   Okay.  And can we identify a Chief Conant on there in the

4   list?

5   A.   Yes.

6   Q.   It might take a little looking.

7         You do see Chief Conant?

8   A.   Uh-huh.

9   Q.   Okay.  And in your role, did you follow up with the sales

10  agent defendants about their plans?

11  A.   Yes.

12  Q.   All right.  And after you followed up with the defendant

13  sales agents, what happened?

14  A.   It was new to have me working on this plan.  I read them

15  every day, and so I started contacting the account managers

16  to ask them questions about their plans; why an order was

17  sitting there so long and not having been received, those

18  sorts of things.  Not only learning, but holding them

19  accountable to keep their plans up-to-date, and there was

20  some that were particularly unfriendly about it.  They didn't

21  want to be questioned about it, and they would rather that I

22  would have spoken to Westly.  Westly would rather that I

23  spoke to him instead of his people.

24  Q.   All right.  Did you contact Mr. Spires directly?

25  A.   Yes.

```
 1    Q.  All right.  And after you did that, did you receive a
 2    call about that from anyone else?
 3    A.  Yes.  It was around when I first started doing this that
 4    there was a lot of questions about why I needed to be
 5    contacting the account managers when, you know, they were
 6    being managed.  Why do I need to contact them?
 7    Q.  All right.  And who asked you why you were contacting
 8    Mr. Spires?
 9    A.  Westly.
10    Q.  And did Mr. Greer confront you about contacting any other
11    sales agents directly?
12    A.  He said "agents" in plural.
13    Q.  Okay.  Does GMS utilize the data in the sales agent
14    portals in any other ways?
15    A.  So many ways.  We're able to track all of the customers
16    for a particular base, for a particular account manager.  We
17    know that they're getting visited regularly and that our --
18            THE COURT:  I'll get you to slow down just a little
19    bit.
20            THE WITNESS:  My apologies.
21            THE COURT:  That's okay.
22            THE WITNESS:  I get excited.
23            THE COURT:  That's okay.
24            THE WITNESS:  I can see that the quality of care is
25    there by knowing that they visited all of the customers and
```

```
 1   they're making those visits.  And they're just creating,
 2   it's really relationships, so that's what it signifies.  The
 3   order sheets are invaluable to me because they allow me to
 4   project materials coming in.  We're able to have our items
 5   ready to be shipped, and I also can tell when something is
 6   moving more slowly.  Or, I mean, it's a plethora of
 7   information.
 8   BY MR. GORDON:
 9   Q.  And do you take the sales information and aggregate it
10   into a larger document?
11   A.  Yes.
12   Q.  All right.  And who has access to that document?
13   A.  Very, very few people.  I don't like people playing with
14   my data.
15   Q.  Okay.  Did Mr. Greer have access to that --
16   A.  Yes, he did.
17   Q.  -- data prior to his termination?
18   A.  Yes.
19   Q.  All right.  After Mr. Greer was terminated, did he return
20   his desktop computer, notebook computer, and tablet to GMS?
21   A.  Yes.
22   Q.  All right.  I would like you to look at 113.  I believe
23   that's in binder 2.
24           Do you recognize -- do you recognize this document?
25   A.  Yes.
```

```
1    Q.  All right.  And what is this?
2    A.  So, this is a material form.  It's a receipt of company
3    property that gets issued to any employee of the company that
4    we give any kind of technical material to.
5    Q.  Okay.  Great.
6            And if you could scan up so we can see the date on
7    the bottom.
8            What's the date on the bottom of this?
9    A.  11/30/2017.
10   Q.  All right.  And this was issued when the equipment was
11   given to Mr. Greer?
12   A.  Yes.
13   Q.  All right.  And it has tracking numbers on it?
14   A.  It has the serial numbers, yes.
15   Q.  All right.  And is this utilized by GMS in its business?
16   A.  Yes.
17   Q.  All right.  And you've seen this before?
18   A.  Uh-huh.  Yes, I have.
19   Q.  How did you utilize this document?
20   A.  Excuse me?
21   Q.  How did you utilize this document?
22   A.  We used it to track any material that left GMS offices
23   and was being utilized out in the field.
24   Q.  All right.  And is this a true and accurate copy?
25   A.  Excuse me?
```

```
1    Q.   Is this a true and accurate copy?

2    A.   Yes.

3              MR. GORDON:  All right.  We'll move for the

4    admission of 117.

5              THE COURT:  Any objection?

6              MR. MCFARLAND:  No objection, Your Honor.

7              THE COURT:  All right.  It will be admitted.

8              (Plaintiff's Exhibit 117 received in evidence.)

9    BY MR. GORDON:

10   Q.   And when Mr. Greer's computers were returned, were they

11   put in your possession?

12   A.   Yes.

13   Q.   And what did you do after you received them?

14   A.   They were in my office where I could see them, physically

15   see them.

16   Q.   Okay.  And then did you send them on to someone else?

17   A.   We took out the account materials that were in there and

18   left the computers wrapped in paper like they came to me.  I

19   escorted them over to our operations, warehouse operations,

20   who is a specialist at packaging items, and he shipped them

21   to BDO.

22   Q.   Okay.  When you say you removed some materials, you mean

23   you removed some materials from the packaging, not from --

24             MR. MCFARLAND:  Objection, Your Honor.  Wait.

25   Whoa.  Objection.  I've let the leading go, but that is a
```

```
 1    leading question.  I am going to object.  The witness ought
 2    to tell us what she did, not Mr. Gordon.
 3           THE COURT:  It's leading.  It's okay.  All right.
 4    It's leading.  So, I think it is leading.  The objection is
 5    sustained.
 6           I'll just ask you to rephrase.
 7           MR. GORDON:  All right.
 8    BY MR. GORDON:
 9    Q.  You stated you -- did you remove some items from a
10    package that you received from Mr. Greer?
11    A.  There were GMS polos and other sample materials that were
12    in the box with the computers, and I separated those out.
13    Q.  Did you remove any data from the computer?
14    A.  I did not unwrap the paper off of the computer.  I didn't
15    do anything with the computers.
16    Q.  All right.  As the marketing manager and with your
17    continuing IT duties, do you have access to GMS Industrial's
18    Google vault?
19    A.  Yes, I do.
20    Q.  All right.  And was a search of that Google vault
21    conducted after the existence of G&S Supply was discovered?
22    A.  Yes, hours and hours and hours of search in the vault.
23    Q.  Did you participate in that search?
24    A.  Yes.
25    Q.  All right.  And what did you do to carry out that search?
```

1    A.   We, myself in particular, picked up keywords, you know,

2    starting out with a G&S email address and then moving on from

3    there.   Every one that I found, I found more keywords, and I

4    was able to create a list of keywords to look through the

5    hundreds, maybe hundreds of thousands of emails that we have

6    in our vault.

7    Q.   All right.   And did you discover emails that had GMS

8    Industrial email addresses that were requests for G&S Supply

9    products?

10   A.   Yes, I did.

11   Q.   I would like to ask you if you could look at Exhibit 107,

12   and that should be in binder 2.

13        Is this one of those documents that you identified in

14   your search?

15   A.   Yes, it is.

16        MR. MCFARLAND:   There is an objection to this

17   exhibit, Your Honor, that's still under advisement.

18        THE COURT:   All right.   Okay.

19        MR. GORDON:   Should we take it up?

20        THE COURT:   Sure.   Yes.   Headsets.   Headsets.

21        *(Sidebar conference as follows.)*

22        MR. GORDON:   Can you hear me, Your Honor?

23        THE COURT:   Okay.   Can everybody hear me?   Thumbs

24   up if you can.

25        All right, Mr. McFarland.   Your objection to this

1   document?

2            And can you state the document number again,

3   Plaintiff, Plaintiff's Counsel?

4            MR. GORDON:  Yeah.  I believe it's 107, Plaintiff's

5   Exhibit 107.

6            THE COURT:  107, okay.

7            Yes, Mr. McFarland.  I'll hear you.

8            MR. MCFARLAND:  Yes, Your Honor.  We object to this

9   document on the grounds of hearsay.  In fact, it's double

10  hearsay.  It's not authored by anyone at GMS.  It's authored

11  -- well, the authors are William G. Long, who is apparently

12  a military officer, senior auto warrant officer.  And there

13  is communications between Mr. Long, a Miss Wagner at the

14  U.S. Army as well, and Mr. Spires.  And it appears to be --

15  I'm not exactly sure what it's being offered for, but it

16  appears to be offered for the truth of the matter of what's

17  in here.  It is not a business record, obviously, of GMS.

18  And the fact that they found it on their drive doesn't make

19  it admissible as an exhibit.

20           THE COURT:  All right.

21           Plaintiff.

22           MR. GORDON:  Thank you, Your Honor.

23           Factually, so we've got an email here from a

24  customer here with the military.  Mr. Spires is the

25  recipient of the top email and also a recipient at the top

1    of page 2.

2            We discussed yesterday that there is admissibility

3    for the limited purpose of confusion.  Here we have a G&S

4    request for parts.  It's got a G&S part number that is sent

5    to a GMS email address.  So it's evidence of confusion.

6            And additionally, this is part of the response to

7    the notice prior to filing the suit on April 3rd.  If you

8    look, it has the April 3rd date in the top left-hand corner.

9            But we did some research.  So the Fourth Circuit,

10   *Benedi versus McNeil-P.P.C., Inc.*, this is a Fourth Circuit

11   1995, 66 F.3d 1378.

12           THE COURT:  All right.

13           MR. GORDON:  And in that case, they said, "We find

14   the district court did not abuse its discretion in admitting

15   the DERs and case summary, because the plaintiff offered the

16   evidence solely to prove notice.  In addition, the district

17   judge properly gave a limiting instruction to the jury that

18   it could only consider the DER and case summaries as

19   evidence of notice."

20           So, we're offering this as notice of G&S' dealings.

21   The DERs in this case were drug experience reports, and this

22   was a case about the interaction of Tylenol and alcohol, so

23   evidence of other interactions was admissible for the

24   purpose of notice.

25           So, we would move to admit this document on the

1  grounds of notice and based on evidence of confusion.  And

2  we would move that this should be admitted on those bases.

3  And if the Court finds it appropriate to issue a limiting

4  instruction, certainly that would be agreeable.

5          THE COURT:  So, what is your evidence with respect

6  to this email about confusion?  Who in this email says

7  they're confused about whether it's GMS or G&S, or somebody

8  thinking that they're dealing with GMS, but they're actually

9  ordering a G&S product?

10          MR. GORDON:  Yes, Your Honor.  So, we've had

11  testimony already about the part numbers.

12          THE COURT:  Yes.

13          MR. GORDON:  And if we look about two-thirds of the

14  way down on page 1, it says, "I did another one."  And the

15  subject is "Order".  So, he is saying, "I did another order

16  with a G&S part number."  And that gets forwarded to Chief

17  William Long, and Chief William Long then sends it to

18  Mr. Spires.  So, we've got essentially a follow-up on a G&S

19  product to a GMS Industrial email address.  So that's the

20  evidence of confusion.  These people are coming to GMS email

21  addresses and saying, you know, Here is my order.

22          THE COURT:  Right.  So, with respect to the

23  confusion argument, I understand what you're saying, but I

24  think there needs to be some other evidence to kind of round

25  that out.  So, I'm not saying that you can't bring it in on

1     confusion.  I don't think you can bring it in now based on

2     what I've heard.  So, on that ground, the objection is

3     sustained.

4            Did you have another ground that you were seeking

5     to move it in on?

6            MR. GORDON:  The other one was notice.  That was

7     the Fourth Circuit case that I had just read.  And there is

8     a companioning Western District of North Carolina that talks

9     about evidence; hearsay evidence can be admitted for the

10    purpose of notice.

11           In that other case, Silicon Knights, Inc. versus

12    Epic Games, Inc., there was a purchase of some software by

13    one company, and it delayed the delivery of their products.

14    And they offered other complaints by other users of this

15    same software as evidence of notice that the software was

16    insufficient.

17           And the Court stated, "When evidence is offered for

18    the limited purpose of proving notice or state of mind, it

19    is not hearsay.  Thus, Silicon may offer evidence of

20    complaints that other licensees made before May 10th for the

21    limited purpose of showing Epic's notice and state of mind."

22           And this is the issue that was raised on

23    Mr. Gorken's cross.  What notice and what state of mind did

24    you have before you went terminating my clients?  That was

25    the argument that was posited.  And this is a direct

 1   response to that.  It shows what notice, what state of mind

 2   they had.  We put in the emails, and the witness would

 3   testify that they were provided to Mr. Gorken.

 4           THE COURT:  All right.

 5           Mr. McFarland, on the issue of notice.

 6           MR. MCFARLAND:  Yeah.  There is nothing in this

 7   document that pertains to notice whatsoever.  The email

 8   exchange is from January 2019.  There is not a dispute that

 9   as of April 3rd they had notice of my clients, or at least

10   two of my clients, Spires and Greer, with respect to G&S

11   Supply.  We've never questioned that.

12           My questioning yesterday of Mr. Gorken was what did

13   he have evidence of for Sabrina Greer, Thomas Hayes, Mike

14   Welton.  That's a different matter.

15           But this document is being offered for the truth of

16   the matter about -- through double hearsay of communications

17   with warrant officers in the Army.  The Court has already

18   ruled on the confusion, but, also, this document doesn't

19   provide any evidence of notice.

20           THE COURT:  Thank you, Mr. McFarland.

21           What is the evidence of notice in this document?

22   So show me what the notice portion of it is.

23           MR. GORDON:  The notice portion is the date, the

24   4/3/2019 date, in the upper left-hand corner.  So, she

25   testified about how they did this search once they found out

1   about G&S.  Mr. Gorken testified about this as well.

2             THE COURT:  All right.

3             MR. GORDON:  So, they did the search, and then they

4   got notice of these G&S sales by GMS account

5   representatives, and I've got two that have got Sabrina

6   Greer.

7             MR. MCFARLAND:  But that's not at issue, Your

8   Honor.  It's not at issue that they --

9             THE COURT:  All right.  Just a minute.

10            So, Plaintiff, what is it that you want to -- if I

11  did allow you to introduce this, what is it that you want to

12  ask this witness?

13            MR. GORDON:  Yeah.  So, we laid the foundation for

14  the investigation.  We asked her if she found emails

15  requesting G&S supplies for -- sent to GMS asking for G&S

16  Supply materials.  Then I'm going to ask her:  Is this one

17  of the emails that you received?  What did you do with it

18  after you found it?  And she will testify, I forwarded it to

19  Mr. Greer.

20            THE COURT:  Okay.

21            MR. GORDON:  I mean, not Mr. Greer.  Mr. Gorken.

22            THE COURT:  So, I think I'm going to sustain the

23  objection in part and overrule it in part in this way.  I'm

24  going to allow you to ask her about it.  At this time, I'm

25  not going to allow you to introduce it, but I think there is

1   a basis, based on what you've argued, for you to be able to

2   introduce it.  I just think I need a little bit more either

3   on the notice issue or on the confusion issue.  I think you

4   have dual ways to introduce it, actually triple ways to

5   introduce it.  Because although Mr. McFarland raised that

6   there is hearsay within hearsay contained within the

7   document, which is true -- which is why I was reading it --

8   that doesn't necessarily keep it out.  There is a way to

9   also get that in.  So there is three bases for you to be

10  able to get it in.  I just don't think you've gotten there

11  yet.  But I will allow you to show her the document and

12  question her in the way that you've just laid out.  All

13  right?

14          MR. GORDON:  Thank you.

15          MR. MCFARLAND:  Well, Your Honor, my concern is

16  that if he questions her about the contents of the document,

17  he is backdooring --

18          THE COURT:  I didn't say the contents of the

19  document.

