```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
 2                       Norfolk Division

 3

 4   - - - - - - - - - - - - - - - - - -
                                       )
 5   GMS INDUSTRIAL SUPPLY, INC.,       )
                                       )
 6           Plaintiff,                 )   CIVIL ACTION NO.
                                       )   2:1cv324
 7   v.                                 )
                                       )
 8   G&S SUPPLY, LLC, et al,            )
                                       )
 9           Defendants.                )
     - - - - - - - - - - - - - - - - - -

10

11

12                 TRANSCRIPT OF PROCEEDINGS
         (EXCERPT TESTIMONY OF DANIELLE RENEE ROBICHAUX)

13                    Norfolk, Virginia

14                      June 3, 2022

15

16   BEFORE:  THE HONORABLE RODERICK C. YOUNG
              United States District Judge

17

18

19   APPEARANCES:

20           PENDER & COWARD PC
             By:  William A. Lascara
21                Jeffrey Dennis Wilson
                  Daniel Berger
22                Thomas S. Berkley
                  Counsel for Plaintiff
23
             MCGUIRE WOODS LLP
24           By:  Robert William McFarland
                  Micaylee Alexa Noreen
25                Jeanne E. Noonan
                  Counsel for the Defendants
```

JILL H. TRAIL, Official Court Reporter

2

```
1                        I N D E X

2   PLAINTIFF'S
    WITNESSES                                      PAGE
3
      DANIELLE RENEE ROBICHAUX
4         Direct Examination By Mr. Berkley             3
          Cross-Examination By Mr. McFarland           66
5         Redirect Examination By Mr. Berkley          99

6
    DEFENDANTS'
7   WITNESSES                                      PAGE

8

9

10

11                      E X H I B I T S

12  PLAINTIFF'S
13  NO.                                            PAGE

14    8                                                 4
      52                                                6
15    32                                               11
      14                                               12
16    16                                               15
      44                                               26
17    91                                               29
      92                                               34
18    97                                               42
      95                                               43
19    96                                               44
      94                                               49
20    98                                               54
      78                                               65
21

22  DEFENDANTS'
23  NO.                                            PAGE

24

25
```

JILL H. TRAIL, Official Court Reporter

```
 1            (Excerpt of proceedings.)
 2            THE COURT:  All right.  Good morning, ladies and
 3    gentlemen of our jury.  Thank you for coming back.  It's
 4    good to see everyone.  I trust everyone had a good evening.
 5    We'll continue with our examination.
 6            Ms. Robichaux, you are still under oath.
 7            All right, Mr. Berkley, go right ahead.
 8            MR. BERKLEY:  Thank you, Your Honor.
 9            DANIELLE RENEE ROBICHAUX, called by the Plaintiff,
10    having been previously duly sworn, was examined and
11    testified as follows:
12                         DIRECT EXAMINATION
13    BY MR. BERKLEY:
14    Q.  Ms. Robichaux, we left off with trial Exhibit 8.  Can you
15    find trial Exhibit 8 in binder 1, please.
16            THE COURT:  I don't think the computer is up; at
17    least my screen is not on.
18            MR. BERKLEY:  How do we turn this on?
19            MR. LASCARA:  We have a blank screen, too.
20            THE COURT:  Okay.
21            MR. LASCARA:  There we go.
22    BY MR. BERKLEY:
23    Q.  Okay.  Ms. Robichaux, in your duty as the custodian of
24    records and administrator of contracts was -- well, actually,
25    do you recognize this document?
```

```
 1    A.  Yes, I do.
 2    Q.  Okay.  Was this one of the documents that you served as
 3    custodian for in your role at GMS Industrial Supply?
 4    A.  Yes.
 5    Q.  Okay.
 6              MR. BERKLEY:  Your Honor, I would like to offer
 7    this into evidence.
 8              THE COURT:  Any objection?
 9              MR. MCFARLAND:  No objection, Your Honor.
10              THE COURT:  All right.  It will be admitted.  You
11    may publish.
12              (Plaintiff's Exhibit 8 received in evidence.)
13    BY MR. BERKLEY:
14    Q.  Ms. Robichaux, can you explain to us what this document
15    is?
16    A.  This is a Sales Agent Agreement.
17    Q.  Okay.  And who is the Sales Agent Agreement for?
18    A.  This is for Greer Group, Sabrina Greer.
19    Q.  Okay.  And is there a date of this agreement?
20    A.  Yes.
21    Q.  And what is the date?
22    A.  January 10th, 2017.
23    Q.  Okay.  Ms. Robichaux, do you -- do the terms
24    "aggressively promote" appear in this document?
25    A.  Yes, they do.
```

1   Q.   Okay.  And can you tell us where they appear in the

2   document?

3   A.   In section 1.

4   Q.   Okay.  And, ma'am, do the terms "confidential

5   information" appear in this document?

6   A.   Yes.

7   Q.   Okay.  Now, ma'am, at the bottom of each page of this

8   document is there a place for initials?

9   A.   Yes, there is.

10  Q.   And what is the purpose of that?

11  A.   For the sales agent to acknowledge reading the change.

12  Q.   Okay.  And do you recognize the initials at the bottom of

13  each of these pages?

14  A.   Yes.

15  Q.   And whose initials are they?

16  A.   Sabrina Greer.

17  Q.   Okay.  Is there also a signature line at the back of this

18  document?

19  A.   Yes, there is.

20  Q.   And do you recognize the signature on that?

21  A.   Yes.

22  Q.   And whose signature is that?

23  A.   Sabrina Greer.

24  Q.   Okay.

25             MR. BERKLEY:  Your Honor, I would like to move to

```
 1   trial Exhibit 52.
 2           THE COURT:  All right.
 3   BY MR. BERKLEY:
 4   Q.  It's also in binder 1.
 5           Ms. Robichaux, do you recognize this document?
 6   A.  Yes.
 7   Q.  Okay.  And was this one of the documents that you served
 8   as a custodian for, for GMS Industrial Supply?
 9   A.  Yes.
10   Q.  Okay.
11           MR. BERKLEY:  Your Honor, I would like to offer
12   this into evidence.
13           THE COURT:  Any objection?  Mr. McFarland, any
14   objection?
15           MR. MCFARLAND:  The only objection, this is not the
16   Government Sales Agent for Mr. Spires, so I think it would
17   be cumulative and irrelevant.
18           THE COURT:  Well, we addressed this and you said
19   withdrawn objection.
20           So this is 52, right?
21           MR. BERKLEY:  That's correct, Your Honor.
22           MR. MCFARLAND:  That's fine, Your Honor.
23           THE COURT:  All right.  Thank you.
24           It will be admitted, and you may publish.
25           (Plaintiff's Exhibit 52 received in evidence.)
```

```
 1              MR. BERKLEY:  Thank you, Your Honor.
 2   BY MR. BERKLEY:
 3   Q.  Ma'am, do you know what this document is?
 4   A.  This is a Sales Agent Agreement.
 5   Q.  Okay.  And who is the Sales Agent Agreement for?
 6   A.  Gregory K. Spires.
 7   Q.  Okay.  And is there a date on this agreement?
 8   A.  Yes.
 9   Q.  And what is that date?
10   A.  January 22nd, 2013.
11   Q.  Okay.  Now, does this document reference territory?
12   A.  Yes, it does.
13   Q.  Okay.  Where does it reference territory?
14   A.  In Section C.
15   Q.  Okay.  And is there a state associated with that
16   territory?
17   A.  Yes.
18   Q.  And what is that state?
19   A.  Oklahoma.
20   Q.  All right.  Does this document also reference the terms
21   "aggressively promote"?
22   A.  Yes.
23   Q.  Okay.  And where do you find that section?
24   A.  Section 6.
25   Q.  Okay.  Does this document refer to the terms
```

1    "confidential and proprietary"?

2    A.  Yes, it does.

3    Q.  Okay.  And where do you find those terms?

4    A.  In Section 13.

5    Q.  Okay.  Now, ma'am, are there initial lines on each of

6    these pages?

7    A.  Yes.

8    Q.  Okay.  And do you recognize the initials for those --

9    A.  Yes.

10   Q.  -- lines?

11          And whose initials are those?

12   A.  Greg Spires.

13   Q.  Okay.  And is there a signature line also on this

14   document?

15   A.  Yes.

16   Q.  And do you recognize the signature on that?

17   A.  Yes.

18   Q.  And whose signature is that?

19   A.  Greg Spires.

20   Q.  Okay.

21          MR. BERKLEY:  Your Honor, I would like to move on

22   to trial Exhibit 56.

23          THE COURT:  All right.

24   BY MR. BERKLEY:

25   Q.  Do you have that one before you, Ms. Robichaux?

```
1    A.   Yes, I do.

2    Q.   Do you recognize that document?

3    A.   Yes.

4    Q.   Okay.  Is this one of the documents that you also had in

5    your custodial role for GMS Industrial Supply?

6    A.   Yes.

7              MR. BERKLEY:  Your Honor, I would like to offer

8    this document into evidence.

9              THE COURT:  All right.  Any objection?

10             MR. MCFARLAND:  Yes, Your Honor.  This is for

11   Gregory Sky Spires, a defendant who was originally sued in

12   this case, and who the plaintiff has dismissed after we

13   filed a motion.

14             THE COURT:  All right.

15             Mr. Berkley.

16             MR. BERKLEY:  Yes, sir.

17             Your Honor, we're just trying to show the

18   consistency of how we handled the contract documents for all

19   of the sales agents for GMS Industrial Supply.

20             THE COURT:  Right.  Well, I think you're going to

21   have enough to do that.  So, if Mr. Spires is no longer

22   before the Court, that motion will be granted.

23             MR. BERKLEY:  Okay.  Then, Your Honor, we will move

24   on to that trial Exhibit 56.

25             THE COURT:  That was 56.
```

```
 1            MR. LASCARA:  That was 56.

 2            MR. BERKLEY:  Yeah.  So, we're moving on to trial

 3    Exhibit 32.

 4    BY MR. BERKLEY:

 5    Q.  Ms. Robichaux, do you have that one before you?

 6    A.  I do.

 7    Q.  Okay.  Do you recognize that document?

 8    A.  Yes.

 9    Q.  Was this also a document over which you served as the

10    custodian for GMS Industrial Supply?

11    A.  Yes.

12    Q.  Okay.  And who is this document for?

13    A.  County Roads, Greg Spires.

14    Q.  Okay.  Is there a date for this document?

15    A.  January 6th, 2017.

16    Q.  Okay.  And is there a territory in this document?

17    A.  Yes.

18    Q.  Okay.  And can you tell us where that's located?

19    A.  Oklahoma and Texas.

20    Q.  Where in the contract would that be?

21    A.  Oh, I'm sorry.  Section B.

22            THE COURT:  Are you moving it into evidence?

23            MR. BERKLEY:  Yes.  I'm sorry, Your Honor.  Can we

24    move this into evidence?

25            THE COURT:  All right.  Any objection?
```

```
1              MR. MCFARLAND:  No objection to this.
2              THE COURT:  All right.  It will be admitted.  It
3    will be admitted.  You may publish.
4              (Plaintiff's Exhibit 32 received in evidence.)
5    BY MR. BERKLEY:
6    Q.  Okay.  Why would this document have two states identified
7    in the territory?
8    A.  Because Greg Spires wanted to add an additional territory
9    to his -- to his area.
10   Q.  Okay.  Was that done on January 6th of 2017?
11   A.  Yes.
12   Q.  Okay.  Does this document also reference the terms
13   "aggressively promote"?
14   A.  Yes, it does.
15   Q.  And where would they be found?
16   A.  In Section 1.
17   Q.  Okay.  And does this document also reference the terms
18   "confidential and proprietary"?
19   A.  Yes.
20   Q.  Okay.  And where is that found?
21   A.  Section 12.
22   Q.  Okay.  Now, does this document also have signature lines
23   at the bottom of each page?
24   A.  There is initials at the bottom of each page.
25   Q.  Initials, excuse me.
```

```
 1              And do you recognize the initials at the bottom of
 2   each page?
 3   A.   Yes.
 4   Q.   And whose initials are they?
 5   A.   Greg K. Spires.
 6   Q.   Okay.  And does this document also have a signature line?
 7   A.   Yes, it does.
 8   Q.   And whose signature is that?
 9   A.   Greg K. Spires.
10              MR. BERKLEY:  Your Honor, we would like to move on
11   to trial Exhibit 14.
12              THE COURT:  All right.
13   BY MR. BERKLEY:
14   Q.   Ms. Robichaux, do you recognize this document?
15   A.   Yes.
16   Q.   Is this a document that you had custodial control over
17   for GMS Industrial Supply?
18   A.   Yes.
19              MR. BERKLEY:  Your Honor, we would like to move
20   this in.
21              THE COURT:  Any objection?
22              MR. MCFARLAND:  No, Your Honor.
23              THE COURT:  All right.  It will be admitted.
24              (Plaintiff's Exhibit 14 received in evidence.)
25              MR. BERKLEY:  Okay.
```

```
1              THE COURT:  You may publish.
2    BY MR. BERKLEY:
3    Q.  Ms. Robichaux, is this an Independent Sales Agent
4    Agreement?
5    A.  Yes, it is.
6    Q.  And who is this for?
7    A.  Thomas Hayes.
8    Q.  And do you know the date of this document?
9    A.  July 27th, 2016.
10   Q.  Okay.  And does this document have a territory section?
11   A.  Yes.
12   Q.  And where is that found?
13   A.  Section B.
14   Q.  Okay.  And what is the territory for this document?
15   A.  Louisiana.
16   Q.  Okay.  Does this document also have an "aggressively
17   promote" term?
18   A.  Yes, it does.
19   Q.  And where is that found?
20   A.  Section 1.
21   Q.  Okay.  Does this document also have "confidential and
22   proprietary" terms?
23   A.  Yes.
24   Q.  And where would that be found?
25   A.  Section 12.
```

1    Q.   Okay.  Are there initial lines at the bottom of each

2    page?

