```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF VIRGINIA
 2                         Norfolk Division

 3

 4   - - - - - - - - - - - - - - - - - -
                                        )
 5   GMS INDUSTRIAL SUPPLY, INC.,        )
                                         )
 6           Plaintiff,                  )   CIVIL ACTION NO.
                                         )   2:19cv324
 7   v.                                  )
                                         )
 8   G&S SUPPLY, LLC, et al,             )
                                         )
 9           Defendants.                 )
                                         )
10   - - - - - - - - - - - - - - - - - -

11

12

13                  TRANSCRIPT OF PROCEEDINGS
               (Excerpt of proceedings - Westly Greer)
14                      Norfolk, Virginia

                         June 6, 2022
15

16

17   BEFORE:  THE HONORABLE RODERICK C. YOUNG
              United States District Judge, and jury
18

19

20   APPEARANCES:

21            PENDER & COWARD
              By:  By:  William A. Lascara
22                     Jeffrey Dennis Wilson
                       Jesse Brian Gordon
23                     Thomas Saunders Berkley
                       Daniel T. Berger
24                     Counsel for Plaintiff

25
```

```
 1          MCGUIREWOODS LLP
            By:  Robert William McFarland
 2               Micaylee Alexa Noreen
                 Jeanne E. Noonan
 3               Counsel for the defendants

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                         I N D E X

2  PLAINTIFF'S
   WITNESSES                                    PAGE
3

4

5
   DEFENDANTS'
6  WITNESSES                                    PAGE

7   WESTLY GREER
        Direct Examination By Mr. McFarland        4
8       Cross-Examination By Mr. Lascara          56

9

10

11                       E X H I B I T S

12 PLAINTIFF'S
   NO.              DESCRIPTION                 PAGE
13

14

15 DEFENDANTS'
   NO.              DESCRIPTION                 PAGE
16
    19                                            51
17  29                                            52
    21                                            54
18

19

20

21

22

23

24

25
```

JILL H. TRAIL, Official Court Reporter

```
 1              (Excerpt of proceedings - testimony of Westly
 2    Greer.)
 3              MR. MCFARLAND:  Your Honor, our next witness will
 4    be Westly Greer.
 5              THE COURT:  All right.
 6              Mr. Greer, please come forward.
 7              (The witness was duly sworn.)
 8              THE COURT:  All right, Mr. McFarland, you may
 9    proceed.
10              MR. MCFARLAND:  Thank you, Your Honor.
11              WESTLY GREER, called by the Defendants, having been
12    first duly sworn, was examined and testified as follows:
13                        DIRECT EXAMINATION
14    BY MR. MCFARLAND:
15    Q.  Good afternoon.  Would you state your full name, please.
16    A.  Westly Greer.
17    Q.  And where do you reside, Mr. Greer?
18    A.  Wentzville, Missouri.
19    Q.  In the state of Missouri?
20    A.  Yes.
21    Q.  And who lives there with you in Missouri?
22    A.  My wife, Sabrina Greer, and Donovan Greer, my son.
23    Q.  And you've lived there since?
24    A.  2019.
25    Q.  And do we understand from some things we've heard
```

```
 1   earlier, were you born or at least grew up in Missouri?
 2   A.   Yes.
 3   Q.   What do you do at the present time?
 4   A.   I sell for Fastenal.  I work for Fastenal in Wentzville,
 5   Missouri.
 6   Q.   And what do you sell for Fastenal?
 7   A.   Just a lot of commodities, stuff like hardware,
 8   janitorial supplies, safety.
 9   Q.   And where did you work before joining Fastenal?
10   A.   I worked for GMS Industrial Supply.
11   Q.   Let's go back a little bit, Mr. Greer.  Your educational
12   background?
13   A.   I went to high school in Wright City, Missouri.  I
14   attended college at UMSL University in St. Louis, Missouri.
15           THE COURT:  I'll ask you to slow down just a
16   smidge.  Thank you.
17           THE WITNESS:  I attended UMSL in St. Louis,
18   Missouri.  I did one year there.
19   BY MR. MCFARLAND:
20   Q.   And what did you do after leaving college, Westly?
21   A.   I worked at Denny's.  I worked at Denny's during the time
22   of college and after, yeah.
23   Q.   And what has your career path been since then?
24   A.   I worked at Lowe's.  I worked for State Industrial and
25   State Chemical, UZ Engineering, and then GMS Industrial
```

```
 1    Supply.
 2    Q.   And for State -- is it State Industrial?
 3    A.   Yes.
 4    Q.   What did you do?
 5    A.   I installed dilution systems on Fort Sill, Oklahoma.
 6    Q.   And how about for -- what was the other, State Chemical?
 7    A.   Yeah.  They branched off into two different companies, UZ
 8    Engineering and State Chemical, and I worked for both
 9    companies at the same time.
10    Q.   Did you do any selling of products for either of those
11    companies?
12    A.   For UZ Engineering, I was in training with my brother,
13    Gary Hodges.
14    Q.   And in training for, to do?
15    A.   Sales.  And then for State Chemical, I was doing
16    installs.
17    Q.   And Fort Sill is located where?
18    A.   Oklahoma, Lawton, Oklahoma.
19    Q.   Did you from your work for UZ or Industrial have any --
20    come to any knowledge about how the Army purchased products
21    at Fort Sill?
22    A.   Yes.  I would walk around with my brother as he sold
23    through their supply system.
24    Q.   And what was your brother's position?
25    A.   He was the account manager for Fort Sill, Oklahoma.
```

1  Q.  And did there come a time when you joined GMS Industrial?

2  A.  Yeah.  It would be April 3rd of 2011.

3  Q.  At the time, what were you doing prior to becoming a -- I

4  guess you became an agent for GMS Industrial Supply

5  initially?

6  A.  A sales agent, yes.

7  Q.  What were you doing before that?

8  A.  I was doing installs for State Chemical Solutions, and I

9  was training with UZ Engineering, and I was also working at

10  Lowe's, and then I was also installing countertops for a side

11  business.

12  Q.  Did you, at the time you came to be an independent sales

13  agent for GMS, have an idea of the Army procurement system?

14  A.  Yes, through the same system, which was the supply system

15  at the time.  My brother taught me a lot of ways to order

16  hardware through that system.

17  Q.  And how did you hear about GMS Industrial?

18  A.  I think that GMS was trying to partner with UZ at the

19  time, because they were a hardware company, and GMS was a

20  chemical company, and my brother would just happen to be the

21  agent at Fort Sill.

22  Q.  And how did it come that you came to be an independent

23  sales agent for GMS Industrial?

24  A.  Like, six months after I started as being an employee for

25  them I became an independent agent, because the sales volume

1    was so high that it was more practical for me to be

2    independent.

3    Q.  So, I'm sorry.  Maybe I mis- -- you started as what at

4    GMS Industrial?

5    A.  I was a sales agent, but as an employee.

6    Q.  Gotcha.  Okay.

7           And what were you selling for GMS Industrial as an

8    employee sales agent?

9    A.  Just a lot of janitorial supplies.

10   Q.  Did you receive any training to sell janitorial supplies

11   for GMS Industrial?

12   A.  No training.  I think Gary Gorken and my brother, we all

13   tag-teamed at the beginning when we first met up and were

14   just seeing -- I don't think Gary Gorken had ever been on a

15   military base or an Army base before, and it was kind of new

16   to him.  And then we were just going around.  Just he had a

17   knowledge of what products they had, so we sold whatever we

18   could.

19   Q.  Just so we can keep it clear, your brother was not

20   employed or an independent sales agent for GMS Industrial,

21   correct?

22   A.  Correct.

23   Q.  And did you come to learn during the time that you were

24   first hired as an employee for GMS Industrial, were they

25   doing much business at Army bases?

1   A.   From what I was told by Gary Gorken, no.

2   Q.   Did that change during your tenure with GMS Industrial?

3   A.   Yes.

4   Q.   Tell us about your career progression.  I guess you start

5   in your employee sales agent for about six months, correct?

6   A.   Yes.

7   Q.   Selling janitorial supplies?

8   A.   Yes, sir.

9   Q.   And then what happens after six months?

10  A.   After six months -- well, at the beginning, I was the

11  first agent to actually make a sale through that supply

12  system for the company.  I had continual sales.  No one else

13  could figure out how to do it, and --

14  Q.   I'm going to stop you for just a second.

15  A.   Yeah.

16  Q.   You said you were the first agent to make a sale at that

17  base through that system?

18  A.   Yes.

19  Q.   What's the system?

20  A.   It was called SAMS-E at the time, SAMS-E, Standard Army

21  Maintenance System.

22  Q.   To your knowledge, had anyone at GMS Industrial used the

23  SAMS-E system to make sales to the Army prior to you?

24  A.   No, there weren't.

25  Q.   Did anyone at GMS Industrial even know how to use that

```
1   system?
2   A.  No, they did not.
3   Q.  Just if we go forward, does that system evolve into
4   something else?
5   A.  Yes.
6   Q.  And what does it evolve into?
7   A.  It evolved into GCSS, the Global Combat Support System.
8   Q.  Well, it sounds like -- and I don't want you to toot your
9   own horn, but it sounds like things go pretty well for you
10  once you join GMS Industrial as a sales agent?
11            MR. LASCARA:  Objection, Your Honor, leading.
12            THE COURT:  Sustained.
13            MR. MCFARLAND:  I'll rephrase.
14  BY MR. MCFARLAND:
15  Q.  How did you do as a sales agent during your, let's say --
16  you started in 2011, right, as an employee.
17            When do you become an independent sales agent?
18  A.  I think it was about six months later that I became an
19  independent.
20  Q.  The first year or two, how do you do as an independent
21  sales agent?
22  A.  Well, in 2012, I became a district manager so I could
23  train everyone around the country how to actually do what I
24  did, so I would say I did pretty good.
25  Q.  Did you receive any commendations or awards during the
```

1    first 18 months of your tenure at GMS Industrial?

2    A.  I won a trip, I think in 2012, the Mexico trip that they

3    had frequently.

4    Q.  When you became either an -- initially an employee, or as

5    an independent sales agent, did you receive any type of

6    documents or pamphlets or materials?

7    A.  I think catalogs, some samples for customers, some

8    aerosols.

9    Q.  Did you receive any document that was stamped

10   "confidential"?

11   A.  No.  No.

12   Q.  Or "proprietary"?

13   A.  No.

14   Q.  Or "trade secret"?

15   A.  No.

16   Q.  Did you, during the first two years of your work for GMS,

17   ever receive anything that you were told was confidential,

18   proprietary, or trade secret?

19   A.  No.

20   Q.  Did you have access to any kind of a computer system

21   during your first couple of years at GMS?

22   A.  No.  We just had a Google account with a Google drive.

23   Q.  How would you access that?

24   A.  With a password for your email.

25   Q.  Did you have access during this period to any of GMS

1   Industrial's pricing?

2   A.  Their costs?

3   Q.  Yes.

4   A.  No.

5   Q.  Did you have access to anything regarding who were their

6   suppliers, their vendors?

7   A.  No.  I knew of a few, like -- I can't disclose them, but

8   there were competitors on the base that they bought from.

9   Q.  But in terms of -- did you ever get a list of GMS

10  Industrial vendors?

11  A.  No.

12  Q.  You said Fort Sill was where you were at least initially

13  primarily working or selling; is that correct?

14  A.  Yes.

15  Q.  Did you get any contact information for who to sell to at

16  Fort Sill?

17  A.  No.  We created that.

18  Q.  When you say we, you mean you created it?

19  A.  I created a spreadsheet to track all of my sales and who

20  I talked to.  And GMS liked the spreadsheet that I created.

21  I think they made it mandatory for everyone to use after I

22  created it.

23  Q.  So, you came up with the form?

24  A.  Yes.

25  Q.  Okay.  Can we -- I apologize.  My memory is not as good

1   on this one.

2           Can we publish P115, please?

3           THE COURT:  All right.

4           MR. MCFARLAND:  I believe it's already been

5   admitted and published.

6           THE COURT:  P115, all right.  You may publish if

7   it's been admitted.

8           MR. MCFARLAND:  Thank you, Your Honor.

9   BY MR. MCFARLAND:

10  Q.  Is this the document you're referring to, Mr. Greer?

11  A.  Yes.  This has evolved over time.  It used to be called

12  "What's in the SAMS."  It used to be called "What's in the

13  SAMS," and it's changed to whatever this is called now.

14  Q.  When you first came to be selling for GMS Industrial, did

15  this document exist?

16  A.  No.

17  Q.  Is this a template then that you created?

18  A.  Yes.

19  Q.  And I guess what I -- has it evolved some over time?

20  A.  Yes.

21  Q.  Okay.  Just -- I don't know that we need to do the column

22  by column by column, but how has it evolved over time,

23  Mr. Greer?

24  A.  Everything was all in one tab at one time, and now it's

25  kind of spread out.  It made it a little bit more organized.

```
1    Q.  And when you created this, what was your purpose?

2           MR. LASCARA:  Your Honor, I'm going to object,

3    because I think it's confusing.  He says, "When you created

4    this."  And I don't believe the testimony is that he created

5    this Exhibit 115.  He testified that at some time in the

6    past he created something that became this, and I think it's

7    confusing to the jury --

8           THE COURT:  Mr. McFarland.

9           MR. LASCARA:  -- to misconstrue these items,

10   because he didn't draft this.

11          THE COURT:  Mr. McFarland.

12          MR. MCFARLAND:  I believe his testimony is that he

13   created this document, the original template, and he said

14   it's a --

15          THE COURT:  I think that's the key question.

16          MR. MCFARLAND:  Sure.

17          THE COURT:  Template.

18          Go ahead.

19          So, objection sustained.

20          MR. LASCARA:  Thank you, Your Honor.

21          THE COURT:  You can rephrase.

22   BY MR. MCFARLAND:

23   Q.  Did you create the template for this document?

24   A.  Yes.

25   Q.  Okay.  Did it evolve over time?
```

1   A.   Yes.

2   Q.   And I take it that the information that we see on this

3   version of the document is -- particularly on the far right,

4   the notes section, that's information that the sales agent

5   inputs, correct?

