```
 1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE EASTERN DISTRICT OF VIRGINIA
 2                          Norfolk Division

 3

 4    - - - - - - - - - - - - - - - - - - -
                                          )
 5     GMS INDUSTRIAL SUPPLY, INC.,        )
                                          )
 6            Plaintiff,                    )   CIVIL ACTION NO.
                                          )   2:19cr324
 7     v.                                  )
                                          )
 8     G&S SUPPLY LLC, et al,              )
                                          )
 9            Defendants.                  )
                                          )
10    - - - - - - - - - - - - - - - - - - -

11

12                     TRANSCRIPT OF PROCEEDINGS
                    (Excerpt Testimony of Westly Greer)
13                        Norfolk, Virginia

14                         June 7, 2022

15


16
      BEFORE:  THE HONORABLE RODERICK C. YOUNG
17            United States District Judge, and jury

18


19
      APPEARANCES:
20
              PENDER & COWARD
21            By:  William A. Lascara
                   Jeffrey Dennis Wilson
22                 Jesse Brian Gordon
                   Thomas Saunders Berkley
23                 Daniel T. Berger
                   Counsel for Plaintiff
24

25
```

JILL H. TRAIL, Official Court Reporter

1          MCGUIREWOODS LLP
           By:   Robert William McFarland
2                Micaylee Alexa Noreen
                 Jeanne E. Noonan
3                Counsel for the Defendants

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                            I N D E X

 2   PLAINTIFF'S
     WITNESSES                                          PAGE
 3

 4

 5
     DEFENDANTS'
 6   WITNESSES                                          PAGE

 7    WESTLY GREER
           Cross Examination by Mr. Lascara              5
 8         Redirect Examination by Mr. McFarland        27

 9

10

11                        E X H I B I T S

12   PLAINTIFF'S
     NO.                                                PAGE
13
      53                                                  13
14    183                                                 14
      87                                                  15
15    90                                                  26

16
     DEFENDANTS'
17   NO.                                                PAGE

18

19

20

21

22

23

24

25
```

JILL H. TRAIL, Official Court Reporter

```
 1              (Excerpt of proceedings - testimony of Westly
 2    Greer.)
 3              THE CLERK:  In the matter of civil case number
 4    2:19cv324, GMS Industrial Supply, Inc. versus G&S Supply,
 5    LLC, et al.  The plaintiff is represented by William
 6    Lascara, Jeffrey Wilson, Daniel Berger, Thomas Berkley, and
 7    Jesse Gordon.  The defendants are represented by Robert
 8    McFarland, Micaylee Noreen, and Jeanne Noonan.
 9              Mr. Lascara, is plaintiff ready to proceed?
10              MR. LASCARA:  Yes.  Good morning.
11              THE COURT:  Good morning.
12              MR. LASCARA:  The plaintiff is ready to proceed.
13              THE COURT:  Good morning.
14              THE CLERK:  And, Mr. McFarland, are defendants
15    ready to proceed?
16              MR. MCFARLAND:  Yes.  Good morning, Your Honor.
17    Defendants are ready.
18              THE COURT:  Good morning.
19              All right.  So, let's go ahead and get Mr. Greer
20    back to the stand, and once he gets there, we'll bring the
21    jury in.
22              MR. MCFARLAND:  Can we take up one housekeeping
23    matter, Your Honor?
24              THE COURT:  Sure.  He can still come to the stand.
25              MR. MCFARLAND:  Good morning, Your Honor.
```