20          MR. MCFARLAND:  Okay.

21          THE COURT:  I'm talking about what she did with the

22  document when she found the document, what she related --

23  exactly what he said.  He didn't say anything about the

24  contents of the document when I asked him what he was going

25  to ask her about.

```
 1                 All right.  Thank you.  Let's go.
 2                 (End of sidebar conference.)
 3    BY MR. GORDON:
 4    Q.  All right.  When we left off, Ms. Rupley, I think we were
 5    discussing an investigation of GMS' Google vault that you
 6    participated in.
 7    A.  Yes.
 8    Q.  All right.  Do you still have Exhibit 107 in front of
 9    you?
10    A.  Yes.
11    Q.  All right.  And what date did you uncover this document?
12    A.  Very, very soon after everything started.  I don't know
13    if that 4/3 means anything on there, but it was very shortly
14    after the discovery of G&S.
15    Q.  And is this Exhibit 107 one of the documents that you
16    discovered in that investigation?
17    A.  Yes.
18    Q.  All right.  And after you located it, did you forward it
19    to Mr. Gorken?
20    A.  I downloaded it as a PDF, and I shared it with Chris
21    Morton, Gary Gorken, and Renee Robichaux, our team.
22    Q.  All right.  And who is the recipient of this email?
23    A.  The recipient was Greg Spires.
24    Q.  All right.  And why did you flag this email?
25    A.  Because GMS part numbers began with GMS or GM.  These
```

```
 1    part numbers began with GS, and it had the cage code for G&S
 2    on the orders.
 3    Q.  Thank you.
 4         If you could move to Plaintiff's Exhibit 103.  It
 5    should be in that same binder.  Are you with me at Exhibit
 6    103?
 7    A.  Now I am, yes.
 8    Q.  Okay.  Was this another email that you uncovered during
 9    your search?
10    A.  Yes, it is.
11    Q.  All right.  And it would have been in that same time
12    frame?
13    A.  Yes, it would.
14    Q.  All right.  And was this also forwarded to that same
15    group, or placed in a PDF and sent to that same group?
16         MR. MCFARLAND:  Objection to the leading, Your
17    Honor.
18         THE COURT:  All right.
19         MR. MCFARLAND:  Literally, Mr. Gordon is --
20         THE COURT:  You've made your objection.  I don't
21    need the rest of it.
22         Objection sustained.
23         Rephrase your question.
24    BY MR. GORDON:
25    Q.  What did you do with this email after you found it?
```

```
1    A.  I did like I did with all of them.  I printed it to PDF.
2    I forwarded it to the group.  And by this time, we were
3    getting a number of emails, so we started building a folder
4    on our Google drive, and that folder is shared between the
5    team of us that were doing the discovery.
6    Q.  Who was the recipient of this email?
7    A.  Sabrina Greer.
8    Q.  All right.  And what's the email address?
9    A.  Sabrina.Greer@gmsindustrialsupply.com.
10   Q.  So that's a GMS company email address?
11   A.  GMS, correct.
12   Q.  Yes.  And why did you include this email with those that
13   you brought to everyone else's attention?
14   A.  You would have to scroll down a little bit, but I believe
15   this is another one of the ones that had the part numbers
16   from -- yes, the GS2201 and that whole line of the part
17   numbers there.
18          MR. MCFARLAND:  Your Honor, this is what I was
19   concerned about.  We're now getting into the hearsay.
20          THE COURT:  We're not going to discuss the
21   particulars of the email.
22          MR. GORDON:  Okay.
23   BY MR. GORDON:
24   Q.  If you could flip to Plaintiff's Exhibit 104.  Is this
25   another email that you uncovered in your investigation?
```

1   A.  Yes, it is.

2   Q.  All right.  And what did you do with this email after you

3   discovered it?

4   A.  Printed it to PDF, shared it with my team, and put it in

5   our folder.

6   Q.  Okay.  All right.  Let's go on to Plaintiff's

7   Exhibit 105.

8          All right.  And did you uncover this document as part

9   of your investigation?

10  A.  Yes.

11  Q.  All right.  And who is the recipient email for

12  Exhibit 105?

13  A.  Mike.Welton@gmsindustrialsupply.com.

14  Q.  So if it ends in @gmsindustrialsupply.com, that's a GMS

15  company email address?

16  A.  That's my domain, yes.

17  Q.  All right.  And this was in GMS' Google vault?

18  A.  Yes, it was.

19  Q.  All right.  And what did you do after you discovered this

20  email?

21  A.  I printed it to PDF, shared it with my team, and put it

22  in the folder.

23  Q.  All right.  Ms. Rupley, if you could go ahead and look at

24  Plaintiff's 258.  It's going to be in binder 4.

25          All right.  Ms. Rupley, I think you testified earlier

```
 1    that you deal with these award forms in performance of your
 2    job?
 3    A.  Yes.
 4    Q.  All right.  And are some of G&S Supply's awards on this
 5    same document?
 6    A.  Yes.
 7    Q.  Okay.  Number 3, in the field at number 3, it says "Date
 8    of Order" --
 9         MR. MCFARLAND:  I'm not able to see the document.
10         THE CLERK:  I don't have 258, Your Honor.
11         THE COURT:  We don't have 258.
12         MR. GORDON:  Okay.
13         MR. LASCARA:  258?
14         MR. GORDON:  Yeah.  This is --
15         Your Honor, do you need our copy?
16         THE COURT:  I've got something in 258.
17         MR. GORDON:  All right.  Thank you, Your Honor.  I
18    apologize.
19         THE COURT:  Does it say "Order For Supplies or
20    Services" at the top?
21         MR. GORDON:  Correct.  And it has a Bates name Fort
22    Sill 116 in the top right-hand corner.
23         THE COURT:  Okay.  Yes.  I have that.
24         MR. GORDON:  Thank you.
25         THE COURT:  I have it.  The courtroom deputy
```

 1   doesn't have it.

 2           All right.  Go ahead.

 3   BY MR. GORDON:

 4   Q.  So, in the top of that document in Box 3 is a Date of

 5   Order/Call.  What is the date that goes in that box?

 6   A.  That's the date the material was awarded by DLA.

 7   Q.  Okay.  And what do you mean by awarded?

 8   A.  There is a whole process to getting an award.  I don't

 9   want to drag it all out, but when the account manager is in

10   the field and is with a customer, and the customer decides

11   they need to procure material, they will put the order -- put

12   the material in their GCSS Army system.  This is for Army

13   customers.  And it will -- if it's not an NSN item, it is a

14   non-NSN item.  It will go to DLA for solicitation.  And when

15   they have done their due diligence on that solicitation, they

16   award the material to a company.

17   Q.  Okay.  If we go about a third of the way down, there is a

18   Box 16, Type of Order.  Are you with me?

19   A.  Yes.

20   Q.  And in the middle of that, it says "Reference Your

21   Offer/Quote," dated 2018 December 28.

22   A.  Yes.

23   Q.  What is that the date of?

24   A.  The solicitation that came out for that order.

25   Q.  All right.  And who issues the solicitation?

1    A.   Excuse me?

2    Q.   Who issues the solicitation?

3    A.   DLA.

4    Q.   DLA, okay.

5         Now, there is another date if we go further back here

6    on to page 5 of 5.  So there is a row that starts with M/F.

7    Is there a date in that column?

8    A.   Yes, there is.

9    Q.   All right.  And can you explain it?

10   A.   The military uses a Julian date, and it counts the days

11   of the year.  And of course, that's going to change year by

12   year because of leap years and other such things.  And so the

13   first six digits in the document number that you're looking

14   at -- they also call it a TCN number.  We call it a doc

15   number -- is the DoDAAC, which is like the address for the

16   buyer of the material, and then the second four digits are

17   the Julian date.

18   Q.   What numbers are the Julian date on here?

19   A.   The Julian date would be 835 -- yes.  Thank you -- 8354.

20   Q.   What does the 8 signify?

21   A.   It would be '18 because you add a 1 to the front of it.

22   It would be 2018.

23   Q.   Yeah.  Okay.

24        And the 354, how does that correspond to a date?

25   A.   It would be the 354th day of the year.

```
1   Q.  Okay.  And what happens on this date?
2   A.  That's the date that they push the order to their SPO,
3   their budgeting department, and it allows funds to be applied
4   to the order, money.
5   Q.  What happens after they allow the funds to be applied?
6   A.  Once the funds are applied, then DLA can actually see the
7   order.  Before it's just kind of like a vapor.  It's just a
8   thought until the money goes behind it, and then it's an
9   actual -- it becomes an order.
10  Q.  All right.  And so what happens between this date that we
11  just looked at and the first date that we looked at, at the
12  top in number 3, which in this document is 2019, April 5th?
13  A.  There is a lot in the process, but once this gets funding
14  behind it and it goes national --
15          MR. MCFARLAND:  Your Honor, I'm going to object.  I
16  understand that the witness has experience with DLA forms
17  and awards, but now she's testifying as to what DLA did, and
18  that's improper.  There is not a foundation for that that
19  has been laid.  The witness' testimony is the award date
20  was, I think -- I don't have it exactly memorized, but
21  something in April of 2019.  That's the award date.  She
22  says that's when it was awarded.
23          THE COURT:  Right.  But she's explaining the rest
24  of the document.
25          So, you answer the objection.  Go ahead.
```

1          MR. GORDON:  Yeah.  This is a part of her job.
2    They deal with this in their job.  They get these awards.
3    They understand the process.
4          THE COURT:  Objection overruled.  Objection
5    overruled.
6          Go ahead.
7    BY MR. GORDON:
8    Q.  Does one of these dates correspond with when the sale
9    gets pushed out to the DIBBS Board?
10   A.  So, when it gets pushed out to the DIBBS board, the DLA
11   team will push out a solicitation that there -- it's a
12   request for quote.  They want other companies.  They want
13   vendors to put in their bids on these items so that the
14   government gets the best possible price and the best possible
15   material to support the warfighter.
16   Q.  So the date that it goes out to the DIBBS Board would be
17   the number in 16 that you described as the solicitation?
18   A.  Yes.
19   Q.  All right.  And what do all of these dates tell us about
20   when the agent provided a quote to the customer?
21   A.  It doesn't, because that happens before all of this.
22   This is a result of that quote given to the customer.
23         MR. GORDON:  Your Honor, we're going to move for
24   the admission of 258.
25         THE COURT:  All right.  Any objection?

```
 1              MR. MCFARLAND:  Yes, Your Honor.

 2              The testimony is that the award date here was past

 3    April 3rd of 2019.  And the witness just said she doesn't

 4    know even when the solicitation was made by the sales agent.

 5    It's not on this document.  So the only evidence is --

 6              THE COURT:  Right.  But your objection is if it was

 7    after April of 2019, correct?

 8              MR. MCFARLAND:  Correct, and it was.

 9              THE COURT:  This is before April of 2019, isn't it?

10              MR. MCFARLAND:  No.  No.  The award date is after

11    April 3rd of 2019.

12              THE COURT:  The award date.  But her testimony was,

13    I believe, was that anything that the agent did preceded

14    April of 2019.  So once the agent has done his work, it goes

15    in.

16              So the objection is overruled.  It's coming in.

17              All right.  Let's go ahead.

18              (Plaintiff's Exhibit 258 received in evidence.)

19    BY MR. GORDON:

20    Q.  All right.  If you could come with me to 279.

21              THE CLERK:  I don't have this one either.

22              THE COURT:  You don't have 279?

23              MR. GORDON:  Yes.

24              THE COURT:  We don't have 279.  When I say we, I

25    mean my courtroom deputy, who is the important person
```

```
 1   because she's putting your exhibits into evidence.
 2   BY MR. GORDON:
 3   Q.  All right.  Ms. Rupley, are you with me on Exhibit 279?
 4   A.  Yes.
 5   Q.  All right.  And what is the number 16 reference here,
 6   Offer/Quote Date?
 7   A.  That would be April 4th, 2019.
 8   Q.  And what is the Julian date?
 9        MR. MCFARLAND:  Your Honor, I'm going to object.
10   Even the offered date here is after April 2019.
11        THE COURT:  Yeah.  So, I'm going to have them blow
12   it up or something because I'm having trouble seeing it.
13   Let me look.
14        MR. LASCARA:  Could we put it on the document
15   camera?  Would that help?
16        THE COURT:  I'll just look at it.  Hold on.
17        So, Mr. McFarland, is your objection that the
18   information that's in Box 16 is prior to 2019?
19        MR. MCFARLAND:  It's --
20        THE COURT:  Or are you dealing with Box 3?
21        MR. MCFARLAND:  I think even Box 16, Your Honor.  I
22   understand the Court's ruling on Box 3, if you will.
23        THE COURT:  Right.
24        MR. MCFARLAND:  But Box 16 is post April 3rd, 2019,
25   as well.  In other words, my clients had already been
```

```
 1   terminated by the time this was even offered.
 2             THE COURT:  Which exhibit is this?
 3             MR. MCFARLAND:  279, I think is what the plaintiffs
 4   are offering, Your Honor.  It's their exhibit, but...
 5             THE COURT:  All right.  Okay.  This one is not
 6   going to come in.  All right.  So go to the next one.
 7             MR. GORDON:  Okay.
 8   BY MR. GORDON:
 9   Q.  281.
10             Are you with us, Ms. Rupley?
11   A.  Yeah.  Uh-huh.
12   Q.  Okay.  What is the Box 16 date on this DLA award?
13   A.  May 3rd, 2018.
14   Q.  Are you on 281?
15   A.  281?
16   Q.  Yeah.
17   A.  That's what I have for 281.  It's -- I don't know how
18   else to identify it for you.  I can give you the agreement
19   number.  It does not match what you have on your screen.
20             THE COURT:  Ladies and gentlemen of the jury, I'm
21   going to excuse you to the jury room for a minute.
22             (The jury exited the courtroom at 3:01 p.m.)
23             THE CLERK:  May I go grab something from the
24   printer real quick?
25             THE COURT:  Yes.  Just one second.
```

1          So, I think part of the confusion is that when I
2    asked you-all to meet with the courtroom deputy, she pulled
3    the ones out that weren't coming in, and it seems now you're
4    trying to put those in; is that correct?
5          MR. GORDON:  That's correct, Your Honor, yes.
6          THE COURT:  All right.  So, why didn't you say that
7    when you had your meeting with her?
8          MR. GORDON:  My apologies, Your Honor.
9          THE COURT:  All right.
10          Ms. Jones, do you need to do something?  Do you
11    need me to take a break?
12          THE CLERK:  No, that's okay.
13          THE COURT:  Are you sure?
14          THE CLERK:  Yeah.
15          THE COURT:  All right.  So we don't have any of
16    these.  And just to make it, you know, go a little more
17    smoothly, if the date on that line 16, or like she explained
18    is before April 3rd of 2019, then I'm going to allow it
19    with, you know, the continuing objection I guess from
20    Mr. McFarland.  If it's not, I don't think we have to waste
21    time on that.
22          MR. GORDON:  Your Honor, I'm only doing this for
23    the purpose of getting them in the record.  So, if we can go
24    back and review those dates and then supply them.
25          THE COURT:  Do you object to that?  I know you had

1    the objection originally, but do you object if he moves en
2    masse these ones in that occurred, you know, based on my
3    ruling on line 16, before April of 2019, preserving your
4    objection?
5         MR. MCFARLAND:  Right.  No, I don't.  Preserving,
6    no, I don't.  Here is part of my problem though, Your
7    Honor -- and I think I said this before the lunch break --
8    is this witness has just said the document that she was
9    looking at that they said is 281 wasn't what she's got at
10   281.  So, we've got two problems here.  We've got my concern
11   about anything post April 3rd, 2019.  And I appreciate, I
12   understand and appreciate the Court's ruling that if it's in
13   Box 3, I lost that one.
14        THE COURT:  Right.
15        MR. MCFARLAND:  On Box 16, I won.
16        THE COURT:  Right.
17        MR. MCFARLAND:  I get that.  But I've got another
18   concern, and I say this -- and I am not trying to be
19   disparaging.  Plaintiffs don't have a very good handle on
20   their own documents and exhibits.
21        THE COURT:  But that's why -- I understand that.
22        MR. MCFARLAND:  So there is real confusion.
23        THE COURT:  So, I understand that.  But I guess I
24   want to keep moving.  So, if you don't have an objection to
25   it, we can sort that out later.

```
 1              MR. MCFARLAND:  Okay.

 2              THE COURT:  We can sort that out.

 3              MR. MCFARLAND:  Okay.  Long before it goes back, I

 4  get a chance to look.

 5              THE COURT:  Yes.  Yes.

 6              MR. MCFARLAND:  Because the way they've numbered

 7  these and renumbered them --

 8              THE COURT:  Yes.  Yes.

 9              MR. MCFARLAND:  -- I'm concerned that what's going

10  to go back is even post April 3rd in Box 16.

11              THE COURT:  So, that's my ruling.  I'm going to

12  allow you-all to work that out at another time so we don't

13  keep the jury waiting, and then I will hear any objections,

14  if there is objections that it's not a correct document or

15  anything like that.

16              MR. MCFARLAND:  I appreciate that, Your Honor.

17              THE COURT:  Let's move along.  And let's bring the

18  jury back.  Thank you.

19              (The jury entered the courtroom at 3:04 p.m.)

20              THE COURT:  All right.  Please continue with your

21  examination.

22  BY MR. GORDON:

23  Q.  Ms. Rupley, if you could look at Plaintiff's 259 with me,

24  and that is in plaintiff's binder 4.

25  A.  Yes.
```

1    Q.  All right.  And if we flip to the second page of this

2    award, is there an area that identifies the part number?