3    A.   Yes.

4    Q.   And do you recognize the initials on the bottom of each

5    page?

6    A.   Yes.

7    Q.   And whose are they?

8    A.   Thomas Hayes.

9    Q.   Okay.  Is there also a signature line at the back?

10   A.   Yes.

11   Q.   Do you recognize that signature?

12   A.   Yes.

13   Q.   And whose is that?

14   A.   Thomas Hayes.

15   Q.   All right.  Moving on to trial Exhibit 16.

16        Ms. Robichaux, do you recognize that document?

17   A.   Yes, I do.

18   Q.   And what is that document?

19   A.   An Independent Sales Agent Agreement.

20   Q.   Okay.  And was this a document that you had custodial

21   control over for GMS Industrial Supply?

22   A.   Yes.

23        MR. BERKLEY:  Your Honor, I would like to move this

24   in.

25        THE COURT:  Any objection?

```
 1              MR. MCFARLAND:  No, Your Honor.
 2              THE COURT:  All right.  It will be admitted.
 3              MR. BERKLEY:  Okay.
 4              (Plaintiff's Exhibit 16 received in evidence.)
 5    BY MR. BERKLEY:
 6    Q.  Ma'am, is there a date to this document?
 7    A.  June 15th, 2016.
 8    Q.  Okay.  And is there a territory section for this
 9    document?
10    A.  Yes.
11    Q.  And where is that found?
12    A.  Section B.
13    Q.  And what would be the territory?
14    A.  Texas.
15    Q.  Okay.  Is there also "aggressively promote" terms in this
16    document?
17    A.  Yes.
18    Q.  And where would that be found?
19    A.  Section 1.
20    Q.  Okay.  Are there "confidential and proprietary" terms in
21    this document?
22    A.  Yes.
23    Q.  And where would those be found?
24    A.  Section 12.
25    Q.  Okay.  Now, Ms. Robichaux, like we've asked before, are
```

1   there initial lines at the bottom of each page?

2   A.  Yes.

3   Q.  Okay.  And do you recognize the initials at the bottom of

4   each page?

5   A.  Yes.

6   Q.  And whose are they?

7   A.  Mike Welton.

8   Q.  Okay.  Is there also a signature line on this document?

9   A.  Yes.

10  Q.  And do you recognize the signature on that line?

11  A.  Yes.

12  Q.  And whose is that?

13  A.  Mike Welton.

14  Q.  All right.

15          MR. BERKLEY:  Moving on to trial Exhibit 48, Your

16  Honor?

17          THE COURT:  All right.

18          MR. MCFARLAND:  Your Honor, I thought we had

19  already done 48.

20          MR. BERKLEY:  Excuse me.

21          MR. MCFARLAND:  Excuse me.  Plaintiff has already

22  presented 48.

23          THE COURT:  That's what my notes show.

24          MR. BERKLEY:  We'll move on, Your Honor, to trial

25  Exhibit 4.

```
 1              THE COURT:  All right.
 2   BY MR. BERKLEY:
 3   Q.  Ms. Robichaux, do you recognize this document?
 4   A.  Yes.
 5   Q.  And was this a document that you had control over in your
 6   custodial role for GMS?
 7   A.  Yes.
 8              MR. BERKLEY:  I would like to offer this into
 9   evidence, Your Honor.
10              THE COURT:  All right.  Any objection?
11              THE CLERK:  It's already admitted.
12              MR. MCFARLAND:  It's already admitted.  That's what
13   I was going to say, Your Honor.
14              THE COURT:  All right.
15   BY MR. BERKLEY:
16   Q.  Okay.  And can you explain to us what this document is?
17   A.  This is a Zone Manager Addendum for Westly Greer.
18   Q.  Okay.  And what was the purpose of this document?
19   A.  To explain his duties and responsibilities as a zone
20   manager.
21   Q.  And when did he become a zone manager?
22   A.  In January of 2019.
23   Q.  Okay.  And what was his role in January of 2019?
24   A.  He was an independent sales agent and had zone manager
25   responsibilities.
```

```
1    Q.  Okay.  Did he have to sign an Independent Sales Agent
2    Agreement in January of 2019?
3    A.  Yes.
4           MR. BERKLEY:  Your Honor, if I could take one
5    minute, please.
6           THE COURT:  Sure.
7           MR. BERKLEY:  Your Honor, if we could move to trial
8    Exhibit 3.
9           THE COURT:  All right.
10          MR. MCFARLAND:  I'm sorry, 3?
11          MR. BERKLEY:  3.
12          MR. MCFARLAND:  Thank you.
13   BY MR. BERKLEY:
14   Q.  Ms. Robichaux, do you recognize this document?
15   A.  Yes.
16   Q.  Is this a document that you had custodial control over
17   while you worked for GMS Industrial Supply?
18   A.  Yes.
19          MR. BERKLEY:  Your Honor, I would like to move this
20   document in.
21          THE COURT:  Any objection?
22          THE CLERK:  It's already admitted.
23          THE COURT:  It's already admitted.
24          MR. BERKLEY:  Okay.
25          MR. MCFARLAND:  Yes.
```

1    BY MR. BERKLEY:

2    Q.   Ms. Robichaux, can you explain to us what this document

3    is?

4    A.   It's an Independent Agent Agreement.

5    Q.   Okay.  And who is the independent agent for this

6    document?

7    A.   Westly Greer.

8    Q.   And is there a territory section for this document?

9    A.   Yes.

10   Q.   And what are the territories?

11   A.   Colorado and Kansas.

12   Q.   Okay.  Do you know why Mr. Greer wanted to become a sales

13   agent in January of 2019?

14   A.   He relinquished his responsibilities as the director of

15   sales position and wanted to be an independent agent.

16   Q.   Okay.  And do you know why he relinquished his

17   responsibilities as the director of sales?

18           MR. MCFARLAND:  Your Honor, I don't mind if the

19   witness had a conversation with Mr. Greer in which he

20   expressed his decision, but otherwise --

21           THE COURT:  Objection sustained.  Objection

22   sustained.

23           Rephrase.

24   BY MR. BERKLEY:

25   Q.   Ms. Robichaux, did you have a conversation with Mr. Greer

JILL H. TRAIL, Official Court Reporter

1    about the Sales Agent Agreement?

2    A.   Yes.

3    Q.   Okay.  And did Mr. Greer sign this Sales Agent Agreement

4    for you?

5    A.   Yes.

6    Q.   Okay.  And what did Mr. Greer tell you about why he

7    wanted to become a sales agent?

8    A.   I can't recall the details from that time frame.  He no

9    longer wanted the responsibilities that he had and just

10   wanted to be an independent sales agent.

11   Q.   Okay.  Does this document have "aggressively promote"

12   terms?

13   A.   Yes.

14   Q.   And where are those found?

15   A.   Section 1.

16   Q.   Okay.  Does this document also have "confidential and

17   proprietary" terms?

18   A.   Yes.

19   Q.   And where is that found?

20   A.   Section 12.

21           MR. BERKLEY:  Your Honor, has this been published

22   to the jury yet?  Yes.

23           THE COURT:  I know it's in evidence, but I don't

24   know if it's been published or not, but you may publish.

25           THE CLERK:  It has.

```
 1              THE COURT:  It has been published.
 2              MR. BERKLEY:  Okay.
 3    BY MR. BERKLEY:
 4    Q.  Are there initial lines on the bottom of each page?
 5    A.  Yes.
 6    Q.  Okay.  And do you recognize the initials at the bottom of
 7    each page?
 8    A.  Yes.
 9    Q.  Okay.  Is there a signature line on the bottom of each
10    page -- or, excuse me, a signature line at the back of the
11    document?
12    A.  Yes, it is.
13    Q.  Okay.  And do you recognize that signature?
14    A.  Yes.
15    Q.  Okay.  And whose signature is that?
16    A.  Westly Greer.
17    Q.  All right.
18              MR. BERKLEY:  Now, Your Honor, if we can go back to
19    trial Exhibit 4.
20              THE COURT:  All right.
21    BY MR. BERKLEY:
22    Q.  Now, Ms. Robichaux, you've already discussed this
23    document briefly, but this is an addendum.  Do you know what
24    it's an addendum to?
25    A.  An addendum to his Independent Sales Agent Agreement.
```

```
1    Q.  Okay.
2              THE COURT:  Who is his?
3              THE WITNESS:  Westly Greer.
4              THE COURT:  All right.
5    BY MR. BERKLEY:
6    Q.  And, again, do you know why there was an addendum to a
7    Sales Agent Agreement?
8    A.  Because he, Westly, was going to have additional
9    responsibilities as a sales manager in addition to his
10   Independent Sales Agent Agreement.
11   Q.  And what were his responsibilities as a zone manager?
12   A.  Providing support to a primary set of customers,
13   assisting account managers with sales, providing product
14   knowledge and training to customers and account managers,
15   reporting customer activity to the marketing team,
16   participating in weekly sales management calls.
17   Q.  Okay.  Was this a level that was higher than your regular
18   sales agent manager?
19   A.  Yes.
20   Q.  Okay.  Was this a level that was created for Westly
21   Greer?
22   A.  I believe we had zone manager positions before.
23   Q.  Okay.
24   A.  Other zone managers, but this position was for Westly
25   Greer.
```

```
1    Q.  Okay.  Thank you.

2         Ma'am, did GMS Industrial Supply reimburse employees

3    for work-related travel expenses?

4    A.  Yes.

5    Q.  Okay.  And --

6         THE COURT:  One moment, Mr. Berkley.  We are going

7    to need to take a brief recess.  I will have the jury go to

8    the jury room.

9         (The jury exited the courtroom at 9:40 a.m.)

10        THE COURT:  We have got a little bit of a technical

11   issue up here, so I'm going to step off the bench for just a

12   minute and let my court reporter fix it.

13        (Recess from 9:40 to 9:42 a.m.)

14        THE COURT:  All right.  Let's have our jury back.

15        (The jury entered the courtroom at 9:42 a.m.)

16        THE COURT:  All right, ladies and gentlemen, so

17   sometimes the tech issues I think are going to be quick take

18   an hour, and sometimes the ones I think are going to take an

19   hour take two seconds, so anyway I think we're good to go.

20        Mr. Berkley, you may continue.

21        MR. BERKLEY:  Thank you, Your Honor.

22        Your Honor, I would like to go back to trial

23   Exhibit Number 4.

24        THE COURT:  All right.

25   BY MR. BERKLEY:
```

1    Q.   If we could scroll down a little bit.

2          And, Ms. Robichaux, is there a date on this document?

3    A.   Yes.

4    Q.   And what is that date?

5    A.   January 12th, 2019.

6    Q.   Okay.  And if we could go back to trial Exhibit Number 3.

7          And, ma'am, is there a date on this document?

8    A.   Yes.

9    Q.   And what is that date?

10   A.   January 21st, 2019.

11   Q.   Okay.  And so did the Addendum Agreement for Westly Greer

12   occur before January 21st of 2019?

13   A.   I believe the documents were provided to him on or around

14   that date of January 12th.

15   Q.   Okay.  Thank you.

16         MR. BERKLEY:  Your Honor, I would like to move on

17   to --

18   BY MR. BERKLEY:

19   Q.   Well, let me ask you this, Ms. Robichaux, did GMS

20   Industrial Supply reimburse employees for work-related travel

21   expenses?

22   A.   Yes.

23   Q.   Okay.  Would GMS Industrial Supply knowingly reimburse

24   travel expenses to employees related to the selling of

25   industrial products for another company?

```
1   A.  No.
2   Q.  Okay.  Can we move on to trial Exhibit Number 44?
3           MR. MCFARLAND:  I'm sorry.  I am having a really
4   hard time hearing again.
5           Reimburse for employees, correct?
6           THE COURT:  Yes.
7           MR. MCFARLAND:  Is that what the testimony was?  I
8   just --
9           THE COURT:  They'll reimburse for travel for GMS
10  not for other types of travel, not for travel related to
11  other businesses.
12  BY MR. BERKLEY:
13  Q.  Ma'am, do you recognize this document?
14  A.  Yes.
15  Q.  Is this a document that you would have control over in
16  your custodial role for GMS Industrial Supply?
17          MR. MCFARLAND:  I'm sorry.  Which exhibit are we
18  on?
19          MR. BERKLEY:  44.
20          THE WITNESS:  Yes.
21          MR. BERKLEY:  Okay.  Your Honor, we would like to
22  publish this document.
23          THE COURT:  All right.  Are you moving it into
24  evidence?
25          MR. BERKLEY:  Yes, Your Honor.
```

```
 1              THE COURT:  All right.  Any objection?

 2              MR. MCFARLAND:  One second, Your Honor.  I'm trying

 3  to keep up here.

 4              44, no, Your Honor.

 5              THE COURT:  All right.  It may be admitted.  All

 6  right.  You may publish.

 7              (Plaintiff's Exhibit 44 received in evidence.)

 8  BY MR. BERKLEY:

 9  Q.  Ms. Robichaux, what is this document?

10  A.  This is a mileage and expense reimbursement document.

11  Q.  Okay.  And what is the date of this document?

12  A.  August 31st, 2017.

13  Q.  And what was Westly Greer's role for GMS Industrial

14  Supply at that time?

15  A.  I believe at that time he was the director of sales.

16  Q.  Okay.  And is this a document that Mr. Greer prepared or

17  someone in your office would prepare?

18  A.  Mr. Greer.

19  Q.  Okay.  And would this be a document that he would submit

20  to you?

21  A.  Yes.

22  Q.  Okay.  And what is he submitting to you in this document?

23  A.  This first page is for mileage reimbursements, and then

24  the next page is expenses related to his travel for a sales

25  training trip, and then there was receipts to follow.
```

1  Q.  Okay.  And you mention this was for a sales training

2  trip.  Do you know which training trip this was for?