6   A.   Yes.  I inputted this information.

7   Q.   Or in your case, when you were the director of sales, you

8   may have inputted some information?

9   A.   Yes.

10  Q.   Through your tenure with GMS Industrial, Westly, do you

11  have a sense of what percentage of the company's revenues

12  were derived from Army sales versus Navy or other military

13  branch sales?

14  A.   When I started, it was the majority of Navy.  And then as

15  I progressed in the company, it had flipped to Army.

16  Q.   Before you joined the company, had there been any sales,

17  to your knowledge, by GMS Industrial at Fort Sill?

18  A.   No.

19  Q.   Had there been any sales by GMS Industrial at Fort Bliss?

20  A.   No.

21  Q.   And how did it come that GMS Industrial started to have

22  sales success at Fort Bliss?

23  A.   I think Greg started down there, Greg Spires.  He sold a

24  lot of kits down there.

25  Q.   And were you responsible for bringing Mr. Spires onboard?

1   A.  Yes.

2   Q.  All right.  How about Fort Carson, any GMS sales there

3   prior to you beginning at GMS Industrial?

4   A.  No.

5   Q.  Fort Riley?

6   A.  No.

7   Q.  Fort Benning?

8   A.  No.

9   Q.  Fort Polk?

10  A.  No.

11  Q.  Fort Campbell?

12  A.  No.

13  Q.  You mentioned that you became the director of sales for

14  GMS Industrial?

15  A.  Yes.

16  Q.  When did that happen?

17  A.  I believe it was 2015.

18  Q.  And at the time you became director of sales for GMS

19  Industrial, did you then have a team of sales agents under

20  you?

21  A.  Yes.

22  Q.  How many reported to you?

23  A.  Off the top of my head, I think seven.

24  Q.  Was yours the largest of the divisions?

25  A.  Yes.

```
1    Q.  Was it the most successful in terms of revenues?
2    A.  Yes, it was.
3    Q.  Was it the most successful in terms of profits?
4    A.  Profits, I'm not sure.  For the company?
5    Q.  Yes.
6    A.  I don't know what their profits were.
7    Q.  Oh, I'm sorry.  That was not something that you had
8    access to?
9    A.  No.
10   Q.  Okay.  Were your sales agents among the very top
11   producers for the company throughout your tenure up through
12   April 3rd of 2019?
13   A.  Yes.
14   Q.  And how do you know that?
15   A.  They were recognized on trips, vacation trips.
16   Q.  Were you the most productive in terms of revenue of the
17   directors of sales for GMS Industrial?
18   A.  Yes.
19   Q.  And how about yourself, did you receive any awards or
20   recognitions from the company through your tenure?
21   A.  I won a lot of trips, yes.
22   Q.  Okay.  What was your compensation based upon once you
23   became an employee for GMS Industrial?
24   A.  As a director?
25   Q.  Yes, sir.
```

 1   A.   I had a required sales amount of 75,000 per quarter to

 2   keep my job, and then anything that exceeded that would be

 3   bonusable.

 4   Q.   Was there ever a quarter from when you became the

 5   director of sales that you didn't meet that -- I guess it's a

 6   quotient, right, or quota of 75,000?

 7   A.   Yes.  No.

 8   Q.   And did you exceed that number for all of those quarters?

 9   A.   Yes.

10   Q.   Were there bonuses paid to sales agents for NSN sales?

11   A.   Yeah.  There were spifs to increase sales of certain

12   kits, yes.

13   Q.   During your tenure at GMS Industrial, did the

14   company's -- well, let me ask it this way first.

15        When did GMS first get an NSN?

16   A.   I can't recall the date.  I want to say 2014, maybe.

17   Q.   And after the company started getting NSNs, did the

18   company focus switch in any way?

19   A.   Yeah.  The focus was to sell the NSNs, yeah.

20   Q.   And we kind of heard this, but from a director of sales

21   standpoint, what is the difference between an NSN and a CCPN?

22   A.   NSNs are National Stock Numbers, so they could be stocked

23   in DLA warehouses, and they can get to the customer a lot

24   quicker.

25   Q.   And how about the payment to GMS for an NSN?

```
1   A.   If they were stocked, they would get paid for the amount
2   that DLA ordered for the stock.  So, it would be essentially
3   a prepay.
4   Q.   I'm sorry?
5   A.   Essentially like a prepay.
6   Q.   How about a CCPN?
7   A.   I don't know how -- what GMS' contract was with DLA, how
8   they got paid, but I would say net 30, net 90, somewhere in
9   that range.
10  Q.   Am I correct that the CCPN first has to be ordered by the
11  customer?
12  A.   Yes.
13  Q.   Okay.  And then there is a bid process?
14  A.   Yes.
15  Q.   If it's even approved by the financier for the
16  government, correct?
17  A.   Yes.
18  Q.   Okay.  Then it's put out to bid?
19  A.   Yes.
20  Q.   And that's what the DIBBS Board is that we've heard
21  about, correct?
22  A.   Yes.
23  Q.   And it is possible for the ultimate recipient of a CCPN
24  sale to be someone who just simply saw it on the DIBBS Board,
25  but wasn't the original contact, if you will, with the
```

```
 1    customer at the base?
 2    A.   Correct.
 3    Q.   Is there a type of sale in which an agent needs to
 4    provide the government more than just one price quote?
 5    A.   Yes.
 6    Q.   What type of sale?
 7    A.   A GPC sale, a Government Purchase Card sale.
 8    Q.   And was GMS involved in any GPC sales?
 9    A.   Yes.
10    Q.   And so if you, as the director of sales, if it's a GPC
11    sale, how do you get quotes?  How do your agents get quotes?
12    A.   GMS had two other companies that they would use as the
13    competitors to quote those out.
14    Q.   And who were those companies?
15    A.   G Cubed and Storm Tactical.
16    Q.   And who owns G Cubed?
17    A.   Gary Gorken.
18    Q.   And what about Storm Tactical?
19    A.   It's either Gary or Rachel.  I'm not sure.
20    Q.   So, if I'm following, if the procurement process required
21    three quotes --
22    A.   Yeah, three competitive quotes.
23    Q.   -- what GMS was doing was providing quotes from companies
24    that its owner or director of regulatory compliance owned?
25    A.   Correct.
```

```
 1            MR. LASCARA:  Your Honor, he's leading, and he's
 2    testifying.
 3            THE COURT:  It is leading.  So, that objection is
 4    sustained.
 5            MR. MCFARLAND:  I'll rephrase, Your Honor.
 6            THE COURT:  Sure.
 7    BY MR. MCFARLAND:
 8    Q.  Would you consider G Cubed to be an independent company
 9    of GMS Industrial?
10    A.  No.
11    Q.  Would you consider Storm Tactical to be an independent
12    company of GMS Industrial?
13    A.  No.
14    Q.  Do you know, was the government advised of who the owners
15    were of G Cubed and Storm Tactical?
16    A.  Not to my knowledge, no.
17    Q.  What -- by the way, what do you know about G Cubed?
18    A.  It was -- as far as I know, it was just used for bidding
19    to help win the bid for the credit card purchase.
20    Q.  And do you know what -- did G Cubed ever sell any
21    industrial products?
22    A.  Not that I've seen.
23            MR. LASCARA:  Your Honor, I'm going to raise an
24    objection regarding the relevance of this as it relates to
25    the claims at issue.  He's talking about some other alleged
```

```
 1    conduct.  It has -- it has no relation to what the issues

 2    are in this case.

 3              THE COURT:  Mr. McFarland.

 4              MR. MCFARLAND:  Oh, it has a direct relation, Your

 5    Honor.  My clients are being sued for selling products or

 6    offering products for sale, and there is apparently two

 7    companies owned by the owners of GMS Industrial that are

 8    also offering products for sale, and are providing quotes

 9    when needed.

10              THE COURT:  It's relevant, and the objection is

11    overruled.

12              Go ahead, Mr. McFarland.

13              MR. MCFARLAND:  Thank you, Your Honor.

14    BY MR. MCFARLAND:

15    Q.  Were there, to your knowledge, sales agents of GMS

16    Industrial that were selling for other companies besides GMS

17    Industrial?

18    A.  Yes.

19    Q.  Who?

20    A.  Mike Welton.

21    Q.  And who else was Mr. Welton selling for besides GMS

22    Industrial?

23    A.  I think the company is called Schaffer Products.

24    Q.  Was he doing that with the approval of Gary Gorken?

25    A.  Yes.
```

1   Q.   Why do you think, Westly, that your sales team was so
2   successful for GMS?
3   A.   They got up every day.  They worked.  They had grit.
4   Q.   And what did you see your role in being the team leader?
5   A.   Just keeping them happy, do what they needed, try to
6   answer anything they asked of me.
7   Q.   Would you yourself go to the bases where they were making
8   sales calls?
9   A.   Yes.
10  Q.   How often?
11  A.   I think quarterly trips.
12  Q.   Were you often called away from your family to do work
13  for GMS Industrial in your position as director of sales?
14  A.   Yes.
15  Q.   You were dealing with your agents on what, a daily basis?
16  A.   Yes.
17  Q.   From your dealings with your agents, was there anything
18  that you could see of a confidential, trade secret,
19  proprietary nature that they were using to be so successful?
20  A.   No.
21  Q.   What were they using to be so successful?
22  A.   Their common knowledge just from their past and
23  friendships.
24  Q.   By the way, did you receive any electronic devices from
25  GMS Industrial?

JILL H. TRAIL, Official Court Reporter

```
 1  A.  Yes.

 2  Q.  What did you get and when?

 3  A.  I got a tablet in 2018, after the Mexico trip.  That was

 4  a gift I received.

 5  Q.  You say it was a gift?

 6  A.  Yeah.

 7  Q.  Is it something you earned?

 8  A.  Yeah, it was.  I was recognized.  We were recognized, and

 9  I received that, yes.

10  Q.  All right.  Prior to that, did you get any type of

11  electronic devices from GMS Industrial?

12  A.  I got a laptop and a PC in 2017.

13  Q.  And what did you use that for?

14  A.  Work stuff, personal stuff, just anything.

15  Q.  Was there any prohibition that came from GMS about using

16  the -- I'm sorry, you said a laptop?

17  A.  Laptop, yes.

18  Q.  -- about using the laptop for personal matters?

19  A.  No.

20  Q.  Did, at some point, you also receive a desktop?

21  A.  Yes.

22  Q.  And when did you get that?

23  A.  Um, I believe I signed for it in 2017.

24  Q.  And did you receive any prohibition about using the

25  desktop for personal use?
```

1  A.   No.  My personal computer quit working, and I told Gary

2  that I was going to buy me another computer.  And he said,

3  "I'll just send you one."

4  Q.   As the director of sales, were you encouraged from -- I

5  guess who did you -- well, let me rephrase first.

6       Who did you report to?

7  A.   Gary Gorken.

8  Q.   Were you encouraged by Mr. Gorken at some point in time

9  to focus on NSNs?

10 A.   Yes, NSNs, off and on sometimes, not just NSNs that were

11 already created, part number kits, goes back and forth.

12 Q.   What's the difference between -- I guess there is NSNs

13 and non-NSNs, right?

14 A.   Uh-huh.

15 Q.   Two broad categories.

16       But then am I correct there is CCPNs, but also CCPN

17 kits that GMS Industrial had?

18 A.   Yeah.  The non-standard kits, yes.

19 Q.   And what were the non-standard kits?

20 A.   They were just prepackaged kits that were in the catalog.

21 Q.   And what's the difference between a prepackaged kit in a

22 catalog and just simply a CCPN item?

23 A.   An item was just a one-off.  And the prepackaged kits, it

24 was a set.  You had to buy the whole thing.