```
 1              THE COURT:  Good morning.
 2              MR. MCFARLAND:  In light of the Court's rulings and
 3  the way the evidence has progressed, we do have a few
 4  additional instructions that we would like to present to the
 5  Court.  Would the Court like us to do that by filing them as
 6  we did before or?
 7              THE COURT:  You should file them, but if you have
 8  copies of them, give them to my law clerk at one of the
 9  breaks.
10              MR. MCFARLAND:  Will do, Your Honor, and we'll
11  present Word copies as well.
12              THE COURT:  Fantastic.
13              Let's have the jury.
14              (The jury entered the courtroom at 9:17 a.m.)
15              THE COURT:  All right.  Good morning, everyone.  I
16  hope you all had a nice evening.  So, we will now continue
17  with our trial.
18              Mr. Lascara, you can continue with your cross.
19              MR. LASCARA:  Thank you, Your Honor.
20              WESTLY GREER, having been first duly sworn, was
21  examined and testified as follows:
22                     CONTINUED CROSS-EXAMINATION
23  BY MR. LASCARA:
24  Q.  Good morning, Mr. Greer.
25  A.  Good morning, sir.
```

1   Q.  Isn't it true that yesterday you testified on the witness

2   stand in response to my question that G&S was created because

3   your brother wanted to sell electric motors for boats?

4   A.  No, sir.

5   Q.  Okay.  Why was -- what do you recall was your testimony

6   then regarding why G&S was created?

7   A.  He was a -- he worked for a manufacturer that created

8   electric motors, and it was a bidding opportunity for us just

9   to make bids on the DIBBS.

10  Q.  Okay.  So, are you saying you did not testify yesterday

11  that the reason G&S was created was because your brother

12  wanted to sell electric motors for boats?

13  A.  He was already selling electric motors.  It was a chance

14  for us to bid on those solicitations.

15  Q.  Okay.  And that's why G&S was formed?

16  A.  Yes.

17  Q.  Okay.  This is not the first time that you've given a

18  statement about the reasons for forming G&S Supply, is it?

19  A.  I'm not sure.

20  Q.  Okay.  Well, you sat and testified for two depositions in

21  this case before this trial, didn't you?

22  A.  I think it was one deposition.  It might have been two.

23  Q.  Okay.  You had what we call a 30(b)(6) corporate

24  deposition taken.  Do you recall that?

25  A.  Yes.

```
 1   Q.  And then you had your individual deposition taken.  Do
 2   you recall that?
 3   A.  Oh, yes.
 4   Q.  All right.  So your first deposition was conducted on
 5   April 13th, 2021, last year, correct?
 6   A.  That was -- I'm sure it was.
 7   Q.  Okay.  And before you took the witness stand today, you
 8   took an oath to give true testimony, correct?
 9   A.  Correct.
10   Q.  Before you answered questions in your April 13th
11   deposition, you also gave an oath to give truthful testimony,
12   didn't you?
13   A.  Yes.
14   Q.  All right.  Even though the deposition wasn't in the
15   courtroom, you understood that you were sworn to give
16   truthful testimony in the deposition, right?
17   A.  Yes.
18   Q.  And you reviewed the deposition transcript prepared by
19   the court reporter and completed a -- the court reporter
20   after the deposition was completed -- in other words, you
21   were given the ability to review that deposition transcript
22   for accuracy, correct?
23   A.  Yes.
24   Q.  And you had the opportunity to make corrections if you
25   found anything that wasn't correct in that deposition
```

1    transcript, didn't you?

2    A.  Yes.

3    Q.  And you, in fact, took the opportunity to make a couple

4    of corrections on what we call an errata sheet that you

5    signed.  Do you recall that?

6    A.  I believe so, yes.

7    Q.  All right.  I'm going to ask that you be provided a copy

8    of the April 13th, 2021, deposition.

9            MR. LASCARA:  And I've provided a copy to

10   Mr. McFarland.

11           THE COURT:  All right.

12           THE WITNESS:  Thank you.

13   BY MR. LASCARA:

14   Q.  So, we're in the April 13th transcript.  Please refer to

15   page 88, line 11 and then to line 23.

16   A.  I've read that, sir.

17   Q.  All right.  And in line 11, I asked you the question:

18   "When did you start G&S Supply, and who did you start it

19   with?"

20          And your answer was:  "I believe it was June of 2017,

21   with Gregory Spires."

22          Correct?

23   A.  Yes.

24   Q.  The next question I asked was:  "Was anyone other than

25   Gregory Spires involved?"

 1          And your answer was:  "No, sir."

 2          Correct?

 3   A.  Yes.

 4   Q.  All right.  I then asked you:  "And why did you start

 5   that business?"

 6          And your answer was at lines 19 and 20:  "The

 7   original thought of G&S Supply was to bid on solicitations on

 8   DIBBS."

 9          Correct?

10   A.  Correct.

11   Q.  All right.  And is that the true reason that you started

12   G&S?

13   A.  Yes.  It's the same answer, yes.

14   Q.  All right.  "And when you say DIBBS" -- I asked the next

15   question -- "what are you referring to?"

16          And your answer was:  "The DLA International" --

17          MR. MCFARLAND:  Your Honor, I'm going to object.

18   There hasn't been any impeachment.  The purpose of pulling

19   out this deposition is that the witness has said something

20   different at trial than he said in the deposition, and

21   what's been read is consistent with the witness' testimony.

22   It's not proper impeachment.  You don't just pull out a

23   deposition and start reading it.  I mean, I'm happy for the

24   jury to see the consistency, but I don't think it's

25   necessarily appropriate.