3    A.  Yes.

4    Q.  All right.  And what's the part number that's listed in

5    the award here?

6    A.  That would be GS1022.

7    Q.  All right.  And is there a description of what that part

8    is?

9    A.  It -- they rarely have a description for the item.

10   Q.  All right.  And in the sales histories that we looked at

11   with the sales agent portals, does GMS ask its sales agents

12   to track more than just the part number?

13   A.  Yes.

14   Q.  All right.  What other information does GMS Industrial

15   track in its internal records?

16   A.  We ask them to track the part number, the nomenclature,

17   the costing -- I mean the pricing on it, the customer, the --

18   I can go on.  It's, like, 26 boxes.

19   Q.  And that includes the product description?

20   A.  That includes the product description, yeah.  It's very

21   difficult to memorize a whole list of just part numbers.

22             MR. GORDON:  All right.  Thank you.

23             You can answer whatever questions Mr. McFarland

24   has.

25             THE COURT:  All right.  Mr. McFarland, any cross?

```
 1              MR. MCFARLAND:  Yes, Your Honor.
 2                        CROSS-EXAMINATION
 3    BY MR. MCFARLAND:
 4    Q.  Good afternoon, ma'am.  I'm Robert McFarland.  I
 5    represent all of the defendants in this case.
 6              And do I understand, ma'am, that you are based in the
 7    San Diego office?
 8    A.  Yes, I am.
 9    Q.  And have you always worked in the San Diego office?
10    A.  Yes, I have.
11    Q.  Okay.  And I may have missed it, but did I follow that
12    you joined GMS approximately six and a half years ago?
13    A.  Yes.
14    Q.  All right.  Mr. Greer was already the director of sales
15    for GMS at the time that you joined, correct?
16    A.  Correct.
17    Q.  Okay.  And the charts that we've been looking at, do we
18    call them portals?  Is that the name for them?
19    A.  Data portals.
20    Q.  Data portals?
21    A.  Yes.
22    Q.  Okay.  Are you aware that he in effect created those
23    portals after he joined GMS?
24    A.  I don't have any knowledge of that.
25    Q.  And you would agree with me that the information that's
```

1  in the portals is information that the sales agents or their

2  supervisor is inputting, correct?

3  A.  The agents supply the information, correct.

4  Q.  Mr. Greer went from being a director of sales through

5  2018, to becoming an independent sales agent in January of

6  2019, correct?

7  A.  Yes.

8  Q.  You're aware of that?

9  A.  Yes.

10  Q.  Okay.  Did he retain authority to access the people that

11  he supervised, their portals?

12  A.  He retained authority over their portals.

13  Q.  During the rest of his tenure through April 3rd of 2019?

14  A.  Correct.

15  Q.  Okay.  And was it your understanding -- because I

16  understand you are involved in sales and marketing among the

17  many hats that you wear?

18  A.  Yes.

19  Q.  Okay.  And was it your understanding that his same sales

20  agents that he had been supervising for his territory

21  continued to report to him, and he continued to supervise

22  them during this period?

23  A.  Yes.

24  Q.  For a non-NSN or a -- what sometimes has been referred to

25  in this trial as CCPNs, is that a term you're familiar with,

1   Cage Code Part Number?

2   A.   Yes, Cage and Part Number, correct.

3   Q.   Okay.  For the CCPN sales that are made on the DIBBS

4   Board, the ultimate price is public knowledge, correct?

5   A.   The awarded price.

6   Q.   Public knowledge?

7   A.   The quoted price, no.

8   Q.   I didn't ask about the quoted price.

9        The awarded price, that's public knowledge.  When the

10  award is actually awarded to the contractor, whoever it is,

11  that's public information?

12  A.   Correct.

13  Q.   Okay.  That can be obtained by anyone who goes to the

14  DIBBS Board, and they can go in and -- what?  Today is

15  June 2nd.  So, if someone wanted to find out what had been

16  awarded on the DIBBS Board on June 1st, they could go in,

17  access it, and see what was sold through the DIBBS Board on

18  June 1st and at what prices, correct?

19  A.   If it was not September, because they get rid of them.

20  Q.   Right.  My hypothetical was -- I'm trying to keep it easy

21  in my mind.  Today is June 2nd.  If someone wanted to see

22  what was awarded on the DIBBS Board yesterday, June 1st --

23  A.   Absolutely.

24  Q.   Absolutely.  Public information?

25  A.   Yes.

1   Q.   Okay.  And I also take it that a contractor may put in a

2   bid for an item, but when it goes to the DIBBS Board, anyone

3   who is eligible to bid through DIBBS can bid on that item,

4   right?

5   A.   Correct.

6   Q.   Okay.  So it isn't always the case that whoever puts in

7   the original bid necessarily --

8            MR. GORDON:  Objection.  This is beyond the scope

9   of her direct.

10           MR. MCFARLAND:  Oh, no.  This is directly --

11           THE COURT:  Okay.

12           MR. MCFARLAND:  -- related to --

13           THE COURT:  All right.  Hold on.  He says beyond

14   the scope.  Why is it not beyond the scope?

15           MR. MCFARLAND:  Ms. Rupley testified at length

16   about the DIBBS process, and the bidding process, and how

17   the award process went through, and I am completing that so

18   the jurors can have complete information about the process.

19           THE COURT:  All right.  Your objection.  I'll give

20   you the last word.

21           MR. GORDON:  Yeah.  Her testimony was just relating

22   to what happened between two dates relative to what happened

23   on the award.  It wasn't related to everything that goes on,

24   on the DIBBS Board.

25           THE COURT:  All right.  It's cross-examination.  He

1    gets some latitude.  So, it's overruled.

2    BY MR. MCFARLAND:

3    Q.  So, it could be that whoever ends up actually winning the

4    award is not the original contractor who put in the bid,

5    correct?

6    A.  Correct.

7    Q.  And I take it, ma'am, that for the non-NSN sales, it's

8    the government, whether it's the chief warrant officer or the

9    government procurement officer, they're the ones who are

10   inputting both the seller, vendor number, and the part

11   number, correct?

12   A.  The person ordering --

13   Q.  Yes.

14   A.  -- the material puts in --

15   Q.  From the government.

16   A.  Yes.  Well, yeah, the Army customer or whoever orders the

17   material.

18   Q.  Right.  So, for example, at Fort Sill, let's say the

19   person ordering on behalf of the government, the chief

20   warrant officer, he's the one who is not only going to, but

21   has to input the vendor number and the Cage Code Part Number?

22   A.  Correct.

23   Q.  The agent, sales agent can't do that?

24   A.  No.

25   Q.  That would be a violation of government regulations,

1   correct?

2   A.  Correct.

3   Q.  Okay.  And if I followed you on the agent portals, you're

4   encouraging the agents to provide as much information as they

5   can in terms of who they're dealing with, who they're

6   speaking with, and what they're ordering?

7   A.  Correct.

8   Q.  Okay.  And that's agent input, sales agent input?

9   A.  Correct.

10  Q.  And so, for example, with -- I think the first portal we

11  looked at was Thomas Hayes, that what we saw, those comments,

12  that's Thomas Hayes doing an excellent job for GMS on

13  inputting the information that he's getting from Fort Polk,

14  correct?

15  A.  I'm not going to agree that -- but Thomas was inputting

16  it, correct.

17  Q.  Right.  Thomas inputted a lot of information?

18  A.  He did.

19  Q.  Thomas, I'll -- since they're my clients, I can pick on

20  them.  Thomas was sure better about inputting information

21  than Greg Spires?

22  A.  Absolutely.

23  Q.  Okay.

24  A.  100 percent.

25          MR. MCFARLAND:  And if we could go to Plaintiff's

```
 1   Exhibit 99, please.
 2            THE COURT:  All right.
 3            MR. MCFARLAND:  And I think this is admitted, Your
 4   Honor, so I would ask that it be published.
 5            THE COURT:  All right.
 6            MR. MCFARLAND:  Ms. Jones, may we?
 7            THE CLERK:  Got it.
 8            MR. MCFARLAND:  Thank you.  Again, obviously way
 9   beyond my skill set.
10   BY MR. MCFARLAND:
11   Q.  So, ma'am, if we're looking -- do you have 99 in front of
12   you there?
13   A.  Yes.
14   Q.  Okay.  You were asked about this at the beginning of your
15   direct exam by Mr. Gordon?
16   A.  Correct.
17   Q.  And what I understand this to be, but please correct me
18   if I'm misstating, this seems to be a series of
19   communications.  Are they emails or texts?  I can't quite
20   tell.  Or is it a chat room?
21   A.  It's a chat.  It's a chat group.
22   Q.  I know a little bit about that, not much, but anyway.
23            So it's a chat.  And what Mr. Hayes is doing here is
24   he is -- first of all, the product that he's initially asking
25   for where there is pink towels in the kit, and his client
```

```
 1   wants white towels, that I take it is a non-NSN, but it's a
 2   CCPN kit, if it had pink towels, that GMS offers?
 3   A.  Um --
 4          MR. GORDON:  Objection, ambiguous.  That was a long
 5   question.
 6          THE COURT:  It was.
 7          MR. MCFARLAND:  Let me see if I can rephrase.
 8          THE COURT:  Ask your question again.
 9   BY MR. MCFARLAND:
10   Q.  What Mr. Hayes is referring to, the first product here
11   that he's looking to sell would be a non-NSN, correct?
12   A.  Correct.
13   Q.  And it would be a CCPN kit that GMS has, but they have it
14   with pink towels and not white towels?
15   A.  Correct.
16   Q.  Okay.  So this is an inquiry from him about selling a GMS
17   product on August 9th of 2018?
18   A.  Correct.
19   Q.  Okay.  And then he even goes down below, and the second
20   thing he's asking is, "Do we sell" -- and the we is obviously
21   GMS --
22   A.  Uh-huh.
23   Q.  -- "shoes?"
24   A.  Correct.
25   Q.  And he's saying, "I know we sell boots."  But he wants to
```

1    know, "Do we sell shoes?"  Because he has got a customer

2    interested in what I take has got to be a non-NSN.

3    A.  Correct.

4    Q.  And not even a CCPN kit, right?

5    A.  An item.

6    Q.  Yes.

7    A.  Correct.

8    Q.  So he's asking in August of 2018, can GMS do this?

9    A.  Correct.

10   Q.  Yeah.  This isn't some email you found when you looked

11   under G&S, right, when you did the search --

12   A.  No.

13   Q.  -- terms for G&S?

14   A.  No.

15   Q.  This is Mr. Hayes, in August of 2018, trying to make

16   sales for GMS?

17   A.  Correct.

18          MR. MCFARLAND:  Thank you very much, Ms. Rupley.

19   That's all of the questions I have.

20          THE WITNESS:  You are welcome.

21          THE COURT:  Any redirect?

22          MR. GORDON:  Just briefly, Your Honor.

23                    REDIRECT EXAMINATION

24   BY MR. GORDON:

25   Q.  Ms. Rupley, Mr. McFarland asked you about pricing on the

```
 1   DIBBS Board, correct?
 2   A.  Correct.
 3   Q.  Does the DIBBS Board include a final price of the sale?
 4   A.  Yes.
 5   Q.  All right.  Is that the same amount that GMS Industrial
 6   gets paid for the sale?
 7   A.  Yes.
 8   Q.  Is there any markup by DLA?
 9          MR. MCFARLAND:  Objection, Your Honor.  He didn't
10   like the answer, but it's been asked and answered.
11          THE COURT:  I'm sorry?
12          MR. GORDON:  I didn't even finish the next
13   question.
14          THE COURT:  Right.  I know --
15          MR. MCFARLAND:  I know what the next question is.
16   He didn't like that answer.
17          THE COURT:  You're telepathic?  Let's let him ask
18   the next question and then see if it's objectionable.
19          Go ahead.
20   BY MR. GORDON:
21   Q.  When GMS Industrial makes a sale through the GCSS portal,
22   does it include any markups?
23   A.  Yes.
24   Q.  All right.  And are any of those markups external to GMS
25   Industrial?
```

1    A.   Yes.

2    Q.   All right.  And whose markup is it?

3    A.   It would be DLA's charges for freight and other such

4    things on an order.

5    Q.   All right.  And who is responsible for paying for that?

6    A.   The customer pays for that.

7    Q.   All right.  And does GMS Industrial get any of that

8    portion of the DLA markup?

9    A.   No, never, no.

10   Q.   And is that amount included in the price that's displayed

11   on the DIBBS Board?

12   A.   No.

13   Q.   Is it included in the total that's on the DIBBS Board?

14   A.   No.

15              MR. GORDON:  All right.  Thank you.

16              THE COURT:  All right.  May this witness be

17   excused?

18              MR. GORDON:  Yes.  Yes, Your Honor.

19              THE COURT:  All right, Mr. McFarland?

20              MR. MCFARLAND:  Yes, Your Honor.

21              THE COURT:  All right.  Ma'am, you may be excused.

22   You can remain in the courtroom, or you're free to leave.

23   Thank you very much.

24              THE WITNESS:  Thank you very much.

25              THE COURT:  All right.  This seems to be a perfect

```
 1   time for us to take our afternoon recess.
 2           So, ma'am, if you could just stay seated for just a
 3   second.  I'm sorry.
 4           THE WITNESS:  My apologies.
 5           THE COURT:  So, jury, I'm going to let you go back
 6   for your afternoon recess.  We'll reconvene at 3:35.
 7           (The jury exited the courtroom at 3:21 p.m.)
 8           THE COURT:  All right.  We'll be in recess until
 9   3:35.
10           And then, Plaintiffs, have your next witness in the
11   courtroom when we come back so we can go ahead and swear
12   them and get started.  Okay?
13           All right.  We'll stand in recess.
14           (Court stood in recess from 3:22 p.m. to 3:36 p.m.)
15           THE COURT:  All right.  Plaintiff, call your next
16   witness.
17           (The witness was duly sworn.)
18           DANIELLE RENEE ROBICHAUX, called by the Plaintiff,
19   having been first duly sworn, was examined and testified as
20   follows:
21                          DIRECT EXAMINATION
22   BY MR. BERKLEY:
23   Q.  Good afternoon, ma'am.  Can you tell us your name,
24   please?
25   A.  Danielle Renee Robichaux.
```

```
1   Q.   And where do you reside?

2   A.   In Virginia Beach.

3   Q.   And how long have you lived in Virginia Beach?

4   A.   Twenty years.

5   Q.   Do you currently have a job?

6   A.   Yes, I do.

7   Q.   And who do you work for?

8   A.   GMS Industrial Supply.

9   Q.   And where do you perform your work for this company?

10  A.   In Virginia Beach.

11  Q.   And how long have you worked at that location?

12  A.   Since 2011.

13  Q.   What was your job title when you began working for GMS

14  Industrial Supply, Inc.?

15  A.   Operations manager.

16  Q.   And as the operations manager, what were your

17  responsibilities?

18  A.   I would oversee our internal staff, monitor their duties

19  and responsibilities, delegate tasks, process sales quotes

20  and sales orders, establish sales prices for products, review

21  vendor quotes, shipping estimates, commission reports, and

22  administer sales agent agreements and documents.

23  Q.   Okay.  Were you the custodian of those sales agent

24  agreements?

25  A.   Yes, I was.
```

```
1    Q.   Okay.  Now, how are you involved in the product bidding
2    process?
3    A.   Processing quotes on GMS products for various purchasing
4    avenues.
5    Q.   And can you describe to us a few of those avenues to
6    purchase products?
7    A.   EMALL, GSA, the DIBBS Board, credit card.
8    Q.   Okay.  In your role as the operations manager of GMS
9    Industrial Supply, did you learn what a DDL -- I mean 1155
10   was?
11   A.   Yes.
12   Q.   Okay.  And how did you learn what that was?
13   A.   By reviewing documents.
14   Q.   Okay.  And what is a DDL -- I mean 1155?
15   A.   It's an order for supplies or services.
16   Q.   Okay.  And if I call a DD 1155 an award for purposes of
17   your work, would that be appropriate?
18   A.   Yes.
19   Q.   Okay.  And did you learn how to read these award
20   documents?
21   A.   Yes, I did.
22   Q.   Okay.  Can you explain to us how you were involved in the
23   product pricing and product cost processes?
24   A.   We would receive vendor quotes for products, determine
25   shipping estimates, determine packaging costs, as well as
```

1  factor in commission payments to establish a sales price.