3  A.  Based on these receipts, it looks like a training trip to

4  Fort Stewart.

5  Q.  Okay.  Now, ma'am, did GMS Industrial Supply pay

6  commissions pursuant to the sales agent contracts to its

7  sales agents?

8  A.  I'm sorry.  Can you repeat that?

9  Q.  Did GMS Industrial Supply pay commissions to its sales

10  agents pursuant to its sales agent contracts with them?

11  A.  Yes.

12  Q.  Okay.  Were you involved in the payment of those

13  commissions?

14  A.  Yes.

15  Q.  Okay.  And how were you involved in the payment of those

16  commissions?

17  A.  I would receive documentation for material received by

18  our customers, and review that documentation, and input it

19  into our database for -- to provide credit for the sales

20  agents, review commission statements and approve them.  Any

21  questions or inquiries about the commission statements, I

22  would answer those questions.

23  Q.  Okay.  And did sales agents have to take certain steps in

24  order to get paid those commissions?

25  A.  Yes.

```
 1   Q.  And what steps would those be?
 2   A.  They would have to document the orders into their data
 3   portal.  They would have to provide specific documentation
 4   that the customer received the goods, and provide that to
 5   myself or my team to review, and we would review it for
 6   accuracy and put it in the system.
 7   Q.  Okay.
 8           MR. BERKLEY:  Your Honor, I would like to move to
 9   Exhibit 91 --
10           THE COURT:  All right.
11           MR. BERKLEY:  -- which might be in binder 2, or
12   1-B, a new binder.
13           THE WITNESS:  You said 92?
14   BY MR. BERKLEY:
15   Q.  Exhibit 91.
16   A.  91.
17   Q.  And are there several pages with that exhibit?
18   A.  Yes.
19   Q.  And have you reviewed all of those pages?
20   A.  I have.
21   Q.  Can you tell us what those pages constitute?
22   A.  These are commission reports.
23   Q.  Okay.  And do you know whose commission reports these are
24   for?
25   A.  These are for Mike Welton.
```

```
 1    Q.  Okay.
 2            MR. BERKLEY:  Your Honor, I would like to offer
 3    Exhibit 91 into evidence.
 4            THE COURT:  Any objection?
 5            MR. MCFARLAND:  No objection, Your Honor.
 6            THE COURT:  All right.  They will be admitted, and
 7    you may publish.
 8            (Plaintiff's Exhibit 91 received in evidence.)
 9    BY MR. BERKLEY:
10    Q.  Ms. Robichaux, on the first page of Exhibit 91, do these
11    pages reference a military base?
12    A.  Yes, they do.
13    Q.  And what base is that?
14    A.  Fort Hood.
15    Q.  Okay.  And in processing Mr. Welton's commission reports,
16    did you come to understand where he sold his goods for GMS
17    Industrial Supply?
18    A.  Yes.
19    Q.  And where was that?
20    A.  Fort Hood.
21    Q.  Okay.  And did he sell at any other fort that you're
22    aware of?
23    A.  No.
24    Q.  Okay.  Ma'am, did you come to an understanding at some
25    point that Mike Welton had begun selling products for G&S
```

1   Supply?

2   A.   Yes.

3   Q.   Okay.  And how did you come to understand when Mr. Welton

4   began selling products for G&S Supply?

5   A.   By reviewing the DLA awards for G&S Supply products.

6   Q.   Okay.

7            MR. BERKLEY:  And, Your Honor, I would like to

8   refer to Exhibit 275.

9            THE COURT:  All right.

10            MR. BERKLEY:  Which is in binder 4.

11            THE COURT:  Is that in evidence already?

12            MR. BERKLEY:  It should be, Your Honor.

13            THE COURT:  All right.

14   BY MR. BERKLEY:

15   Q.   Ma'am, we're not going to refer to that exhibit right

16   now, but did Mike Welton begin selling G&S Supply products on

17   March 22nd, 2018?

18   A.   Yes.

19   Q.   Okay.  And when you looked at the commission reports,

20   considering that date of March 22nd, 2018, did you -- did you

21   add up the commissions that GMS Industrial Supply paid him

22   from that date moving forward?

23   A.   Yes.

24   Q.   And would you have ended that addition period at his

25   point of termination from GMS Industrial Supply?

```
1    A.   Yes.
2    Q.   Okay.  And did you come to a conclusion of how much GMS
3    Industrial Supply had paid him from that -- in that period of
4    time?
5    A.   Yes.
6    Q.   Okay.  Did GMS Industrial Supply pay Michael Welton
7    $48,549.38 during that period of time?
8    A.   Yes.
9         MR. MCFARLAND:  I'm sorry, Your Honor.  That's
10   absolutely leading.  If the witness knows the answer, she
11   can give the answer, but Mr. Berkley literally, without even
12   a foundational document before her, said the figure, and she
13   simply said yes.
14        THE COURT:  That is leading.  Sustained.
15   BY MR. BERKLEY:
16   Q.   Okay.  Ms. Robichaux, did you prepare a computation for
17   the commissions paid to Mr. Welton during that period that we
18   just discussed?
19   A.   Yes, I did.
20        MR. BERKLEY:  Your Honor, if I may show the witness
21   a document?
22        THE COURT:  Sure.  Yes.
23        MR. MCFARLAND:  I'm sorry, Your Honor.  I haven't
24   seen the document.  Is it something that's been produced to
25   the defendants before today?
```

```
 1              THE COURT:  What is it?
 2              MR. BERKLEY:  Your Honor, I'm using this to refresh
 3    her memory.
 4              THE COURT:  That's fine, but you still have to show
 5    it to opposing counsel.
 6              MR. MCFARLAND:  Your Honor, this is the first time
 7    we've ever been presented with this document.
 8              THE COURT:  Okay.
 9    BY MR. BERKLEY:
10    Q.  Ms. Robichaux, did you prepare --
11              THE COURT:  He can still show it to her to refresh
12    her recollection.
13              MR. MCFARLAND:  I think it's being offered for the
14    truth of the matter, Your Honor.  We're not refreshing
15    recollection.  Supposedly she created this document, we
16    don't know when, and it's being offered for the truth.
17              THE COURT:  Well, he hasn't asked her any questions
18    yet.  So, a couple of things, your first thing was he hasn't
19    shown it to you.  He's shown it to you.  Now he's asked her
20    the question.  The figure is actually already out, but I
21    sustained your objection, so he's going back and asking her
22    the questions, so he can do that.
23              Go ahead, Mr. Berkley.
24              MR. BERKLEY:  Thank you, Your Honor.
25    BY MR. BERKLEY:
```

1  Q.  Ms. Robichaux, did you -- when you reviewed the

2  commission reports that are already in evidence, did you add

3  up the commissions that were paid to Mike Welton during that

4  period that he was selling for G&S Supply and working for GMS

5  Industrial Supply?

6  A.  Yes.

7  Q.  Okay.  And is the document before you what you used to

8  add up those commissions?

9  A.  Yes, it is.

10  Q.  Okay.  And did you come up with a total on that document

11  of what Mr. Welton was paid during that period of time?

12  A.  Yes.

13  Q.  And what is that total?

14  A.  $48,549.38.

15  Q.  Okay.  Thank you, ma'am.

16       MR. BERKLEY:  Your Honor, we would like to move on

17  to Exhibit 92.

18       THE COURT:  All right.

19  BY MR. BERKLEY:

20  Q.  Do you have that?

21  A.  Yes.

22  Q.  Okay.  Do you recognize those documents?

23  A.  Yes.

24  Q.  Okay.  And were those documents that you were involved

25  in, in the payment of commissions to sales agents?

```
 1   A.  Yes.

 2        MR. BERKLEY:  Your Honor, we would like to offer

 3   these into evidence.

 4        THE COURT:  Any objection?

 5        MR. MCFARLAND:  No, Your Honor.

 6        THE COURT:  All right.  They will be admitted.  You

 7   may publish.

 8        (Plaintiff's Exhibit 92 received in evidence.)

 9        MR. BERKLEY:  Okay.

10   BY MR. BERKLEY:

11   Q.  Ma'am, can you tell us what those documents are?

12   A.  Commission reports.

13   Q.  And who are the commission reports for?

14   A.  Thomas Hayes.

15   Q.  Okay.  And if you look at that first page, is there a

16   fort identified on that commission report?

17   A.  Yes.

18   Q.  And what is that fort?

19   A.  Fort Campbell.

20   Q.  Ma'am, I'm looking a couple of pages down from that.

21   It's dated 1/7/19 to 1/20/19.

22   A.  Yes.

23   Q.  Do you see that?

24   A.  I do.

25   Q.  Okay.  Is there a fort identified on that page?
```

1    A.   Yes, Fort Benning.

2    Q.   Okay.  Ma'am, I want to refer you to a page that's

3    starting with 5/14/18 through 5/27/18.

4    A.   Yes.

5    Q.   Now, that's the period where commissions were paid at the

6    top of each page; is that right?

7    A.   Yes.

8    Q.   Now, is there forts identified on this page?

9    A.   Yes.

10   Q.   And what forts are those?

11   A.   Fort Campbell and Fort Polk.

12   Q.   Okay.  Thank you, ma'am.

13        Now, did you come to an understanding at some point

14   in time that Thomas Hayes began selling products for G&S

15   Supply?

16   A.   Yes.

17   Q.   And how did you come to that understanding?

18   A.   By reviewing G&S -- by reviewing DLA awards for G&S

19   products.

20   Q.   Okay.  And if we can refer to Exhibit 281.  It should be

21   in binder 4.

22        Ma'am, do you recognize this document?

23   A.   Yes.

24   Q.   Okay.  And what is this?

25   A.   This is an order, an award for G&S products.

```
 1   Q.  Okay.  And is there a quote date on this document?
 2   A.  Yes, there is.
 3   Q.  And what is that quote date?
 4   A.  January 3rd, 2019.
 5   Q.  Okay.  And can you tell from this document and its pages
 6   where this product was sold?
 7   A.  Yes.
 8   Q.  And where would you find that?
 9   A.  It's on the fourth page, towards the bottom.  It shows
10   Fort Benning.
11   Q.  Excuse me.  Where?
12   A.  Fort Benning.
13   Q.  Okay.  Is Fort Benning one of the forts that Thomas Hayes
14   sold at for GMS Industrial Supply?
15   A.  Yes, it is.
16   Q.  Okay.  Did you come to an understanding that Thomas Hayes
17   began selling G&S Supply products on January 3rd, 2019?
18   A.  Yes.
19   Q.  Okay.  The same questions as you did before, ma'am.  When
20   you found that out, did you take the commission pages that
21   you had for Thomas Hayes while he was working for GMS
22   Industrial Supply and review them?
23   A.  Yes.
24   Q.  And did you review them from that date until the date he
25   was terminated with GMS Industrial Supply?
```

1    A.   Yes.

2    Q.   Okay.   And did you come to a figure of how much GMS

3    Industrial Supply had paid him during that period of time?

4    A.   Yes.

5    Q.   Okay.

6              MR. BERKLEY:   May I approach, Your Honor?

7              THE COURT:   Approach her with what?

8              MR. BERKLEY:   Just her document.

9              THE COURT:   What document are you showing her?

10             MR. BERKLEY:   This is the document with the

11   computation of her damages for Mr. Hayes.   It's going to be

12   the same process for each defendant, if we're --

13             THE COURT:   Well, I don't think you've asked the --

14   so, a couple of things.   I don't think you've asked the

15   right question yet to be able to approach her to refresh her

16   recollection, if that's what you're trying to do.

17             MR. BERKLEY:   Okay.   I was just trying to short

18   circuit the process knowing what was coming, Your Honor.   I

19   apologize.

20             THE COURT:   I understand.   But I know there is

21   going to be an objection, so --

22             MR. BERKLEY:   Yeah.   Okay.

23             THE COURT:   -- so, you can't short circuit the

24   process.

25   BY MR. BERKLEY:

1    Q.  Ma'am, did GMS Industrial Supply pay Thomas Hayes $12,087

2    and --

3              THE COURT:  Objection sustained.

4              MR. BERKLEY:  Okay.

5    BY MR. BERKLEY:

6    Q.  Ms. Robichaux, were you able to -- did you prepare a

7    computation of the commission reports during that period of

8    time that we discussed?

9    A.  Yes.

10   Q.  Okay.  And did that computation add up all of those

11   commissions?

12   A.  Yes, it did.

13   Q.  Okay.

14             MR. BERKLEY:  And, Your Honor, I would like to show

15   Ms. Robichaux that computation to refresh her memory, if she

16   cannot remember.

17             THE COURT:  Did she say she couldn't remember what

18   the figure was?