25 Q.   Did there come a time when you, as director of sales,

```
 1    received mandates to stop essentially the sale of one-off
 2    CCPNs?
 3    A.  Yes.
 4    Q.  And when did that begin?
 5    A.  I don't remember dates.  There was -- there was a
 6    stoppage in 2018, and another one in 2019.
 7    Q.  And could we have -- I think it's 110 is the March 9th,
 8    2018.
 9         MR. MCFARLAND:  This has already been admitted, Your
10    Honor, and used.
11         THE COURT:  You may publish.
12         MR. MCFARLAND:  Thank you.
13    BY MR. MCFARLAND:
14    Q.  Do you remember this, well, this memo coming by email,
15    Westly?
16    A.  Yes.
17    Q.  Okay.  And as a director of sales, what did you
18    understand the purpose of this company memorandum to be?
19    A.  It was a focus on selling NSN kits.
20    Q.  All right.  And by the way, one of the headings in this
21    memorandum is "Long-Term Contract."  What is a long-term
22    contract?
23    A.  The company announced a long-term contract with NSNs
24    where they were, like, guaranteed sales of NSNs for a period
25    of time.  I think it was like five years.
```

```
 1    Q.  And do you know, was the company successful in fulfilling
 2    that long-term contract?
 3    A.  Yes.
 4    Q.  And what happened when the company met the sales?  I
 5    guess there is a sales maximum, right?
 6    A.  Yes.  I don't know the details of the contract.  I just
 7    know there is a long-term contract.
 8    Q.  As the director of sales, what did you understand when
 9    Mr. Morton is writing, "No more bid board process causing
10    additional delays"?
11    A.  So, these would skip the bidding process.  They just
12    automatically had awards.  So, you just skipped the initial
13    process of bidding on the item.
14    Q.  Then there is a section entitled "CCPNs."  As the
15    director of sales, what did you understand the policy
16    directed to be coming down from Mr. Morton here?
17    A.  It -- it was a lot of work to build new kits, and they
18    were really busy, so try to focus on what we already have.
19    Q.  All right.  Thank you.
20            And in fact, did there come a time when the company
21    was even more direct, and put a moratorium on new CCPNs?
22    A.  Yes.
23    Q.  Could we have -- I think it's 111.
24            Did you receive this memo, Mr. Greer, as the director
25    of sales?
```

1  A.  Yes.

2  Q.  Okay.  And I guess I want to keep our dates straight, but

3  as of January 9th, 2019, I think you were still director of

4  sales?

5  A.  Yes.

6  Q.  Okay.  What did you understand this memorandum to be?

7  What was the policy being instituted here?

8  A.  Basically stop requesting new one-off kits, and sell the

9  kits that we already have.

10  Q.  Now, at some point you and Greg Spires create G&S Supply;

11  is that correct?

12  A.  Yes.

13  Q.  And when was that?

14  A.  June of 2017.

15  Q.  And why did the two of you create G&S Supply?

16  A.  My brother was a manufacturer for electric motors for the

17  Navy, and he was giving me an opportunity to bid on those

18  electric motors.

19  Q.  And electric motors being what?

20  A.  He said they were electric motors that they build for the

21  ships.  I didn't really know much about it.

22  Q.  I take it that was not something you were doing at the

23  time for GMS Industrial, or overseeing as the director of

24  sales for GMS Industrial?

25  A.  Correct.

1  Q.  All right.  And had you had any experience previously in
2  forming an LLC, a limited liability company?
3  A.  Yes.  We created Greer Group.
4  Q.  And why did you create Greer Group, and what was it for?
5  A.  Gary Gorken and his brother Greg Gorken told me it will
6  save us a lot of money on taxes and expenses if we get paid
7  through an LLC instead of direct.
8  Q.  And did you use Greer Group not only for compensation and
9  payments from GMS Industrial, but anything else in the
10 family?
11 A.  Yes.
12 Q.  What was that?
13 A.  I think my wife was doing a lot of things like
14 DoorDashing, Facebook gaming, Twitch.  It's just a lot of
15 little things.
16 Q.  Okay.  I have some familiarity with DoorDash, and maybe
17 some of the jurors do, but just in case, what is DoorDash?
18 A.  It's like Uber for food.
19 Q.  Delivery basically?
20 A.  Yes.
21 Q.  Okay.  So, your wife is doing the arrangements, I guess,
22 for DoorDash?
23 A.  Yes.
24 Q.  She's like an agent?
25 A.  Yes.

```
 1   Q.   Okay.  So, in other words, Greer Group that you created
 2   was not just for GMS Industrial --
 3   A.   Correct.
 4   Q.   -- compensation for GMS Industrial?
 5        Tell us about the evolution of G&S Supply, because it
 6   sounds like we're first talking about in terms of your
 7   brother and motors.  And I can confidently say that's not why
 8   we're here and the nine people in the jury box are here.
 9   A.   Yeah.  We had customers that wanted stuff other than what
10   was in the GMS catalog, and they wanted, like, single items
11   or certain packaged items that didn't involve, like, shop
12   towels and soaps that GMS would throw in every one of their
13   kits.  And we had a customer that bought from a different
14   company because of that.
15   Q.   Were you then hearing the customers', is it fair to say,
16   frustrations?
17   A.   Yes.
18   Q.   As the director of sales?
19   A.   Yes.
20   Q.   Okay.  Did you think when you formed G&S Supply and it
21   began selling -- I mean, I take it these are strictly
22   non-NSNs?
23   A.   Yes.
24   Q.   When G&S Supply began selling non-NSNs, did you think you
25   were competing with GMS Industrial?
```

```
1   A.  No.  Because they weren't getting the sales anyways.
2   Q.  Did you see any benefits as the director of sales for
3   being able to supply customers NSNs and CCPNs, the one-offs
4   that I take GMS Industrial didn't want to sell?
5   A.  Yeah.  We were able to satisfy the customer in all
6   different aspects.
7           MR. LASCARA:  Your Honor, that was a leading
8   question.  Again, he testified, and he asked him --
9           MR. MCFARLAND:  I'll rephrase, Your Honor.
10          THE COURT:  Sustained.
11          MR. MCFARLAND:  The witness is telling the story.
12  BY MR. MCFARLAND:
13  Q.  As director of sales for GMS Industrial, what did you see
14  were the benefits for GMS customers in having also G&S
15  Supply?
16  A.  We were able to fulfill the customer's needs, even if GMS
17  couldn't.
18  Q.  Did Mr. Gorken from, say, the time you became director of
19  sales, did he ever accompany you to any Army bases?
20  A.  I think maybe once or twice.
21  Q.  Was he, to your knowledge -- I take it you spoke with him
22  on a regular basis?
23  A.  Yes.
24  Q.  How often?
25  A.  Once a week I think, at least.
```

```
 1   Q.  Was he having any direct communications with the bases in
 2   terms of what they were requesting and needing?
 3   A.  No.
 4   Q.  What would happen when you or one of your sales agents
 5   said, Hey -- I'm just going to pick -- Fort Bliss needs one
 6   crimper?
 7   A.  Yeah.
 8   Q.  And obviously there is not a kit, there is not a GMS
 9   Industrial kit for one crimper, is there?
10   A.  No.
11   Q.  So, what would happen when there was a request for that?
12         MR. LASCARA:  Your Honor, again, he's telling him
13   there is not one crimper.  He's not asking him the question.
14   And he's incorporating his statement into the follow-on
15   question.  So, it's compound and it's leading, Your Honor.
16         MR. MCFARLAND:  I don't think -- I don't think it
17   is leading, Your Honor, but I don't mind --
18         THE COURT:  I don't think your end question was
19   leading, but I think the lead-up is what he was saying.  So,
20   you can ask him the questions, just be tight and rephrase a
21   little.
22         MR. MCFARLAND:  Okay.
23   BY MR. MCFARLAND:
24   Q.  Is there a CCPN kit, or was there a CCPN kit by GMS that
25   sold just -- by which you could buy just one crimper?
```

1    A.   No.

2    Q.   Okay.  So, to use my hypothetical, when a customer would

3    say, I don't want the kit.  I don't need the paper towels,

4    the pink ones that are in there.  I just want the crimper.

5    What were you hearing from your sales agents, and what was

6    happening when you were conveying that to GMS?

7    A.   They were losing sales because of it, and the

8    conversations I had with Gary was, They need to sell what we

9    have.  If they can't sell it, we'll find someone else to sell

10   it.

11   Q.   When GMS -- excuse me -- when G&S Supply started and

12   began selling its products, did you use any kind of pricing

13   information from GMS Industrial?

14   A.   No.

15   Q.   Did you possess any pricing information from GMS

16   Industrial?

17   A.   Only the end price of NSN kits.

18   Q.   And by the way, is that public knowledge?

19   A.   Yes.

20   Q.   Did you use any confidential or proprietary information

21   to set up G&S Supply?

22   A.   No.

23   Q.   Did you use any confidential or proprietary information

24   to help G&S Supply make sales?

25   A.   No.

1    Q.   How was the G&S catalog created?

2    A.   Just by simply figuring out what the customer wanted, and

3    searching Google for pictures, and having my friend, Mike,

4    put it into a catalog for us.

5    Q.   Did you, as the director of sales for GMS Industrial,

6    ever tell anyone who was selling G&S Supply as well not to

7    sell for GMS?

8    A.   No, never.

9    Q.   Did you ever tell them to even emphasize G&S over GMS?

10   A.   No.

11   Q.   In -- let's see.  I think you said you formed G&S Supply

12   in June of 2017?

13   A.   Yes.

14   Q.   Did it have any sales in 2017?

15   A.   No.  I don't think it was until 2018.

16   Q.   Okay.  In 2018, who were the company's, by that I mean

17   GMS Industrial, who were their top salespeople?

18   A.   In 2018, Greg and Thomas, and I think Ken Reynolds were

19   the top three.

20   Q.   To whom did they report?

21   A.   Two of them reported to me.

22   Q.   And did you, as a director of sales in 2018, meet your

23   requirements and quotas?

24   A.   Yes.

25   Q.   Did you receive a bonus for 2018?

```
1    A.   Yes.
2    Q.   Did you get to go on a trip at the end of 2018, because
3    of your performance as the director of sales?
4    A.   Yes.
5    Q.   Is that the trip to Mexico?
6    A.   Yes.
7    Q.   Did you ever pressure any of your team members at GMS
8    Industrial to sell for G&S Supply?
9    A.   No.
10   Q.   Did anyone ever come to you and say, I've heard about
11   G&S, or what is this?
12   A.   Did anybody come to me and ask me that?
13   Q.   About G&S?
14   A.   No.
15   Q.   Okay.  Who else sold for G&S Supply during the remainder
16   of your tenure there?
17   A.   Other than the defendants, Amber.  I'm not sure if Abe
18   Salfiti did.  I can't think of anyone else.
19   Q.   Did you pressure Ms. Wenrick to sell for G&S Supply?
20   A.   No.
21   Q.   How did it come about that she made some sales for G&S
22   Supply?
23   A.   Just a similar situation.  A customer wanted something
24   that GMS couldn't provide, and then the opportunity came to
25   Amber through me.
```

1   Q.   For GMS Industrial, what was Ms. Wenrick selling in terms

2   of NSNs versus non-NSNs?

3   A.   It was almost a hundred percent NSN items.

4   Q.   Now, you didn't tell Mr. Gorken about G&S Supply during

5   your tenure there, correct?

6   A.   No.

7   Q.   Why not?

8   A.   Because he wouldn't -- he's not out in the field.  He

9   wouldn't understand the needs of the customer.  He thinks

10  that you can just sell them what we already have, and they

11  would buy it.  You've just got to be a better salesman.  But

12  it just wasn't true.

13  Q.   Did you think that in offering customers non-NSNs through

14  G&S Supply that you were somehow in derogation of your duties

15  or obligations to GMS Industrial?

16  A.   No.

17  Q.   Why not?

18  A.   Because I think it helped increase the sales of GMS

19  Industrial Supply.

20  Q.   Okay.  From your position as director of sales, and when

21  you went to the bases, did you ever see firsthand any

22  confusion by anyone at the base about GMS Industrial versus

23  G&S Supply?

24  A.   No.

25  Q.   Did your agents ever report to you about any confusion

```
 1   among their customers?
 2   A.   No.
 3   Q.   Did you ever say to anyone at any of the bases who were
 4   customers of GMS Industrial that G&S Supply was a sister
 5   company?
 6   A.   No.
 7   Q.   Were you ever present when any of your sales agents said
 8   that G&S Supply was a sister company?
 9   A.   No.
10   Q.   For you and your agents, how did you keep the two
11   companies different for your sales calls?
12   A.   We had separate catalogs.  We always showed the GMS
13   products first.  If there was stuff in there they didn't
14   want, then we would move on to the next catalog.
15   Q.   Did there come a time at the end of 2018 or early 2019,
16   when you learned that GMS Industrial was going to do away
17   with having independent sales agents?
18   A.   I want to say it was in 2019.
19   Q.   And how did you learn of that?
20   A.   Gary was proposing a statutory agreement.
21   Q.   When you say that, what do you mean specifically, Westly?
22   A.   He said the California law is changing, and it's going to
23   be required across the country, and everyone is going to have
24   to sign this agreement.
25   Q.   At the time were any of your independent sales agents
```

1    selling in California?

2    A.   No.

3    Q.   And where were you based?

4    A.   Colorado Springs.

5    Q.   And do you happen to know where the company GMS

6    Industrial is incorporated?

7    A.   Virginia Beach or Virginia.

8    Q.   So, when you learned of this, what was the -- what did

9    you do, and what was the response of your sales agents?

10   A.   All of the sales agents were opposed of it.  They asked

11   their CPAs about it, and they said it would hurt you

12   financially with all of your write-offs.

13   Q.   And from a personal standpoint at this point in time, did

14   you have any issues with your compensation for what you were

15   paid in 2018?

16   A.   Yes.

17   Q.   And what were those issues?

18   A.   It's just not getting paid the bonus I deserved.

19   Q.   Had you had prior compensation issues with GMS

20   Industrial?

21   A.   Yes.

22   Q.   And when did they date back to?

23   A.   It's almost every quarter.  Almost every quarter there

24   was an issue with the bonus, it wasn't paid fully.