```
 1            MR. LASCARA:  Your Honor --

 2            THE COURT:  Mr. Lascara.

 3            MR. LASCARA:  Yes, Your Honor.

 4            THE COURT:  I haven't heard any impeachment yet.  I

 5   was waiting.

 6            MR. LASCARA:  Your Honor, his testimony during the

 7   hearing earlier was that it was formed because his brother

 8   wanted to sell electric motors for boats, and they were

 9   going to be able to bid on them through this --

10            THE COURT:  What hearing are you talking about?

11            MR. LASCARA:  Pardon me?  Today -- yesterday's --

12            THE COURT:  The trial?

13            MR. LASCARA:  -- trial.

14            THE COURT:  Okay.  Right.  I understand that's what

15   you're saying, but to me you can -- you're free to use a

16   deposition to impeach someone, that's fine under the rules,

17   both the Rules of Evidence and the Rules of Civil Procedure,

18   but it seems that your impeachment is consistent with the

19   answer that he gave today, like ten minutes ago, when he

20   said, "No.  I created G&S to bid on DIBBS."  And what you

21   just read in the deposition was consistent with that.  So, I

22   don't know if there is another question after that, that

23   leads to this creation for the purpose of selling electric

24   motors to the military, but so far I haven't heard that it's

25   impeachment.
```

```
 1              So, unless you have another question from that same
 2    line that you asked him to read, the objection is sustained.
 3    But I'll give you leave if that material is in the
 4    deposition to follow-up on that question.
 5              MR. LASCARA:  No, Your Honor.  I've read all that I
 6    had intended to read.  My -- the impeachment was his
 7    testimony yesterday related to forming the corporation
 8    because his brother wanted to sell these motors, and he --
 9              THE COURT:  Right.
10              MR. LASCARA:  -- he was going to use the company to
11    bid on it.
12              THE COURT:  Right.  So, right.  But the thing is
13    that you can't use the -- the deposition is not impeaching
14    him, because he has stated that same thing.  He's stated
15    something consistent with the deposition.
16              Now, you've pointed out what you believe to be an
17    inconsistency, and if you have other documents that he has
18    read or signed, or reports that he's done, or emails that
19    he's done that says, you know, "I created G&S to be able to
20    sell electric motors," then you can use that, but that's not
21    -- that's not impeachment, what I just heard.
22              So, the objection is sustained.
23              MR. LASCARA:  I understand, Your Honor.
24              THE COURT:  All right.
25    BY MR. LASCARA:
```

JILL H. TRAIL, Official Court Reporter