2  Q.  Okay.  Was competitor pricing involved in that pricing at

3  all?

4  A.  Yes, it was.

5  Q.  Okay.  How were you involved in the product sales

6  process?

7  A.  By processing sales quotes and processing sales orders.

8  Q.  Okay.  Would you process these sales orders and sales

9  quotes for DLA?

10  A.  Yes.

11  Q.  What is DLA?

12  A.  It's Defense Logistics Agency, one of our customers.

13  Q.  Okay.  Would you do the same for GSA?

14  A.  Yes.

15  Q.  And what is GSA?

16  A.  General Services Administration, also one of our

17  customers.

18  Q.  Okay.  Do you recognize EMALL?

19  A.  Yes.

20  Q.  What is EMALL?

21  A.  EMALL was a procurement avenue for government agencies to

22  purchase products.

23  Q.  Okay.  And were you involved in handling EMALL matters

24  for GMS?

25  A.  Yes.

```
1    Q.   Okay.  How was GMS involved with EMALL?
2    A.   We were awarded a contract to have our products available
3    for purchase to government agencies.
4    Q.   Okay.  Do you know when you secured that contract for
5    EMALL?
6    A.   In 2007.
7    Q.   Okay.  Did GMS Industrial Supply have access to EMALL
8    when you started working for GMS?
9    A.   Yes.
10   Q.   Okay.  In your tenure with GMS Industrial Supply, did GMS
11   ever lose access to EMALL?
12   A.   No.
13   Q.   Okay.  Does EMALL still exist today?
14   A.   No.
15   Q.   Okay.  Has it become something else?
16   A.   Yes.  It's now known as FedMall.
17   Q.   Okay.  Did GMS Industrial Supply maintain its access to
18   offer products when EMALL became FedMall?
19   A.   Yes.
20   Q.   Okay.  How long has GMS Industrial Supply had access to
21   FedMall?
22   A.   Since 2017.
23   Q.   Okay.  How were you involved in the management of
24   internal employees?
25   A.   I would oversee their daily tasks, delegate tasks, review
```

```
 1    operating procedures and processes, administer employment
 2    agreements.
 3    Q.  Did you have any role in the establishment of pay?
 4    A.  Yes, I did.
 5    Q.  How were -- how were you involved in the custodial
 6    administrative processes for the sales agent agreements?
 7    A.  I would administer the sales agent agreements as well and
 8    maintain them, if there was any updates or additions.
 9    Q.  What do you mean when you say you "maintained additions"?
10    A.  If a sales agent wanted to add an additional territory to
11    their non-exclusive sales agent agreement, we would update
12    the agreement or have a new agreement.
13    Q.  Okay.  Now, you just used the word "non-exclusive."  What
14    did you understand non-exclusive to mean in those agreements?
15    A.  That GMS Industrial Supply had the right to appoint other
16    sales agents to territories.
17    Q.  Okay.  So that was a benefit that was provided to GMS and
18    not to the sales agent; is that correct?
19    A.  Correct.
20    Q.  Okay.  Were you also involved in sales agent support?
21    A.  Yes.
22    Q.  Okay.  How were you involved in that process?
23    A.  Providing them with access to training documents,
24    resource documents, new agent kits, which included, like,
25    catalogs, novelties, anytime we had updated catalogs, yeah.
```

```
1   Q.  Did you maintain price lists as well?
2   A.  Yes.
3   Q.  I would like to refer you to trial Exhibit 64, which is
4   in binder.  1?
5           MR. MCFARLAND:  I'm sorry.  Plaintiff's 26?
6           MR. LASCARA:  64.
7           MR. MCFARLAND:  Oh, 64.
8           MR. BERKLEY:  In binder 1.
9           THE CLERK:  I don't have it.
10          THE COURT:  Again, we don't have -- my courtroom
11  deputy doesn't have that exhibit.  We'll straighten it out
12  later.  Let's go.
13          MR. MCFARLAND:  This is a document, Your Honor,
14  that the defendants have objected to, and the Court has
15  under advisement.
16          THE COURT:  Okay.  All right.  Thank you.  Thank
17  you for alerting me to that, Mr. McFarland.
18          MR. BERKLEY:  I don't have that document in front
19  of me, Your Honor, and I'm not sure the witness is going to
20  remember.
21          MR. LASCARA:  Do you see the screen?
22          MR. BERKLEY:  That's not it.
23          MR. MCFARLAND:  Are you sure it's Plaintiff's
24  Exhibit 64?
25          MR. BERKLEY:  It's 2329 GMS.  63, I'm sorry.
```

```
 1            MR. MCFARLAND:  I'm sorry.
 2            MR. BERKLEY:  My bad.  This is Exhibit 63.
 3            THE COURT:  Do you have that?
 4            THE CLERK:  Yes.
 5            THE COURT:  Yes, Mr. Lascara.
 6            MR. LASCARA:  I just wanted to make sure the Court
 7   had that one.
 8            THE COURT:  We have it.  Thank you.
 9            All right.  Go ahead.
10   BY MR. BERKLEY:
11   Q.  Okay.  Ma'am, do you recognize Exhibit 63?
12   A.  Yes, I do.
13   Q.  And how do you recognize this document?
14   A.  This is a document that GMS would use to teach sales
15   agents how to make sales to military customers and conduct
16   themselves in the sales field.
17   Q.  Okay.  As the operations manager, would you have control
18   over this document?
19   A.  Yes.
20            MR. BERKLEY:  Your Honor, I would like to offer
21   Exhibit 63 into evidence.
22            THE COURT:  All right.
23            Mr. McFarland, the basis for your objection?
24            MR. MCFARLAND:  Well, this one we don't object to,
25   Your Honor.
```

JILL H. TRAIL, Official Court Reporter

```
 1                THE COURT:  Okay.

 2                MR. MCFARLAND:  It was the one that --

 3                THE COURT:  Okay.

 4                MR. MCFARLAND:  -- Mr. Berkley, I think, had a

 5      little confusion about.

 6                THE COURT:  Any objection to this?

 7                MR. MCFARLAND:  63 we're good with, Your Honor.

 8                THE COURT:  All right.  No objection.  It will be

 9      admitted.

10                You may publish.

11                MR. BERKLEY:  Yes, please publish, Your Honor.

12                (Plaintiff's Exhibit 63 received in evidence.)

13      BY MR. BERKLEY:

14      Q.  Ms. Robichaux, what is this document?

15      A.  This is a training document that shows -- that we would

16      use to teach our sales agents how to make sales to military

17      customers.

18      Q.  Okay.  And what did you, in your capacity as operations

19      manager, do in providing sales agents with support with this

20      document?

21      A.  I would share this document with them, new and existing

22      sales agents, through a folder on our Google drive.

23      Q.  Okay.  And do you know how this document was created?

24      A.  From Gary Gorken's sales experience.

25      Q.  Okay.  And where is this document kept?
```

1    A.   On the account manager Google drive folder.

2    Q.   Okay.  And who has access to the account manager Google

3    drive folder?

4    A.   Myself, our sales managers, our sales agents, and our

5    graphics team.

6    Q.   Okay.  Has access to this been expanded beyond those

7    people?

8    A.   Once we developed our marketing planning team, they

9    gained access to this as well.

10   Q.   Okay.  And do you know when that access was provided to

11   the marketing team?

12   A.   2017.

13   Q.   Okay.  Now, how would a sales agent gain access to the

14   account manger's Google drive folder?

15   A.   I would share a link to the account manager folder

16   through email.

17   Q.   Okay.  And was that email like an electronic key to get

18   into the system?

19   A.   Yes, it was.

20   Q.   Okay.  Now, is this document that we're looking at, 63,

21   is this document stagnant, or does it evolve over time?

22   A.   It evolves.

23   Q.   And how would it evolve?

24   A.   Based on information that we may receive from the sales

25   team, it may be information that's documented in their data

```
 1    portals, or if it was relevant, we would add it and
 2    incorporate it into the document.
 3    Q.  Now, who would add it and incorporate it into the
 4    document?
 5    A.  Myself.
 6    Q.  Okay.  Would you have any assistance in incorporating
 7    information from the data portal into the document?
 8    A.  From our marketing team.
 9    Q.  Okay.  Now I would like to move on to trial Exhibit 65.
10          Okay.  Ma'am, do you recognize this document?
11    A.  Yes.
12    Q.  Okay.  And how do you recognize this document?
13    A.  This is an email where I'm sharing access to the account
14    manager documents folder to a sales agent.
15          MR. MCFARLAND:  Your Honor, this one the Court has
16    under advisement, and I will just note that it's a document
17    that apparently was created after, months after my clients
18    were terminated.
19          THE COURT:  All right.  Well, let me -- so --
20          MR. MCFARLAND:  Irrelevant, Your Honor.
21          THE COURT:  Okay.
22          All right, Plaintiff.
23          MR. BERKLEY:  Your Honor, the relevancy of this
24    document is an example of the electronic key that she was
25    talking about as how she would send it out to the sales
```

```
 1    agents and other people, and this is just a sample of how
 2    that is done.
 3            THE COURT:  All right.  So, I think it's definitely
 4    demonstrative, so it can come in as a demonstrative exhibit.
 5            So, the objection is overruled.
 6            MR. BERKLEY:  Okay.  Can we published this for the
 7    jury, Your Honor?
 8            MR. LASCARA:  Your Honor, just maybe housekeeping,
 9    we've called the first demonstrative exhibit as
10    Demonstrative Exhibit 1.  And in keeping with that, should
11    we call this Demonstrative 2?
12            THE COURT:  We can keep your current number.
13            MR. LASCARA:  Okay.
14            THE COURT:  But just note that.  We can take care
15    of that as a housekeeping matter.
16            MR. LASCARA:  Thank you.
17            MR. MCFARLAND:  I'm sorry, Your Honor.  Is the
18    Court saying it can be used, or is the Court admitting it as
19    an exhibit for publication to the jury?
20            THE COURT:  I'm admitting it.  It can be published
21    to the jury as a demonstrative exhibit to help explain her
22    testimony.
23            MR. MCFARLAND:  Okay.
24            THE COURT:  Thank you.
25            Go ahead.  You may publish.
```

```
 1              (Plaintiff's Exhibit 65 received in evidence.)
 2    BY MR. BERKLEY:
 3    Q.   So, ma'am, did you draft this email?
 4    A.   Yes, I did.
 5    Q.   Okay.  And who did you send it to?
 6    A.   To our marketing team, Manuel Ortega and Cory Allen.
 7    Q.   Okay.  And the section to Manuel Ortega, is there a link
 8    that he would have to go to in order to get into the account
 9    manager Google drive folder?
10    A.   Yes.
11    Q.   Okay.  And so this is a sample of the electronic key that
12    you would have to send out; is that right?
13    A.   Yes.
14    Q.   Okay.  Now, if this key was given to anybody outside of
15    GMS Industrial Supply, would they be able to get into the
16    account manager Google drive folder?
17    A.   No.
18    Q.   Okay.  If, for instance, Mr. Manuel gave it to a
19    warehouse worker for GMS Industrial Supply, would that
20    warehouse worker working inside GMS Industrial Supply be able
21    to get into the system?
22    A.   No.
23    Q.   Okay.  And why is that?
24    A.   Because I would have to share it with the individuals in
25    order to gain access to it.
```

```
1   Q.  So, your sharing of it, you control the access to any
2   information --
3   A.  Correct.
4   Q.  -- you sent from the account manager Google drive folder?
5   A.  Correct.
6          MR. BERKLEY:  Your Honor, I would like to move on to
7   trial Exhibit 62.
8          THE COURT:  All right.
9          MR. BERKLEY:  Which is in binder 1 as well.
10  BY MR. BERKLEY:
11  Q.  Ma'am, do you recognize this exhibit?
12  A.  I do.
13  Q.  Okay.  And how do you recognize it?
14  A.  This is a document used to teach sales agents how to
15  provide -- how to sell to military customers at the motor
16  pool.
17  Q.  Okay.  And was this an exhibit that was in the account
18  manager Google drive folder?
19  A.  Yes.
20  Q.  Okay.  And was this an exhibit that you would have to
21  provide access to individuals in order to see?
22  A.  Yes.
23         MR. BERKLEY:  Your Honor, I would like to offer
24  this into evidence.
25         THE COURT:  Any objection?
```

```
 1              MR. MCFARLAND:  Oh, no objection, Your Honor.
 2              THE COURT:  All right.  It will be admitted.
 3              (Plaintiff's Exhibit 62 received in evidence.)
 4    BY MR. BERKLEY:
 5    Q.  Can you explain to us what this document is?
 6    A.  It's a training that we use to teach the sales agents how
 7    they were to sell to the motor pools, the military customers
 8    at the motor pools, and how to conduct themselves in the
 9    field.
10    Q.  Okay.  And, again, this document was kept in the account
11    manager Google drive folder, right?
12    A.  Yes.
13    Q.  So, the information in this document, who developed the
14    information in this document?
15    A.  From Gary Gorken's sales experience, and then information
16    that we may have received from the account managers' data
17    portal or sales managers' information that was relevant.
18    Q.  So, who would go into the data portal and gather that
19    information to supplement Gary Gorken's sales experience?
20    A.  Our marketing team.
21    Q.  Okay.  And that would include you as well?
22    A.  Includes me, yes.
23    Q.  Okay.  Was all of the training materials for sales agents
24    sent by you using this electronic key process?
25    A.  Yes.
```

1          MR. BERKLEY:  Your Honor, I would like to move on

2  to trial Exhibit 40.

3          THE COURT:  All right.

4  BY MR. BERKLEY:

5  Q.  Do you have that before you, Ms. Robichaux?

6  A.  Yes, I do.

7  Q.  Okay.  Now, do you recognize this document?

8  A.  Yes, I do.

9  Q.  And how do you recognize it?

10  A.  This is also a training resource document that's kept in

11  the account manager Google drive.

12          MR. BERKLEY:  Your Honor, I would like to offer

13  this into evidence.

14          THE COURT:  Any objection?

15          MR. MCFARLAND:  I'm trying to keep up, Your Honor,

16  if I can.  Just one second.

17          THE COURT:  All right.

18          MR. MCFARLAND:  Your Honor, we do object to this

19  document as irrelevant.

20          I understood originally plaintiffs had withdrawn

21  the document.  I don't know that it was put forth on the

22  joint motion.  And then the Court has it under advisement.

23          THE COURT:  All right.  So what's the relevance of

24  this document?