19             MR. BERKLEY:  Yes.

20   BY MR. BERKLEY:

21   Q.  Ms. Robichaux, do you remember what the figure was?

22   A.  I don't remember.

23   Q.  Okay.

24             THE COURT:  All right.  Yes.  Show a copy to

25   counsel if you haven't provided it already.

```
 1              MR. BERKLEY:  Sure.
 2              THE COURT:  And you can show it to Ms. Robichaux.
 3              MR. MCFARLAND:  Thank you.
 4    BY MR. BERKLEY:
 5    Q.  Ms. Robichaux, is that the document that you prepared for
 6    Thomas Hayes?
 7    A.  Yes, it is.
 8    Q.  Okay.  And those are the commissions that occurred during
 9    that period where he was selling for GMS Industrial Supply
10    and G&S Supply?
11    A.  Yes.
12    Q.  Okay.  And did you add up all of those commissions?
13    A.  Yes.
14    Q.  And what figure did you come to?
15    A.  $12,087.78.
16    Q.  Okay.  Thank you.
17              Moving on to Exhibit 97.
18              Ma'am, do you recognize those pages?
19    A.  Yes.
20    Q.  And what are those pages?
21    A.  Commission reports.
22    Q.  Okay.  And who are they commission reports for?
23    A.  Greg Spires.
24    Q.  Okay.  And on the first page of that document is there a
25    fort identified?
```

```
1    A.   Yes.

2    Q.   And what is that fort?

3    A.   Fort Bliss.

4    Q.   Is there more than one fort on that page?

5    A.   Yes, Fort Sill as well.

6    Q.   Okay.  And in your work with Greg Spires and paying his

7    commissions, did you come to understand what forts he worked

8    at?

9    A.   Yes.

10   Q.   And what were those forts?

11   A.   Fort Bliss and Fort Sill.

12   Q.   All right.  At some point in time did you come to know

13   the date that Gregory Spires began selling products for G&S

14   Supply?

15   A.   Yes.

16   Q.   Okay.  And how did you determine that date?

17   A.   By reviewing the DLA awards for G&S products.

18   Q.   Okay.  If we can go to Exhibit 274.

19              THE COURT:  Is this in evidence already?

20              THE CLERK:  Yes.

21              THE COURT:  All right.  You may publish.

22   BY MR. BERKLEY:

23   Q.   Do you have that document before you, ma'am?

24   A.   I do.

25   Q.   Okay.
```

```
 1    A.   Yes.

 2    Q.   And what is this document?

 3    A.   This is a DLA award for G&S Supply.

 4    Q.   Okay.  And is there a quote date on this document?

 5    A.   Yes.  It's March 9th, 2018.

 6    Q.   Okay.  And can you tell from this document where this

 7    product was sold?

 8    A.   Yes.

 9    Q.   And where was that?

10    A.   Fort Bliss.

11    Q.   Okay.  Now, ma'am, after you referred to this document,

12    did you total the number of commissions paid to Gregory K.

13    Spires by GMS Industrial Supply from the time he began

14    selling GMS products until the date he stopped --

15    A.   Yes.

16    Q.   -- working for GMS Industrial Supply?

17    A.   Yes.

18    Q.   Okay.  Do you know what that total is?

19    A.   I don't recall.

20    Q.   Okay.  Ma'am, did you prepare a computation of the

21    commissions paid to Mr. Spires during that period of time?

22    A.   Yes.

23    Q.   And did you total up those commissions paid?

24    A.   I did.

25    Q.   Okay.
```

1              MR. BERKLEY:  Your Honor, if I may approach?

2              THE COURT:  Yes.

3              THE WITNESS:  Thank you.

4    BY MR. BERKLEY:

5    Q.  Ms. Robichaux, is that a copy of the computations that

6    you prepared for Mr. Spires during that period of time?

7    A.  It is.

8    Q.  Okay.  And does that document add up all of the

9    commissions during that period of time?

10   A.  Yes.

11   Q.  And what is the total of those commissions?

12   A.  $141,768.41.

13   Q.  Okay.  Thank you, ma'am.

14             THE COURT:  Mr. Berkley, I don't have that you

15   moved 97 into evidence.  Were you asking that that come into

16   evidence?

17             MR. BERKLEY:  Yes, Your Honor.  We would like to

18   have that into evidence.

19             THE COURT:  Any objection?

20             MR. MCFARLAND:  No, Your Honor.

21             THE COURT:  All right.  It will be admitted.

22             (Plaintiff's Exhibit 97 received in evidence.)

23   BY MR. BERKLEY:

24   Q.  Now we're referring to Exhibits 95 and 96.

25   A.  Okay.

1   Q.  Ms. Robichaux, do you recognize the pages that constitute

2   Exhibit 95?

3   A.  Yes.

4   Q.  And what are those pages?

5   A.  Commission reports.

6   Q.  Okay.  And whose commission reports are they?

7   A.  Sabrina Greer.

8   Q.  Okay.

9          MR. BERKLEY:  Your Honor, we would like to offer

10  Exhibit 95 into evidence.

11         THE COURT:  Any objection?

12         MR. MCFARLAND:  No objection, Your Honor.

13         THE COURT:  All right.  It will be admitted.  You

14  may publish.

15         (Plaintiff's Exhibit 95 received in evidence.)

16         MR. BERKLEY:  Your Honor, if we could go ahead and

17  refer to Exhibit 96 now.

18         THE COURT:  All right.

19  BY MR. BERKLEY:

20  Q.  Ms. Robichaux, do you recognize the pages that constitute

21  Exhibit 96?

22  A.  Yes.

23  Q.  And what are those pages?

24  A.  Commission reports.

25  Q.  And who are those commission reports for?

```
1   A.   Sabrina Greer.

2   Q.   Okay.  Now, on these commission reports, do you recognize

3   a fort on the first page?

4   A.   Yes.

5   Q.   And what's that fort?

6   A.   Fort Carson.

7   Q.   Okay.  And did you come to understand where Sabrina Greer

8   worked when she --

9           THE COURT:  Are you asking that these be moved into

10  evidence, P96?

11          MR. BERKLEY:  Yes, Your Honor.

12          THE COURT:  All right.

13          Any objection, Mr. McFarland?

14          MR. MCFARLAND:  No objection, Your Honor.

15          THE COURT:  All right.  It will be admitted.  You

16  may publish.

17          (Plaintiff's Exhibit 96 received in evidence.)

18  BY MR. BERKLEY:

19  Q.   So, Ms. Robichaux, on the first page of these commission

20  reports is there a fort listed?

21  A.   Yes.

22  Q.   And what is that fort?

23  A.   Fort Carson.

24  Q.   And did you come to an understanding, working with

25  Sabrina Greer, where she worked for GMS Industrial Supply?
```

```
1   A.   Yes.

2   Q.   And where was that?

3   A.   Fort Carson.

4   Q.   Okay.  If we could go back to the previous Exhibit 95.

5        Ms. Robichaux, on the page dated 5/28/18 through

6   6/10/18, do you see that page?

7   A.   Yes, I do.

8   Q.   Okay.  And is there a fort identified on that page?

9   A.   Yes.

10  Q.   Okay.  And what fort is that?

11  A.   Fort Carson.

12  Q.   Okay.  Thank you, ma'am.

13       Did you come to know a date that Sabrina Greer began

14  selling products for G&S Supply?

15  A.   Yes.

16  Q.   Okay.  And how did you come by that date?

17  A.   By reviewing the DLA awards for G&S products.

18  Q.   Okay.  If we could refer to Exhibit 247.

19       And do you recognize this document?

20  A.   Yes.

21  Q.   And what is this document?

22  A.   This is a DLA award for G&S Supply.

23  Q.   Okay.  Is there a quote date on this document?

24  A.   Yes.

25  Q.   And what is that date?
```

1    A.   September 15th, 2017.

2    Q.   Okay.  And can you tell from this document where the

3    products were sold?

4    A.   Yes.

5    Q.   And where would that be?

6    A.   At Fort Carson.

7    Q.   Okay.  Did Sabrina Greer begin selling G&S products on

8    September 15th, 2017?

9    A.   Yes.

10   Q.   Now, after you determined that Ms. Greer had been selling

11   products, did you review her commissions?

12          MR. MCFARLAND:  I am going to note an objection

13   here, because the testimony is that not only Sabrina Greer

14   but her husband sold at Fort Carson during this time period,

15   so there has got to be a little better foundation as to how

16   we know this is a Sabrina Greer --

17          THE COURT:  You can explore that on cross.  You can

18   explore that on cross.

19          Go ahead, Mr. Berkley.

20          MR. BERKLEY:  Thank you, Your Honor.

21   BY MR. BERKLEY:

22   Q.   Did you total the number of commissions paid to Sabrina

23   Greer from -- from September 15th, 2017, until she was

24   terminated?

25   A.   Yes.

```
1   Q.  Okay.  And did you prepare -- well, and do you know what
2   the total amount of those commissions are?
3   A.  I don't recall.
4   Q.  Okay.  And did you prepare a computation of those total
5   amount of commissions?
6   A.  I did.
7   Q.  Okay.  And did that computation add up each of the
8   commission pages that you've reviewed?
9   A.  Yes.
10  Q.  Okay.
11          THE COURT:  Yes.  You may show the witness.
12          MR. BERKLEY:  Oh, I'm sorry, Your Honor.
13          THE COURT:  That's all right.
14          MR. BERKLEY:  I'm getting into a routine.
15  BY MR. BERKLEY:
16  Q.  Ms. Robichaux, is this the computation that you prepared
17  for Sabrina Greer?
18  A.  Yes, it is.
19  Q.  Okay.  And in this computation did you add up each of the
20  commission pages that we've talked about today?
21  A.  Yes.
22  Q.  Okay.  And what was the total amount of commissions paid
23  to Sabrina Greer during that period of time?
24  A.  $137,905.44.
25  Q.  Okay.  Thank you, ma'am.
```

```
1              MR. BERKLEY:  Your Honor, if we could move on to
2    Exhibit 94.
3              THE COURT:  All right.
4    BY MR. BERKLEY:
5    Q.  Do you recognize those pages, ma'am?
6    A.  Yes.
7    Q.  And what are they?
8    A.  Commission reports.
9    Q.  Okay.  And whose commission reports are they?
10   A.  Westly Greer.
11   Q.  And what is the date of this payroll report, the first
12   page?
13   A.  This was the period of March 4th, 2019, through
14   March 17th, 2019.
15   Q.  And at this time had Westly Greer decided to become a
16   sales agent?
17   A.  Yes.
18   Q.  And he had relinquished his role as the director of sales
19   by this time?
20   A.  Correct.
21   Q.  Okay.  Did you come to an understanding of when Mr. Greer
22   began selling products for G&S Supply, Inc. in 2019, as a
23   sales agent?
24   A.  Yes.
25   Q.  Okay.  And how did you come by that determination?
```

```
 1   A.  By reviewing the DLA awards for G&S products.
 2   Q.  Okay.  And if we could refer to Exhibit 460 --
 3            THE CLERK:  Are you moving in that exhibit?
 4            MR. BERKLEY:  Yeah, I'm sorry.  Yes, we are moving
 5   in that exhibit.
 6            THE COURT:  You're asking to move in P94?
 7            MR. BERKLEY:  Yes.
 8            THE COURT:  All right.
 9            Mr. McFarland, any objection?
10            MR. MCFARLAND:  No objection, Your Honor.
11            THE COURT:  All right.  It will be admitted.
12            (Plaintiff's Exhibit 94 received in evidence.)
13            THE WITNESS:  Which exhibit number are you looking
14   at?
15   BY MR. BERKLEY:
16   Q.  It's Exhibit 460.
17   A.  416?
18   Q.  460.
19            Now, do you recognize this document?
20   A.  Yes.
21   Q.  And what is it?
22   A.  This is an award for G&S Supply.
23   Q.  Okay.  And is there a quote date on this document?
24   A.  Yes.
25   Q.  Okay.  And what is that quote date?
```

1    A.   February 12th, 2019.

2    Q.   And can you tell from this document where the product was

3    sold?

4    A.   Can you scroll up on it?

5           Yes.

6    Q.   And where was that?

7    A.   Fort Riley.

8    Q.   Okay.

9           MR. BERKLEY:  And, Your Honor, if we can go back to

10   Exhibit 94.

11          THE COURT:  All right.

12   BY MR. BERKLEY:

13   Q.   Now, on the first page of Exhibit 94, is there a fort

14   identified?

15   A.   Yes.

16   Q.   And what is that fort?

17   A.   Fort Riley.

18   Q.   Did Westly Greer begin selling G&S Supply products on

19   February 12th of 2019, according to your analysis?

20   A.   Yes.

21   Q.   Okay.  And after you determined that, did you add up the

22   commission reports during the period of time when he began

23   selling for G&S Supply until the time he was terminated by

24   GMS Industrial Supply?

25   A.   Yes.

```
1    Q.  Okay.  And do you recall that total number of

2    commissions?

3    A.  I don't recall.

4            MR. BERKLEY:  Your Honor, may I approach?

5            THE COURT:  Yes.

6    BY MR. BERKLEY:

7    Q.  Ms. Robichaux, does that document represent your

8    computations that you made for Westly Greer during that

9    period of time?

10   A.  Yes.

11   Q.  And did you add up the commissions during that period of

12   time?

13   A.  Yes.

14   Q.  And did you come to a total figure?

15   A.  Yes.

16   Q.  And what is that total figure?

17   A.  $11,860.34.

18   Q.  Okay.  Thank you, ma'am.

19           Now, if we could refer back to Exhibit 460.

20           Ma'am, on this document, are you aware where there is

21   a Julian date on this document?

22   A.  Yes.

23   Q.  And where would that be found?

24   A.  Can you scroll down some?

25           Okay.  It's in Section B.  It's underneath the
```

1  address.  It's -- it also has TCN.
2  Q.  Okay.  And what are the letters and numbers in that
3  Julian date?
4  A.  So the first six characters are DoDAAC, which is -- which
5  tells you who, what customer or what government entity
6  purchased the material.  And then the next four digits is the
7  Julian date, which tells you the date of the document.
8  Q.  Okay.  And the -- so we can follow along, what are those
9  first letters?
10 A.  The first letters, the W907FD, those are the DoDAAC which
11 identify the unit or government.
12 Q.  And then there is the numbers 8345, what do those
13 represent?
14 A.  So the 8 stands for 2018, and 345 is the 345th day of
15 2018.
16 Q.  So, what does that date represent on this document?
17 A.  It represents the date that the material was funded
18 by the customer -- funded to the customer for order.
19 Q.  Funded to the customer for order?
20 A.  Uh-huh.
21 Q.  Does there have to be -- is there something done before
22 the funding takes place by a sales agent?
23 A.  The sales agent would present products to the customer to
24 order and provide them with the information to order the
25 material.

1   Q.   So, the sales agents would have had to done something

2   before that date in order to sell the products; is that

3   correct?

4   A.   Yes.

5   Q.   And if we refer back up to the first page of this

6   document, under or next to Box 16 under offer/quote --

7   A.   Uh-huh.

8   Q.   -- does that date of February 12th of 2019 match up with

9   the -- is that the same date as the Julian date?