25   Q.   And did you raise that with Mr. Gorken?

1    A.   Yes.

2    Q.   What was the response?

3    A.   Lost profits, I guess.  One time he said paper clips in

4    Virginia are expensive, so...

5    Q.   All right.  So, when it comes beginning of the year 2019,

6    from a personal standpoint, where are you in terms of your

7    relationship with GMS Industrial?

8    A.   In 2019, I was wanting to be an independent sales agent.

9    Q.   Why was that?

10   A.   I just wasn't getting paid what I deserved, and I would

11   have made more money staying at home and selling than

12   traveling across the world.

13   Q.   So, how much did you travel, say, in 2017, 2018?

14   A.   It would be two, sometimes two weeks, three weeks a

15   month.

16   Q.   And where were you going?

17   A.   Just all over the U.S. really.

18   Q.   Bases?

19   A.   Yes, military bases.

20   Q.   You weren't going to New York City or Miami?

21   A.   Yeah.

22   Q.   This is all work related?

23   A.   Right.

24   Q.   Okay.  So, do you make the decision in January of 2019,

25   to switch over and just become an independent sales agent?

```
 1   A.  Yes.
 2   Q.  Okay.  I forget the exact number, but it's a lower
 3   Plaintiff's Exhibit, I think.  Could we have P3, please?
 4              THE COURT:  All right.
 5              MR. MCFARLAND:  And, Your Honor, this is admitted
 6   previously.
 7              THE COURT:  All right.  You may publish.
 8              MR. MCFARLAND:  Thank you.
 9   BY MR. MCFARLAND:
10   Q.  Do you recognize this document, Mr. Greer?
11   A.  Yes.
12   Q.  And does it bear your signature?
13   A.  Yes.
14   Q.  And when you went from being the director of sales --
15          At that point you're an employee, right?
16   A.  Yes.
17   Q.  Okay.
18          -- to being an independent agent, what did you
19   understand the differences and your responsibilities now as
20   an independent sales agent?
21   A.  I would just -- I would be independent, and I can sell at
22   Fort Carson or -- I don't know.  I think Fort Riley was on
23   here.
24   Q.  Did you give up your -- well, let me ask this.
25          Did you receive any benefits when you were an
```

1    employee of GMS Industrial?

2    A.  I think they started giving out health insurance in 2018.

3    Q.  And did you give that up when you became an independent

4    sales agent?

5    A.  Yes.

6    Q.  Okay.  Notwithstanding that you became an independent

7    sales agent, did you remain a supervisor of agents to an

8    extent?

9    A.  I think I was a supervisor over Amber, I think.

10   Q.  All right.  And if we could have Plaintiff's Exhibit, I

11   think it's 4, the addendum.

12        Do you recognize this document, Mr. Greer?

13   A.  Yes.

14   Q.  Okay.  And what did you understand it to be?

15   A.  It was a Zone Manager Addendum.

16   Q.  Did you understand this to be in tandem or in conjunction

17   with the Independent Sales Agent Agreement?

18   A.  Yes.  I received them at the same time, yes.

19   Q.  Did you get paid any additional compensation for agreeing

20   to be a zone manager?

21   A.  No.

22   Q.  Same commissions?

23   A.  Yes.

24   Q.  But you had more responsibilities than your typical

25   independent sales agent, correct?

```
 1   A.   Yes.
 2   Q.   Okay.  When you became an independent sales agent, was
 3   your access to the Google share restricted in any way?
 4   A.   I don't think so.
 5   Q.   Did you receive any new access?
 6   A.   No.
 7   Q.   By the way, for you as director of sales, what did you
 8   have access to on Google?
 9   A.   I think the agents below me, their data sheets.  I can't
10   think of anything else.  Just standard documents that they
11   send out.
12   Q.   Did you have access through Google to any pricing
13   information of the company in terms of costs that they paid?
14   A.   Costs, no.
15   Q.   Did you have access to any vendors of the company --
16   A.   No.
17   Q.   -- who were supplying products?
18   A.   No.
19   Q.   When you as a director of sales would go into the Google
20   drive, do you remember seeing anything that was marked
21   confidential and proprietary?
22   A.   No.  I don't remember anything confidential or
23   proprietary.
24   Q.   So, this is -- I think there is a little -- and we can
25   scroll down just a little bit.
```

1            The date on this is January 12th, and the date on

2    your Independent Sales Agreement is January 21st.  But do you

3    recall them essentially being in tandem?

4    A.  I think they both were supposed to be on the 12th.  I

5    think the numbers got mixed up.

6    Q.  All right.  From the time that you became an independent

7    sales agent in January of 2019, through the rest of your

8    tenure, what did you do?

9    A.  I sold products to Fort Carson and Fort Riley.

10   Q.  Were you successful?

11   A.  Yes.

12   Q.  Did you at any time during that time period not

13   aggressively promote GMS Industrial products --

14   A.  No.

15   Q.  -- for GMS at Fort Carson and Fort Riley?

16   A.  No.

17   Q.  I guess you didn't -- you weren't even an independent

18   sales agent for a whole quarter, were you?

19   A.  No, I wasn't.

20   Q.  So, you don't know whether you qualified for the

21   quarterly bonus or whatnot?

22   A.  No.

23   Q.  How did you come to be terminated as an independent sales

24   agent, Mr. Greer?

25   A.  By not signing the statutory agreement that was sent out

1   in, I think it was April.

2   Q.  And how did you receive notice that you were being

3   terminated?

4   A.  I think it was through my personal email.  I got

5   something from Pender and Coward.

6   Q.  And did you also receive any kind of notification from

7   the company about G&S Supply?

8   A.  Through -- I think through the emails from Pender and

9   Coward.

10   Q.  Did Mr. Gorken call you up to discuss the issue before

11   you were terminated?

12   A.  Nothing with the G&S Supply, no.

13   Q.  Did he call you up about the independent contractor or

14   independent sales agent statutory employment issue before

15   April 3rd of 2019?

16   A.  Yes.

17   Q.  And what did you all discuss?

18   A.  Just wanting me to sign it, and how it's going to make me

19   more money, and it's the same as the last agreement, just a

20   few, few things had changed.

21   Q.  Did you think it was the same as the last agreement?

22   A.  No.

23   Q.  Was it ever expressed to you why you were permitted to

24   become an independent sales agent in January of 2019, and

25   then approximately 60 days later they're terminating you

1    because you want to stay an independent sales agent and not
2    become a statutory employee?
3    A.  Right.  He said that the agreement is going to expire,
4    and this is going to supercede it.
5    Q.  Can we go back to, I think it's P3, the independent sales
6    agent agreement?
7          Does it have any kind of an expiration date in here,
8    to your knowledge?
9    A.  No.
10   Q.  Just keep scrolling.  I haven't seen anything in there.
11   Thank you.
12         When then, Westly, did you find out that you had been
13   terminated from GMS Industrial?
14   A.  I think it was the morning of April 3rd, my phone -- I
15   had a notification on my phone that says you need to log into
16   your email account, which means my access was removed.
17   Q.  And when you say you got a notice to log in --
18   A.  Yes.
19   Q.  -- why, what was your understanding of why you were
20   getting that notice?
21   A.  The password was changed.  And typically when someone
22   gets let go or terminated from the company, they would remove
23   their password and put whatever password they would assign to
24   it so they couldn't get access.
25   Q.  What did you do from that point forward?

```
 1   A.   I think I called Greg and Thomas and let them know that I
 2   don't have access to my email anymore.
 3   Q.   How about did you speak with Mr. Gorken that day?
 4   A.   April 3rd, I don't think so.   It would have been a couple
 5   of days before.
 6   Q.   Did you do anything on your computer that day to try and
 7   access your files on your GMS desktop?
 8   A.   GMS desktop, no.
 9   Q.   Did you at some point get a notification to return the
10   desktop and the laptop?
11   A.   Yes.
12   Q.   And what did you do upon receiving that notification?
13   A.   I just read it and realized that the terms that I had
14   before was if you don't return it, there is a small fee.   I
15   was going to keep it because I used it for personal use.
16   Q.   So, is it in your -- was it in your Employment Agreement
17   and perhaps in your Independent Sales Agent Agreement that
18   you could keep the desktop and the laptop if you reimbursed
19   the company for them?
20   A.   It was somewhere.   I don't remember what we talked about,
21   but yeah.
22   Q.   Was that your plan then?
23   A.   Yes.
24   Q.   Okay.   But obviously you didn't, that isn't what ended up
25   happening, correct?
```

```
1    A.  Correct.

2    Q.  All right.  So what happened?  Take us through it,

3    please.

4    A.  There were several notices that they really wanted it

5    back.  So, I cleaned it.  I wiped it clean and gave it back

6    the way I received it.

7    Q.  And when you say you wiped it clean, what did you do?

8    A.  I downloaded a file shredder to shred everything.  I had

9    tax information, personal stuff on there.  I wanted to make

10   sure they couldn't see all of my personal information on the

11   laptop.

12   Q.  And when you say you downloaded a file shredder, had you

13   ever used a file shredder before?

14   A.  No.

15   Q.  So, how did you learn about it, and what did you do?

16   A.  I've heard about it in the past.  It, like, makes it

17   where they can't go and recover and pull my files back, and

18   look through all of my personal information.

19   Q.  And what kind of personal information did you have on

20   your desktop?

21   A.  Tax information, pictures, personal messages to my wife,

22   friends, just a lot of different personal information.

23   Q.  Did your wife also use the desktop?

24   A.  Yes.

25   Q.  Did she have some of her information on there?
```

1    A.   Yes.

2    Q.   Wholly unrelated to GMS?

3    A.   Correct.

4    Q.   Did you have concerns about GMS recovering your personal

5    information?

6    A.   Yes.

7    Q.   Why?

8    A.   Because there was -- me and Sabrina had conversations in

9    confidence about, like, how I was treated and stuff, and

10   that's personal information I don't think they should have

11   looked at.

12   Q.   Did you have any knowledge of experience with other

13   former GMS employees or agents who were terminated and what

14   happened with their computers?

15   A.   Yes.  For instance, Howard Barlow was fired, and he told

16   me that he just removed his hard drive from the computer and

17   just sent it back.

18   Q.   To your knowledge, when you used file shredder, were you

19   deleting anything of GMS' that it didn't already possess?

20   A.   No.  I only had access to copies of information, not -- I

21   can't -- I can't take their information.  It's just I have a

22   copy.

23   Q.   And was it your understanding you also couldn't delete or

24   destroy anything if it was on the GMS Google drive?

25   A.   Correct.

1   Q.   Or the cloud?

2   A.   Correct.

3   Q.   After you sent -- well, how did you send back the desktop

4   and the laptop, and did you even send back the tablet?

5   A.   Yes.  I sent back all three.  I boxed it all in a big

6   package with some polo shirts and a letter to them for my

7   bonus that I was owed.

8   Q.   I'm sorry, a letter that was?

9   A.   Addressed to Gary for the bonuses that was owed to me.

10  Q.   So, there were still moneys that you should receive?

11  A.   Yes.

12  Q.   And before this lawsuit was filed, did you ever hear

13  anything further from GMS about what you returned?

14  A.   No.

15  Q.   How soon after you sent back these electronic devices did

16  you learn that you would become a defendant in a lawsuit,

17  Westly?

18  A.   I think it was the next month, May, yeah.

19  Q.   And after you were terminated, were you still owed

20  commissions for sales that you had made on behalf of GMS

21  Industrial for which it was paid?

22  A.   Yes.

23  Q.   And did you have an opportunity to calculate how much you

24  were still owed?

25  A.   Yes.

```
 1   Q.  And what's the amount?
 2   A.  It was about 13,000.
 3   Q.  $13,000?
 4   A.  Yes.
 5   Q.  Have you ever received that payment?
 6   A.  No.
 7   Q.  Are you certain that GMS Industrial has in fact been paid
 8   by the government for those sales?
 9   A.  Correct.
10   Q.  And how do you know that?
11   A.  Because they would have been NSN sales that they were
12   prepaid when they delivered them to DLA.
13   Q.  When you were terminated by GMS Industrial in early April
14   of 2019, did you take any of its trade secrets or proprietary
15   information?
16   A.  No.
17   Q.  Did you download them?
18   A.  No.
19   Q.  Were you even aware if you possessed anything that was a
20   trade secret or proprietary information?
21   A.  No.  I had nothing marked, no.
22           MR. MCFARLAND:  One moment if I may, Your Honor.
23           THE COURT:  Yes.
24   BY MR. MCFARLAND:
25   Q.  Let me go back just a little bit, Mr. Greer.  We talked
```

1    about the moratorium on CCPNs from January of 2019, and I

2    think we also looked at an email from Mr. Morton in March of

3    2018.

4            Could we have Defendants' 19, please?

5            Do you remember receiving this memo from

6    Ms. Robichaux in April of 2017, Westly?

7    A.  Yes.

8    Q.  Okay.  And what was Ms. Robichaux's position at the time,

9    and what was her professional GMS relationship to you?

10   A.  She was the director of marketing.  She kind of answered

11   any -- I guess she was -- she answered any questions that

12   anyone had.

13           MR. MCFARLAND:  Your Honor, we would move in

14   Defendants' 19.

15           THE COURT:  Any objection?

16           MR. LASCARA:  No, Your Honor.

17           THE COURT:  All right.  It will be admitted.

18           MR. MCFARLAND:  Thank you.  We would ask that it be

19   published.