```
1    Q.  Okay.  So, the reason you formed G&S was to bid on
2    products on the DIBBS Board?
3    A.  Yes.  The original thought was my brother was a
4    manufacturer for electric motors and to bid on their motors
5    that they created.
6    Q.  All right.  And is that through the DIBBS Board?
7    A.  Yes, sir.
8    Q.  Okay.  I understand.
9         I would like to show you Exhibit 53, and that should
10   be in volume one of the binder in front of you.  It's in one
11   of these binders, Exhibit 53.
12        Do you recognize Exhibit 53 as the Articles of
13   Organization of G&S Supply?
14   A.  Yes.
15   Q.  And if you go over to page 3 of that document, is that
16   your name and address information?
17   A.  Yes.  At the time that was my address.
18   Q.  All right.  Did you prepare and file this document with
19   the Colorado Secretary of State?
20   A.  I'm not sure if it was me or a CPA.  It was one of the
21   two.
22   Q.  Okay.  So, it was done at your request?
23   A.  Yes.
24        MR. LASCARA:  I would move for admission of this
25   Articles of Organization, Exhibit 53.
```

```
 1              THE COURT:  Any objection?
 2              MR. MCFARLAND:  No objection, Your Honor.
 3              THE COURT:  It will be entered.  You may publish.
 4              (Plaintiff's Exhibit 53 received in evidence.)
 5   BY MR. LASCARA:
 6   Q.  And can you identify the date in the receipt up at the
 7   top right corner?
 8   A.  June the 22nd, 2017.
 9   Q.  All right.  And in binder two, I believe that should also
10   be -- you're in binder one.  I believe you have binder two
11   also at the stand.
12              Is that binder two?
13   A.  Yes.  Yes, sir.
14   Q.  Okay.  If you could turn to 183.
15   A.  This one goes to 150.
16   Q.  Oh, 150.  So, it must be binder three.  I apologize.
17   A.  Thank you.
18   Q.  All right.  Do you recognize that document?
19   A.  Yes, sir.
20   Q.  What is that document?
21   A.  It's the Operating Agreement for G&S Supply.
22   Q.  All right.  And does your signature appear at page 15 of
23   that Operating Agreement?
24   A.  Yes, sir.
25   Q.  And did you sign that agreement on behalf of yourself as
```

1    a member?

2    A.  Yes, sir.

3    Q.  All right.

4         MR. LASCARA:  I move for admission of this

5    Exhibit 183.

6         THE COURT:  Any objection?

7         MR. MCFARLAND:  No objection, Your Honor.

8         THE COURT:  All right.  It will be entered.

9         (Plaintiff's Exhibit 183 received in evidence.)

10   BY MR. LASCARA:

11   Q.  And with respect to the effective date of the Operating

12   Agreement, if you could refer to the first line on the first

13   page, when was it made effective?

14   A.  Effective June 22nd, 2017.

15   Q.  All right.  Thank you.

16        Now, if you could turn to Exhibit 87.  It should be

17   in binder one.

18   A.  There is nothing in the binder, but I can see this.

19   Q.  Okay.  It's up on the screen here.

20        Can you identify what that document is?

21   A.  It's an email from myself to Mike Welton.

22   Q.  Okay.  And what is the date?

23   A.  September 16, 2016.

24   Q.  And who was copied on the document?

25   A.  Renee Robichaux.