25          MR. BERKLEY:  Your Honor, this is one --

```
 1              THE COURT:  Let's jump on the headsets for this.
 2              (Sidebar conference as follows.)
 3              THE COURT:  All right.  Thumbs up when everybody
 4   can hear.
 5              Okay, Plaintiff, what's the relevance of this
 6   document?
 7              MR. BERKLEY:  Your Honor, this is one of the many
 8   training guide documents that are kept in the Google drive
 9   folder that sales agents must review in order to go out and
10   make sales for GMS Industrial Supply.  It is a trade secret.
11   We believe it's a trade secret.  And as you know, Your Honor
12   had ruled that Mr. Greer had spoliated evidence and
13   documents that were in the laptop.  This, we have adverse
14   instructions hopefully coming with regards to trade secrets,
15   and we believe this is one of the documents that could have
16   been destroyed.  This teaches the sales agents how to
17   specifically sell to aircraft squadrons with aircraft parts
18   using NSNs, the National Stock Numbers.  Now, while that's
19   not something that GMS is saying that they were selling at
20   the time, the whole purpose of selling CCPNs or non-standard
21   NSNs is to eventually get to an NSN level, and if they did,
22   they would have this document that would allow them to
23   expand their business into aircraft squadrons and other
24   areas.  So, I think it's very relevant to the trade secret
25   analysis that's before the Court.
```

```
 1              THE COURT:  All right.
 2              Mr. McFarland.
 3              MR. MCFARLAND:  First off, Your Honor, I don't
 4     think this is in any way a trade secret.  It's a generic
 5     how-to document.
 6              But more important, number one, we don't know when
 7     this document was created so that it was even available to
 8     my clients before April 3rd of 2019, so that's first.
 9              Second, it's wholly irrelevant.  My clients didn't
10     sell anything to the Navy.  The top of this document is
11     Naval Aviation Logistics Command Management Information
12     System.  My clients never had anything to do with that,
13     never set foot on a naval base.
14              I mean, this is totally irrelevant to this case.
15     It's going to confuse this jury, and it's not adding -- it's
16     not probative.  It is not in any way going to make a fact
17     more or less probable.
18              THE COURT:  All right.
19              Plaintiff, I'll give you the last word.
20              MR. BERKLEY:  Your Honor, I think this is relevant,
21     and it goes to the growth of GMS and what they could do once
22     they established NSN sales and expanded beyond the CCPN
23     market that they were trying to say that that's all they
24     were involved in.  They were clearly heading towards the NSN
25     market, because that's why you sell the non-standard NSNs,
```

1    and this would be a means for them to grow their business
2    which they didn't have.
3            And you will hear testimony from this witness
4    saying that GMS created this document.  This was not a copy
5    and cut and paste job from some instruction manual.  They
6    came up with this idea and this plan and how to make it work
7    for aircraft carriers.  It's very important to their trade
8    secrets.
9            THE COURT:  All right.  Well, right now, based on
10   what the witness has testified, the objection is sustained.
11   But I will allow you to ask some more questions about it,
12   and then we'll see where we are.
13           MR. BERKLEY:  Thank you, Your Honor.
14           *(End of sidebar conference.*
15   BY MR. BERKLEY:
16   Q.  Ms. Robichaux, with regard to this document, how was this
17   document created?
18   A.  From information received from our sales team to develop
19   these steps.
20   Q.  Okay.  Did you cut and paste this document from
21   instructions, or did you come up -- or did GMS come up with
22   this document on its own?
23   A.  GMS came up with this document.
24   Q.  And they used their own experience in order to come up
25   with how to make sales to aircraft squadrons?

A.  Yes.

 1        MR. BERKLEY:  Okay.  Again, Your Honor, we offer
 2  this into evidence.

 3        THE COURT:  All right.

 4        Mr. McFarland.

 5        MR. MCFARLAND:  The same objections, Your Honor.
 6  And there must be a reason, but it hasn't even been asked
 7  when this document was created.

 8        THE COURT:  All right.  The objection is sustained.

 9        MR. BERKLEY:  Okay.

BY MR. BERKLEY:

Q.  Ma'am, how long did you hold the title of operations
manager for GMS Industrial Supply?

A.  Until March of 2016.

Q.  Okay.  And during that time, would price lists for
non-NSNs and NSNs be some of the type of documents that you
would pass to sales agents through the electronic key
process?

A.  Yes.

Q.  Okay.  And did you receive a new job title from GMS
Industrial Supply in March of 2016?

A.  Yes, I did.

Q.  And what was this title?

A.  It was director of marketing administration.

Q.  Okay.  Did this new title mean you no longer had the

1  responsibilities of the operations manager?

2  A.  No.  I continued with those responsibilities.

3  Q.  Okay.  And did you gain some new responsibilities?

4  A.  Yes, I did.

5  Q.  And what were these additional responsibilities?

6  A.  I have spoken more with contracting officers for

7  government agencies, negotiated contracts, also maintaining

8  any sales agent agreements that were amended or updated or

9  any new sales agent agreements.

10  Q.  Did you also support the sales managers?

11  A.  Yes, I did.

12  Q.  And was this an additional task added to your

13  responsibility to support the sales agents?

14  A.  Yes.

15  Q.  Okay.  And who were some of the sales managers?

16  A.  Westly Greer, Jeff Johnson, Howard Barlow.  I'm trying to

17  think back to that time.  Jennifer Allen.

18  Q.  Okay.  So how are you involved in providing support to

19  these sales managers?

20  A.  By reviewing information that's in the sales agents' data

21  portals to look at trends, gather information, compile sales

22  information that they could use to strategize or to gain more

23  sales in the field.

24  Q.  Okay.  So what is the account manager data portal?

25  A.  The account manager data portal is an individual data

1    portal for each account manager that keeps information as far

2    as customer preferences, customer contact information,

3    customer lists, ordering information, order history and

4    preferences from customers, as well as the account managers'

5    daily activities.

6    Q.   Okay.  And how is the account manager data portal

7    different from the account manager Google drive folder?

8    A.   The account manager data portal is an individual thing

9    for each specific account manager.  The account manager

10   documents Google drive folder is compiled of resources that

11   are shared with all of the sales agents.

12   Q.   Okay.  And can you describe some of the information that

13   was placed into the account manager data portal?

14   A.   The customer lists for GMS, the ordering histories of the

15   customers, daily activities, trends, I think that...

16   Q.   Okay.  And what would GMS management do with this data

17   that was in the data portal?

18   A.   We would review the interactions of the account managers,

19   pass that information along to sales management if there was

20   any, you know, maybe challenges or any special occurrences,

21   things that they needed to be aware of.  We would use that

22   information, the ordering information for internal tracking

23   purposes for stocking, having material available, and looking

24   for other trends.  And the customer lists, we always needed

25   to keep our database updated with current customers.

```
1   Q.  Okay.  And so who would have access to the account
2   manager data portal?
3   A.  The specific account manager, their sales manager, the
4   marketing team, the director of sales.
5           MR. BERKLEY:  Your Honor, I would like to move on
6   to trial Exhibit 86 in binder 1.
7           THE COURT:  All right.
8   BY MR. BERKLEY:
9   Q.  Ma'am, do you recognize trial Exhibit 86?
10  A.  Yes, I do.
11  Q.  Okay.  And how do you recognize this document?
12  A.  This is a document that I was sharing to Westly regarding
13  Fort Leavenworth.
14  Q.  And what is the date of this document?
15  A.  September 12th, 2018.
16          MR. BERKLEY:  Your Honor, I would like to offer
17  this into evidence.
18          THE COURT:  Any objection?
19          MR. MCFARLAND:  Your Honor, this one was one the
20  Court has actually ruled on and says it can only be shown to
21  show knowledge, not for the truth of the matter asserted; in
22  other words, the contents.
23          THE COURT:  Okay.  All right.  You can use it for
24  that purpose.
25          MR. BERKLEY:  Okay.
```

```
 1    BY MR. BERKLEY:
 2    Q.  Ma'am, why did you send this document to Westly Greer?
 3    A.  Because he was planning a training trip to Fort
 4    Leavenworth, and we were providing previous GSA sales orders
 5    that GMS had received.
 6    Q.  And how did you send this message to Westly Greer?
 7    A.  Through the Google drive.  It was shared.
 8    Q.  Okay.  And was access to this Google drive restricted to
 9    the same electronic key process?
10    A.  Yes.
11    Q.  Okay.  And was this a sample of information that you were
12    sharing with an account manager to support them?
13          MR. MCFARLAND:  Objection, Your Honor.  Now we're
14    getting into what the document is.  The ruling was it can be
15    shown to show that Mr. Greer received it, notice, not the
16    contents, not the purpose.
17          THE COURT:  Plaintiff.
18          MR. BERKLEY:  Your Honor, I'm not getting into the
19    specific contents of this.  I'm just asking if it was a
20    sample of account manager support that she sent out through
21    the Google drive electronic key process.
22          THE COURT:  Overruled.
23          Go ahead.  She can answer that question.
24    BY MR. BERKLEY:
25    Q.  Ma'am, was this a document -- this is a sample of a
```

```
 1   document that you would send out to an account manager
 2   through the electronic key process?
 3   A.  Yes.
 4   Q.  Okay.  Ma'am, were you involved in government contract
 5   negotiations in your role as the director of marketing
 6   administration?
 7   A.  Yes, I was.
 8   Q.  Okay.  And how were you involved?
 9   A.  Communicating with government contracting officers,
10   attending industry day events or government contracting
11   events, submitting bids and proposals, compiling the
12   information for those bids and proposals.
13   Q.  Okay.  And this process, were you trying to secure
14   long-term contracts with the government?
15   A.  Yes.
16   Q.  And do you know when GMS Industrial Supply received its
17   first long-term contract with the government?
18   A.  In January of 2018.
19   Q.  And were you involved in securing that contract?
20   A.  Yes.
21   Q.  So, what did this long-term contract do for GMS
22   Industrial Supply?
23   A.  It meant that GMS did not have to bid on individual
24   solicitations for our NSN material.
25   Q.  Okay.  And what do you mean by not have to bid?
```

1   A.  We didn't have to go to the DIBBS Board to bid on

2   solicitations for that material, and the government would

3   stock our items, stock our material in the government depots.

4   Q.  Okay.  And was there a certain level of goods that had to

5   be stocked in their depots?

6   A.  Yes.

7   Q.  Okay.  And what would happen if somebody used the GCSS

8   system to purchase an item?  Would it come from that depot?

9   A.  Yes, it would.

10  Q.  Okay.  If it was one of the items that was --

11  A.  If it was one of the items that was on the long-term

12  contract.

13  Q.  Okay.  And what would happen when the items in the depot,

14  the level of -- the number of the items in the depot would

15  shrink?

16  A.  DLA would issue GMS another order for supplies.

17  Q.  And that order did not have to go through the DIBBS order

18  process?

19  A.  Correct.

20        MR. BERKLEY:  Your Honor, I'm going to turn to

21  trial Exhibit 64.

22        THE COURT:  All right.

23        THE CLERK:  I don't have that one.

24        THE COURT:  For the record, the courtroom deputy

25  doesn't have that one.

```
 1            MR. BERKLEY:  This is the one we started with,
 2   so...
 3   BY MR. BERKLEY:
 4   Q.  Ma'am, can you see trial Exhibit 64 on your screen?
 5   A.  I do.
 6   Q.  Okay.  And do you recognize this document?
 7   A.  Yes.
 8   Q.  Okay.  And how do you recognize this document?
 9   A.  This is one of the training resource documents that's on
10   the account manager Google drive.
11   Q.  Okay.  And is this one of the documents that you would
12   have access and control dissemination of with your electronic
13   key?
14   A.  Yes.
15            MR. BERKLEY:  Your Honor, I would like to offer
16   this into evidence.
17            THE COURT:  All right.
18            Mr. McFarland.
19            MR. MCFARLAND:  Yes, Your Honor.  This is a
20   document that the Court took under advisement our objections
21   to.  One, there is no date.  There is no foundation for this
22   document at this point in time.  We don't know if it was in
23   existence when my clients were still doing sales before they
24   were terminated.  And, two, it's irrelevant.
25            THE COURT:  Headsets.
```

```
 1              (Sidebar conference as follows.)

 2          THE COURT:  Thumbs up when everybody can hear.

 3          All right, Plaintiff, relevance.

 4          MR. BERKLEY:  Your Honor, this is another one of

 5  the trade secrets that is kept in the account manager Google

 6  drive folder that Westly Greer would have had access to and

 7  could have disseminated among all of the other sales agents.

 8  It is instructions on how to load NSNs into the GCSS system,

 9  which the Army uses to purchase NSNs.  And, again, while

10  they are focussing on CCPN sales or non-standard sales,

11  this would obviously lead to the sale of NSN sales in the

12  future.  And this would be a way for them to teach their

13  oncoming sales agents how to do the process and share it

14  with them.

15          THE COURT:  All right.

16          All right, Mr. McFarland.

17          MR. MCFARLAND:  Thank you, Your Honor.

18          First off, we don't know that Mr. Greer ever had

19  access to this document because we don't know when it was

20  created.  There is no foundation for it.  Second, my clients

21  never sold an NSN.  They were terminated long before they

22  had anything to do with NSNs, and so it's irrelevant.

23          THE COURT:  All right.

24          MR. MCFARLAND:  And, third, I'll just note the idea

25  that this document is a trade secret, we wholly disagree
```

```
 1    with that.
 2              THE COURT:  All right.
 3              MR. MCFARLAND:  This is a --
 4              THE COURT:  That's a later argument, I think.
 5              MR. MCFARLAND:  Yes, I get you.
 6              THE COURT:  But he raised it.  It's fair for you to
 7    respond to that.
 8              MR. MCFARLAND:  Yes.
 9              THE COURT:  Yes.  Okay.  So, here is what I think.
10    Again, I do think this is a little different from the other
11    document because there has been a lot of discussion about
12    NSNs, CCPNs, et cetera.  And so I think instructions to do
13    that would be relevant, but you would need to ask some more
14    questions to lay the proper foundation for that to come in.
15    So, I am sustaining the objection right at this second, but
16    allowing you to ask some more questions.
17              MR. BERKLEY:  Sure, Your Honor.
18              (End of sidebar conference.)
19    BY MR. BERKLEY:
20    Q.  Ms. Robichaux, would this document have existed at the
21    time that Westly Greer was working for GMS Industrial Supply?
22    A.  Yes.
23    Q.  Would this document have existed at the time that
24    Mr. Spires was working for GMS Industrial Supply?
25    A.  Yes.
```

```
1    Q.   What about Mr. Welton?

2    A.   Yes.

3    Q.   And what about Sabrina Greer?

4    A.   Yes.

5    Q.   And was this a document that you would have shared with

6    new sales agents when they came onboard?

7    A.   Yes.

8    Q.   Okay.  And it would have been shared with -- and you

9    started in that role of sharing training materials when?

10   A.   Sharing training materials, probably even back in my

11   operations manager days.

12   Q.   Okay.  And did you -- would this be a document that you

13   also would have shared with Thomas Hayes, when he came

14   onboard?

15   A.   Yes.

16        MR. BERKLEY:  Okay.  Your Honor, again we would

17   like to move this into evidence.

18        THE COURT:  All right.  Mr. McFarland, I note your

19   objection.  Overruled.  It will come in.  Thank you.

20        (Plaintiff's Exhibit 64 received in evidence.)

21   BY MR. BERKLEY:

22   Q.   Ma'am, can you explain to us what this document is?

23   A.   This is the document that has instructions on how to

24   input NSN items into the GCSS system to be available to

25   order.
```

```
 1   Q.   And can you explain to us again what the GCSS system is?
 2   A.   It's the Global Combat Support System used by military
 3   for ordering material and tracking material, logistics.
 4   Q.   Okay.  And what could you order through the GCSS system?
 5   A.   You could order NSN items and non-NSN items.
 6   Q.   Okay.  And so what is the purpose of this document?
 7   A.   This document, the purpose is one of our established
 8   training methods was to teach our sales agents to learn the
 9   processes and the systems that the military customers used,
10   so that they could assist them with how to order our
11   material.
12   Q.   Okay.  And, again, where is this document kept?
13   A.   The account manager Google drive folder.
14   Q.   And that would have been kept under that electronic key
15   process that you had, right?
16   A.   Yes.
17   Q.   And did you control that access?
18   A.   Yes.
19           MR. BERKLEY:  Your Honor, moving on to trial
20   Exhibit 66.
21           THE COURT:  All right.
22   BY MR. BERKLEY:
23   Q.   Ma'am, do you have that before you?
24   A.   I do.
25   Q.   Okay.  Do you recognize this document?
```

```
1    A.   I do.
2    Q.   Okay.  And how do you recognize this document?
3    A.   I created it.
4    Q.   Okay.  And when did you create this document?
5    A.   Um, in 2018.
6    Q.   Okay.  And were the defendants working for GMS Industrial
7    Supply at that time?
8    A.   Yes.
9    Q.   Okay.  And where did you keep this document?
10   A.   In the account manager Google drive folder.
11            MR. BERKLEY:  Your Honor, I would like to offer
12   this into evidence.
13            THE COURT:  All right.
14            Any objection?
15            MR. MCFARLAND:  No objection to this one, Your
16   Honor.
17            THE COURT:  All right.  It will be entered.
18            (Plaintiff's Exhibit 66 received in evidence.)
19   BY MR. BERKLEY:
20   Q.   Ma'am, can you explain to us what this document is?
21   A.   This is a training guide or checklist that was provided
22   to new account managers and taught to them to ensure that
23   they had all of the basic training steps from GMS.
24   Q.   Okay.  And how did you develop this document?
25   A.   It was developed from sales experience from Gary Gorken
```

1    and different steps that we -- and the different manner that

2    we wanted to train the sales agents.