10   A.   No, it's not.

11   Q.   Okay.  So the Julian date event occurs before this date;

12   is that correct?

13   A.   Yes.

14   Q.   Thank you.

15        Ma'am, did you prepare a lost profit analysis for GMS

16   Industrial Supply?

17   A.   Yes.

18   Q.   Okay.  And if we could refer to trial Exhibit 98.

19   A.   Which binder would that be in?

20   Q.   It might be in 2.

21   A.   2, okay.

22   Q.   Okay.  Ma'am, do you recognize that document?

23   A.   I do.

24   Q.   Is that the document you prepared?

25   A.   Yes.

1    Q.  Okay.

2         MR. BERKLEY:  Your Honor, I would like to move this

3    into evidence.

4         THE COURT:  All right.  I believe we already dealt

5    with the objection, which is noted, and so that's in.  It

6    will be entered, and you may publish.

7         MR. BERKLEY:  Thank you.  I'm sorry, Your Honor,

8    did you say that was published?

9         THE COURT:  You may publish it, yes.

10         MR. BERKLEY:  Thank you.

11         (Plaintiff's Exhibit 98 received in evidence.)

12    BY MR. BERKLEY:

13    Q.  Ms. Robichaux, does this document represent the lost

14    profit analysis that you prepared for GMS Industrial Supply?

15    A.  Yes.

16    Q.  Okay.  What does the first column on these pages

17    identify?

18    A.  This is the award number.

19    Q.  Okay.  And that's -- and if we go through all of those

20    pages and scroll through all of them, that's all of the

21    awards that who made?

22    A.  These are the awards for G&S Supply products.

23    Q.  Okay.  So these are not GMS Industrial Supply awards.

24    These are G&S Supply awards; is that right?

25    A.  Correct.

```
1    Q.  Okay.  And your second column, going through those pages,
2    what does that column represent?
3    A.  This is the CAGE Code.
4    Q.  And whose CAGE Code is represented in that column?
5    A.  This is the CAGE Code for whom the award was awarded to.
6    Q.  Okay.  And for who was the award awarded to?
7    A.  There is G&S Supply.  There is a couple of other CAGE
8    Codes that won awards for other G&S Supply products.
9    Q.  Okay.  But this first CAGE Code, 7WPR4, is that G&S
10   Supply's CAGE Code?
11   A.  Yes.
12   Q.  Okay.  And if we scroll down a little bit, we see on that
13   first page -- you're on the second page, that's fine.  We see
14   a CAGE Code of 61125.  Do you see that?
15   A.  Yes.
16   Q.  Okay.  Why is that CAGE Code listed here?
17   A.  This is the CAGE Code for the company that was awarded
18   G&S Supply product.
19   Q.  Okay.  And that would be the same, if you go a little bit
20   lower, for 19151?
21   A.  Correct.
22   Q.  So if there is a different CAGE Code number than this
23   7WPR4, it would still be related to the sale of a G&S Supply
24   product; is that right?
25   A.  Yes.
```

1    Q.   Okay.  Now, what does the third column represent?

2    A.   This is the award date.

3    Q.   Okay.  And the award date is not the quote date, is it?

4    A.   Correct.

5    Q.   And the award date is not the Julian date?

6            MR. MCFARLAND:  Objection, Your Honor.  Can the

7    witness testify?  Leading.

8            THE COURT:  All right.

9            MR. BERKLEY:  Fine.

10           THE COURT:  Rephrase.  The objection is sustained.

11   You may rephrase.

12   BY MR. BERKLEY:

13   Q.   Ms. Robichaux, do you know the difference between the

14   award date and the solicitation date?

15   A.   Yes.

16   Q.   And do you know the difference between the award date and

17   the Julian date that we have talked about on award documents?

18   A.   Yes.

19   Q.   Okay.  Does this date represent the Julian date?

20   A.   No, it does not.

21   Q.   Does this column represent the quote date?

22   A.   No.

23   Q.   Okay.  Now, if we move forward to the G&S award total

24   column, do you see that?

25   A.   Yes.

JILL H. TRAIL, Official Court Reporter

```
1    Q.   What does that column represent?
2    A.   This is the total award amount for the G&S products.
3    Q.   Okay.  If we scroll down to the last page, did you total
4    up the G&S awards from -- that you listed on this document?
5    A.   Yes.
6    Q.   And what is that total?
7    A.   $961,397.18.
8    Q.   Okay.  Now, if we could go back up to the top.
9            What does the next column represent that you have,
10   QTY?
11   A.   That's for the quantity of how many items that were on
12   the award.
13   Q.   Okay.  So, in those first two rows, you have quantity
14   one.  So there was just one item for that award?
15   A.   Yes, one each.
16   Q.   And the next column or the next row, that would show
17   there was four for that award?
18   A.   Correct.
19   Q.   Okay.  All right.  And let's move on to the unit price
20   column.
21   A.   Okay.  This is the unit price for each item on the award.
22   Q.   Okay.  So, that was the price on the award documentation?
23   A.   Yes.
24   Q.   Okay.  Now, the next column represents GMS sale price.
25   Do you see that column?
```

```
1    A.   Yes.
2    Q.   And does that run down along all of the awards as well?
3    A.   Correct.
4    Q.   Okay.  And what does that column represent?
5    A.   This is the price that GMS Industrial Supply had for
6    those items.
7    Q.   Okay.  And how did you come by that sales price?
8    A.   From our database.
9    Q.   Okay.  And did you compare the products in your database
10   with what's in the award documentation?
11   A.   Yes.
12   Q.   Okay.  Now, the next column is lowest price, unit price.
13   What does that represent?
14   A.   It's the between, looking at the G&S product price and
15   the GMS sale price, we use the lowest sale price.
16   Q.   And so for each award, you would choose to set forth what
17   the lowest price --
18           MR. MCFARLAND:  Objection, Your Honor.  Can the
19   witness tell us what she did?
20           THE COURT:  Just what's your objection,
21   Mr. McFarland?
22           MR. MCFARLAND:  Absolutely leading, Your Honor.
23           MR. BERKLEY:  Okay.
24           THE COURT:  All right.  Thank you.  That's
25   sustained.
```

```
 1              All right, Mr. Berkley, rephrase.
 2              MR. BERKLEY:  Sure.
 3   BY MR. BERKLEY:
 4   Q.  Ms. Robichaux, so why did you use the lowest price, unit
 5   price?
 6   A.  Because that would have been the price that the
 7   government paid for the product.
 8   Q.  Okay.  So if the --
 9              Okay.  So then we have a column, GMS cost.  What does
10   that represent?
11   A.  That's the GMS cost associated with the product.
12   Q.  Okay.  And how did you come by the GMS cost that you've
13   listed down these pages?
14   A.  It's the cost that's in our database, which is comprised
15   of the material costs, shipping costs, packaging, and
16   commissions paid.
17   Q.  Okay.  And then you have a profit lost column; is that
18   correct?
19   A.  Yes.
20   Q.  And how did you calculate the figure in the profit lost
21   column?
22   A.  Using the price that's in the lowest price, unit price,
23   subtracting out the GMS cost.
24   Q.  Okay.  And why did you subtract the GMS cost from the
25   lowest priced unit?
```

1   A.  Those were the known costs that GMS would have had for

2   those items, so...

3   Q.  And this document represents GMS lost profits; is that

4   right?

5   A.  Correct.

6   Q.  Okay.  Then you have this column, extended profit loss.

7   Do you see that?

8   A.  Yes.

9   Q.  Why do you have that there?

10  A.  That was using the quantity column times the profit loss.

11  Q.  Okay.  So, we have to go to the column that says QTY, and

12  whatever that number was, multiply it by the profit loss,

13  right?

14  A.  Correct.

15  Q.  Okay.  Then if we scroll down to the last page, did you

16  come up with a total profit lost?

17  A.  Yes.

18  Q.  And what is that figure?

19  A.  $195,872.95.

20  Q.  Okay.  Now, again, Ms. Robichaux, the quote dates were

21  not the same as the award dates you have on here; is that

22  right?

23  A.  Correct.

24  Q.  And the Julian date is not the same as the award dates on

25  here, right?

```
 1  A.  Correct.
 2  Q.  Now, when you came up with the GMS price, you said you
 3  compared products, right?
 4  A.  Yes.
 5  Q.  Okay.  And you determined that you were able to -- that
 6  GMS was able to sell the same product?
 7  A.  Yes.
 8           MR. MCFARLAND:  Objection, Your Honor, again
 9  leading.
10           THE COURT:  Sustained.
11           MR. BERKLEY:  Okay.
12  BY MR. BERKLEY:
13  Q.  Ms. Robichaux, when you looked at the database, did you
14  compare it to the award documents?
15  A.  Yes.
16  Q.  Okay.  And did you find any inconsistencies between your
17  database and the award documents, so that you could not
18  determine the sales price?
19  A.  No.
20  Q.  Okay.  And that would be the same for the cost; is that
21  correct?
22  A.  Correct.
23  Q.  Okay.  Now, Ms. Robichaux, did you come to an
24  understanding of when G&S Supply first tried to sell a DLA
25  award or achieve a DLA award?
```

1    A.   Yes.

2    Q.   Okay.  And how did you come by that date?

3    A.   By reviewing the DLA award.

4    Q.   Okay.  And do you remember what that date was?

5    A.   September 15th, 2017.

6    Q.   Okay.  And do you have an understanding of who created

7    G&S Supply?

8    A.   Yes.

9    Q.   And who created it?

10   A.   Westly Greer and Greg Spires.

11   Q.   And have you come to an understanding of how much GMS

12   Industrial Supply paid Westly Greer from that date until the

13   time he became a sales agent for GMS Supply in 2019?

14   A.   Yes.

15   Q.   Okay.  And do you remember off the top of your head what

16   he was totally paid during that period of time?

17   A.   Not off the top of my head.

18   Q.   Okay.  And did you prepare a computation of what he was

19   paid during that period of time?

20   A.   Yes.

21   Q.   Okay.  And --

22        MR. BERKLEY:  May I approach, Your Honor?

23        THE COURT:  Yes.

24   BY MR. BERKLEY:

25   Q.   And, Ms. Robichaux, does that document represent your

1  computations?

2  A.  Yes, it does.

3  Q.  And so how much did Westly Greer make during that period

4  of time?

5  A.  $396,832.59.

6  Q.  Okay.

7          MR. BERKLEY:  Now, Your Honor, I would like to move

8  to trial Exhibit 78.

9          THE COURT:  All right.  Hold on a second.

10          Headsets everybody.

11          (Sidebar conference as follows:)

12          THE COURT:  All right.  Thumbs up if everybody can

13  hear me.

14          Can you hear me, Mr. Lascara?

15          All right.

16          So, in looking at my order, it says 78 was

17  withdrawn and the objection to it was withdrawn.

18          MR. BERKLEY:  Your Honor, I think this is where

19  there was some confusion with pulling exhibits out of the

20  binders when it was a withdrawn objection and not a

21  withdrawn exhibit, which we tried to correct last night, and

22  I'm not -- it looks like this one slipped through the

23  cracks.