20           (Defendants' Exhibit No. 19 received in evidence.)

21           THE COURT:  All right.  You may publish.

22   BY MR. MCFARLAND:

23   Q.  Westly, what did you understand Ms. Robichaux to be doing

24   in terms of her directions to the agents in April of 2017?

25   A.  Try to sell what we already have, and not try to request

1    other items that we don't have.

2    Q.  Did that become a company theme from the time that the

3    company got its NSNs?

4    A.  Yeah.  It was back and forth a lot with this information.

5    Q.  Thank you.

6         And could we go to Defendants' 29, please?

7         Did you receive this memorandum from the company on

8    or about January 11th of 2019?

9    A.  Yes.

10   Q.  Okay.

11        MR. MCFARLAND:  We would move this in, Your Honor,

12   as Defendants' Exhibit 29.

13        THE COURT:  Any objection?

14        MR. LASCARA:  If I could have just a moment, Your

15   Honor.

16        THE COURT:  Sure.

17        MR. LASCARA:  I haven't had a chance to completely

18   review it.

19        Can I see the date of this?

20        MR. MCFARLAND:  Sure.  Do you want to scroll up?

21        MR. LASCARA:  No objection, Your Honor.

22        THE COURT:  It will be admitted.  You may publish.

23        MR. MCFARLAND:  Thank you.

24        (Defendants' Exhibit No. 29 received in evidence.)

25   BY MR. MCFARLAND:

```
 1   Q.  This is the same day as the moratorium email we looked at
 2   earlier, correct?
 3   A.  I believe so.
 4   Q.  Okay.  And if we scroll down, the last paragraph is what?
 5   A.  It's another paragraph just trying to push the kits they
 6   already have created in the catalog.
 7   Q.  And it's using the term "moratorium," correct?
 8   A.  Correct.
 9   Q.  Okay.  Thank you.
10           After you were sued by GMS Industrial, Westly, did
11   Mr. Gorken continue to contact you?
12   A.  Yeah, through texts.  Through texts, yeah.
13   Q.  Did you encourage or ask for those contacts?
14   A.  No.
15   Q.  All right.  If we could have D21, please.
16           Do you recognize this printout, Westly?
17   A.  Yes.
18   Q.  And what is it?
19   A.  It's the Punisher.
20   Q.  From whom did you receive this?
21   A.  Gary Gorken.
22   Q.  And when did you receive it?
23   A.  July 5th of 2020.
24   Q.  So, that's over a year after the lawsuit was filed,
25   correct?
```

```
 1    A.   Correct.
 2             MR. MCFARLAND:   We would ask that this be admitted
 3    Your Honor, and published.
 4             THE COURT:   All right.   Any objection?
 5             MR. LASCARA:   No objection, Your Honor.
 6             THE COURT:   All right.   It will be entered.   You
 7    may publish.
 8             (Defendants' Exhibit No. 21 received in evidence.)
 9             MR. MCFARLAND:   Thank you.
10    BY MR. MCFARLAND:
11    Q.   And I guess in terms of texts, we go from the bottom up
12    in terms of when things are said, right?   So if we go to the
13    bottom --
14    A.   I think it would be the top down.
15    Q.   Top down, okay.   Technology, here I am showing again, but
16    okay.
17             What did you as the recipient interpret this to be,
18    Westly?
19    A.   The Punisher?
20    Q.   Yes.
21    A.   Yeah.   It's -- it's someone that takes the law in their
22    own hands.   I've seen the movie, so relevant to that.
23    Q.   Is the Punisher then, is that a cartoon character or
24    super-type hero, something?
25    A.   Yeah, like a super villain, I guess.   Super hero, yeah,
```

1    whatever.

2    Q.  And from a personal standpoint, how did you interpret

3    that Mr. Gorken is sending you a picture of the Punisher and

4    saying, "Tick tock.  And ready to talk yet?"

5    A.  So the Punisher would, you know, I guess they would kill

6    their enemies, but the way I took it is that he would come

7    after me financially.

8              MR. MCFARLAND:  Thank you, Westly.  That's all of

9    the questions I have.  Please answer any questions from

10   Mr. Lascara.

11             THE WITNESS:  Thank you.

12             THE COURT:  All right.  We're going to take our

13   afternoon recess at this time.  So, again, I'll ask you not

14   to talk about the case until it's been submitted to you.

15             (The jury exited the courtroom at 3:38 p.m.)

16             THE COURT:  All right.  We'll reconvene at 3:55 and

17   begin with cross.

18             Mr. Greer, I'll just ask you -- you can talk to

19   your lawyers, but please don't discuss your testimony.  All

20   right?

21             THE WITNESS:  Yes, Your Honor.

22             THE COURT:  Okay.  We'll be in recess.

23             (Recess from 3:39 p.m. to 3:55 p.m.)

24             THE COURT:  All right.  Let's have the jury.

25             (The jury entered the courtroom at 3:55 p.m.)

```
 1              THE COURT:  All right, Mr. Lascara, any
 2    cross-examination?
 3              MR. LASCARA:  Yes, Your Honor.
 4              THE COURT:  All right.
 5                        CROSS-EXAMINATION
 6    BY MR. LASCARA:
 7    Q.  Good afternoon, Mr. Greer.
 8    A.  Good afternoon.
 9    Q.  What experience did you have in Army sales before you
10    started to work for GMS in 2011?
11    A.  With State Chemical Solutions, State Industrial, and UZ
12    Engineering.
13    Q.  Okay.  So, I understand that's who you were employed
14    with --
15    A.  Yes.
16    Q.  -- but what was your experience in making sales?
17    A.  I was -- I tagged along with my brother when he sold to
18    lots of motor pools on Fort Sill.
19    Q.  Okay.  So, you weren't making sales, you were tagging
20    along --
21    A.  Correct.
22    Q.  -- with somebody who was making sales?
23    A.  Yes.
24    Q.  So, your experience in making sales was zero before you
25    came to GMS?
```

```
1   A.  I went through the process with my brother, so I --
2   Q.  I understand that, but you never made any sales, did you?
3           MR. MCFARLAND:  I object.  He gets to finish his
4   answer, Your Honor.  Literally, the witness was still trying
5   to answer when Mr. Lascara --
6           THE COURT:  All right.
7           MR. LASCARA:  I'm sorry I cut him off.  I didn't
8   realize.
9   BY MR. LASCARA:
10  Q.  Please answer the question.
11  A.  From my opinion, I think that's experience.
12  Q.  Okay.  But you hadn't made any sales?
13  A.  No.  They were in my brother's name.
14  Q.  Okay.  You were asked a question whether you received any
15  documents stamped confidential or trade secret when you came
16  to GMS.
17          Isn't it true that you had access to the computer
18  system through the Google account?
19  A.  I had Google drive access.
20  Q.  Okay.  It was a Google drive that was owned and operated
21  by GMS, correct?
22  A.  Yes.
23  Q.  And you said you had to log in, so there was a password
24  requirement, right?
25  A.  Yeah, for my email, yes.
```

```
 1    Q.  Okay.  So, it was protected from people who didn't have
 2    access, right?
 3    A.  Correct.
 4    Q.  So, that means it was kept private to those people who
 5    were granted access, right?
 6    A.  Yes.
 7    Q.  All right.  And there is information in that Google drive
 8    relating to each of the points of contact at each of the
 9    locations where GMS sells products, correct?
10    A.  If the agents put it in the system, then yes.
11    Q.  Okay.  Well, the agents put it in the system, didn't
12    they?
13    A.  I wouldn't say all of them did, but some of them did,
14    yes.
15    Q.  Well, wasn't there a policy that you wouldn't get paid a
16    commission if you didn't put it in there?
17    A.  Yes.
18    Q.  So, they were pretty well incentivized to put it in
19    there, right?
20    A.  Yes.
21    Q.  So, that information included the names, correct?
22    A.  Yes.
23    Q.  The addresses, correct?
24    A.  I don't think that was required.
25    Q.  Well, the addresses were in there, weren't they?
```

```
1   A.   In some of them, yes.

2   Q.   All right.   Emails?

3   A.   Yes.   And some were required and some weren't.

4   Q.   Phone numbers?

5   A.   Yeah.   For the most part there was phone numbers.

6   Q.   I mean, the whole point was it was a gathering of the

7   contact information for people that GMS sold to, correct?

8   A.   Yes.

9   Q.   Okay.   And so in addition to that point of contact

10  information, the sales agents were required to put in what

11  the customers were looking to purchase, correct?

12  A.   Yeah.   If they purchased, yes.

13  Q.   Not only if they purchased, but also what they were

14  asking to purchase; that was put in there, too, wasn't it?

15  A.   I think some agents did that, yes.

16  Q.   So, they made sales reports, right?

17       So, in some cases they didn't make a sale every time

18  they went there?

19  A.   Correct.

20  Q.   So, they talked with the people, the purchasing agents

21  for the government, and they found out what they wanted, what

22  they would like to have, and in some cases they were able to

23  sell, and they listed what they were going to sell, correct?

24  A.   Yeah.   They put the orders in the spreadsheet, yeah.

25  Q.   So, this gathering of information in this
```

```
 1   password-protected Google drive contained confidential
 2   information of GMS, didn't it?
 3   A.  I wouldn't think so, no.
 4   Q.  Okay.  So, how many points of contact did you put in
 5   there?
 6   A.  I'm unsure.
 7   Q.  A lot?
 8   A.  Yes.
 9   Q.  Okay.  Well, you couldn't just remember every one of
10   them, could you?
11   A.  Every one that I wrote down, no.
12   Q.  Right.  And you couldn't remember their email address,
13   could you?
14   A.  No.
15   Q.  So, you couldn't remember their telephone number, could
16   you?
17   A.  No.
18   Q.  So, all of that information that was essential to market
19   and sell the products was contained in a -- required by GMS
20   to be contained in a protected environment, and it would be
21   accessed when it was needed for use by the agents, correct?
22   A.  Yes, for input.
23           MR. MCFARLAND:  I am going to object to the
24   compound question, Your Honor, and the characterization.
25   There has been no testimony that the information in that
```

1    chart that Mr. Greer created is essential.  That's a

2    characterization.  There hasn't been the first bit of

3    testimony that it's, quote, essential.

4              THE COURT:  I think it's okay for cross.  But I

5    will sustain the objection as to a compound question.

6              MR. LASCARA:  Yes.  Thank you, Your Honor.

7              THE COURT:  All right.

8    BY MR. LASCARA:

9    Q.  So, there was some testimony you gave about Plaintiff's

10   Exhibit 115.

11             I would like to, if we can, bring that up.  I believe

12   it's been admitted.  If you could publish it.

13             So, is it -- isn't it true that you didn't create

14   this document; is that right?

15   A.  This document?

16   Q.  Yes.

17   A.  I think I -- the original document was "What's in the

18   SAMS?"  And the titles were changed, and they added columns

19   to it.

20   Q.  Okay.  So, you had received that.

21             You came up with a template, I think the word was.

22   Is that -- is that what your testimony was?

23   A.  It was for myself to track orders, yeah.

24   Q.  Okay.  Well, you were an employee of GMS when you did

25   that, right?

1    A.   I was an independent sales agent.

2    Q.   Okay.  So --

3    A.   Yeah.

4    Q.   -- when was that?

5    A.   It would have to have been sometime in 2011.

6    Q.   And at what date did you become an employee?

7    A.   It was six months after April.

8    Q.   Okay.  So, from six months after that April date you were

9    an employee?