```
1   Q.  All right.
2   A.  And Gary Gorken, I'm sorry.
3   Q.  And was this in relation to communications on behalf of
4   GMS Industrial?
5   A.  Yes, sir.
6           MR. LASCARA:  I would move for admission of
7   Exhibit 87.
8           THE COURT:  Any objection?
9           MR. MCFARLAND:  No objection, Your Honor.
10          THE COURT:  It will be entered.  You may publish.
11          (Plaintiff's Exhibit 87 received in evidence.)
12          MR. LASCARA:  Thank you, Your Honor.
13  BY MR. LASCARA:
14  Q.  This appears to have a picture.  Can you identify what
15  that picture is of?  It's a little, small box.
16  A.  I can't, sir.
17  Q.  Well, it says right below it a little PDF symbol.  And
18  then to the right of that do you see "Battle Damage
19  Assessment List"?
20  A.  I see that, sir.
21  Q.  That's a CCPN or a non-NSN item, correct?
22  A.  I have no idea what that is, sir.  I don't know if this
23  was a soldier's lunch bag.  I don't know what this is.
24  Q.  Well, in this communication, you were sending an email to
25  Mike Welton, correct?
```

1    A.   Yes, sir.

2    Q.   And your statement was:  "Before doing this, does your

3    customer have the option of ordering through credit card?"

4         Do you see that?

5    A.   Yes.

6    Q.   "DOD EMALL" --

7    A.   Yeah.

8    Q.   -- "or only ordering through the stock system GCSS?"

9         Do you see that?

10   A.   Yes.

11   Q.   All right.  So, you were aware that customers or some

12   customers of GMS had the opportunity or option to order

13   through credit card, right?

14   A.   Yes.  There was very few customers that could.

15   Q.   So, how about through the DOD EMALL?

16   A.   Yeah.  That would have been another credit card request.

17   Q.   So, there is a separate credit card option that can be

18   done, what, at the -- at the entity or organization that's

19   buying it, and a separate credit card opportunity through the

20   DOD EMALL?

21   A.   Correct.  Yeah.

22   Q.   All right.  And then what is meant "or only ordering

23   through the stock system?"  What did you mean there?

24   A.   Just the Army supply system, whatever they had at the

25   time, one of those three.

```
 1   Q.   Okay.  Were you familiar with all of the avenues as to

 2   how the government could purchase supplies from GMS, such as

 3   credit cards, the FedMall, the GCSS, those various types of

 4   contract vehicles?

 5   A.   For the most part, yes.

 6   Q.   When you gave your testimony in the 30(b)(6) deposition,

 7   isn't it true that you were asked about what contracts --

 8   what government contracts GMS sales agents could sell

 9   through, and you said you didn't know?

10           THE COURT:  Objection?

11           MR. MCFARLAND:  Your Honor, I am going to object.

12           THE COURT:  Okay.

13           MR. MCFARLAND:  If he's going to impeach the

14   witness with his prior deposition testimony, as the Court

15   knows, there is a procedure that you follow.

16           THE COURT:  Sustained.  Sustained.

17           MR. MCFARLAND:  Thank you.

18   BY MR. LASCARA:

19   Q.   I'm going to ask you to look at the deposition transcript

20   in front of you over on page 8 -- excuse me -- page 9.

21           MR. MCFARLAND:  I'm sorry.  Which transcript?  I've

22   got two.

23           MR. LASCARA:  Yeah, 30(b)(6).

24   BY MR. LASCARA:

25   Q.   It's the 30(b)(6) deposition transcript that's been
```

1   handed up.

2   A.  I have it pulled up, sir.

3   Q.  All right.  So, if you go to line 15, you see my

4   question:  "Okay.  What avenues of sale -- let me rephrase

5   that.  Through what contracts, government contracts, could

6   GMS sales agents, including yourself, sell to?"

7           THE COURT:  I'll just ask you to slow down a little

8   bit, Mr. Lascara.

9           THE WITNESS:  What page was that again?

10  BY MR. LASCARA:

11  Q.  Page 9.

12  A.  And what number, sir?

13  Q.  Line 17 --

14  A.  Okay.

15  Q.  -- through line 19.

16  A.  I think I have the wrong document.

17  Q.  This is the 30(b)(6).

18  A.  Thank you.

19          I see that, sir.

20  Q.  Okay.  So -- and your answer was:  "I don't know the

21  specifics of the contracts."

22          MR. MCFARLAND:  And, Your Honor, I'm going to

23  object.  This is improper impeachment.  The question is --

24  which wasn't read very clearly, but I'll read it clearly:

25  "Through what contracts, government contracts, could GMS

1   sales agents, including yourself, sell to?"

2         And the answer is:  "I don't know the specifics of

3   the contracts."

4         That's not what was asked of him on

5   cross-examination here.

6         THE COURT:  All right.  Your objection is improper

7   impeachment.

8         MR. MCFARLAND:  Absolutely, Your Honor.

9         THE COURT:  Mr. Lascara.

10        MR. LASCARA:  Your Honor, he testified that he did

11  know about the availability of these contracts in connection

12  with 87.  Yet, in his deposition transcript on behalf of the

13  company, which occurred on April 20th, 2021, he gave an

14  exactly opposite answer.

15        THE COURT:  All right.  It's overruled, and he can

16  explore it on redirect.

17        Go ahead, Mr. Lascara.

18        MR. LASCARA:  All right.

19  BY MR. LASCARA:

20  Q.  Would you agree that we've talked about catalogs, and

21  catalogs of GMS as well as G&S?

22        With respect to GMS catalogs, do you agree that there

23  were plenty of other products, including non-NSN products,

24  that GMS could sell and did sell that were not in the

25  catalog?

JILL H. TRAIL, Official Court Reporter