3    Q.   Okay.  And who was responsible for producing this

4    document to the new account managers or sales agents?

5    A.   Myself.

6    Q.   Okay.  And when I say account manager, that's also a

7    sales agent; is that correct?

8    A.   Yes, it is.

9    Q.   Okay.  Would this document be used to teach sales agents

10   how to make sales?

11   A.   Yes.

12   Q.   Okay.  Does this document refer to NSNs?

13   A.   Yes, it does.

14   Q.   Okay.  Does it also refer to CCPNs?

15   A.   Yes, it does.

16   Q.   Why did you decide to put CCPNs on this document?

17   A.   Because GMS was selling CCPNs and NSN items, and we

18   wanted to be sure that our sales agents knew the different

19   procurement avenues for those, for both of those things.

20   Q.   Okay.  So when a new sales agent would come to GMS, one

21   of the first documents they would see is this; is that

22   correct?

23   A.   Yes.

24   Q.   And they were put on notice at that time that their job

25   was to sell NSNs and CCPNs; is that right?

```
 1    A.  Yes.

 2    Q.  And when I say CCPNs, that's also a non-NSN?

 3    A.  Correct.

 4          MR. BERKLEY:  Your Honor, I would like to move on to

 5    trial Exhibit 67.

 6          THE COURT:  All right.

 7    BY MR. BERKLEY:

 8    Q.  Ma'am, do you recognize trial Exhibit 67?

 9    A.  Yes, I do.

10    Q.  And who prepared this document?

11    A.  Our customer service manager.

12    Q.  Okay.  And who does the customer service manager work

13    with?

14    A.  Myself.

15    Q.  Okay.  And would you have any oversight on the

16    preparation of this document?

17    A.  Yes.  I provided information, and input, and a final

18    review and approval.

19    Q.  Okay.  And what is the date of this document?

20    A.  January 25th, 2016.

21    Q.  And were the defendants in this case working for GMS

22    Industrial Supply at that time?

23    A.  Yes.

24          MR. BERKLEY:  Your Honor, I would like to offer

25    this into evidence.
```

```
 1            THE COURT:  Mr. McFarland, any objection?
 2            MR. MCFARLAND:  No.  No objection to this one, Your
 3    Honor.
 4            THE COURT:  All right.  It will be admitted.  You
 5    may publish.
 6            (Plaintiff's Exhibit 67 received in evidence.)
 7    BY MR. BERKLEY:
 8    Q.  Ms. Robichaux, what is the purpose of this document?
 9    A.  It's a reminder to the sales agents on the proper
10    procedure to request a quote from our customer service team.
11    Q.  Okay.  And what do you mean request a quote?
12    A.  Request a quote for GMS items.
13    Q.  Okay.  And who would you be requesting the quote from or
14    to or given to?
15    A.  The sales agents would be requesting a quote from our
16    customer service team.
17    Q.  Okay.  And what would they do with that quote?
18    A.  The customer service team would send it to the sales
19    agent and/or GMS' customer.
20    Q.  Okay.  And when the sales agent received this quote, what
21    would they do with it?
22    A.  They would take this to their customer to review with
23    their customer.
24    Q.  Okay.  Was this one of the documents that was kept in the
25    account manager Google drive folder?
```

1    A.   Yes.

2    Q.   And this was under lock and key like we've talked about

3    before with the electronic key process?

4    A.   Yes.

5    Q.   Okay.  So who would have issued this document out of the

6    account manager Google drive folder?

7    A.   Myself.

8    Q.   Okay.  Ma'am, in the middle of this document, the "Info

9    Below Needs" section, do you see that?

10   A.   Yes.

11   Q.   Okay.  What is the purpose of that section?

12   A.   Because we needed to maintain our customer lists and our

13   database, so we've always needed to get the customer's name,

14   the base they're at, their unit or their command, and their

15   point of contact information.

16   Q.   And why did you need all of that information?

17   A.   To maintain our customer lists.

18   Q.   Okay.  And what would you do with those customer lists?

19   A.   It was historical information that we would need.  It

20   would show us purchasing trends for customers.

21   Q.   Okay.  And so you were instructing with this document the

22   sales agents to provide information in the sales agent data

23   portal?

24   A.   Yes.  That information would be in their data portal as

25   well, yes.

```
 1              MR. BERKLEY:  Your Honor, I'm moving on to trial
 2    Exhibit 68.
 3              THE COURT:  All right.
 4    BY MR. BERKLEY:
 5    Q.  Ms. Robichaux, do you recognize this document?
 6    A.  I do.
 7    Q.  And who prepared this document?
 8    A.  Myself.
 9    Q.  Okay.  And was this a document that you kept in your
10    account manager Google drive folder?
11    A.  It is.
12    Q.  Okay.  And do you know when you prepared this document?
13    A.  I believe it was 2016.
14    Q.  Okay.  And would the defendants have been working for GMS
15    at the time you prepared this document?
16    A.  Yes.
17              MR. BERKLEY:  Your Honor, I would like to offer
18    this into evidence.
19              THE COURT:  Any objection?
20              MR. MCFARLAND:  No objection, Your Honor.
21              THE COURT:  All right.  It will be admitted.
22              (Plaintiff's Exhibit 68 received in evidence.)
23    BY MR. BERKLEY:
24    Q.  Ma'am, could you explain to us what you were doing with
25    this document?
```

```
 1    A.  Notifying our sales agents of the process and procedure
 2    on how to submit documentation or confirmation of sales
 3    orders, products received, so that they could receive credit
 4    for it to be paid commission.
 5    Q.  Okay.  So, why did you feel it was important for them to
 6    send confirmation of their sales orders?
 7    A.  So that they would get credit for it, so we could pay
 8    commissions.
 9    Q.  So, the idea was that you weren't going to pay
10    commissions until you received confirmation from the sales
11    agents?
12    A.  Correct.
13    Q.  Okay.  And this notice that you sent out to the agents in
14    2016, was to let them know that every time they made a sale
15    they needed to provide some type of confirmation?
16          MR. MCFARLAND:  Objection, Your Honor, leading and
17    testifying.
18          THE COURT:  All right.  Sustained.
19          MR. BERKLEY:  Okay.
20          THE COURT:  Rephrase.
21    BY MR. BERKLEY:
22    Q.  Again, ma'am, what was the purpose of sending this
23    document to sales agents?
24    A.  To notify the sales agents that they needed to provided
25    confirmation of material receipt to receive credit,
```

JILL H. TRAIL, Official Court Reporter

1    commissions.

2          MR. BERKLEY:  Your Honor, I'll move on.  Moving on

3    to trial Exhibit 89 in binder 1.

4    BY MR. BERKLEY:

5    Q.  Ma'am, do you recognize this document?

6          MR. MCFARLAND:  Your Honor, I am going to object.

7    We have an agreement with plaintiff's counsel that this

8    document would come in through another witness and not

9    Ms. Robichaux.

10         THE COURT:  Yes.  Headsets.  Headsets.

11            (Sidebar conference as follows.)

12         THE COURT:  Thumbs up if you can hear me.

13         All right.  I'm looking at the list, and it says

14   89, to which the defendant objected, was an email regarding

15   GSA price lists.  It says withdrawn exhibit and withdrawn

16   objection.  Is that the basis of your objection,

17   Mr. McFarland?

18         MR. MCFARLAND:  I think what I understood was page

19   3 was withdrawn, and so we -- page 3 is withdrawn, and the

20   remainder is admissible if used with Mr. Greer, but not with

21   this witness.

22         THE COURT:  Okay.  All right.

23         MR. WILSON:  Well, Your Honor, our understanding of

24   this is we withdrew page 3 altogether, and that anybody

25   could bring it in as long as page 3 didn't get in.

```
 1              THE COURT:  All right.

 2              So that's not your understanding, Mr. McFarland?

 3              MR. MCFARLAND:  No, Your Honor.  Our understanding

 4    is because it's a hearsay document, it can only come in

 5    through Greer as potentially a party admission.

 6              THE COURT:  All right.  So, what we'll do is this.

 7    Plaintiff, if you're still moving to admit it, I'll see if

 8    you can lay the proper foundation.  If you can't, then you

 9    can't.  If you can, then it will come in.

10              Mr. Wilson, is there something else you wanted to

11    say?

12              MR. WILSON:  No, Your Honor.

13              THE COURT:  All right.

14              (End of sidebar conference.)

15              THE COURT:  So, at any rate, page 3, which is in

16    the courtroom deputy's documents is being removed.

17              Go ahead with your examination.

18    BY MR. BERKLEY:

19    Q.  Ma'am, is this a document that you prepared?

20    A.  Yes.

21    Q.  And on what date did you prepare this document?

22    A.  August 11, 2015.

23    Q.  Okay.  And, again, were all of the defendants working for

24    GMS Industrial Supply at that time?

25    A.  Yes.
```

1    Q.   Okay.  And was this one of the documents that you would
2    have kept in your account manager Google drive folder?
3    A.   Some of the attachments would have been kept in there,
4    but this looks like it's emailed out.
5    Q.   Okay.  And why were you sending this document out?
6    A.   Because we had added -- we were granted additions to our
7    EMALL contract for additional GMS products.
8    Q.   Okay.  And were you involved in that process of getting
9    those additional products with EMALL?
10   A.   Yes.
11            MR. BERKLEY:  Your Honor, I would like to offer
12   this into evidence.
13            THE COURT:  All right, Mr. McFarland.
14            MR. MCFARLAND:  Your Honor, it is a hearsay
15   document.  It is an out-of-court statement being offered for
16   the truth of the matter.  And now we also know that it
17   wasn't kept in the Google drive folder under any secure
18   system or whatever the lock and key phrase I have heard, and
19   the attachments aren't being offered and are irrelevant.
20            THE COURT:  All right.
21            MR. MCFARLAND:  So the document is irrelevant and
22   it's hearsay.
23            THE COURT:  All right.
24            Mr. Wilson, you can consult with your lawyer up
25   here.

```
 1              MR. WILSON:  I just wanted to make sure.
 2  BY MR. BERKLEY:
 3  Q.  Ma'am, again, did you draft this, the first page of this
 4  document?
 5  A.  I did.
 6  Q.  Okay.  And this is all your language and your words,
 7  right?
 8  A.  Yes.
 9              MR. BERKLEY:  So, Your Honor, again, we would like
10  to admit at least the first page of this document based on
11  the fact that she drafted it.
12              THE COURT:  Can you scroll down to the second page,
13  so I can see the second page?
14              All right.  Are the first page and the second page
15  the same thing?
16              MR. BERKLEY:  Well, the second page is a reminder
17  making sure that people received it.  But, again, that's her
18  words.  That is her writing this.
19              THE COURT:  All right.  The objection is overruled.
20              You may publish.
21              (Plaintiff's Exhibit 89 received in evidence.)
22  BY MR. BERKLEY:
23  Q.  Ma'am, again, you drafted the first page of this
24  document; is that correct?
25  A.  Yes.
```

1   Q.   And why did you do that?

2   A.   To announce the new additional items that were added to

3   our GMS EMALL contract.

4   Q.   Okay.  And what was the importance of announcing these

5   additional items?

6   A.   It was many more items that were added for the sales

7   agents to be able to just go out and sell.

8   Q.   Okay.  And what type of items would have been added to

9   the EMALL process?

10  A.   We added some containment system items.  We added some

11  consumable items.  It looks like we also added some

12  additional spill pallets.

13  Q.   Okay.  And were these NSN items?

14  A.   These were not.

15  Q.   Okay.  And would these be non-standard NSN or non-NSN?

16  A.   Non-NSNs.

17  Q.   Okay.  And were you informing the sales agents that they

18  had a lot more non-NSNs to sell?

19          MR. MCFARLAND:  Objection.  Now he's leading.

20          THE COURT:  Sustained.

21          MR. BERKLEY:  Okay.

22  BY MR. BERKLEY:

23  Q.   Again, why did you send this document out to the sales

24  agents?

25  A.   To let them know of the additional non-NSN items that we

```
 1   had available.
 2   Q.   Okay.  And was this a big deal for GMS?
 3   A.   Yes.
 4   Q.   Okay.  Had you been able to have a one-time event like
 5   this happen in the past when you've had so many non-NSNs
 6   added to EMALL?
 7   A.   Not that I can recall, no.
 8   Q.   Okay.  And, again, when did this occur?
 9   A.   August 11th, 2016, is when I sent this out.
10   Q.   Okay.  And were all of the defendants working for GMS at
11   that time?
12   A.   Yes.
13   Q.   Okay.  If we could scroll down to the next page.
14        Okay.  Ma'am, is this also your writing on this
15   email?
16   A.   Yes, it is.
17   Q.   And what's the date of this email.
18   A.   August 12, 2016.
19   Q.   Okay.  And why were you sending out this email?
20   A.   Just an additional reminder to make sure that they saw
21   the new items that were added to our product offering on
22   EMALL.
23   Q.   Okay.  And who did you send this to?
24   A.   To our agents, sales management, and our internal
25   customer service team.
```

1   Q.  Okay.  And your sales management, who would -- who would

2   that include?

3   A.  That would have included the sales managers I mentioned

4   before:  Westly Greer, Jeff Johnson, Greg Naschansky.  I

5   can't recall all of them at the time.

6   Q.  Okay.  And the sales agents that you sent it to, would

7   that have been the defendants here today?

8   A.  Yes.

9        MR. BERKLEY:  That's all of the questions I have

10   for that, Your Honor.

11        THE COURT:  All right.  Thank you very much.

12        All right, Mr. McFarland, any cross?

13        MR. BERKLEY:  No.  I'm sorry.  That was just for

14   that exhibit, Your Honor.

15        THE COURT:  I misunderstood.  All right.

16        MR. BERKLEY:  I'm sorry.  I've got a ways to go.

17        THE COURT:  Okay.  Go ahead.

18        MR. BERKLEY:  Let's see.  Moving on to trial

19   Exhibit 73, Your Honor.

20        THE COURT:  All right.

21   BY MR. BERKLEY:

22   Q.  Ma'am, this is several pages that we're going to run

23   through on the screen until we get to the end, so you can

24   take a look at them.  If we could do that.

25        Ma'am, did you have the opportunity to review all of

1    those pages?

2    A.   Yes.

3    Q.   Okay.  And do you recognize this document?

4    A.   I do.

5    Q.   Okay.  And how do you recognize trial Exhibit 73?

6    A.   This is a document that shows the different procurement

7    avenues that customers can purchase GMS products.

8    Q.   Okay.  And did you prepare this document?

9    A.   I added input to prepare this document.

10   Q.   Okay.  And did you have to provide approval for the final

11   version of this document?

12   A.   Yes.

13   Q.   Okay.  And who helped you prepare this document?

14   A.   Our graphics team and marketing.

15   Q.   Okay.  And was this document in existence when all of the

16   defendants were working for GMS Industrial Supply?

17   A.   Yes.

18   Q.   Okay.  And was this a document that you would provide to

19   people through the account manager Google drive folder?

20   A.   Yes.

21   Q.   So that was under the same lock and key?

22   A.   Yes.

23          MR. BERKLEY:  Okay.  Your Honor, I would like to

24   offer this into evidence.