24          THE COURT:  This is something different from last

25  night.  This has to do with the objections at the final

```
 1    pretrial conference that I asked you all to meet and confer
 2    about, and when you all met and conferred and filed your
 3    joint memorandum, it said with respect to Exhibit 78 that
 4    the the GMS contractor and payroll payments, that the
 5    exhibit was withdrawn and the objection was withdrawn.
 6              MR. BERKLEY:  Oh, so --
 7              THE COURT:  Am I incorrect?
 8              MR. BERKLEY:  So, in this document it had also Sky
 9    Spires' information.
10              THE COURT:  Okay.
11              MR. BERKLEY:  And it had Wayne Sides' information.
12              THE COURT:  Okay.
13              MR. BERKLEY:  And they were dismissed from the
14    case, so we withdrew those pages from this document and left
15    everything else in.
16              THE COURT:  Okay.
17              Is that your recollection, Mr. McFarland?
18              MR. MCFARLAND:  Yes, Your Honor.
19              THE COURT:  Okay.  Very good.  Let's proceed.
20              (End of sidebar conference.)
21              THE COURT:  All right, Mr. Berkley, go ahead.
22    BY MR. BERKLEY:
23    Q.  So, ma'am, do you have document or trial Exhibit 78 in
24    front of you?
25    A.  Yes.
```

```
 1   Q.  Okay.  And if we could flip through those pages.
 2        Ma'am, do you recognize this document?
 3   A.  Yes.
 4   Q.  Okay.  And is this a document you had custodial control
 5   of in your role at GMS Industrial Supply?
 6   A.  Yes.
 7   Q.  Okay.
 8        MR. BERKLEY:  Your Honor, I would like to admit
 9   this into evidence.
10        THE COURT:  All right.  Any objection?
11        MR. MCFARLAND:  No, not under the understanding,
12   Your Honor -- I don't think it's a business record.  It was
13   created for this litigation, so I think custodial control is
14   irrelevant, but we don't object with the --
15        THE COURT:  Okay.
16        MR. MCFARLAND:  -- withdrawn portions.
17        THE COURT:  All right.  No objection.  It will be
18   entered.  You may publish.
19        (Plaintiff's Exhibit 78 received in evidence.)
20   BY MR. BERKLEY:
21   Q.  So, if we can scroll through the document briefly.
22        Ma'am, if you could tell us what this document is.
23   A.  These are payroll records.
24   Q.  Okay.  So these are payroll records kept by GMS
25   Industrial Supply?
```

```
1    A.  Yes.
2           MR. BERKLEY:  That's all of the questions I have,
3    Your Honor.
4           THE COURT:  All right.
5           Okay, Mr. McFarland, any cross?
6           MR. MCFARLAND:  Yes, Your Honor.  Thank you.
7           THE COURT:  All right.  And, Mr. McFarland, I'll
8    ask you to pull the microphone over towards you --
9           MR. MCFARLAND:  Okay.
10          THE COURT:  -- if you are going to be at that
11   podium, which is fine.
12          MR. MCFARLAND:  Thank you, Your Honor.
13          THE COURT:  Go ahead.
14                     CROSS-EXAMINATION
15   BY MR. MCFARLAND:
16   Q.  Good morning, Ms. Robichaux.
17   A.  Good morning.
18   Q.  Can we go to Plaintiff's 98, please?
19          THE COURT:  All right.  All right.  Is that it on
20   the screen?
21   BY MR. MCFARLAND:
22   Q.  Are you good with the screen?
23   A.  Yeah.
24   Q.  Okay.  All right.  If I followed you, ma'am, this is a
25   document that you created for this litigation, correct?
```

```
1    A.  Correct.

2    Q.  Okay.  And it's entitled GMS Lost Profit Final.

3         And if I understood your testimony on direct, this is

4    a listing of every sale my clients made during a period of

5    essentially 20- what, 2017 through 2019, correct, first

6    quarter of 2019?

7    A.  This is a listing of the DLA awards that we have for your

8    clients.

9    Q.  Right.  The DLA awards for my clients?

10   A.  Yes.

11   Q.  Okay.  First off, GMS never -- GMS, your employer, never

12   bid on a single one of these, did they?

13   A.  No.

14   Q.  These are all DIBBS board bids and sales to my client

15   that GMS never submitted a bid for, correct?

16   A.  Correct.

17   Q.  And the other assumption in this document is not only did

18   GMS not bid on any of these, but there is an assumption that

19   every sale my clients made would have gone to GMS?

20        MR. BERKLEY:  Your Honor, I object.

21        THE COURT:  All right.

22        MR. BERKLEY:  It's a mischaracterization calling it

23   an assumption.

24        THE COURT:  All right.

25        MR. MCFARLAND:  It's absolutely an assumption.
```

```
 1          MR. BERKLEY:  She just said what it is.  She just
 2   said what the awards were.
 3          THE WITNESS:  Correct.
 4          THE COURT:  Yes.  So, she said what the awards
 5   were.  I think it's proper cross-examination, and she can
 6   say if that's not the case.
 7          So go ahead, Mr. McFarland.
 8          So it's overruled at this time.
 9   BY MR. MCFARLAND:
10   Q.  Let's be clear, ma'am, what this document is purporting
11   to represent is that every non-NSN DIBBS board sale that my
12   client made would have somehow gone to GMS, notwithstanding
13   that they never even put in the first bid on any of these,
14   correct?  That's what this document is?
15   A.  Yes.  If your clients had sold GMS Industrial Supply
16   products to the customers, GMS Industrial Supply would have
17   gotten the awards.
18   Q.  But you're assuming that the customer would have wanted
19   GMS products, correct?
20   A.  If they were aggressively promoting GMS products to the
21   customers.
22   Q.  Except that we heard yesterday, and I don't want to
23   regurgitate but too much, but we saw that GMS in, for
24   example, Plaintiff's 110 put a moratorium on --
25          THE COURT:  What's your question, Mr. McFarland?
```

1           MR. MCFARLAND:  I'm getting to it.

2   BY MR. MCFARLAND:

3   Q.  GMS, as of January 10th, 2019, put a moratorium on these

4   type of sales, correct, ma'am?

5   A.  GMS put a moratorium on new non-NSN items.  We already

6   had hundreds of non-NSN items.

7   Q.  So, did you go through every one of my clients' sales

8   through the DLA's DIBBS board and compare it to make sure

9   that GMS actually had an existing CCPN kit for every one of

10  those items?

11  A.  Yes.  We researched -- I researched our database.

12  Q.  And you're telling me that every one of the items that my

13  clients sold, GMS had an existing CCPN kit at the time of the

14  sale?

15  A.  Not only kits or single items, we had those items

16  available.

17  Q.  Well, you would have to get those items, correct?

18  A.  There were already in our database.

19  Q.  Every one of these?

20  A.  Yes.

21  Q.  Was in your database?

22  A.  Yes.

23  Q.  Well, then why don't we see the GMS part or product

24  number on this document?

25  A.  There is no -- no product numbers listed on the document.

1   Q.  Well, wait a minute.  If we go to your catalog, ma'am,

2   for your CCPN kits, there is a CAGE Code Number, right?

3   A.  Yes.

4   Q.  Okay.  And if you've got a part that you're selling for a

5   customer, it's got to have a part number, correct?

6   A.  That's correct.

7   Q.  Yet on this, there is no part numbers here that show that

8   GMS has these products available for sale, is there?

9   A.  Not on this list, no.

10  Q.  This is the list that you're offering to the jury, right?

11  A.  Right.

12  Q.  Okay.  Ma'am, I notice --

13         So, we're operating on the assumption that every one

14  of these sales would have gone to GMS, correct?

15  A.  Yes.

16  Q.  Notwithstanding that GMS didn't want to do one-off sales,

17  as we've heard repeatedly from Mr. Gorken and Mr. Morton,

18  correct?

19  A.  Can you restate your question?

20  Q.  Sure.  We have heard --

21         THE COURT:  She wasn't in here for Mr. Gorken's

22  testimony or Mr. Morton's testimony.

23         MR. MCFARLAND:  I will rephrase, Your Honor.

24         THE COURT:  So you should rephrase that question.

25         MR. MCFARLAND:  I will definitely rephrase.

```
1              THE COURT:  Objection sustained.
2   BY MR. MCFARLAND:
3   Q.  You are familiar with the January 10th moratorium memo
4   from Mr. Morton, correct?  You received a copy of that?
5   A.  Yes.
6   Q.  And you're familiar with even earlier the March 9th,
7   2018, memorandum that said concentrate on existing CCPN
8   existing kits if you're going to make non-standard sales,
9   correct?
10  A.  Yes.
11  Q.  Okay.  But your testimony is this document is
12  representing things that GMS would have gotten,
13  notwithstanding the company's stated policy in its memorandum
14  to its sales agents, correct?
15  A.  Can you rephrase --
16  Q.  Sure.
17  A.  -- the question exactly?
18  Q.  Notwithstanding the company policy that you were well
19  aware of, right?
20  A.  Uh-huh.  Yes.
21  Q.  In fact, you helped formulate that policy --
22  A.  Yes.
23  Q.  -- right?
24          Concentrate on NSNs, and if you're going to bring us
25  CCPNs, they need to be existing CCPN kits, right?  That's the
```

1    policy that is set forth in those memoranda?

2    A.  To concentrate on the existing non-standard items.

3    Q.  Okay.  And yet this is primarily a bunch of one-off

4    sales.  The majority that I'm seeing here, for example, on

5    the first page is quantity 1.  Non --

6              MR. BERKLEY:  Your Honor.

7              THE COURT:  Yes.

8              MR. BERKLEY:  Your Honor, I object.  He's

9    testifying to what they are.  The document speaks for

10   itself.

11             THE COURT:  Don't testify, Mr. McFarland.  Just ask

12   your question.

13             MR. MCFARLAND:  All right.

14   BY MR. MCFARLAND:

15   Q.  Let me also note, ma'am, the very first item here on

16   page 1, with a date of July 28, 2018, it says G&S Award Total

17   $25,000?

18   A.  Yes.

19   Q.  That means that's what DLA paid G&S?

20   A.  Correct.

21   Q.  For that price, for that item, correct?

22   A.  Yes.

23   Q.  Okay.  It then says -- keep going forward -- the GMS

24   sales price is $30,003.85.  And then you're -- continuing

25   forward -- you claim an extended profit loss and profit lost

1   of $9,959.22.

2          The government isn't going to pay 30,000 -- at least

3   I certainly hope the government isn't going to pay $30,003.85

4   for GMS's sales price, when it could buy it from G&S and did

5   buy it from G&S for 25,000, correct, ma'am?

6   A.  If your clients promoted the GMS item, whatever this item

7   is, if they promoted the GMS item, the customer would have

8   entered the GMS price for that item, and that would have been

9   what was awarded.

10  Q.  Well, the customer wouldn't have paid $30,000 on the

11  DIBBS board if they could get it for $25,000.

12  A.  If they would have submitted the GMS Industrial Supply

13  item, that would have been the item that would have been on

14  the DIBBS board.

15  Q.  So, you're saying my clients should have submitted a GMS

16  higher price to the government than what they sold it for?

17          THE COURT:  That's asked and answered twice,

18  Mr. McFarland, so go to your next question.

19          MR. MCFARLAND:  Very well.

20  BY MR. MCFARLAND:

21  Q.  I also note, ma'am, that on the third line down, the

22  award date is April 10th of 2019, correct?

23  A.  Yes.

24  Q.  My clients were terminated on April 3rd of 2019, correct?

25  A.  Correct.

```
 1   Q.  Can we go to Plaintiff's 92, please?
 2           You were asked a lot of questions, and I'm trying to
 3   make sure that I understand it and that the jurors understand
 4   all of this testimony about commissions paid to my clients.
 5           So, I'm looking at Plaintiff's 92, which I think is
 6   the payroll report for Thomas Hayes for the period -- the
 7   first page is February 18th, 2019 to March 3rd of 2019,
 8   correct?
 9   A.  Correct.
10   Q.  Okay.  So that's, give or take, a month before Mr. Hayes
11   is terminated?
12   A.  Yes.
13   Q.  Okay.  And if I follow, the two items on this page are
14   sales that he made for GMS, correct?
15   A.  Correct.
16   Q.  Not for G&S Supply?
17   A.  Correct.
18   Q.  For GMS?
19   A.  Yes.
20   Q.  That GMS was paid for by the government, correct?
21   A.  Correct.
22   Q.  Okay.  And, in fact, the first one of these is a DLA
23   sale, correct?
24   A.  Yes.
25   Q.  Okay.  And then the second one is FAS Southwest Supply
```

1    Center.
2         And did I understand this was -- did we figure out
3    which fort these were made at?
4    A.  Fort Campbell for the first one.
5    Q.  I'm sorry?
6    A.  Fort Campbell for the first one.
7    Q.  Okay.  That's in Kentucky, correct?
8    A.  Yes.
9    Q.  And we know that Mr. Hayes' Independent Sales Agent
10   Agreement, his stated territory was Louisiana, correct, in
11   his Independent Sales Agent Agreement?
12   A.  Yes.
13   Q.  Okay.  But obviously it was okay for GMS, they wanted him
14   to sell beyond that territory, and accepted the sales that he
15   made at Fort Campbell?
16   A.  We did.
17   Q.  Okay.  So -- and I think if we go through this, you said
18   that -- I'm just picking Mr. Hayes as an example -- his total
19   commissions from the time that he -- you think he began
20   selling for G&S Supply through his termination, which you
21   have on this document you created is 12/21/18 to March 3,
22   2019, is $12,087.78.  That's what you told us?
23   A.  Yes.
24   Q.  But those are commissions paid to him for sales for GMS
25   Industrial?

```
1    A.   Yes.
2    Q.   Successful sales?
3    A.   Yes.
4    Q.   Why does GMS think that it should take back commissions
5    earned by my client on behalf of GMS sales?
6    A.   Because he was also selling products for G&S Supply, and
7    had he -- had we been aware of that, we would never have paid
8    him sales or paid him commissions for sales for GMS.
9    Q.   You think under his Independent Sales Agreement you have
10   the right to not pay him commissions for sales he made for
11   GMS?
12           MR. BERKLEY:  Your Honor, I object.  He's asking
13   for a legal opinion in a contract --
14           MR. MCFARLAND:  Well, I'm not asking for a legal
15   opinion.
16           THE COURT:  Let him finish, Mr. McFarland.
17           MR. BERKLEY:  He's asking for a legal opinion under
18   the contracts, and she's not up there to testify legally
19   about the contracts.
20           THE COURT:  All right.  So, I don't think it's a
21   legal opinion.  You asked her questions about various
22   provisions of each sale agreement, so I think he can pose a
23   question about the sale agreement as well.
24           You might want to rephrase it a little bit,
25   Mr. McFarland, but go ahead.
```

```
 1            MR. MCFARLAND:  Sure.
 2   BY MR. MCFARLAND:
 3   Q.  You're trying to claw back, and by you, I mean GMS,
 4   ma'am, not you individually.
 5   A.  I understand.
 6   Q.  I know you wouldn't do that.
 7            You're trying to claw back commissions that my
 8   clients were paid at whatever percentage rate, what is it,
 9   18, 20 percent?
10   A.  It varies for the product.
11   Q.  For which your employer got the revenue fully paid by the
12   government, and they were GMS sales, correct?
13   A.  Yes.
14   Q.  Okay.  We're not talking about G&S Supply sales here?
15   A.  We're not.  We're talking about GMS Industrial.
16   Q.  Okay.  Can we go to -- I believe it's Plaintiff's
17   Exhibit 11.
18            MR. MCFARLAND:  I'm sorry.  What is Mr. Hayes'
19   contract?  I may have given you the wrong number.  I
20   apologize.
21            Plaintiff's 14, if we could publish Plaintiff's 14.
22            THE COURT:  All right.
23   BY MR. MCFARLAND:
24   Q.  And, Ms. Robichaux, you would agree with me this is the
25   Independent Sales Agreement for Thomas Hayes made as of
```

1   July 27th, 2016, correct?

2   A.  Yes.

3   Q.  And you testified that one of your duties is to keep

4   track of these contracts, make sure they're executed.  You're

5   essentially the custodian, I think is the word that was used

6   for these agreements, correct?

7   A.  Yes.

8   Q.  Okay.  First off, ma'am -- and you're familiar with these

9   documents?

10  A.  I am.

11  Q.  At this point in time, in 2016, essentially all of the

12  Independent Sales Agent Agreements are word for word the same

13  except for who, is, the independent sales agent or the

14  entity?