10   A.   No.  I was an independent six months later, yes.

11   Q.   I'm sorry?

12   A.   I was independent six months after my hire date.

13   Q.   You were an independent sales agent?

14   A.   Yes.

15   Q.   Okay.  And then when did you become an employee?

16   A.   Sometime in, I think it was 2012 --

17   Q.   Okay.

18   A.   -- or '13.

19   Q.   All right.  So, this process of the requirement by GMS

20   for its sales agents and its employees who were selling to

21   its customers to record this type of information regarding

22   contact, points of contact, customer preferences, and minutes

23   or explanations about each visit with them, that started and

24   continued while you were there both as an agent and an

25   employee, correct?

```
 1   A.  I am not sure what -- we originally started with just
 2   emails, with a plan email.  I'm not sure what was required to
 3   actually fill out the spreadsheets.
 4   Q.  Okay.  But it was required by GMS of agents and employees
 5   who were sales agents, correct?
 6   A.  Yeah.  I think the requirement was just for the SAMS GCSS
 7   tab.
 8   Q.  So, you testified early in your direct examination about
 9   your involvement at Fort Bliss and Fort Carson.  Were those
10   the first two bases that you were assigned to, to sell?
11   A.  Fort Sill was the first base, and then the second base
12   would have been Fort Hood.
13   Q.  Okay.  You testified, did you not, that there were no
14   sales at Fort Bliss or Fort Carson before you made sales
15   there; is that correct?
16   A.  Correct.
17   Q.  Okay.  But those aren't the first sales that GMS ever
18   made to the Army, are they?
19   A.  I think they had a few sales at Fort Eustis, which is
20   somewhere around here.
21   Q.  So, are you aware of all of the sales that were made by
22   GMS to the Army before you became involved?
23   A.  Not all sales.  But the territory that I went to, I was
24   literally the first person there.
25   Q.  I understand in the territory that you went to --
```

JILL H. TRAIL, Official Court Reporter

```
1    A.   Yeah.
2    Q.   -- it might have been the first sale that GMS made to the
3    Army on those particular locations, correct?
4    A.   Correct.
5    Q.   Okay.  But you don't know what sales GMS made to the Army
6    on other bases that you didn't go to before you arrived?
7    A.   From what I heard from Gary, they had only sold to Fort
8    Eustis by credit card before I started.
9    Q.   I see.
10        Do you know how many sales?
11   A.   No.
12   Q.   All right.  You were the director of sales commencing in
13   2015; is that correct?
14   A.   Yes.
15   Q.   All right.  And can you state which sales agents came
16   under your direction?
17   A.   Greg Spires, Thomas Hayes, Sabrina Greer, Abe Salfiti,
18   Mike Welton, Amber Wenrick, and I think Wayne Side.  I think
19   that's it.
20   Q.   Okay.  You've mentioned that there was a bonus for sales
21   on NSNs, correct?
22   A.   Yes.
23   Q.   There was also a bonus for sales on total sales volume,
24   right?
25   A.   Correct.
```

1    Q.   So, therefore, there was a bonus on sales of NSNs and
2    non-NSNs, correct?
3    A.   Correct.
4    Q.   All right.  So, would you agree that there are lots of
5    other ways to sell non-NSNs, which sometimes we've referred
6    to as CCPNs and non-NSN kits, other than the DIBBS Board?
7    A.   For the motor pools, it would be a rare occasion where a
8    motor pool is able to even actually use a credit card.  Other
9    than that, I would say no.
10   Q.   Okay.  So, a credit card is not the only way to sell CCPN
11   items or non-NSNs, is it?
12   A.   The DIBBS Board was the other option.
13   Q.   Okay.  Well, what about -- so you're saying only credit
14   cards and DIBBS Board?
15   A.   I guess FedMall, but that's frowned upon.  GSA, they
16   would use their credit card, so it would still be a credit
17   card.
18   Q.   So, what's your understanding of the FedMall contract
19   that -- GMS had a FedMall contract, correct?
20   A.   Yes.
21   Q.   Okay.  So those CCPNs, the non-NSNs could be sold through
22   FedMall, right?
23   A.   You could, but it would skip checks and balances.
24   Q.   So, it would skip checks and balances?
25   A.   Yeah.  So, if you go into a motor pool and order a

1   FedMall item with their DoDAAC, it would skip purchasing,

2   like, the checks and balances above them, and it would

3   automatically become an order, and I think they made a stop

4   on that, the government.

5   Q.  So it was an avenue for a while?

6   A.  When I was with GMS, I think the credit card purchasing

7   capability of FedMall was an avenue, but not using their

8   DoDAAC.

9   Q.  Okay.  So, again, there were credit card sales, and then

10  there were FedMall credit card sales; is that right?

11  A.  And there was also a FedMall DoDAAC.

12  Q.  Okay.  So, those were all available means to sell CCPNs

13  or non-NSNs other than just the DIBBS Board, correct?

14  A.  Not to the motor pools.  It would have to be a special

15  occasion where it's, like, an emergency buy.

16  Q.  Okay.  So, they could buy?

17  A.  Yeah, in emergencies, yes, sir.

18  Q.  When you became director of sales, it was your job to

19  teach the sales force of these various other methods of sale,

20  correct?

21  A.  No.

22  Q.  So, you were director of sales, but you're saying you

23  didn't have any obligation to tell those sales agents that

24  were working for you that there were other avenues to sell

25  GMS products?

 1    A.   We were to sell through GCSS Army through the motor
 2    pools.   The credit card was really of no option for us,
 3    because it was a rare occasion on emergency buys.
 4    Q.   What about the GSA contract?
 5    A.   You have to use your credit card to purchase through GSA.
 6    Q.   Okay.   But it was another avenue, in addition to just
 7    credit cards?   It was through the GSA contract?
 8    A.   Yeah, with the credit card.
 9    Q.   Okay.   So, are you saying that you didn't teach any of
10    the seven people that you were overseeing about those
11    different methods?
12    A.   No.   I have not.
13    Q.   Okay.   Why not?
14    A.   Like I explained, it was for emergencies.   The only way
15    they could use a credit card was in rare occasions on
16    emergency buys, like if someone was deploying and they need a
17    one-off special item, and that just didn't happen.
18    Q.   Okay.   You mentioned that Mike Welton was permitted to
19    sell Schaffer products with Gary's approval.   Do you know
20    under what circumstances and what products?
21    A.   I just know they were lubricants.
22    Q.   Okay.   So, do you understand what the arrangement there
23    was?
24    A.   Just that he can sell both.   I don't know anything other
25    than that.

68

```
1   Q.  Okay.  And so you don't know any of the details of that?
2   A.  No.
3   Q.  Or what was sold?
4   A.  No.
5   Q.  Who would know that?  Would Gary Gorken know that?
6   A.  He should know that, yes.
7   Q.  Okay.  So, you mentioned something about electronic
8   devices.  And apparently you were given by GMS a laptop
9   computer, correct?
10  A.  Yes.
11  Q.  And you were given a desktop computer, correct?
12  A.  Yes.
13  Q.  And you were given a tablet, correct?
14  A.  Yes.
15  Q.  All right.  And sometime after you were requested to do
16  so, I believe on April 3rd, 2019, sometime around April 19th,
17  2019, you turned back or turned over all three of those
18  computer devices, correct?
19  A.  Yes.
20  Q.  And that's after you encoded an access code to the
21  tablet, correct?
22  A.  Yes.
23  Q.  All right.  And you used the file shredder on the laptop
24  and the desktop, correct?
25  A.  I'm not sure if I used it on the laptop.  From what the
```

1   BDO said, it looked like I just used it on the desktop.

2   Q.  Were you here during the BDO testimony?

3   A.  Yes.

4   Q.  And you're not familiar with the fact that he did an

5   evaluation of both your desktop and your laptop?

6   A.  Yes.

7   Q.  And he testified that the file shredder was used on both?

8   A.  I thought he just said desktop, but I think so.

9   Q.  All right.  We'll come back to that.

10          I would like to get rid of one or two of these.

11          If you would turn to Exhibit 110.

12          All right.  And if that could be published?  Thank

13  you.

14          THE COURT:  It can be published.

15  BY MR. LASCARA:

16  Q.  So, this was reviewed.  It's a March 9th, 2018, email

17  from Chris Morton.

18          And were you involved in the meetings that occurred

19  prior to Chris Morton issuing this?

20  A.  I don't know if this is a reference to a meeting or not.

21  I'm not sure.

22  Q.  Well, did you hear Chris Morton's testimony with regard

23  to this email and who was involved in preparing it and

24  presenting it?

25  A.  I think he said him and Gary and Renee.

1   Q.  Okay.  Are you saying you have no recollection of being

2   involved in the discussions that led to this email being

3   issued?

4   A.  I may have heard meetings about this.

5   Q.  Did you attend meetings about it?

6   A.  If it was a Friday meeting, then yes.

7   Q.  Okay.  But you have no independent recollection of

8   whether you did or not?

9   A.  No.

10  Q.  So, this doesn't prevent or encourage any sales agent at

11  GMS to not sell CCPNs or non-NSNs, does it?

12  A.  No.

13      MR. MCFARLAND:  I am going to object, Your Honor.

14  The document says what it says.  I don't mind him

15  questioning on the document.

16      THE COURT:  He can ask him.  It's overruled.  He

17  can ask him.  He can ask his question and put his spin on

18  it.  He can answer the question.  He's got the document in

19  front of him.

20      THE WITNESS:  No.

21  BY MR. LASCARA:

22  Q.  I'm sorry.  Did you understand the question?

23  A.  Yeah.

24  Q.  And your answer was no, it did not request or require any

25  stoppage of sales of non-NSNs or CCPNs, correct?

```
 1   A.  Right.  Under the current one, yes.
 2   Q.  And it didn't curtail the issuance of new CCPNs or
 3   non-NSNs, did it?
 4   A.  Come again, sir.
 5   Q.  It did not dictate that new non-NSNs or CCPNs would not
 6   be issued, did it?
 7   A.  No.
 8   Q.  Okay.  And then if you go to 112 --
 9           If we could go to 112 and publish it to the jury.
10   Thank you.
11           -- this is June 14th, 2018.  Were you involved in the
12   meetings and conversations which led to Chris Morton issuing
13   this email?
14   A.  If it was on a Friday and I wasn't traveling, I would say
15   yes.
16   Q.  All right.  Well, do you have any independent
17   recollection of whether you actually were there and
18   participated?
19   A.  No.
20   Q.  Okay.  Are you familiar with the issue that is being
21   attempted to be addressed in this email?
22   A.  Yeah.  It looks like there was an overload on part number
23   requests, and they want you to try to sell the ones that they
24   already have first.
25   Q.  So, were you aware that there was an overload or a lot of
```

```
 1   requests for special one-off items and/or kits of CCPNs?
 2   A.   What was the date on this again?
 3   Q.   January 14th, 2018.
 4   A.   I would say yes.
 5   Q.   You would say yes?
 6   A.   Yes.
 7   Q.   Well, what do you recall the problem being?
 8   A.   I think that was around the time where Thomas was
 9   requesting a lot of non-standards, in the June time frame.
10   Q.   Okay.  And this was dealt with in the prior memo and in
11   this memo not by saying, We're not going to consider more
12   CCPNs or CCPN kits, correct?
13   A.   It's, yeah, to limit.
14   Q.   Well, it says for process -- for there to be a process so
15   that they could be evaluated as to whether it was financially
16   feasible or worthwhile.  Would you agree with that?
17   A.   I would say, yeah, worthwhile.  I don't know about the
18   financial aspect.
19   Q.   You had no involvement in the financial aspects?
20   A.   No, sir.
21   Q.   So, you didn't know if this was good for the company or
22   bad for the company?
23   A.   I had no idea on the profits of what they purchase stuff
24   at, no.
25   Q.   Do you have any knowledge as to how many new CCPN kits or
```

```
1    new CCPN items, if they were individual items, were created
2    after this June 14th, 2018, memorandum?
3    A.   No.  I have no idea how many were.
4    Q.   Okay.  And then let's go to 111, Exhibit 111.
5         Do you see this is dated January the 9th, 2019,
6    correct?
7    A.   Yes.
8    Q.   And this is the first time in any of the paperwork we've
9    seen here or the testimony that the word "moratorium" was
10   used.
11        Do you see that?
12   A.   Yes.
13   Q.   Again, this date is January 9, 2019.  But you had already
14   started a competing company back in June of 2017, correct?
15   A.   I started another company in June of 2017, yes.
16   Q.   2017, excuse me.
17        So, when you started this competing company in 2017,
18   you focused on CCPN or non-NSN items; is that correct?
19   A.   When I started G&S in 2017, we focused on bidding on
20   electric motors for the Navy.
21   Q.   Well, how many proposals or bids did you submit for
22   boats?
23   A.   It was electric motors.  My brother --
24   Q.   Electric motors for boats?
25   A.   Yeah.  My brother was a manufacturer.  He was -- he was a
```

```
 1   manufacturer, so he was letting people bid on their motors
 2   that they created.
 3   Q.  How many bids on those motors did you submit?
 4   A.  I'm not sure.
 5   Q.  Did you submit any?
 6   A.  Yes.
 7   Q.  You personally?
 8   A.  Yes.
 9   Q.  Okay.  How long after that was it that G&S started
10   submitting bids to the government for non-NSN items?
11   A.  I think it was late 2018 -- or late 2017.
12   Q.  Late 2017.  So, that would be still a year and a couple
13   of months before that January 9th email that you all claim
14   was a moratorium on CCPN items, correct?
15   A.  Yes.
16   Q.  And this January 9th memorandum -- you heard
17   Mr. Naschansky here in court testifying under oath, did you
18   not?
19          MR. MCFARLAND:  Your Honor, I'm going to object.
20   This witness is here to answer questions on cross-exam, but
21   Mr. Lascara keeps asking about other witnesses' testimony.
22   He's not here to validate other witnesses' testimony.
23          THE COURT:  He's not asking him to validate.  So,
24   it's overruled right now.
25          Go ahead and ask your questions, Mr. Lascara.
```

```
 1   BY MR. LASCARA:
 2   Q.  You were here in the courtroom when Mr. Naschansky
 3   testified, were you not?
 4   A.  Correct.  Correct.
 5   Q.  He testified about this document, Exhibit 111, that says
 6   "Moratorium on new CCPN kits."
 7           Do you remember his testimony?
 8   A.  I don't remember what he said about it.  I remember that
 9   he testified about it, yes.
10   Q.  Okay.  Well, let me see if this refreshes your
11   recollection.  He testified that the moratorium --
12           MR. MCFARLAND:  Your Honor --
13           THE COURT:  You can't refresh his recollection like
14   that, Mr. Lascara.
15           MR. LASCARA:  Yes, Your Honor.
16           THE COURT:  So, the objection is sustained.
17           MR. LASCARA:  I understand.
18   BY MR. LASCARA:
19   Q.  Do you have any recollection as to whether or not
20   Mr. Naschansky stated the moratorium ended, or was not in
21   effect at some point after this?
22           MR. MCFARLAND:  I renew my objection, Your Honor.
23   Now we're asking him to validate or disagree with another
24   witness' testimony.
25           THE COURT:  Overruled.  He can be asked if he
```