```
1    A.  There were pending kits that sometimes needed to be added

2    to the catalog that weren't in there yet, yes.

3    Q.  So the answer is yes, not everything that could be sold

4    was in the catalog, correct?

5    A.  Correct.

6    Q.  All right.  So, you recall times where there were items

7    that the government wanted that weren't in the GMS contract,

8    yet they were sold to the government, correct?

9    A.  In the contract, sir?

10   Q.  Excuse me.  In the catalog?

11   A.  I believe so, sir.

12   Q.  So, what is your understanding of the FedMall contract

13   that GMS Industrial had with DLA?  What did it entail?

14   A.  I have no idea, sir.  I don't know much about their

15   contract.

16   Q.  Wasn't it a contract vehicle that you, as the director of

17   sales, would alert other sales agents that it was an avenue

18   for their sales?

19   A.  We used GCSS to sell through DLA.  We didn't -- we didn't

20   push the FedMall contract.

21   Q.  Well, you say, "We didn't push the FedMall contract."

22   A.  As in GMS.

23   Q.  Are you saying you didn't press?

24   A.  Not anybody that dealt with the Army at the time.

25   Q.  Okay.  Well, the Army materials could be purchased
```

1    through the FedMall contract, couldn't they?

2    A.  I believe so.

3    Q.  And so it was an avenue to sell to the Army on behalf of

4    GMS, correct?

5    A.  Yes.

6    Q.  And you could sell non-NSNs through the FedMall contract,

7    couldn't you?

8    A.  You could, but I wouldn't do that.

9    Q.  Okay.  You had an obligation and the other agents had an

10   obligation to aggressively promote the sale of GMS' products,

11   whether they were in the catalog or not, correct?

12   A.  In the catalog, yes.

13   Q.  So, are you saying they didn't have an obligation to

14   aggressively promote the sales of GMS' products that were not

15   in the catalog?

16   A.  We sold what we can sell.

17   Q.  I'm sorry?

18   A.  We sold what we can sell.  You cannot just sell random

19   stuff that wasn't in the catalog.  You had to get approval.

20   Q.  So, did you ever teach any of the agents that you

21   oversaw, as the sales director, how to sell through the

22   FedMall contract?

23   A.  I don't believe so.

24   Q.  Okay.  Are you familiar with the ability that GMS

25   Industrial Supply had to sell industrial supply products to

1    the federal government through credit card purchases?

2    A.  I'm sorry.  You said "had to sell," sir?

3    Q.  Yes, had to sell industrial.  So, are you familiar with

4    the ability that GMS Industrial Supply had to sell industrial

5    supply products to the federal government through credit card

6    purchases?

7    A.  Yes, sir.

8    Q.  Explain to me what you know about credit card purchases

9    by the federal government for products from GMS Industrial

10   Supply.

11   A.  So, on the rare occasion that you can get a customer that

12   has a credit card, there had to be -- they had to get three

13   quotes from three different vendors that were competitive,

14   and only then could they choose the lowest price to purchase

15   from that vendor.  So, GMS would use G Cubed, their own

16   quotes, and also Storm Tactical.

17   Q.  Well, at the same time you indicated that it was

18   difficult for GMS to sell credit card sales.

19        Isn't it true that G&S was using credit card sales

20   starting back in late 2017, all through the end of March of

21   2019, to sell its products?

22   A.  If a third-party vendor had bidded on DIBBS and won the

23   award, that's how they paid us.  So, it wasn't us using the

24   card to the military.  It was a vendor paying us.

25   Q.  Okay.  So, credit card sales were available to --