25          THE COURT:  All right.  Mr. McFarland, I know

```
 1    you've objected, but I think I overruled this one, correct?
 2            MR. MCFARLAND:  You did, Your Honor, and I
 3    certainly don't need --
 4            THE COURT:  Okay.  Very good.  It will be admitted.
 5            (Plaintiff's Exhibit 73 received in evidence.)
 6            MR. BERKLEY:  So if we could publish that.
 7    BY MR. BERKLEY:
 8    Q.  Okay.  Ma'am, again, what is the purpose of this
 9    document?
10    A.  This is a document that shows the different avenues that
11    customers can procure GMS Industrial Supply products, and to
12    train our sales agents on those different processes so they
13    can assist customers.
14    Q.  Okay.  And is this something that you would give to new
15    sales agents?
16    A.  Yes.
17    Q.  Okay.  And was it also a resource for the existing sales
18    agents?
19    A.  Yes.
20    Q.  Okay.  So they could go back and refer to this if a
21    customer needed help?
22    A.  Correct, from the account manager Google drive.
23    Q.  Okay.  I want to turn to the third page of this document.
24            Okay.  What does it say across the top of that
25    screen?
```

```
1    A.   "Ways supply can process your orders."
2    Q.   Okay.  And why was this page placed into the document?
3    A.   To show the different procurement avenues that our GMS
4    material could be ordered.
5    Q.   Okay.  So, your new sales agents would learn, for
6    instance, that they could use credit card direct sales?
7              MR. MCFARLAND:  Objection, Your Honor, leading.
8              THE COURT:  Sustained.
9    BY MR. BERKLEY:
10   Q.   So, the first item on this, this first bullet point, what
11   is the purpose of that?
12   A.   To inform sales agents that credit card -- direct credit
13   card orders could be an avenue to order material.
14   Q.   And what about the second bullet point?
15   A.   That GSA via MILSTRIP was a procurement avenue available.
16   Q.   Can you explain MILSTRIP to us?
17   A.   MILSTRIP, I don't know what the acronym stands for off
18   the top of my head, but it's military funding.
19   Q.   Okay.  And GSA, again, what is that?
20   A.   General Services Administration, another one of our
21   customers.
22   Q.   Okay.  And the third bullet point, gsaadvantage.gov, what
23   is that?
24   A.   Gsaadvantage.gov is a website offering products, and you
25   could order by credit card.  Customers could order by credit
```

JILL H. TRAIL, Official Court Reporter

 1    card.

 2    Q.   Okay.  And then DOD EMALL, what is that?

 3    A.   Another procurement avenue for military customers to

 4    order material that GMS had an EMALL contract with.

 5    Q.   And BPA, what is BPA?

 6    A.   Blanket purchase agreement.

 7    Q.   Yeah.  But what is that process?

 8    A.   That's a process through GSA to have an open purchase

 9    agreement for certain materials, for specific materials.

10    Q.   And what is prime vendor, the bullet point for --

11            MR. MCFARLAND:  Your Honor, I understand the

12    document has been admitted, but this is all irrelevant.  My

13    clients didn't make a single sale through any of these

14    means.

15            THE COURT:  That's okay.  That's fine.  That's

16    fine.

17            So, Plaintiff, Mr. Berkley, why is this relevant?

18            MR. BERKLEY:  So, Your Honor, this is provided to

19    new sales agents about how to sell, and there is so many

20    different avenues of selling that a sales agent could go.

21    So it could be through credit cards, or it could be through

22    the GS or DOD EMALL, and it's all different products.

23            THE COURT:  So two things.  So the objection is

24    overruled.  So that's that.  But I also think it's starting

25    to get cumulative.  We've heard testimony about credit

```
 1    cards, about FedMall and EMALL and all of that, that's fine.
 2    And I'm going to let you do your case, but that portion is
 3    starting to get cumulative.  So I'm going to ask you to move
 4    on.
 5              MR. BERKLEY:  Sure, Your Honor.
 6              THE COURT:  And I understand I sustained his
 7    objection when you led her through it before, so I get it,
 8    but we're going to have to move on.  Okay?
 9              MR. BERKLEY:  Okay.  Sure, Your Honor.
10    BY MR. BERKLEY:
11    Q.  So, if we can look at the pages that are marked at the
12    bottom 2378 through 2386 on the side, and let me know when
13    you've read those or reviewed.
14    A.  You said through 2386?
15    Q.  2378 through 2386.
16    A.  Okay.
17    Q.  And can you tell us what those pages represent?
18    A.  These are training resources on how customers can order
19    through GSA, the steps to making, placing orders through GSA
20    avenues.
21    Q.  Okay.  So this is what the customers would need to do to
22    place your order through the system; is that right?
23    A.  Yes.
24    Q.  Okay.  And why were you showing this to your sales
25    agents?
```

1    A.   So that they could be informed and knowledgeable of the

2    different processes and systems that the customers would use,

3    and they could teach them the system if they needed help.

4    Q.   So the sales agents would teach the customers if they had

5    any problem with entering --

6    A.   Right.

7    Q.   -- data; is that correct?

8    A.   That's correct.

9    Q.   Okay.  Was that an advantage that GMS had in the

10   marketplace?

11   A.   Yes.  It's one of the ways that we trained our sales

12   agents to learn these systems so that they could assist the

13   customers.

14   Q.   Okay.  Now, if we can look to pages 2387 through 2397.

15   A.   Okay.

16   Q.   Can you tell us what those pages represent?

17   A.   This represents the DOD EMALL platform and how to

18   navigate through the DOD EMALL system.

19   Q.   Okay.  And would this be something that the customers

20   would have to navigate through?

21   A.   The customers have to navigate through, yes.

22   Q.   So, again, why are you teaching your sales agents about

23   what the customers have to do with DOD EMALL?

24   A.   So they could be knowledgeable of the systems, and they

25   could train and assist the customers if they needed help with

1 ordering our materials.

2 Q.  So this is one of the training documents that you would

3 give to new sales agents; is that right?

4 A.  New and existing sales agents.

5 Q.  Okay.  Now, if we look at the last few pages, 2398

6 through 2400.

7 A.  Okay.

8 Q.  Can you tell us what those pages represent?

9 A.  This gives information on how blanket purchase

10 agreements -- things that the customer would need to get

11 blanket purchase agreements established, how to -- you said

12 just 238 and 239?

13 Q.  2398 just through 2400.

14 A.  Okay.  Okay.  Yes.  So the first couple is about the

15 blanket purchase agreements, what would be needed for

16 customers to establish that.

17 Q.  So, again, this was you -- why was this provided to the

18 sales agents?

19 A.  So that they could learn the systems and processes to

20 assist a military customer if they needed assistance

21 purchasing our materials through any of these avenues.

22 Q.  Okay.  All right.  Now, ma'am, how long did you hold the

23 title of director of marketing administration?

24 A.  Until August of 2020.

25 Q.  Okay.  And did you receive another change in your title

```
 1    at that time?
 2    A.  Yes.
 3    Q.  And what was that new title?
 4    A.  Marketing HR director.
 5    Q.  Okay.  And did this new title mean you no longer had the
 6    responsibilities from your previous positions with GMS?
 7    A.  No.  I kept those.
 8    Q.  Okay.  So did you get additional responsibilities?
 9    A.  Yes, I did.
10    Q.  What were they?
11    A.  Data input of payroll and also increased responsibilities
12    with internal employee HR oversight.
13    Q.  Okay.  Now I want to move on to trial Exhibit 49.
14            THE CLERK:  I don't have this one.
15            THE COURT:  Okay.  You don't have that one?
16            THE CLERK:  No.
17            THE COURT:  All right.  She doesn't have that one.
18    Just keep a list of it.
19            All right.  Keep going, Counsel.
20            MR. BERKLEY:  Okay.
21    BY MR. BERKLEY:
22    Q.  Ma'am, can you see trial Exhibit 49 on your screen?
23    A.  Yes.
24    Q.  Okay.  And how do you recognize this document?
25    A.  It was one of the documents that I administered.
```

1   Q.   Okay.   Is this a contract?

2   A.   Yes.

3   Q.   Okay.   And what is the date of this contract at the top?

4   A.   April 3rd, 2011.

5   Q.   Okay.

6         MR. MCFARLAND:   Your Honor, I'm going to object to

7   this exhibit.   It's superceded by when Mr. Greer became an

8   employee by his employment agreement, and then superceded by

9   his independent sales agent agreement.   It's dated

10  April 3rd --

11        THE COURT:   What exhibit is this?

12        MR. BERKLEY:   This is 49.

13        MR. MCFARLAND:   49, Your Honor.

14        THE COURT:   It says objection withdrawn.

15        MR. MCFARLAND:   If admitted through Greer, not this

16  witness.   This is a hearsay document in any other context.

17        THE COURT:   Okay.   Well, so I understand your

18  objection now.   I will let him go ahead.

19        And you finish asking your questions, and we'll

20  decide if it comes in or not.

21        MR. BERKLEY:   Okay.

22  BY MR. BERKLEY:

23  Q.   Ma'am, was this one of the documents that you kept

24  custodial control over?

25  A.   Yes.

```
 1   Q.  Okay.  And this was in your position as HR director, and
 2   as operations manager, and as the marketing director for GMS?
 3   A.  Marketing HR director, yes.
 4   Q.  Okay.
 5   A.  All three positions.
 6   Q.  And what is the date of this document?
 7   A.  April 3rd, 2011.
 8   Q.  Okay.  And were you working for GMS at that time?
 9   A.  Yes.
10   Q.  Okay.  And did you have the responsibility of maintaining
11   the contract documents then?
12   A.  Yes.
13   Q.  Okay.  And who is this document for?
14   A.  Westly Greer.
15   Q.  Okay.  And do you understand this to be one of
16   Mr. Greer's first contracts with GMS Industrial Supply?
17   A.  Yes.
18          MR. BERKLEY:  Your Honor, I would offer this into
19   evidence.
20          MR. MCFARLAND:  Your Honor, this Court has already
21   ruled that there is no claim as to Mr. Greer about
22   non-competition.  So that's why I say this document is
23   irrelevant, in addition to the fact that it's been
24   superceded.
25          THE COURT:  All right.  Headsets.
```

```
 1              (Sidebar conference as follows.)

 2              THE COURT:  All right, Mr. McFarland, lay that out

 3    again for me, please.

 4              MR. MCFARLAND:  Sure, Your Honor.  This Court ruled

 5    in conjunction with the preliminary injunction hearing and

 6    the motion to dismiss that we filed that there is no

 7    non-competition claim as to Mr. Greer, so this document is

 8    irrelevant.  Moreover, it's dated April 3rd of 2011.  He

 9    later became an employee, and he had an employment

10    agreement, and that is what it is.  And then after that he

11    became an independent sales agent.  And both of those

12    documents we agree can be used because they cover the time

13    period at issue in this case.  But this document is wholly

14    irrelevant, and it's bringing up a claim that no longer is

15    in this case and has a real potential to prejudice this jury

16    about something that is not a valid claim.  They shouldn't

17    be hearing about non-competition.

18              THE COURT:  Okay.  So two things.  I'm not as

19    concerned about the timeline, but as it relates to the prior

20    rulings.

21              MR. WILSON:  Your Honor, may I address this

22    question?

23              THE COURT:  Yes.

24              MR. WILSON:  We dealt with this.  As we noted, the

25    objection had been removed, as far as I'm aware.  But
```

JILL H. TRAIL, Official Court Reporter

```
 1    anyway, in any event, the defendants in this, if you look at
 2    the final pretrial order --
 3            THE COURT:  Right.  Hold on one second.
 4            So, Mr. McFarland, it does say --
 5            What document is this again?
 6            MR. BERKLEY:  49.
 7            THE COURT:  49, objection withdrawn.  Now, why was
 8    your objection withdrawn, and what are you saying is
 9    different now?
10            MR. MCFARLAND:  I think it can be shown to Greer
11    for notice, but it can't be admitted through this witness on
12    the non-competition aspect.
13            THE COURT:  Okay.  All right.  So I understand your
14    argument.
15            Now, Mr. Wilson, go ahead.
16            MR. WILSON:  Your Honor, we're not presenting this
17    for the non-competition aspect.  The defendants, when they
18    put in their final pretrial order, added one of the issues
19    of triable fact or issues of law is whether we had trade
20    secrets and whether we protected our trade secrets.  As you
21    know, one of the elements to have a trade secret is to
22    protect it.  Part of that protection was we had contracts
23    with the defendants going back to the initiation of their
24    employment that have confidentiality clauses in them that
25    prevent them from disclosing the trade secrets.  So this
```

```
 1    goes to the element of trade secrets.  It goes to the
 2    question of whether we were -- that's been brought by the
 3    defendants, I might add -- whether we were defending our
 4    trade secrets.  And I believe this is a key aspect of that
 5    element, and I don't believe that we're bringing it in for
 6    any other reason.
 7              THE COURT:  All right.
 8              MR. BERKLEY:  Your Honor, if I may, we're going to
 9    be referring to section 1C of the first page of the
10    document, and we might also refer to Mr. Greer's signature
11    on the last, and that's it.
12              THE COURT:  Okay.  All right.  Objection is
13    overruled.  It will be entered.
14              (End of sidebar conference.)
15              THE COURT:  So the objection is overruled.  The
16    document will be entered.
17              You may publish.
18              (Plaintiff's Exhibit 49 received in evidence.)
19    BY MR. BERKLEY:
20    Q.  So, ma'am, on the first page in section 1C, do you see
21    that?
22    A.  Yes.
23    Q.  Okay.  Do you recognize the terms "confidential
24    information" in that section?
25    A.  Yes, I do.
```

1  Q.  Okay.  And do you understand what the purpose of that

2  section was?

3  A.  Yes.

4  Q.  And what is that?

5  A.  To protect GMS's confidential --

6          MR. MCFARLAND:  I object, Your Honor.  It says what

7  it says.

8          THE COURT:  All right.

9          MR. MCFARLAND:  I don't think she's the author of

10 this document, and it hasn't been raised that there is an

11 ambiguity about that paragraph such that we need parole

12 evidence to define it.  It says what it says.  And now we're

13 trying to get a legal conclusion.  And Mr. Berkley --

14         THE COURT:  I understand your objection.

15         Mr. Berkley.

16         MR. BERKLEY:  Your Honor, I'm just having her point

17 out the confidential information section in the contract.  I

18 can ask her to read it and not interpret it.

19         THE COURT:  Right.  Let's ask her to read it.

20 BY MR. BERKLEY:

21 Q.  Ma'am, can you identify the confidential information

22 section of this contract by pointing out where it is in the

23 contract and reading that section for us?

24         THE COURT:  No.  Just reading it to herself.

25 BY MR. BERKLEY:

```
 1   Q.   Reading it to yourself.

 2   A.   Okay.  Okay.

 3   Q.   Ma'am, as the custodian administrator of the contracts,

 4   do you have an understanding that Westly Greer had an

 5   obligation to keep documents confidential when he was --

 6              MR. MCFARLAND:  Well --

 7              THE COURT:  Sustained.  Sustained.

 8              MR. BERKLEY:  Okay.

 9   BY MR. BERKLEY:

10   Q.   Okay.  Ma'am, could you find the confidential information

11   clause in the contract?

12   A.   Yes.

13              MR. BERKLEY:  Okay.  That's all of the questions I

14   have on that, Your Honor.

15              THE COURT:  All right.

16              MR. BERKLEY:  Moving on to trial Exhibit 48, Your

17   Honor.

18              THE COURT:  48?

19              MR. BERKLEY:  48.

20   BY MR. BERKLEY:

21   Q.   Ma'am, do you recognize this document?

22   A.   Yes, I do.

23   Q.   Was this one of the documents that you kept in your

24   custodial duties of holding contracts for GMS Industrial

25   Supply?
```

1    A.  Yes.

2    Q.  Okay.  And was this document for one of the defendants in

3    this case?

4    A.  Yes.

5    Q.  Okay.  And do you know the date of this document?

6    A.  April 4th, 2011.

7            MR. BERKLEY:  Okay.  Your Honor, I would offer this

8    into evidence.

9            THE COURT:  All right.  Any objection?

10           MR. MCFARLAND:  No objection, Your Honor, but I

11   would ask if it's going to be put in the record, Mr. Greer's

12   Social Security number is in there, and it hasn't been

13   redacted.

14           THE COURT:  Then it's not going to be published, or

15   at least that page that it's on is not going to be

16   published, and it's going to be redacted.  Plaintiffs will

17   be responsible for redacting that before it goes back to the

18   jury room.

19           MR. BERKLEY:  Understood, Your Honor.

20           (Plaintiff's Exhibit 48 received in evidence.)