15  A.  Right.  Correct.

16  Q.  Some folks as we saw with Mr. Spires and the Greers, they

17  create an LLC company --

18  A.  Correct.

19  Q.  -- for tax purposes?

20          But Mr. Hayes -- so you would agree with me, word for

21  word these are pretty much the same?

22  A.  Identical, yes.  Uh-huh.

23  Q.  Okay.  First off, you would agree with me that Mr. Hayes

24  is an independent non-exclusive sales agent, correct?

25  A.  Non-exclusive sales agent for the territory.

```
1   Q.  Right.  Which means from the GMS perspective that you can
2   put somebody else in his territory and -- for example, for
3   him, his stated territory is Louisiana -- you can have
4   another GMS either independent sales agent or employee sell
5   in his territory, and he's stuck with that, right?
6   A.  Right.
7   Q.  But what it also means is that Mr. Hayes doesn't have to
8   sell just for GMS Industrial, correct?  Yeah.
9   A.  No.
10  Q.  Well, can you point me to a provision in this
11  agreement -- and you agree with me, this is the governing
12  document for GMS's relationship with Thomas Hayes?
13  A.  Yes.
14  Q.  Point me to a provision in here which says he can't sell
15  for another entity or for himself.
16  A.  I'm not seeing one, but that was never the understanding
17  of the document.
18  Q.  Well, ma'am, it may not be your understanding, but you
19  just agreed with me; it's the wording of this document, the
20  actual wording of this document that controls the
21  relationship between GMS, your employer, and Thomas Hayes, my
22  client, during the period that he was an independent sales
23  agent, correct?
24  A.  Yes.
25  Q.  Okay.  Now, I also would like you, and take whatever time
```

1    you need, to point out to me in this Independent Sales

2    Agreement where it says that when my client makes a

3    successful sale for GMS for which it receives revenue that it

4    can nonetheless withhold his commission.

5    A.  I'm reading in the commission Section 4, it's toward the

6    end.  "The company shall have the right -- shall have the

7    absolute right to" --

8              THE COURT:  I'm going to get you to slow down just

9    a hair.

10             THE WITNESS:  Okay.

11             THE COURT:  Thank you.

12             THE WITNESS:  "The company shall have the absolute

13   right in its discretion to refuse to accept any orders

14   procured through the agent and to refuse to ship any goods

15   described therein, or to make any allowance or adjustments

16   to orders and accept any returns of any shipments.  The

17   company shall notify the agent in writing of such refusal,

18   allowances or adjustments.

19   BY MR. MCFARLAND:

20   Q.  I'm sorry.  Can we scroll down?

21             Was that on the second page of the document?

22   A.  It goes into the second page, number 4 on the second page

23   at the top.

24   Q.  Okay.  But the commissions that GMS is trying to claw

25   back from Mr. Hayes were not for orders that the company

1    refused.  They were for orders that the company sent the
2    products and was paid in full by the government, correct?
3    A.  Yes.
4    Q.  Okay.  So this, what you just cited is of no
5    consequences, it's not material to the issue with Mr. Hayes'
6    commissions, is it?
7    A.  What I was referring to is the "make allowances or
8    adjustments to orders."
9    Q.  But the company didn't make any allowances or
10   adjustments.  The company shipped and was paid for exactly
11   for the orders that Mr. Hayes placed, correct?
12   A.  Correct.
13   Q.  Okay.  And in fact, ma'am, if we go to paragraph 11 in
14   the Independent Sales Agent Agreement, this paragraph is
15   entitled Commission Payments After Termination.  "The agent
16   will be paid commissions on all orders from the territory
17   accepted by the company prior to the effective termination
18   date, even though such orders may be shipped after the
19   effective date of termination."
20          And yet putting aside that GMS wants to claw back the
21   commissions that my client earned on GMS's behalf --
22          THE COURT:  Question, Mr. McFarland.
23          MR. MCFARLAND:  Certainly, Your Honor.
24   BY MR. MCFARLAND:
25   Q.  -- the reality is that GMS still owes Mr. Hayes

1    commissions for sales he made on GMS's behalf, but that they
2    won't pay him; isn't that correct, ma'am?
3    A.   No.   That's not correct.
4    Q.   You are telling this Court and this jury that Mr. Hayes
5    doesn't have unpaid commissions for sales that GMS made, he
6    made on behalf of GMS, and GMS was paid in full by the
7    government?
8            MR. BERKLEY:   Objection to the mischaracterization,
9    Your Honor.   That's not what she just testified to.
10           THE COURT:   Well --
11           MR. BERKLEY:   He asked her what the contract does,
12   and she explained what it does.   And now he's asking her
13   something else, and he mischaracterized her testimony.
14           THE COURT:   Mr. McFarland.
15           MR. MCFARLAND:   I don't want to mischaracterize her
16   testimony.   Let me take it this way --
17           THE COURT:   Rephrase your question.
18           MR. MCFARLAND:   I'll rephrase.
19   BY MR. MCFARLAND:
20   Q.   You would agree with me, ma'am, that Mr. Hayes still is
21   owed commissions for sales he made prior to his termination
22   on April 3rd, 2019.   There are sales that went through, for
23   which GMS received the revenue but has not paid Mr. Hayes'
24   commissions, correct?
25   A.   No.

1   Q.   You think GMS has paid Mr. Hayes everything he is

2   entitled to for commissions, for all of the sales that he

3   made on GMS's behalf prior to April 3rd, 2019?

4   A.   Yes.  Because GMS has to accept the -- accept the sales.

5   Q.   Well, GMS did accept the sales.  It accepted the revenue

6   from the government, didn't it, ma'am?

7   A.   There is documentation that the sales agents would have

8   to provide for GMS to accept the sales --

9   Q.   Did GMS get --

10  A.   -- in order to pay commission.

11  Q.   -- did GMS get paid from the government for the sales

12  that Mr. Hayes made, for every sale that Mr. Hayes made prior

13  to April 3rd, 2019?

14  A.   I would have to check accounting records to be sure that

15  we got paid everything from the government, but...

16  Q.   Well, do you have any indication that the government

17  didn't pay GMS for any sale that Mr. Hayes made prior to

18  April 3rd, 2019?

19  A.   No.  Not at this time, no.

20  Q.   So, is it your testimony that because he was terminated

21  and no longer had access to GMS records that somehow he

22  didn't do something, that he didn't fully earn those

23  commissions for the sales he made?

24  A.   If he didn't turn in the proper documentation for GMS to

25  accept the sales prior to his termination, he would not be

1   owed the commission.
2   Q.  Well, do you have any evidence that he didn't turn in the
3   proper documentation prior to his termination?
4   A.  I know that there was some documents that came in after
5   his termination, not prior.
6   Q.  So if he nonetheless, even though you terminated him, was
7   fulfilling his duties and providing you the evidence, further
8   confirmation of the sales, that's unacceptable; is that what
9   GMS's position is?
10  A.  If GMS hadn't accepted the documentation, correct.
11  Q.  Notwithstanding that the sale was made, it received the
12  revenue, and it's not going to accept the documentation
13  because GMS terminated him; is that what you're saying?
14  A.  He did not turn the documentation in prior.
15  Q.  All right.  But you didn't say he didn't turn it in.  You
16  can't --
17          THE COURT:  Mr. McFarland, I think we're starting
18  to exhaust this line of questioning.
19          MR. MCFARLAND:  Well, I just want to make sure.
20          THE COURT:  I am going to give you one more on
21  this, and then let's move forward.
22          MR. MCFARLAND:  For my clients, Your Honor, we have
23  a counterclaim --
24          THE COURT:  I understand.
25          MR. MCFARLAND:  -- for monies they are owed.

```
1              THE COURT:  I understand.  But it seems like we're
2      asking the same question and getting the same answer, that's
3      what I'm talking about.
4              MR. MCFARLAND:  Okay.
5              THE COURT:  So one more question on that particular
6      thing and then let's go.
7      BY MR. MCFARLAND:
8      Q.  Can you name me a single sale for which Thomas Hayes was
9      the sales agent prior to April 3rd, 2019, for which he did
10     not either turn in his documentation or attempt to turn it in
11     after April 3rd?
12     A.  Not off the top of my head, no.
13     Q.  By the way, ma'am, the document that was created for the
14     commissions that GMS wants to claw back from this gentleman,
15     you created this, correct?
16     A.  Yes.
17     Q.  Okay.  You would agree with me it's never been produced
18     to me or my clients prior to today?
19     A.  I don't...
20     Q.  Pardon?
21     A.  I don't know.
22     Q.  Well, when did you create it?
23     A.  Um, I created that several days ago from the commission
24     reports that have already been received.
25     Q.  You created this several days ago?
```

```
 1   A.   To total it up.

 2   Q.   This case has been going on how long, ma'am?

 3   A.   Three years.

 4   Q.   Okay.  Could we go to Plaintiff's 95.

 5           This is a document that you testified about on direct

 6   exam, ma'am.

 7   A.   Yes.

 8   Q.   Okay.  And this is the report of Sabrina Greer's sales

 9   for GMS, correct?

10   A.   Correct.

11   Q.   And I guess this is a several-page document?

12   A.   Uh-huh.

13   Q.   Okay.  And Ms. Greer sold exclusively at Fort Riley, do I

14   understand?

15   A.   Fort Carson.

16   Q.   Fort Carson, I'm sorry.

17           Fort Carson, correct?

18   A.   Fort Carson.

19   Q.   Am I correct that every one of Sabrina Greer's sales was

20   an NSN sale?

21   A.   Um, I would have to go back and look at all of the

22   specific sales.

23   Q.   Pardon?

24   A.   I would have to go back and look at all of the specific

25   sales to see.
```

1   Q.   If we look at Plaintiff's 247, please.

2         Do you recognize this document, ma'am?

3   A.   Yes.

4   Q.   This is a DLA report for a sale for GS Supply LLC,

5   correct?

6   A.   Yes.

7   Q.   Okay.  And the date of order is November 30th of 2017?

8   A.   Correct.

9   Q.   And is this the document that you used as the starting

10  point for when Sabrina Greer began selling for G&S Supply?

11  A.   Yes.

12  Q.   Okay.  Where on this document do we find Mrs. Greer's

13  name?

14  A.   Her name is not on this document.

15  Q.   So how do we know that this is a Sabrina Greer sale?

16  A.   It was at Fort Carson.

17  Q.   Who else sold at Fort Carson?

18  A.   Westly Greer.

19  Q.   Okay.  Who else?

20  A.   For GMS Supply, GMS Industrial Supply?

21  Q.   Yes.

22  A.   At this time, it was only Sabrina and Westly.

23  Q.   When did Amber Wenrick begin selling at Fort Carson?

24  A.   I don't recall off the top of my head.  I would have to

25  see an agreement.  I don't have one.

```
 1   Q.  Well, isn't it possible then that this is either a Westly
 2   Greer sale or an Amber Wenrick sale?
 3   A.  For G&S?
 4   Q.  Yeah.
 5   A.  I don't recall when Amber Wenrick started selling for --
 6   at Fort Carson, so I don't have that date.
 7   Q.  Well, what you've done, ma'am, is you've just taken this
 8   date for this G&S sale and assumed that from then on every
 9   sale at Fort Carson was a Sabrina Greer sale, correct?
10   A.  Yes.
11   Q.  I don't dispute your math, I guess.  I'll assume that's
12   correct.
13        But whether or not it was for Sabrina Greer or Westly
14   Greer or Amber Wenrick, we can't tell, and you can't tell
15   from just looking at the DLA awards, correct?
16   A.  From this document, no.
17   Q.  Pardon me?
18   A.  No, not from this document.
19   Q.  And is it fair to say -- so I don't belabor this too
20   much -- that these totals that you came up with for sales or
21   the commissions, and I guess you did it for Sabrina, too,
22   right?
23   A.  Yes.
24   Q.  And that figure is for commissions that Sabrina sold for
25   products for GMS, correct?
```

A.  Correct.

Q.  And, again, that's why I asked about NSNs, because Sabrina Greer sold nothing but NSNs for GMS, correct?

A.  Again, I would have to look at every sale she ever made. I don't know specifically that they were only NSN items.

Q.  Okay.  Well, you would agree with me if they were NSN items, those were not sales that my clients even could have made, correct?

A.  G&S did not have any NSNs.

Q.  Exactly.

        And I take it that these sheets that you made, they were all made about the same time?

A.  Yes.

Q.  A few days ago?

A.  Yes.

Q.  I asked you about Mr. Hayes and his efforts on behalf of GMS and the commissions that he's owed.

        Who was the top sales agent for GMS in 2017, independent sales agent?

A.  I don't have that total in my head.

Q.  Would you believe it might be Thomas Hayes?

A.  Quite possible.

Q.  And who was the top independent sales agent for GMS in 2018?

A.  Again, I don't have that information in my head.

1  Q.  Would you accept that it was Thomas Hayes?

2  A.  Possible.

3  Q.  And in fact, Hayes, Mr. Hayes and Mr. Spires were the two

4  top sales agents in 2018 for GMS, correct?

5  A.  They were quite successful, yes.

6  Q.  And they earned GMS as --

7          MR. BERKLEY:  Your Honor, I am going to object.

8  This is going way beyond direct.

9          MR. MCFARLAND:  Oh, no.

10         THE COURT:  How is it beyond direct, Mr. Berkley?

11         MR. BERKLEY:  We weren't talking about the sales

12 experience and what these gentlemen have done over a period

13 of time.

14         THE COURT:  Right.  But you did talk about sales

15 and commission and how much people made on commissions,

16 correct?

17         MR. BERKLEY:  Yeah.  During a set period of time,

18 Your Honor.

19         THE COURT:  Yeah.  I think it's proper

20 cross-examination.

21         MR. MCFARLAND:  I'm talking about the same period

22 of time, Your Honor.

23         THE COURT:  All right.  I think it's proper.

24         MR. MCFARLAND:  They want to claw back commissions.

25         THE COURT:  I have overruled the objection.  Go

1    ahead with your next question, Mr. McFarland.