1    remembers that.
2           THE WITNESS:  Um, I think he said he had no
3    recollection of it being lifted.  Is that correct?  I don't
4    know.
5           THE COURT:  All right.  He doesn't know,
6    Mr. Lascara.
7           MR. LASCARA:  Yes, Your Honor.
8           THE COURT:  Next question.
9    BY MR. LASCARA:
10   Q.  So, you had testified about crimps, I think, at some
11   point in your testimony on direct, you know, a pair -- a tool
12   called a crimp.  And could that type of item be purchased by
13   the government under the GSA contract that GMS had?
14   A.  Through the GSA contract?
15   Q.  GSA contract, right, that GMS had?
16   A.  If it was on the contract.  I didn't -- I don't recall it
17   being on the contract.
18   Q.  You're not sure if it was on the contract?
19   A.  It wouldn't have been by itself on the contract, if they
20   had it.
21   Q.  Okay.  Why would you say it wouldn't have been on the
22   contract?
23   A.  Because they package items with it.
24   Q.  All right.  How about through FedMall, could a crimp be
25   purchased through FedMall?

```
 1   A.  I think FedMall is just a copy of GSA.  I don't know.
 2   Q.  You don't know the answer to that question?
 3   A.  It wouldn't have been on there, because it would have
 4   been packaged.
 5   Q.  Well, if you don't know, how can you testify that it
 6   wouldn't have been on there?
 7   A.  Because they package everything when it comes to kits.
 8   Q.  Well, this wouldn't be a kit.  It would be an item, a
 9   crimp.
10   A.  Yeah.  A crimper wasn't a core item of GMS.
11   Q.  So, how about credit cards, could you purchase it under a
12   credit card purchase?
13   A.  A crimper would be used for a motor pool, so I don't
14   think it would fall under emergency.
15   Q.  Okay.  So, are you saying the only way the United States
16   Government could buy a crimper is through the DIBBS Board?
17   A.  The only way the motor pools can buy it, I would say
18   that.
19   Q.  You don't know about anything other than the motor pool;
20   is that correct?
21   A.  Yeah.  I don't see anybody else needing a crimper other
22   than at the motor pool.
23   Q.  You were the sales manager for Amber Wenrick; is that
24   correct?
25   A.  Correct.
```

1  Q.  And you were the only one who trained her, correct?

2  A.  Yeah, until April of 2019.

3  Q.  Right.  Until you left the employer as a sales agent for

4  GMS.  You're the only one who trained Amber from the

5  beginning of the time she got there until the time you left?

6  A.  Correct.

7  Q.  You never taught her to sell at FedMall, into the FedMall

8  contract, did you?

9  A.  No.

10  Q.  And you never taught her to sell credit card sales, did

11  you?

12  A.  No.

13  Q.  So, if you thought creating this competing company and

14  selling CCPN items, that was not a problem, why didn't you

15  tell Gary that's what you were doing?

16  A.  He would flip out about anything, so I didn't tell him.

17  He would say, You're not a good salesman if you can't sell

18  what we have.

19  Q.  And so you weren't afraid that he was going to say you're

20  competing against me?

21  A.  I don't know what he would have said.

22  Q.  Again, going back to the Google drive, were you aware of

23  the existence of training memoranda on the Google drive?

24  A.  Training memorandum?

25  Q.  Yes.

1  A.  Not to my knowledge.

2  Q.  You're not aware of any sales agent training information

3  that was resident on the GMS Google drive?

4  A.  I think they had a checklist or something that they

5  emailed to us, a new agent checklist to make sure they knew

6  how to log into their email, fill out their sheets, and I

7  think that was about it.

8  Q.  So, do you recall whether that was on -- in the Google

9  drive?

10  A.  I don't.  I think it was emailed.  I'm not sure.

11  Q.  All right.  Let's go to Exhibit 2 in binder one.

12         Did you receive that document on or about April 3rd,

13  2019, by email?

14  A.  Yes.

15  Q.  And what did you do when you received it?

16  A.  Just looked at it, and called Greg or Thomas and asked

17  them if they received the same thing.

18  Q.  Had they received the same thing?

19  A.  I think Greg did.  I'm not sure if Thomas did.

20  Q.  What was the first action you took, if any, after

21  reviewing this correspondence, other than you said you called

22  Greg, I think you mentioned, and some others of the sales

23  agents?

24  A.  I just thought this was something that was part of

25  termination, because it was sent out to previous people that

1    were terminated.

2    Q.  All right.  You were directed in the end of the first

3    paragraph to cease all activities on behalf of GMS and to

4    return all GMS property and materials, including

5    documentation, the new agent kit.

6          What was the new agent kit?

7    A.  I know usually a new agent kit was just like a bunch of

8    aerosols and some polos.  But I was a new agent in 2011, so I

9    wouldn't even have all of that stuff.

10   Q.  All right.  Were you also requested to return -- to

11   preserve all sources of data within your possession, custody,

12   and control?  Do you see at the top of page 2?

13   A.  Yes.

14   Q.  Did you do that?

15   A.  I mean, I guess so.

16   Q.  What do you mean by "I guess so"?

17   A.  Everything was preserved to its normal state, the polos,

18   the laptop, and the desktop.

19   Q.  Well, did you hear the testimony by the BDO expert, Eric

20   Shirk --

21   A.  Yes.

22   Q.  -- about the affect of the file shredder?

23   A.  Yes.

24   Q.  You knew when you put that file shredder on the desktop

25   and the laptop that it was going to destroy the files,

1   correct?

2   A.   Yeah.   It would erase all files.

3   Q.   Okay.   And that included files on there related to G&S,

4   correct?

5   A.   Yes.   It erased everything that was on there.

6   Q.   Okay.   So, it included files related G&S, correct?

7   A.   Yeah.   There would have been some awards on there.

8   Q.   Is that all you think that was on there about GMS is

9   awards?

10  A.   Awards, probably a copy of my spreadsheet when I was --

11  when I would be on the plane, I would make sure to download

12  it before I got on the plane so I could fill out my report,

13  because we didn't have internet on the plane, and I would

14  re-upload it whenever I landed.

15  Q.   So, there was a great deal of GMS financial data, sales

16  data, marketing data on that desktop that the file shredder

17  shredded; isn't that true?

18  A.   No.   You said marketing data?   No.

19  Q.   So, you sent those computers back because you knew you

20  didn't have the right to keep them, right?

21  A.   I sent them back because I was -- I kept getting these

22  letters, and I thought they would stop sending letters if I

23  send them back.

24  Q.   How many letters did it take you before you decided to

25  send it back?

```
 1    A.  I think it was three.
 2    Q.  So, you testified that you didn't want them, meaning GMS,
 3    to see all of your personal information, right?
 4    A.  Right.
 5    Q.  But it wasn't just personal information you didn't want
 6    them to see.  You didn't want them to see the information
 7    regarding the sales activity of G&S, correct?
 8    A.  That's not true, because they could have seen that on
 9    DIBBS.
10    Q.  Well, you had been able to keep it away from them for
11    over a year on DIBBS, right?
12    A.  Uh-huh.
13              THE COURT:  Is that yes?  Is that a yes, Mr. Greer?
14              THE WITNESS:  Yeah.  I mean, I didn't tell them
15    about DIBBS, yes.
16              THE COURT:  Okay.  Go ahead.
17    BY MR. LASCARA:
18    Q.  So, when you testified here under oath just earlier that
19    to your knowledge you weren't deleting anything -- that you
20    were not deleting anything that they did not already have --
21    A.  Right.
22    Q.  -- that's not true, is it?
23    A.  That is true.
24    Q.  Well, they didn't have your G&S information, because you
25    kept it from them, correct?
```

```
 1   A.  That's not true, because this letter states G&S Supply,
 2   which means they would have looked up our cage code, and they
 3   had already seen all of the data.
 4   Q.  Well, are you saying that everything related to G&S that
 5   was on that computer could be found on some government
 6   website?
 7   A.  Yes, sir.
 8   Q.  Well, I understand that perhaps sales could be found on
 9   that website, but could your financial records be found there
10   of G&S?
11   A.  No.
12   Q.  Okay.  Well, there were G&S financial records that you
13   shredded from your computer with the file shredder, weren't
14   there?
15   A.  I didn't save financial records to my computer.
16   Q.  I'm sorry.  I didn't quite understand.
17   A.  I didn't save financial records to my computer.
18   Q.  You didn't save any on your computer?
19   A.  No.
20   Q.  So, you stated on direct that after you sent back all
21   three of the computers, it was the next month that you
22   learned that you were involved in a lawsuit, correct?
23   A.  I think so.  I don't know all of the dates, but whenever
24   we got served, yeah.
25   Q.  Had you ever used that file shredder program before?
```

1    A.   No, sir.

2    Q.   So, you thought you had gotten rid of it all, right?

3    A.   Gotten rid of all of?

4    Q.   Everything that was on the computer?

5    A.   Yeah.  I wiped it clean.

6    Q.   Okay.  Well, if your intent was to simply protect your

7    personal information that was on that computer -- which, by

8    the way, the computers belonged, did they not, to GMS?

9    A.   Yeah, two of them did.  Yes, sir.

10   Q.   So, if your concern was that you didn't want your

11   personal stuff on there, why did you delete everything?

12   A.   I just wiped it clean because you couldn't -- when you

13   delete something, it's like using an eraser.  You can even go

14   to recovery and recover files that were deleted and pull

15   everything back.

16   Q.   So, are you trying to tell this jury that you didn't

17   destroy all of that data because you wanted to hide it?

18   A.   Correct.

19   Q.   Yet, you knew when you got the file shredder program and

20   read what it was about, you knew it was going to destroy all

21   of it, right?

22   A.   I knew it would wipe it clean, yes, sir.

23   Q.   And that was your intent when you downloaded it on those

24   two mechanisms, those two computers, that was your intent to

25   destroy all of it, right?

1    A.  I meant to wipe both of them, but I guess I only wiped

2    one.

3    Q.  So, you heard the testimony of Mr. Eric Shirk of BDO

4    regarding the USB timeline?

5    A.  Correct.

6    Q.  The timeline, event timeline and the list of USBs, excuse

7    me, two separate documents, you saw them up on the screen,

8    correct?

9    A.  Yes.

10   Q.  All right.  And so one of those exhibits, which was

11   diagram 3.1, showed a number of USB drives that were

12   connected to that computer over time.

13          You didn't produce any of those USB drives in this

14   case, did you?

15   A.  I produced one.

16   Q.  Well, I may be --

17          MR. LASCARA:  If I may, Your Honor -- if I remember

18   how to do this -- show this?

19          THE COURT:  Does it take a minute, Julie?

20          THE CLERK:  Yes, it does.

21          THE COURT:  Okay.

22   BY MR. LASCARA:

23   Q.  So, there are two diagrams related to USB drives.  So,

24   the first one I was referring to is this USB drive diagram

25   3.1 as part of the expert report of Eric Shirk.

```
 1              MR. MCFARLAND:  I'm sorry.  Is this being published
 2     to the jury?
 3              THE CLERK:  Yes.  It came in, didn't it?
 4              THE COURT:  Is it the same demonstrative that came
 5     in earlier?
 6              MR. MCFARLAND:  It's not the same as the
 7     demonstrative.  The demonstrative exhibit is the chart that
 8     was used previously.  Now we've got the report itself that's
 9     being published.
10              MR. LASCARA:  Well, I can find the chart.
11              THE COURT:  Okay.  So take that down if it's not
12     the same report -- the same chart, excuse me.
13              MR. LASCARA:  It is the same chart, Your Honor.
14              THE COURT:  All right.  Well, did the same chart
15     have that paragraph of writing on it?
16              MR. LASCARA:  I don't believe --
17              MR. MCFARLAND:  I don't mind the chart.
18              THE COURT:  Just a minute.  Just a minute.
19          Did that same chart have that paragraph of writing
20     on it, Mr. Lascara?  I don't believe it did.
21              MR. LASCARA:  No, Your Honor.  The writing was not
22     on the first one I used.  I grabbed the actual --
23              THE COURT:  So, you either need to crop it so it's
24     just the chart or use the same chart.
25              MR. LASCARA:  Okay.  I understand, Your Honor.
```

1          THE COURT:  So, the objection is sustained.

2          MR. LASCARA:  And I'm sorry, Your Honor.  I'm

3     trying to get through this.

4          Your Honor, I want to make sure that I -- this

5     diagram 3.1 shows USBs that he testified to.  I'm not sure

6     this chart was actually put up as a demonstrative.

7          This chart, diagram 3.2, was put up.

8          THE COURT:  Okay.

9          MR. LASCARA:  And so I just want to make sure

10    everyone understands that, and I'll fold this under.  It was

11    a part of the report, but I don't believe that I used it as

12    a demonstrative when Mr. Shirk was here, and I want everyone

13    to understand that.

14         THE COURT:  Okay.

15         MR. MCFARLAND:  Your Honor, if this wasn't used by

16    Mr. Shirk, you can't use it with this witness.

17         THE COURT:  He can use it as a demonstrative

18    exhibit if he's talking about USBs, and he wants to show him

19    what USBs he's talking about.

20         MR. MCFARLAND:  There is no foundation with this

21    witness, Your Honor.  You're going to show him something

22    that he's never seen before.