```
 1              MR. MCFARLAND:  Goodness gracious, Your Honor,
 2    asked and answered at least a half dozen times between
 3    yesterday and today.
 4              THE COURT:  Overruled at this point.
 5              Go ahead, Mr. Lascara.
 6    BY MR. LASCARA:
 7    Q.  So, credit card sales were available for GMS Industrial
 8    sales agents, correct?
 9    A.  Yes, sir.
10    Q.  Are you aware of any limit that related to use of credit
11    sales?  Like, was there a dollar limit?
12    A.  Yes, and they changed all of the time, so I'm not sure.
13    Q.  So, you would have to keep up with what the government
14    requirements for purchasing through credit card sales were if
15    you wanted to use it?
16    A.  It was 3,000 at one time, and then it switched to, like,
17    $3,500 as their limit.
18    Q.  So, do you recall a point in time in 2016, August of
19    2016, when GMS Industrial obtained a new DOD EMALL contract?
20    A.  If there was an email sent, then yes.
21    Q.  Pardon me?
22    A.  If it was through email, then yes.
23    Q.  I'm sorry.  I did not understand your answer.
24    A.  If it was through an email, then yes.
25    Q.  So, do you recall it being?
```

```
 1   A.  I don't know the date, no.
 2   Q.  Okay.  But you recall that they, in that time period, won
 3   a new contract through DOD EMALL?
 4   A.  I think it switched to FedMall or something.
 5   Q.  Okay.  Is that the same thing?  EMALL and FedMall were
 6   the same contract?
 7   A.  It evolved to FedMall.
 8   Q.  Okay.  So, that vehicle, that contract could be used to
 9   sell non-NSNs, correct?
10   A.  The contract?
11   Q.  Yes.
12   A.  I don't know what the contract was, but if they had items
13   on FedMall, you can sell it, yes.
14   Q.  So, you're not -- as sales director, you were not
15   familiar with what that new DOD EMALL or FedMall contract
16   permitted?
17   A.  I just know you can sell whatever was on FedMall.
18   Q.  Do you recall that there was a point in time where
19   Mr. Spires objected to his receipt of commissions, claiming
20   that he was underpaid?
21   A.  Yes.  What he testified, yes.
22   Q.  No.  I'm talking about on specific transactions.
23   A.  Yeah.  I think at one time any motor pool sale you would
24   get deducted 5 or 10 percent commission for a certain period
25   of time because they said they were losing money on the sales
```

1   through the motor pools.

2   Q.  And that was by GMS?

3   A.  Yes.

4   Q.  Okay.  Well, let me have you turn to Exhibit 90 in the

5   binder in front of you, and that should be in exhibit binder

6   one.

7        Do you have that up in front of you on the screen?

8   A.  Yes.

9   Q.  Okay.  So, do you recognize what this document is?

10  A.  It was an email to Greg Spires and copying Renee and

11  Rachel.

12  Q.  All right.  And are you the author of the email?

13  A.  Yes.

14  Q.  And what is the date of the email?

15  A.  What does it say?  Do you want me to just read it?

16  Q.  Yeah.

17  A.  "Greg, we are currently" --

18  Q.  No.  I said the date.

19        THE COURT:  The date.

20  BY MR. LASCARA:

21  Q.  The date.

22  A.  January 12th, 2016.

23  Q.  All right.  And did this relate to a request or for

24  information or a --

25        THE COURT:  Are you asking to move this into

1    evidence?

2         MR. LASCARA:  Yes.  I am asking to move it into

3    evidence.

4         THE COURT:  Any objection, Mr. McFarland?

5         MR. MCFARLAND:  No objection, Your Honor.

6         THE COURT:  All right.  It will be entered.

7         (Plaintiff's Exhibit 90 received in evidence.)

8    BY MR. LASCARA:

9    Q.  So, with regard to the specifics of the document,

10   Mr. Spires had emailed -- sent an email and wrote, "My

11   commission report shows I'm getting paid for less than the

12   kit sales and the paperwork I turned in.  My commission check

13   was $243.82 less because of the difference on the price I was

14   paid for.  See below.  Thank you."

15        And did you --

16        MR. MCFARLAND:  Your Honor, I don't object to the

17   exhibit to the extent it is an email from Mr. Greer.  This

18   is way beyond the scope of my direct examination.  I didn't

19   go into anything with Mr. Spires' commissions with this

20   witness.  It seems to me the time for this subject was with

21   Mr. Spires.

22        THE COURT:  All right.

23        Mr. Lascara.  Mr. Lascara.

24        MR. LASCARA:  Your Honor, I do think that it is

25   referring back to Mr. Spires' testimony that he was shorted,

 1   and what I'm trying to get into --

 2         THE COURT:  It does refer back to that, but his

 3   specific objection is that it's beyond the scope of the

 4   direct of this witness.

 5         MR. LASCARA:  I don't recall him testifying about

 6   this specific issue, but I do recall there was some

 7   testimony regarding markup by DLA, and that's what I'm

 8   trying to address.

 9         THE COURT:  All right.  Well, I think the objection

10   is proper, and so I'm going to sustain it.

11         MR. LASCARA:  All right.  Thank you, Your Honor.

12         Your Honor, I think those are all of the questions

13   I have.

14         THE COURT:  All right.

15         Mr. McFarland, do you have any redirect?

16         MR. MCFARLAND:  Very briefly, Your Honor.

17         THE COURT:  All right.

18                    REDIRECT EXAMINATION

19   BY MR. MCFARLAND:

20   Q.  Westly, what branch of the military did you and your

21   sales agents sell to?

22   A.  We sold to the Army.

23   Q.  And with respect to the Army, I take it, it was mostly at

24   Army bases?

25   A.  Yes.