21   BY MR. BERKLEY:

22   Q.  Ms. Robichaux, do you recognize Westly Greer's signature

23   at the back of that document?

24   A.  Yes, I do.

25   Q.  Okay.  Do you recognize or can you find the term

1    "confidential information" -- the terms "confidential

2    information" in this document?

3    A.  Yes.

4    Q.  Okay.  Are they in this document on more than one

5    occasion?

6    A.  Yes.

7            MR. BERKLEY:  All right.  Your Honor, moving on to

8    trial Exhibit 48.

9            THE COURT:  I thought this was 48.

10           MR. BERKLEY:  Wait.  Excuse me.  6.

11           MR. MCFARLAND:  I'm sorry.  Which exhibit are we

12   moving to next?

13           MR. BERKLEY:  6.

14           THE COURT:  6.

15           MR. MCFARLAND:  Plaintiff's 6?

16           THE COURT:  Yes.

17           MR. MCFARLAND:  Okay.  Thank you.

18   BY MR. BERKLEY:

19   Q.  Ma'am, do you recognize this document?

20   A.  Yes.

21   Q.  And was this one of the documents that you also kept as a

22   custodian of the contracts for the sales agent employees of

23   GMS Industrial Supply?

24   A.  Yes.

25   Q.  And is Westly Greer the employee identified in this

1   document?

2   A.  Yes.

3   Q.  Okay.

4           MR. MCFARLAND:  Your Honor, I show this document as

5   being withdrawn, in part because if you look at the second

6   page, it's wholly illegible.

7           THE COURT:  No, I don't -- is this 6, 06?

8           MR. BERKLEY:  Yes.  Yes, Your Honor.

9           THE COURT:  I don't show that on my order.  Can you

10  show me where that is, where it says withdrawn?  I don't see

11  it on the order.

12          MR. MCFARLAND:  Well, when we met, as the Court

13  directed us to, I understood that because the second page,

14  at least in my volume, the second page is illegible --

15          THE COURT:  Is that in your joint submissions to

16  me?

17          MR. MCFARLAND:  I'm sorry.  I don't know.  I don't

18  think it is, Your Honor.

19          THE COURT:  Okay.  All right.

20          MR. LASCARA:  Your Honor, if I may?  They have a

21  version of it in their exhibits, I believe, that is clear,

22  and our thought was we would just use that and shift it over

23  to our list to address his concerns that it wasn't very

24  legible.  So, that was my understanding of how we were going

25  to try to handle it.

```
 1          THE COURT:  All right.  Well, that's not what seems
 2   to be happening.  What seems to be happening right now is
 3   you're attempting to move this one in.  So, that's something
 4   you-all will have needed to work out.
 5          MR. BERKLEY:  But, Your Honor, my understanding is
 6   the objection is withdrawn.  There is no objection by
 7   Mr. McFarland on this one.
 8          THE COURT:  That's my understanding as well.
 9          MR. BERKLEY:  Okay.
10          THE COURT:  So anyway, go ahead.
11          MR. BERKLEY:  So, Your Honor, I would like to offer
12   this into evidence.
13          THE COURT:  All right.
14          Any objection, Mr. McFarland?
15          MR. MCFARLAND:  No, Your Honor.  It is what it is.
16          THE COURT:  All right.  It will be entered.
17          MR. LASCARA:  And may we, if they're in agreement,
18   may we substitute it with the clearer version, Your Honor?
19          THE COURT:  You-all can work that out this evening.
20          MR. LASCARA:  Yes, sir.  Thank you.
21          (Plaintiff's Exhibit 6 received in evidence.)
22   BY MR. BERKLEY:
23   Q.  Ma'am, do you see the terms "district manager" in this
24   document?
25   A.  Yes.
```

1    Q.   Okay.  And is this a document for Westly Greer?

2    A.   Yes.

3    Q.   Can you explain to me what the duties of the district

4    manager are?

5    A.   District manager would oversee a region or team of sales

6    agents to assist them with making sales, and communicate with

7    the sales management team, marketing team.

8    Q.   Okay.  So it is the district managers who would oversee

9    the sales agents?

10   A.   Yes.

11   Q.   And what is the date of this document?

12   A.   November 5th, 2012.

13   Q.   And did Westly Greer become a district manager for GMS

14   Industrial Supply on November 5th, 2012?

15   A.   Yes.

16   Q.   Okay.  Ma'am, can you find the terms "confidential

17   information" in this document?

18   A.   Yes.

19   Q.   Okay.  Thank you, ma'am.

20            Moving on to trial Exhibit 5.

21            Ma'am, do you recognize trial Exhibit Number 5?

22   A.   Yes.

23   Q.   Okay.  Was this one of the documents that you also served

24   as custodian for GMS Industrial Supply?

25   A.   Yes.

1    Q.   Okay.  And what is the date of this document?

2    A.   July 1st, 2015.

3    Q.   Okay.  And was Mr. Greer working for GMS Industrial

4    Supply at that time?

5    A.   Yes, he was.

6         MR. BERKLEY:  Your Honor, I would like to offer

7    this into evidence.

8         THE COURT:  All right.

9         Mr. McFarland.

10        MR. MCFARLAND:  No objection to this, Your Honor.

11        THE COURT:  All right.  It will be entered.

12        (Plaintiff's Exhibit 5 received in evidence.)

13   BY MR. BERKLEY:

14   Q.   Ma'am, can you explain to us what this document is?

15   A.   This is a memo to Westly Greer that his new title would

16   be director of sales for GMS Industrial Supply --

17   Q.   Okay.

18   A.   -- and notating his salary amount.

19   Q.   Okay.  Is there an effective date for this document?

20   A.   Yes, July 1st, 2015.

21   Q.   Okay.  And at that time he began to oversee the other GMS

22   sales agents?

23   A.   Oversee the entire sales force, yes.

24   Q.   Okay.  Thank you, ma'am.

25        MR. BERKLEY:  Moving on to trial Exhibit 9.  Now, I

```
 1   believe there is a duplicate for this one, Your Honor, also
 2   at trial Exhibit 28.
 3            THE COURT:  Which one are you seeking to move in?
 4            MR. BERKLEY:  We're going to move in 28 because
 5   it's a little bit more legible, Your Honor.
 6            THE COURT:  All right.
 7   BY MR. BERKLEY:
 8   Q.  Ma'am, do you recognize this document?
 9   A.  Yes.
10   Q.  Is this one of the documents that you had custodial
11   control over for GMS Industrial Supply?
12   A.  Yes.
13   Q.  Okay.  And what is the date of this document?
14   A.  This one is dated January 10th, 2017.
15   Q.  Okay.  And was this document for Greer Group and Sabrina
16   Greer?
17   A.  Yes, it is.
18   Q.  And were they working for -- was Sabrina Greer working
19   for GMS Industrial Supply at the time, at the date of this
20   document?
21   A.  Yes.
22            MR. BERKLEY:  Your Honor, I would like to move this
23   in as an exhibit.
24            THE COURT:  Any objection?
25            MR. MCFARLAND:  No objection to the exhibit itself,
```

124

```
 1   Your Honor.
 2              THE COURT:  All right.  It will be entered.
 3              (Plaintiff's Exhibit 28 received in evidence.)
 4              THE COURT:  You may publish.
 5   BY MR. BERKLEY:
 6   Q.  Okay.  Ma'am, does this document reference the term --
 7              MR. BERKLEY:  Are we publishing this, Your Honor?
 8              THE COURT:  You may, yes.
 9   BY MR. BERKLEY:
10   Q.  Does this document reference the term "territory"?
11   A.  Yes, it does.
12   Q.  Okay.  And where do you see "territory" in this document?
13   A.  In section B, also in section 1.
14   Q.  Okay.  Did sales agents have sales territories?
15   A.  Yes.
16   Q.  Okay.  And were the sales agents that were given those
17   territories, were those exclusive to those sales agents?
18   A.  No.
19   Q.  Okay.  Did GMS have the right to add additional people to
20   sales territories?
21   A.  Yes.
22   Q.  Was that the non-exclusive nature of the sales agent
23   agreements?
24   A.  Correct.
25   Q.  Okay.  Ma'am, does this document refer to the terms
```

JILL H. TRAIL, Official Court Reporter

125

```
1    "aggressively promote"?
2    A.   Yes, it does.
3    Q.   And where do you see that in this document?
4    A.   In section 1.
5    Q.   Okay.  Does this document also reference the terms
6    "confidential and proprietary"?
7    A.   Yes.
8    Q.   And can you tell us where that is found in the document?
9    A.   Section 12.
10   Q.   Okay.  Ma'am, did GMS Industrial Supply place initial
11   lines on each page of this document?
12   A.   Yes.
13   Q.   Okay.  And why did it place the lines on each page of the
14   document?
15   A.   To ensure that the sales agent read and understood --
16   read each page.
17   Q.   Okay.  Did the document also have a signature page?
18   A.   Yes, it does.
19   Q.   Okay.  And do you know who initialed this document?
20   A.   Sabrina Greer.
21   Q.   And do you know who signed this document?
22   A.   Sabrina Greer.
23        MR. BERKLEY:  Your Honor, I would like to move on
24   to trial Exhibit 8.
25        THE COURT:  All right.  I would like for the
```

1    lawyers to jump on the headsets.

2              *(Sidebar conference as follows.)*

3              THE COURT:  Thumbs up everybody.

4              Plaintiff, how much more of this do you have today?

5              MR. BERKLEY:  There are several contract documents

6    that we have to get in, Your Honor.  I'm just scratching the

7    surface at this point in time.

8              THE COURT:  All right.  We're going to end that

9    scratch for today.

10             MR. BERKLEY:  Okay.

11             THE COURT:  We're going to take up tomorrow.  Okay?

12             MR. BERKLEY:  Okay.

13             THE COURT:  All right.  Thank you.

14             MR. MCFARLAND:  Your Honor, before we get off, this

15   is another document that has got Sabrina Greer's personal

16   identifier.

17             THE COURT:  I'm going to raise that once I let the

18   jury go, and we'll talk about that.

19             MR. MCFARLAND:  Okay.  Thank you.

20             *(End of sidebar conference.)*

21             THE COURT:  All right, ladies and gentlemen, I

22   think this is as good a place as any to stop, given how much

23   more testimony we have.  So, I'm going to release you for

24   the day.

25             Again, I will admonish you not to discuss the case

1    with anyone, even amongst yourselves overnight.  Do not do

2    any independent research on the case.

3            Enjoy your night.  We'll see you back here

4    tomorrow, and we'll get going bright and early at 9:15.

5    Have a great evening.

6            (The jury exited the courtroom at 5:07 p.m.)

7            THE COURT:  All right.  So, a couple of things.

8            And, Mr. Berkley, you can return to the table or

9    you can stay at the podium.

10           So, a couple of things.  So, one, with respect to

11   the exhibits, when I leave the bench, you will need to

12   confer with my courtroom deputy.  She's been nice enough to

13   make a list of the stuff that hasn't come in, but this is

14   your responsibility to make sure that she has these

15   documents, because if they -- at the end of the day, if they

16   don't get back to the jury, we're not going to hunt down to

17   make sure that document number 258 is there.  That's your

18   responsibility to make sure she has it, to make sure that it

19   got marked, so that it can get back to the jury.  All right?

20           MR. LASCARA:  Yes, Your Honor.  And I did speak

21   with her regarding the transgressions earlier today, and we

22   had them delivered, so I'm going to bring the first part of

23   what we're looking for, and we'll get the rest of it.

24           THE COURT:  Very good.

25           The next thing is you'll need to make sure that

1    these documents are scrubbed for personal identifying

2    information, so that needs to happen as well.  Because I'm

3    not going to let anything go back to the jury that has that

4    information in it.

5              MR. WILSON:  I will personally make sure tonight

6    that you have these documents tomorrow, Your Honor, and all

7    personal information has been removed.

8              THE COURT:  Very good.  All right.

9              And by tomorrow at 9:00 a.m., you all are supposed

10   to have a joint verdict form, so we know that.

11             And then when I leave the bench, Plaintiffs, I want

12   you to give the case that you cited that stood for the

13   proposition that notice was an acceptable means by which to

14   have a hearsay exception.  I do want to read that case

15   overnight as it relates to those exhibits.

16             MR. WILSON:  Your Honor, I will check.  I may have

17   a copy of it, but I think Mr. Gordon may have taken it with

18   him.  I will make sure that you --

19             THE COURT:  You must get my law clerk's information

20   and make sure you get the cite to her, if you want me to

21   read it overnight.  If you don't want me to read it

22   overnight, I won't read it tonight.

23             MR. WILSON:  I'll make sure your law clerk gets

24   copies.

25             THE COURT:  All right.  That's all I have.

JILL H. TRAIL, Official Court Reporter

1          Plaintiff, anything else before we recess?

2          MR. LASCARA:  No, Your Honor.

3          THE COURT:  All right, Mr. McFarland.

4          MR. MCFARLAND:  Two things, Your Honor.

5          THE COURT:  Certainly.

6          MR. MCFARLAND:  First is I understand the

7    employment agreements or sales agent agreements for my

8    clients for the pertinent time can come in, and we didn't

9    object to those.  But there are these continuing references

10   to the confidential information section in them.  There is

11   no claim remaining in this case about confidential

12   information.  That was struck through both the preliminary

13   injunction, Judge Smith's rulings, and the ruling on the

14   motion to dismiss.  And I have grave concerns that the jury

15   is hearing repeatedly about confidential, confidential

16   information.  It's not part of this case.

17         THE COURT:  All right.  I'm going to take a look at

18   that overnight.

19         MR. MCFARLAND:  Okay.

20         THE COURT:  And if I need to do some type of

21   instruction on that, I will.

22         MR. MCFARLAND:  The second thing that I will say

23   that I am concerned about is -- and, look, I understand the

24   plaintiffs have to put on their case, and I was happy

25   because I thought that Mr. Berkley was done, and I was going

1    to get to cross-examine Ms. Robichaux, and I promise I would

2    have finished my cross by 5:00.  I'm really concerned though

3    now, and I said this at the beginning of the trial, and I'm

4    serious, I've got to defend my clients.  I've got five

5    clients, individuals, putting aside the corporate entities.

6    I am really concerned that I am going to have sufficient

7    time to do that.  They're not going to finish tomorrow.  I

8    mean, I think that's perfectly clear.  They've got two

9    experts that they're going to put on.

10          THE COURT:  How many more witnesses do you have,

11   Plaintiff?

12          MR. LASCARA:  We have the two experts that will

13   follow Ms. Robichaux.  One is going to be fairly -- I think

14   both of them are going to be fairly short.

15          THE COURT:  Do you think you will finish tomorrow?

16          That sounds like a no.

17          MR. BERKLEY:  I think Monday morning we would

18   finish.  I think by noon on Monday we would finish.

19          THE COURT:  All right.  How many days of testimony

20   do you have?

21          MR. MCFARLAND:  I am going to streamline, Your

22   Honor.  I would think that we would have at least two.

23          THE COURT:  Look at it.  Look at it overnight.

24          MR. MCFARLAND:  I will.

25          THE COURT:  And then let's discuss in the morning.

1          MR. MCFARLAND:  Again, I appreciate that plaintiffs
2     have to present their case and it's their burden.
3          THE COURT:  I understand.  I understand.
4          MR. MCFARLAND:  But I've got to defend my clients.
5          THE COURT:  The Court takes no offense to you
6     raising this, and it's proper given what we discussed at the
7     final pretrial conference, and it's been on my mind as well.
8     So that's well taken.
9          MR. MCFARLAND:  Thank you, Your Honor.
10         THE COURT:  Not a problem.  All right.  Thank you.
11         So let's definitely be here by 9:00 a.m. tomorrow
12    because we will have some things to discuss.  I will be
13    taking the bench at 9:00 for us to follow up on a few of
14    these things before the jury comes in.
15         Okay.  Let's close court.
16         (Proceedings adjourned at 5:13 p.m.)
17                         CERTIFICATION
18
19    I certify that the foregoing is a correct transcript
20    from the record of proceedings in the above-entitled matter.
21
22
23         _____/s/_____
24                         Jill H. Trail
25                         June 5, 2022

JILL H. TRAIL, Official Court Reporter