2              MR. MCFARLAND:   Thank you, Your Honor.

3    BY MR. MCFARLAND:

4    Q.   We've seen a figure for the commissions you want to claw

5    back for Mr. Hayes for his successful sales, and the

6    commissions you want to claw back from Sabrina for her

7    successful sales, and from Greg Spires for his successful

8    sales, and Mike Welton for his successful sales.

9              Have you presented any figures about the actual

10   revenues that these gentlemen and Mrs. Greer brought in for

11   GMS?

12   A.   No.

13   Q.   Now, with respect to Mr. Greer, you testified that he

14   went from being the director of sales to an independent sales

15   agent in January of 2019, correct?

16   A.   Yes.

17   Q.   And I think we've seen the addendum to his Independent

18   Sales Agent Agreement that's dated 1/12/19, and the agreement

19   itself is dated 1/21/19?

20   A.   Uh-huh.

21   Q.   Is it possible that the addendum date, the middle date,

22   or that the day got transposed?

23   A.   There was a series of documents that I sent to him, had a

24   discussion about these are the documents that I am going to

25   send to you to make your Independent Sales Agent Agreement

1    effective, and the Zone Manager Addendum is one of the

2    documents in that packet.  I don't know the specific date

3    that I sent those things to him.

4    Q.  But the documents are to be taken together, correct?

5    A.  Yes.

6    Q.  In other words, he's now an independent sales agent?

7    A.  Yes.

8    Q.  But what GMS is saying is we value you so much that we

9    also still want you to be the supervisor of some other agents

10   in a certain zone?

11   A.  In a certain zone, yes.

12   Q.  And therefore, he still had access to certain materials

13   that other just plain independent sales agents wouldn't have

14   access to?

15   A.  Correct.

16   Q.  Now, you were asked about why Mr. Greer went from being

17   director of sales to an independent sales agent, correct?

18   A.  Yes.

19   Q.  Okay.  In fact, ma'am, you were on a phone call with

20   Mr. Gorken and Mr. Greer when he indicated that he wanted to

21   switch to being a sales agent because he wasn't getting paid

22   his proper bonus, correct?

23   A.  I remember being on phone calls.  I don't remember the

24   details of the conversation.

25   Q.  Well, do you remember that Mr. Greer's beef, or what he

1   was upset about and why he went from being director of sales

2   to an independent sales agent was compensation, his

3   compensation?

4   A.   I know that he had concerns about it.  I don't remember

5   the specifics of the conversation.

6           THE COURT:  All right.  Mr. McFarland, we're going

7   to take the morning recess at this time, so I'm going to

8   excuse the jury and give them a break.

9           Again, ladies and gentlemen, don't discuss your

10  testimony until the case is submitted to you.

11          (The jury exited the courtroom at 11:19 a.m.)

12          THE COURT:  All right.  We'll give the jury and the

13  court reporter about 15 minutes to rest her fingers, and

14  then we'll come back and resume with your cross-examination

15  at 11:35.

16          MR. MCFARLAND:  Thank you, Your Honor.

17          (Recess from 11:26 a.m. to 11:35 a.m.)

18          THE COURT:  All right, Mr. McFarland, you may

19  continue with your cross.

20          MR. MCFARLAND:  Thank you very much, Your Honor.

21          If we may publish Plaintiff's 98, please.

22          THE COURT:  All right.

23  BY MR. MCFARLAND:

24  Q.   Ma'am, again, this is the document that you created for

25  the lost profits?

1    A.   Yes.

2    Q.   Okay.  And I notice that while the majority of the time

3    the G&S price is lower than the GMS price, that's not always

4    the case, right?

5    A.   Correct.

6    Q.   There are some times when GMS has a lower price, or at

7    least the lowest unit price than my client got for the

8    successful award, correct?

9    A.   Yes.

10   Q.   Okay.  Could we have Plaintiff's 97, please.

11            With respect to this document, ma'am, I don't know

12   that we discussed Mr. Spires' commission reports, but this is

13   again a document that you created?

14   A.   Yes.

15   Q.   Okay.  I notice highlighted in yellow it's plus 1,600

16   spifs; is that what it is?

17   A.   Yes, it is.

18   Q.   What are spifs?

19   A.   Spifs is if we were trying to promote specific items.  In

20   order to increase the sales on that specific item, we would

21   offer a spif or a dollar amount, $50, $100 to promote those

22   particular items, and if the sales agents sold them, they

23   would get the spif.

24   Q.   So in other words, Mr. Spires earned $1,600 in spifs, or

25   essentially it's a bonus, right?

```
1    A.   Right.
2    Q.   Okay.  And you're getting that because you've met or
3    exceeded a sales quota for a product that GMS is pushing?
4    A.   Not exactly.  If there was a product that we said, if you
5    sell this product, you would get a spif, a dollar amount, so
6    he would have sold that product during that time.
7    Q.   For GMS?
8    A.   For GMS.
9    Q.   Okay.  So in other words, he's been pretty successful
10   because he's not only getting the regular commissions, but
11   he's sold the product that GMS is emphasizing at that time
12   and getting an extra payment for it?
13   A.   Yes.
14   Q.   Okay.  And I don't want to belabor it too much, but we're
15   going to see spifs on there for Thomas Hayes and Michael
16   Welton, correct?
17   A.   Yes.
18   Q.   You would agree with me, ma'am, putting aside the dispute
19   that brings us here together, one thing we can agree on is my
20   clients were darn good salespeople for GMS?
21   A.   They did well, yes.
22   Q.   And could we have Plaintiff's Exhibit 518, please.
23         This is a GMS catalog, ma'am, that you're familiar
24   with?
25   A.   GMS Industrial Supply catalog, yes.
```

1   Q.   Now, I note that the title is Department of Defense

2   Supply Catalog, and underneath that is NSN.   And we've heard

3   a lot about the NSN sales.   Those are the pre-approved

4   contracts with the government, correct, DLA or GSA?

5   A.   Yes.

6   Q.   Okay.   Then there is FedMall, which is another, as I

7   understand it, another manner that you can sell to the

8   government?

9   A.   Correct.

10  Q.   But which my clients never used, correct, for G&S Supply?

11  A.   Prior to it being called FedMall it was EMALL, and Greg

12  Spires had customers using EMALL.

13  Q.   For GMS?

14  A.   Yes.

15  Q.   Right.   But not for G&S Supply?

16  A.   Not that I'm aware.

17  Q.   All right.   And if we go, ma'am --

18          I guess maybe scroll down.   I think it's either at

19  the bottom of the page -- I'm sorry.   Maybe it's the very end

20  of the catalog.   Okay.   Yep.   Here we go.

21          On the very bottom at the right it says, "Need

22  tactical products?   GMS offers the Storm Tactical

23  international product line."

24          What is the Storm Tactical international product

25  line?

1    A.  It would have been tactical products, protective gear,

2    things like that.

3    Q.  I'm sorry.  Protective gear?

4    A.  Protective gear, equipment.

5           MR. BERKLEY:  And, Your Honor, this seems to be way

6    out of the scope of direct.

7           THE COURT:  All right.

8           Mr. McFarland, I don't remember him asking any

9    questions to this witness about the catalog or anything

10   related to tactical gear.

11          MR. MCFARLAND:  No, Your Honor, but the witness

12   yesterday testified about getting price quotes, sometimes

13   the need to get three price quotes for certain items, I

14   think on the DIBBS board, and that's where this is going.

15          THE COURT:  Okay.  So, sustained for right now, but

16   let's go there.

17   BY MR. MCFARLAND:

18   Q.  Is Storm Tactical then, ma'am, an affiliate or subsidiary

19   company of GMS?

20   A.  It was our d/b/a.

21   Q.  I'm sorry?

22   A.  It was our d/b/a.

23   Q.  D/b/a?

24   A.  Yes.

25   Q.  So it's -- I'm not sure what that means.

```
1    A.  It's a doing business as.
2    Q.  Is it GMS doing business as Storm Tactical, or Storm
3    Tactical doing business as GMS?
4    A.  Storm Tactical as GMS.
5    Q.  Okay.  And who owns Storm Tactical?
6    A.  It's GMS.
7    Q.  It's not a separate corporate entity?
8    A.  No.
9    Q.  Well, did GMS regularly use Storm Tactical for quotes for
10   items when three price quotes were required?
11   A.  There may have been times.
12   Q.  And you're sure Storm Tactical isn't a company that's
13   owned by Gary Gorken?
14   A.  Correct.
15   Q.  What is G Cubed?
16   A.  G Cubed is a company owned by Gary Gorken.
17   Q.  And what does G Cubed sell?
18        MR. BERKLEY:  Your Honor, I think this is getting
19   way beyond where we were.
20        THE COURT:  Sustained.
21        Next question.
22        MR. MCFARLAND:  One moment, if I may, Your Honor.
23        THE COURT:  Certainly.
24        MR. MCFARLAND:  Thank you, ma'am, that's all of the
25   questions I have.
```

JILL H. TRAIL, Official Court Reporter

```
 1              THE COURT:  All right.

 2              Mr. Berkley, any redirect?

 3              MR. BERKLEY:  Yes, Your Honor.

 4              THE COURT:  All right.

 5              MR. BERKLEY:  Your Honor, if I could refer to

 6  Exhibit 14.

 7              THE COURT:  All right.

 8                     REDIRECT EXAMINATION

 9  BY MR. BERKLEY:

10  Q.  Binder 1.

11              MR. BERKLEY:  Madam Clerk, I think you need to

12  switch it.

13              THE CLERK:  Sorry.

14              THE COURT:  All right.  Go ahead, Mr. Berkley.

15  BY MR. BERKLEY:

16  Q.  Ms. Robichaux, Mr. McFarland asked you about this

17  document and your understanding of this document.

18              Let me ask you this:  Did you ever go to law school?

19  A.  No.

20  Q.  Do you have a law degree?

21  A.  No.

22  Q.  Did you draft this document?

23  A.  No.

24  Q.  Okay.  And now let me ask you something.  In Section 1,

25  you were talking -- you identified "aggressively promote,"
```

 1   right?

 2   A.  Yes.

 3   Q.  And what is your understanding of aggressively promote?

 4           MR. MCFARLAND:  I am going to object, Your Honor,

 5   way beyond the scope of my cross; and B, now he's asking her

 6   for a legal conclusion, or at least an opinion about the

 7   wording of the document.  The document says what it says.

 8   It hasn't been claimed to be ambiguous.  You don't get to

 9   try and put in parol evidence on her understanding.

10           THE COURT:  The document does say --

11           Well, go ahead, Mr. Berkley.

12           MR. BERKLEY:  Okay.  Your Honor, he did ask her

13   about provisions of this document.  I do not believe it is

14   beyond the scope.

15           THE COURT:  He did.  It is not beyond the scope.

16           Overruled.

17           MR. BERKLEY:  He was asking her --

18           THE COURT:  I overruled his objection.  You won.

19   Go ahead and ask your next question.

20           MR. BERKLEY:  Okay.

21   BY MR. BERKLEY:

22   Q.  So, ma'am, the aggressively promote section in there,

23   were the agents required to aggressively promote --

24   A.  Yes.

25   Q.  -- for GMS?

```
1    A.  Yes.
2    Q.  And do you believe that aggressively promoting means they
3    could walk in and sell both GMS and G&S Supply products to
4    customers?
5           MR. MCFARLAND:  Objection.  Mr. Berkley is now
6    testifying, not asking a question.
7           THE COURT:  I think you mean leading.
8           MR. MCFARLAND:  Yes.
9           THE COURT:  And that objection is sustained.
10          MR. BERKLEY:  Okay.
11          THE COURT:  Go ahead, Mr. Berkley.  You may
12   rephrase.
13          MR. BERKLEY:  All right.
14   BY MR. BERKLEY:
15   Q.  If we can move on to Section 12 of this document.  Go to
16   13 and 14.
17          Now, Ms. Robichaux, when you were talking about these
18   pages that you prepared in order to, you know, have the
19   number more recently in front of you with these
20   commissions --
21   A.  Uh-huh.
22   Q.  -- how long had you had those commission reports before
23   you prepared those?
24   A.  Since the commission reports were created.
25   Q.  And you had reviewed those commission reports multiple
```

```
 1   times in this case; is that right?
 2   A.  Yes.
 3   Q.  Okay.  Do you recollect when Amber Wenrick was hired by
 4   GMS Industrial?
 5   A.  I don't recall specifically.  I believe it might have
 6   been 2018.  I don't recall specifically.
 7   Q.  Okay.  So, if she was hired in 2018, that would be -- was
 8   she hired after Sabrina Greer?
 9   A.  Yes.
10   Q.  Okay.  And was she hired after Westly Greer?
11   A.  Yes.
12           MR. BERKLEY:  That's all of the questions I have,
13   Your Honor.
14           THE COURT:  Okay.  Thank you.
15           May Ms. Robichaux be excused, Mr. Berkley?
16           MR. BERKLEY:  Hold on one second, Your Honor.
17           THE COURT:  Yes.
18           MR. BERKLEY:  Excuse me, Your Honor.  No questions,
19   Your Honor.  She can be excused.
20           THE COURT:  Mr. McFarland?
21           MR. MCFARLAND:  Yes, Your Honor.
22           THE COURT:  All right.
23           All right, Ms. Robichaux, you may be excused.
24   You're free to either stay in the courtroom, or you may
25   leave the courthouse.  Thank you very much.
```

```
 1              Plaintiffs, call your next witness.  Who is your
 2    next witness?
 3              (End of excerpt.)
 4
 5                             CERTIFICATION
 6
 7        I certify that the foregoing is a correct transcript
 8    from the record of proceedings in the above-entitled matter.
 9
10
11              _____/s/_____
12                             Jill H. Trail
13                             July 6, 2022
14
15
16
17
18
19
20
21
22
23
24
25
```