23         THE COURT:  He just asked him three or four

24    questions about USBs.

25         MR. MCFARLAND:  Right.  That's fine.  I don't mind

1    him asking questions about USBs, but what we're now asking

2    the witness to do is comment on a hearsay chart that he did

3    not prepare, and there is no evidence that he's even seen it

4    before.

5            THE COURT:  It's a demonstrative.

6            Are you seeking to admit it, Mr. Lascara, or are

7    you seeking it to have it as an aid to the testimony?

8            MR. LASCARA:  An aid to the testimony, Your Honor.

9            THE COURT:  Right.  That's the definition of

10   demonstrative, so you can use that.  Go ahead.  But not with

11   the writing, just with the chart.

12           MR. MCFARLAND:  I'm just going to note, Your Honor,

13   this is way beyond the scope of my direct.  We didn't talk

14   about USBs one iota in my direct.

15           THE COURT:  Right.  You talked about computers,

16   didn't you?

17           MR. MCFARLAND:  Yes, and that's something

18   different, Your Honor.

19           THE COURT:  USBs are inextricably intertwined with

20   the computers, right?  Because the testimony from the expert

21   was that -- well, I'm not going to rehash it all.  But it's

22   inextricably intertwined with the computers.  So, I think

23   it's proper cross-examination.

24   BY MR. LASCARA:

25   Q.  So, this is diagram 3.1.  And do you recall utilizing

1    these USB devices on your desktop computer?

2    A.   No.  Also, didn't I sign for this computer in November of

3    2017?  I might be wrong.

4              THE COURT:  All right.  Hold on a second.

5              All right.  Take that down, and I want to get on

6    the headsets.

7              (Sidebar conference as follows:)

8              THE COURT:  Hello, can everybody hear me?

9              All right.  So, Mr. Lascara, I mean, maybe I'm

10   misremembering this, but the chart that dealt with the USBs

11   I remember, and somebody correct me if I am wrong, because I

12   could be wrong, but it started with dates in 2017 and all

13   the way to 2019, about the time that this witness no longer

14   was employed with GMS.

15             What you just put up just deals with 2017, so

16   that's not, at least to me, a replica of one of the charts

17   that was used, but please disabuse me of that notion if I'm

18   wrong, because I could be.

19             MR. LASCARA:  No, Your Honor.  I think you are

20   correct.  And I mentioned that this one was not shown, but

21   it does list USBs that were attached.  And we asked for all

22   of the USBs that were attached to this equipment in

23   discovery, and that's why I found it relevant to add this

24   list of USBs.  This chart that I have in my hand is the one

25   that I had put up, and I'm not trying to over complicate,

```
 1   and if you would like me to simply put that away and go back
 2   to the one I used, I will do that, I don't want to cause
 3   confusion.
 4          THE COURT:  I think you're right.  You need to use
 5   the one you used before if you want to ask him questions
 6   about it based on the foundation that you laid, specifically
 7   asking him a series of questions about did he hear the
 8   testimony from the BDO expert.
 9          MR. LASCARA:  Yes, sir.
10          THE COURT:  Okay.  All right.
11          MR. LASCARA:  Yes, sir.  Thank you.
12          (End of sidebar conference.)
13   BY MR. LASCARA:
14   Q.  All right.  We're going to put a different chart up, and
15   it's diagram 3.2 from the Eric Shirk BDO report.
16          So, do you recall testimony given in this courtroom
17   last week by Mr. Shirk related to this diagram?
18   A.  Yes, sir.
19   Q.  Okay.  And included in his testimony was a reference to
20   this top USB storage device that was last seen and first seen
21   on April 19th, 2019, at 8:42 p.m.
22          Do you recall that?
23   A.  Yes.
24   Q.  All right.  And did you in fact attach that USB drive to
25   your desktop computer immediately before you executed the
```

```
 1    file shredder program?
 2    A.   Yeah.  It would have been before.
 3    Q.   Okay.  And did that USB storage device get produced?
 4    A.   I believe so.
 5    Q.   Is that the only USB drive that you produced?
 6    A.   Yes.
 7    Q.   Okay.  So, what about the USB drive, Epson storage USB
 8    device on April 2nd, 2019, at 7:39 a.m., was that produced?
 9    A.   That was a printer, so no.
10    Q.   I'm sorry?
11    A.   That was a printer, so no.
12    Q.   The Epson storage USB device?
13    A.   Yes, sir.
14    Q.   Is a printer?
15    A.   Yes, sir.
16    Q.   Well, what type of printer is?
17    A.   Epson.
18    Q.   Why does it say "storage USB device" as opposed to
19    printer?
20              MR. MCFARLAND:  Your Honor, I'm going to object.
21    He didn't create this document.  I don't mind him being
22    asked about it, but to go after this witness for wording
23    that --
24              THE COURT:  He can ask him about it.  I mean, your
25    client seems to know what an Epson printer is, so he can
```

```
 1   certainly ask him about it.
 2          MR. MCFARLAND:  Right.  But the last question,
 3   though, asked him why that wording was used in this diagram
 4   document that my client certainly didn't create.
 5          THE COURT:  That question is sustained.
 6          MR. MCFARLAND:  Thank you, Your Honor.
 7          THE COURT:  You can reword, Mr. Lascara.
 8   BY MR. LASCARA:
 9   Q.  So, do you know why this diagram indicates that a storage
10   USB device was attached to the computer on April 2nd, 2019,
11   at 7:39 a.m., but you believe that it was a printer?
12   A.  I believe it was a printer, yes, sir.
13   Q.  Do you know why?
14   A.  Because it says Epson, and the only Epson USB I recall
15   using was an Epson printer.
16   Q.  Okay.  Is the Epson printer a USB drive?
17   A.  It's attached by USB.
18   Q.  Okay.  Now, as it relates to the contents, I would like
19   to show you, just as an example, page 42 of 72 of Exhibit 11.
20   This was presented at trial, if you recall, while Mr. Shirk
21   was testifying.
22          MR. MCFARLAND:  This is another demonstrative, Your
23   Honor.  I don't mind him trying to answer the best he can on
24   a demonstrative, but I want it to be clear this isn't an
25   exhibit.  Plaintiff didn't offer this as an exhibit on their
```

```
 1   exhibit list.
 2           THE COURT:  This is demonstrative, Mr. Lascara?
 3           MR. LASCARA:  Yes, Your Honor.
 4           THE COURT:  Okay.  Very well.
 5   BY MR. LASCARA:
 6   Q.  So, this is page 43 -- I can't quite fit it all on -- 42,
 7   excuse me, of 72.  I don't think I can make it any smaller.
 8           So, you see that at the bottom of this page and
 9   starting at the top these item numbers, they appear to be
10   item numbers, are item numbers for G&S Supply products; is
11   that correct?
12   A.  You said at the top, sir?
13   Q.  Yes.  Right here.
14   A.  I have no idea.  They look like solicitation from DIBBS.
15   I have no idea what they were for.
16   Q.  Okay.  But do you know that they relate to G&S Supply
17   because of the cage code?
18   A.  It just looks like a solicitation number, sir.
19   Q.  A solicitation number, you said?
20   A.  Yes, sir.
21   Q.  All right.  Going down to Greer Group 2018, W-2, W-3, W-2
22   forms 1/29/19, that's a G&S document, correct?
23   A.  No, sir.
24   Q.  What document is that?
25   A.  I don't know exactly what it was, but it says Greer Group
```

```
 1   on it.
 2   Q.  Well, Greer Group was involved in G&S Supply, correct?
 3   A.  Greer Group was me and my wife's company that we received
 4   payments from all sorts of things.
 5   Q.  Okay.  These are specifically W-2s and W-3s for 2018.
 6   So, wouldn't that relate to compensation that you received?
 7   A.  Yeah, compensation we received from Greer Group.
 8   Q.  And is it your testimony that that doesn't have -- in any
 9   way relate to GMS?
10   A.  It's just payments from Greer Group.  We received money
11   from GMS Industrial Supply as well.
12   Q.  So, are you saying that that doesn't relate in any way to
13   G&S?
14   A.  No.  This is Greer Group.  It's a separate entity.
15   Q.  Looking at page 1, these items that are listed here all
16   the way down to this point before the license, what are
17   those?
18   A.  These look like pictures, pings, and gifs.
19   Q.  And GS indicates it's a G&S Supply photograph, correct?
20   A.  It probably is a photo off of Google, yeah.
21   Q.  And this list right here, is that the same?
22   A.  Without seeing it, just the name, probably so.
23   Q.  Well, we can't -- we can't see the documents because
24   they're destroyed, correct?
25   A.  Yeah.  They're erased.
```

1    Q.   How many of the items on this page are personal?

2    A.   I don't know.  I don't know what a read me is.  I don't

3    know what those programs are.

4    Q.   All right.  Let's go to page 3.  It's another sampling

5    of -- do you understand that this is a listing of file names

6    that were recovered after they were changed by the file

7    shredder, correct?

8    A.   Correct.

9    Q.   All right.  Which of this list of files is personal?

10   A.   I would say W-2.

11   Q.   Well, who is the W-2 from?

12   A.   It likely would be from Greer Group or GMS.

13   Q.   It could be from G&S, correct?

14   A.   No.

15   Q.   No?

16   A.   No.  They paid dividends.  There was no W-2.

17   Q.   Okay.

18   A.   Export final, ODS, I think it's just -- I think this is a

19   lot to do with the G-Army.

20   Q.   All right.  This one right here, G&S tax, is that a tax

21   return?

22   A.   It could be.  I'm not sure.

23   Q.   For G&S Supply?

24   A.   Yes.

25   Q.   I'm going to show you another group of items.  These G&S

1   items below the document that is G&S items description.XLS.

2   Do you see that?

3   A.   Yes.

4   Q.   And the list of XLS files below them, what are those?

5   A.   I would think that would be inside of that spreadsheet.

6   I don't know why they are listed like this, because I don't

7   see a spreadsheet being one part number or one PR number.

8   Q.   What is a PR number?

9   A.   It's just a purchase request number.

10  Q.   All right.   The G&S item descriptions, what is that

11  document?

12  A.   It's probably just descriptions of kits which would be

13  put in the catalog.

14  Q.   Now, there are also GMS items listed in this recovered

15  file name.   What are these items referring to GMS here at the

16  bottom of the page?

17  A.   It's probably some of the part numbers that are in their

18  catalog.

19  Q.   All right.   And this document here, the file shredder

20  setup, is that when you actually executed the file shredder

21  at around 8:53 p.m.?

22  A.   I think this would be the deletion of the file shredder.

23  I don't really know.

24  Q.   Okay.   Well, this is a recovery of a file name.

25  A.   Uh-huh.

```
 1    Q.   Right?
 2    A.   Yeah.
 3            MR. LASCARA:   Let me just beg the Court's
 4    indulgence.   I'm not going to keep doing this.   I just want
 5    to find one or two others, and then we'll move on.
 6            THE COURT:   I think we've almost exhausted this
 7    line of questioning, Mr. Lascara.
 8            MR. LASCARA:   Yes, sir, Your Honor.
 9    BY MR. LASCARA:
10    Q.   So, is it your testimony that you didn't download
11    anything other than personal items on the USB drive before
12    you ran the file shredder?
13    A.   On the USB drive?
14    Q.   Uh-huh.
15    A.   From the report, it showed that I only had the
16    spreadsheet on there which showed the bonus that was owed to
17    me.
18    Q.   Well, my question is:   Is it your testimony that you only
19    downloaded personal files onto the USB drive before you
20    executed the file shredder?
21    A.   Yeah.   I guess so.
22    Q.   Okay.   Well, you sent back your tablet that had a code on
23    it?
24    A.   Uh-huh.
25    Q.   You understand that the code that you provided didn't
```

JILL H. TRAIL, Official Court Reporter

1    open it?

2    A.  The code I provided did open it.  Someone must have

3    changed it after I sent it.

4    Q.  Okay.  And then the desktop and the laptop were both

5    devoid of any readable files because of the file shredder,

6    correct?

7    A.  I think the BDO said just the desktop.

8    Q.  Okay.  So, did you just destroy every bit of data that

9    you owned that was stored on all three of those computer

10   devices and didn't keep any of it?

11   A.  Yeah.  I just wiped it clean.

12   Q.  Poof?

13   A.  The desktop.  I meant to do it to the laptop, but I

14   forgot to do it, I guess.

15   Q.  So, were none of those documents important to you to be

16   maintained for personal purposes or tax purposes?

17   A.  No.  I don't really like to keep anything.

18   Q.  I just want to review Defendants' Exhibit 21.

19           THE COURT:  Can we jump on the headsets before you

20   do that, Mr. Lascara?

21           (Sidebar conference as follows:)

22           THE COURT:  Mr. Lascara, I'm not rushing you, but

23   how much more do you think you have?

24           MR. LASCARA:  Your Honor, I could have 20 to 25

25   more minutes.

1        THE COURT:  All right.  We're going to stop there

2   and pick up tomorrow.

3        MR. LASCARA:  All right.  Thank you.

4        (End of sidebar conference.)

5        (End of excerpt.)

6

7                    CERTIFICATION

8

9     I certify that the foregoing is a correct transcript

10  from the record of proceedings in the above-entitled matter.

11

12

13        _____/s/_____

14                    Jill H. Trail

15                    July 27, 2022

16

17

18

19

20

21

22

23

24

25