```
 1   Q.   Was it even exclusively at Army bases?
 2   A.   Yes.
 3   Q.   And was there a focus on motor pools?
 4   A.   Yes.  It was mainly motor pools.
 5   Q.   And do most Army motor pools have the ability to make
 6   purchases with a credit card?
 7   A.   It would be very rare, sir.
 8   Q.   You were asked some questions about FedMall.  Was FedMall
 9   a method of sale that GMS wanted you to use with the Army
10   bases?
11   A.   It was never really pushed.  It was more of the GCSS,
12   just the standard, non-standard ordering through GCSS.
13   Q.   And if we could have Plaintiff's Exhibit 87.
14        By the way, Westly, when I asked you about FedMall --
15   A.   That's the one that's not in here.
16   Q.   Okay.  Well, I think it's going to go up on the screen
17   for you in a minute.
18        But was FedMall an option that was used much, if at
19   all, with the motor pools?
20   A.   Oh, no.  No.
21   Q.   This email, Plaintiff's 87, do I follow that what you're
22   asking --
23        Mike Welton, by the way, is an independent sales
24   agent who reported to you, correct?
25   A.   Correct.
```

```
1    Q.  Okay.  And you're asking him what options the customer or
2    his customer might have for payment?
3    A.  Correct.
4    Q.  Because you don't know what the customer's contract is in
5    terms of purchase options, correct?
6    A.  Correct.
7          MR. MCFARLAND:  Okay.  Thank you.  That's all I
8    have.
9          THE COURT:  Thank you.
10         All right, Mr. Greer, you may return to your seat.
11   Thank you very much.
12         THE WITNESS:  Thank you, Your Honor.
13         (End of excerpt.)
14
15                      CERTIFICATION
16
17      I certify that the foregoing is a correct transcript
18   from the record of proceedings in the above-entitled matter.
19
20
21   _____/s/_____
22                      Jill H. Trail
23                      July 27, 2022
24
25
```

JILL H. TRAIL, Official Court Reporter