```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
 2                      Norfolk Division

 3

 4   - - - - - - - - - - - - - - - - - - -
                                         )
 5   GMS INDUSTRIAL SUPPLY, INC.,         )
                                         )
 6          Plaintiff,                    )    CIVIL ACTION NO.
                                         )    2:19cv324
 7   v.                                   )
                                         )
 8   G&S SUPPLY, LLC, et al,              )
                                         )
 9          Defendants.                   )
                                         )
10                                        )
     - - - - - - - - - - - - - - - - - - -
11

12

13                 TRANSCRIPT OF PROCEEDINGS
             (Excerpt Testimony of Sabrina Greer)
14                     Norfolk, Virginia

15                     June 7, 2022

16

17   BEFORE:  THE HONORABLE RODERICK C. YOUNG
             United States District Judge, and jury
18

19
     APPEARANCES:
20
             PENDER & COWARD
21           By:  William A. Lascara
                  Jeffrey Dennis Wilson
22                Jesse Brian Gordon
                  Thomas Saunders Berkley
23                Daniel T. Berger
                  Counsel for Plaintiff
24

25
```

2

```
 1            MCGUIREWOODS LLP
              By:  Robert William McFarland
 2                 Micaylee Alexa Noreen
                   Jeanne E. Noonan
 3                 Counsel for Defendants

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        I N D E X

 2   PLAINTIFF'S
     WITNESSES                                    PAGE
 3

 4

 5
     DEFENDANTS'
 6   WITNESSES                                     PAGE

 7    SABRINA STAR GREER
          Direct Examination By Mr. McFarland        4
 8        Cross-Examination By Mr. Gordon           26

 9

10

11                    E X H I B I T S

12   PLAINTIFF'S
     NO.                                          PAGE
13

14

15   DEFENDANTS'
     NO.                                          PAGE
16
      23                                            24
17

18

19

20

21

22

23

24

25
```

JILL H. TRAIL, Official Court Reporter

1              (Excerpt of proceedings - testimony of Sabrina
2    Greer.)
3              MR. MCFARLAND:  Thank you, Your Honor.  Our next
4    witness is Sabrina Greer, Your Honor.
5              THE COURT:  All right.
6              Ms. Greer, please come forward.
7              (The witness was duly sworn.)
8              THE COURT:  All right.  Go ahead, Mr. McFarland.
9              MR. MCFARLAND:  Thank you, Your Honor.
10             SABRINA STAR GREER, called by the Defendants,
11   having been first duly sworn, was examined and testified as
12   follows:
13                        DIRECT EXAMINATION
14   BY MR. MCFARLAND:
15   Q.  Good morning, ma'am.  Would you state your full name,
16   please.
17   A.  Sabrina Star Greer.
18   Q.  And, Sabrina, where do you live?
19   A.  Wentzville, Missouri.
20   Q.  And with whom do you live?
21   A.  My husband, Westly Greer, and my son, Donovan Greer, and
22   my two dogs.
23   Q.  And can you tell us a little bit about your background?
24   Where did you go to high school, and what have you done since
25   graduating from high school?

A.  I went to high school at Fort Zumwalt West in O'Fallon,
Missouri.  Fast-forward, I was pregnant with my son when I
was 21.  Started my associate's degree; that's in business.
Finished that.  Didn't really do anything for a little period
of time, well, for school wise.  And then I started my
nutrition therapy school for a few years in Colorado.
Finished that last year.  And now I'm working on NASM
certification for youth exercise.

          THE COURT:  How do you spell NASM?

          THE WITNESS:  It's abbreviated.  It's N-A-S-M, but
it stands for the National Academy of Sports Medicine, I
believe.

          THE COURT:  All right.

          THE WITNESS:  So, that's for my education.

BY MR. MCFARLAND:

Q.  All right.  And in addition to being a full-time mother,
what else, if anything, do you do outside the home, or I
guess in today's pandemic it may be partially in the home,
but in other words for occupation wise?

A.  Currently I do a lot of DoorDashing because it's very --
you get to pick your hours.  And then I do have a little bit
of income from Twitch and Facebook gaming, because I play
Call of Duty.

Q.  Okay.  And how did you meet your husband?

A.  We met at Denny's when I was 16.  I believe he was 17,

1   yeah.  I was a cook.  He was a cook at a different one, but
2   got transferred to my Denny's, and that's how we met.
3   Q.  And have you been, I guess, dating and married since
4   then?
5   A.  Yes.
6   Q.  Okay.  Fast-forward, at some point we've heard a little
7   bit that you came to be an independent sales agent for GMS
8   Industrial Supply?
9   A.  Yes.
10  Q.  Okay.  How did that occur, Sabrina?
11  A.  I believe after my husband started in Oklahoma, when he
12  became a manager, we moved back to Missouri because that's
13  where our family is, and we have a baby, and trying to be
14  around family.  But then we got the opportunity to move to
15  Colorado, where we would be right next to a military base.
16  And since he traveled, it was like an opportunity for me to
17  be a sales rep there because we lived right there.
18  Q.  All right.  And I guess I probably should have maybe done
19  a little better in the time frame.
20       When you mention that you moved from Oklahoma, what
21  did you do, go back to Missouri, and then to --
22  A.  And then to Colorado.
23  Q.  And during that period, Westly had already started with
24  GMS Industrial, correct?
25  A.  Yes.

```
1   Q.  Okay.
2   A.  He was a manager, like, traveling around.
3   Q.  All right.  But you were not at that time?
4   A.  No.
5   Q.  Okay.  So, did you become an independent sales agent with
6   the move to Colorado?
7   A.  Yes.  I do think sometime when I lived in Missouri, there
8   was -- we were trying, I think, for me to call people to set
9   up appointments for GMS.  I didn't get anywhere with that,
10  so, like, it wasn't -- it just didn't benefit, so yeah.  So
11  yeah.
12  Q.  So, for you, what was the process of actually becoming an
13  independent sales agent for GMS?
14  A.  I think I just walked around Fort Carson with my husband,
15  signed the document that said I was an agent.
16  Q.  The agreement?
17  A.  Yeah.
18  Q.  Okay.  Did you yourself -- prior to becoming an
19  independent sales agent for GMS, had you ever been an
20  independent sales agent for anyone else?
21  A.  No.
22  Q.  Had you ever had any experience selling industrial
23  products?
24  A.  No.
25  Q.  When you became an independent sales agent, did you
```

```
 1    receive any documents from GMS?
 2    A.   I don't think so.
 3    Q.   Well, your recollection.
 4    A.   Yeah.  Not that I remember.
 5    Q.   Okay.  Well, did you get anything, either by email or in
 6    the mail, that came in sort of a packet that said these are
 7    confidential, these are proprietary?
 8    A.   No.
 9    Q.   So, you become an independent sales agent.  And as I
10    gather, you go to -- this is Fort Carson?
11    A.   Yes.
12    Q.   Okay.
13    A.   In Colorado.
14    Q.   And you first go to the base with Westly?
15    A.   Uh-huh.
16              MR. GORDON:  Objection, leading.
17              MR. MCFARLAND:  I'll rephrase.
18              THE COURT:  Sustained.
19    BY MR. MCFARLAND:
20    Q.   What if any training did you receive, ma'am, in order to
21    be an independent sales agent for GMS?
22    A.   I guess you could say I just shadowed my husband, like
23    walked around with him on Fort Carson when he talked to
24    people.
25    Q.   And after that, anything further that you got in terms of
```

1    training or how to do this?

2    A.   No.

3    Q.   And then did you yourself then start to go to Fort

4    Carson?

5    A.   Yes.

6    Q.   Well, let me ask you this.  When you and Westly -- when

7    you shadowed Westly at Fort Carson, were you given any kind

8    of a list of people to talk to, or these are the chief

9    warrant officers, or anything like that?

10   A.   I don't think so.  I don't have a memory of that, but I

11   do know there was one chief there that someone from GMS knew

12   from somewhere else.  His name was Chief Hoskins.  Somebody

13   in GMS knew him, so...  I think it was Jeff Johnson.  He was

14   a manager at GMS.  So, that was the only name that -- like,

15   they're friends, so...

16   Q.   So, how did you then, ma'am, figure out who you were

17   going to make calls to?

18   A.   You just walk in the building and ask who is in charge of

19   ordering supplies for the building, and then a soldier will

20   just take you to that person.

21   Q.   And so did you yourself then start to come to understand

22   who were the folks that were potential customers for GMS

23   Industrial?

24   A.   Yes.

25   Q.   And how did it go from there?

```
 1   A.   Like how do I?
 2   Q.   I guess let me see.  How do you make a sale?
 3   A.   For me personally, I make friends, and then, like --
 4   well, like, NSNs are very, very easy to order.  So, I just
 5   make friends with people, and if they need something, they'll
 6   just order it.
 7   Q.   Do you bring anything with you when you make a call on a
 8   potential Army purchaser?
 9   A.   Yes.
10   Q.   And what would you bring with you?
11   A.   An NSN catalog.
12   Q.   Of GMS?
13   A.   GMS, yeah.
14   Q.   Okay.  And did you have any success in selling GMS NSNs?
15   A.   Yes.
16   Q.   All right.  And I think you're an Independent Sales Agent
17   Agreement.  Best recollection when you signed that?
18   A.   Well, I moved to Colorado in 2015, so I think it was
19   right after that I started working on Fort Carson, so...
20   Q.   Okay.  Well, let me help you.
21        Do we have Sabrina's Independent Sales Agent
22   Agreement, please?
23        MR. MCFARLAND:  And I believe, Your Honor, this has
24   been admitted, so we ask that it be published.
25        THE COURT:  All right.
```

```
 1          Any objection, Plaintiff?

 2          MR. GORDON:  We have no objection.

 3          THE COURT:  Okay.  I can't hear you when you're

 4   sitting down talking to me.

 5          MR. GORDON:  No objection, Your Honor.

 6          THE COURT:  Very good.

 7          THE CLERK:  What exhibit number was this?

 8          THE COURT:  What's the exhibit number,

 9   Mr. McFarland?

10          MR. MCFARLAND:  This would be Plaintiff's 8, Your

11   Honor.

12          THE COURT:  Okay.

13          MR. MCFARLAND:  And I thought it had been admitted.

14          THE COURT:  Do we have it admitted, Ms. Jones?

15          THE CLERK:  I'm trying to find it.  Yes.

16          THE COURT:  Yes.

17          MR. MCFARLAND:  Okay.

18          THE COURT:  Yes.  Go ahead.

19          MR. MCFARLAND:  Thank you.

20          THE COURT:  You may publish.

21          MR. MCFARLAND:  Thank you, Your Honor.

22   BY MR. MCFARLAND:

23   Q.  Ma'am, do you recognize this document, ma'am?

24   A.  Yes.

25   Q.  This would be your Independent Sales Agent Agreement with
```

1   a date of January 10th, 2017?

2   A.  Yes.

3   Q.  Okay.  Fair to say it's about this time that you start

4   selling for GMS Industrial?

5   A.  I believe it was a little earlier, but I was in 2017.

6   Q.  Okay.

7   A.  Yes.

8   Q.  How much time would you devote as an independent sales

9   agent for GMS, GMS?

10  A.  It would vary week by week, but I tried to do at least

11  three days a week.

12  Q.  And I take it as a new -- well, your son was born when?

13  A.  2011.

14  Q.  So, he's, I guess, kindergarten age --

15  A.  Yes.

16  Q.  -- at this point in time?

17  A.  Yes.

18  Q.  Okay.  So, as a mother, I take it the advantage of being

19  able to pick your own hours as an independent sales agent is

20  quite a bonus or benefit for you?

21  A.  Yes.

22  Q.  All right.

23  A.  I go to all of the field trips.

24  Q.  Did you sell at any other bases other than Fort Carson?

25  A.  No.

```
 1   Q.  And during your tenure as an independent sales agent for
 2   GMS Industrial, did you sell anything but NSNs?
 3   A.  I do not believe so.
 4          THE COURT:  Meaning?  So, I'm a little confused by
 5   that answer.
 6          Can you ask that question again?
 7          MR. MCFARLAND:  Sure.
 8   BY MR. MCFARLAND:
 9   Q.  During your tenure as an independent sales agent for GMS
10   Industrial, do you recall selling anything but NSNs?
11   A.  No.
12   Q.  Can you get information about potential purchasers of GMS
13   Industrial products at Fort Carson through public means?
14   A.  Like the unit information?  Yes.
15   Q.  And how can you get it, ma'am?
16   A.  For me, I would go to their Facebook page where their
17   directories are.  Like, every base I think has -- well, I
18   know Fort Carson for sure has a directory on their Facebook
19   page with the units and their phone numbers.
20   Q.  And I take it you didn't have to have a password or pass
21   code to access something on Facebook?
22   A.  No.
23   Q.  For the NSN sales that you made, ma'am, how were you
24   paid?
25   A.  Commissions.
```

```
1    Q.  You didn't receive any salary or a set salary?
2    A.  No.
3    Q.  Or any type of benefits?
4    A.  No.
5    Q.  And how was Westly paid during the period when he was a
6    director of sales?
7    A.  He was salary.
8    Q.  Was he your supervisor, I guess?
9    A.  Yes.
10   Q.  Did you ever have any customers discuss with you wanting
11   to buy something other than the NSNs pre-approved contracts?
12   A.  Yes.
13   Q.  And how did you handle that?
14   A.  Chief Oyola was a close customer of mine.  He wanted an
15   item that was in an NSN kit, just the item, a case of it.  He
16   tried to order it, but it never went through.
17   Q.  And when you say he tried to order it, did you try and
18   satisfy his need through GMS?
19   A.  Yes.  That was a GMS product.
20   Q.  But it didn't work out?
21   A.  No.
22   Q.  How did you come to learn about G&S Supply?
23   A.  I don't remember how I learned about G&S Supply,
24   honestly.
25   Q.  Well, did there come a time when it became a topic that
```

1   you learned about in the Greer household?

2   A.  It had to have been conversations, like, me

3   eavesdropping, but I don't really recall learning about it or

4   talking about it really.

5   Q.  Well, is it fair to say then that Mr. Greer didn't come

6   to you and discuss the formation initially of G&S Supply with

7   you?

8          MR. GORDON:  Objection, leading.

9          THE COURT:  Sustained.

10  BY MR. MCFARLAND:

11  Q.  Do you recall any discussions with your husband about

12  forming G&S Supply?

13  A.  No.

14  Q.  In the Greer household, is there any kind of division

15  between business and financial and majority of childcare and

16  family things?

17  A.  Yes.

18  Q.  And how does that division in the Greer household break

19  down?

20  A.  Um, he's more of the businessy numbers person, and I'm

21  more the family person.

22  Q.  Who pays the bills in the Greer household?

23  A.  He does.

24  Q.  Well, at some time, ma'am, you do come to learn about G&S

25  Supply?

1   A.   Yes.

2   Q.   And did you become a sales agent for G&S Supply?

3   A.   No.

4   Q.   Did you ever offer any of your customers at Fort Carson

5   G&S products or the opportunity to purchase G&S products?

6   A.   There is two customers that I have memory of having some

7   sort of G&S, like, ordering.  I don't know how it was

8   initiated, like, how it started really.

9   Q.   Well, what did you do when these two instances came up?

10  A.   I believe my husband was with me.  I have a hard time

11  remembering because I'm usually talking about things with the

12  soldiers unrelated to ordering.  I do have memory of Chief

13  Oyola ordering shelving, and me looking on the GMS catalog

14  from their website to see if it was in there, and it was not.

15  Q.   So Chief Oyola wants some shelving not available through

16  GMS?

17  A.   Correct.

18  Q.   How does it go from there?

19  A.   I believe I pawn it off on my husband to handle.

20          MR. GORDON:  Objection, foundation.  She believes.

21          THE COURT:  Excuse me?

22          MR. GORDON:  Objection, foundation.  She believes.

23          THE COURT:  All right.

24          MR. GORDON:  We're getting into a lot of I don't

25  knows and she believes.

```
 1              THE COURT:  Mr. McFarland.
 2              MR. MCFARLAND:  She's giving the best recollection
 3    she can about something that happened years ago.  If she
 4    says she believes, I think that is a very honest, candid
 5    answer.  I mean --
 6              THE COURT:  Does she know?
 7              So, the objection is sustained, and you can
 8    rephrase.
 9              MR. MCFARLAND:  Thank you.
10    BY MR. MCFARLAND:
11    Q.  What's your best recollection, ma'am, of when Chief Oyola
12    wanted some shelving, from what you did?  What did you do?
13    A.  I don't recall what I did other than I know I looked at
14    the GMS catalog from the website, and I knew there wasn't a
15    shelf there.
16    Q.  Very well.
17              And I think you said there was another instance where
18    a non-NSN item came up through one of your customers?
19    A.  Yes.
20    Q.  Do you recall what that was?
21    A.  The item?  Socks and maybe something else, a couple of
22    other items.  I don't remember exactly what they were.
23    Q.  Do you remember who it came up through?
24    A.  Yes.  Brandon, Chief Conant.
25    Q.  And what did you do with the chief's request for socks or
```

1    whatever it was?

2    A.  I believe my husband assisted him.

3    Q.  Well, let me ask this, ma'am.  When you would go to visit

4    your customers at Fort Carson --

5    A.  Yes.

6    Q.  -- did you ever bring any G&S materials with you?

7    A.  I started to after my termination with GMS.

8    Q.  Okay.  Well, I'm sorry --

9    A.  So, not before.

10   Q.  -- let's keep it all right.

11   A.  Okay.

12   Q.  I think everyone has agreed that the letters that came to

13   you for termination were April 3rd of 2019.

14           Prior to April 3rd of 2019, were you bringing your

15   customers at Fort Carson G&S catalogs?

16   A.  No.

17   Q.  You've been here for the trial, ma'am, and there was

18   testimony that somehow you earned commissions totalling about

19   $138,000 for G&S.  Is that accurate?

20   A.  G&S?  Oh, no.  No.

21   Q.  Did you yourself ever make any sales for G&S at Fort

22   Carson?

23   A.  No.

24   Q.  When you became an independent sales agent for GMS

25   Industrial, had you had any dealings with Mr. Gorken?

JILL H. TRAIL, Official Court Reporter

1   A.  Prior to GMS?  No.

2   Q.  Okay.  Had you had any dealings with Mrs. Gorken?

3   A.  No.

4   Q.  Did you have a close relationship with them outside of

5   GMS in some way?

6   A.  Uh, we didn't talk a lot, but together, like, on trips

7   and stuff, it felt that way.

8   Q.  And did there come a time when they learned of your and

9   Westly's engagement?

10  A.  Yes.

11  Q.  And was there a wedding ceremony held with

12  Mr. and Mrs. Gorken, and I believe his brother and the

13  brother's wife?

14  A.  Yes.

15  Q.  And where was that, ma'am?

16  A.  The Dominican Republic.

17  Q.  And why were y'all in the Dominican Republic?

18  A.  I'm not really sure of the reason for that.  I was the

19  wife of a manager.  So, that's -- I think that's why I was

20  there.

21  Q.  Okay.  It was GMS related though, I take it?

22  A.  Yes.

23  Q.  Okay.  In keeping with Westly's position at GMS?

24  A.  Yes.

25  Q.  Did you request that the Gorkens help you with the

1    wedding ceremony?

2    A.   No.

3    Q.   Anyone else attend besides you, your husband,

4    Mr. and Mrs. Gorken, and his brother and his wife?

5    A.   No.

6    Q.   From your sales calls at Fort Carson, did any of your

7    customers ever indicate to you that they were confused about

8    GMS versus G&S Supply?

9    A.   No.

10   Q.   Did you ever hear anyone during your visits to Fort

11   Carson use the term "sister companies"?

12   A.   No.

13   Q.   And I take it that you are not doing at the present time

14   any sales for G&S's successor, WarTech Industries?

15   A.   Correct.

16   Q.   Did you ever use anything on the Google drive of GMS?

17   A.   I filled out my spreadsheets that we've all seen.

18   Q.   And why did you do that?

19   A.   So I could get paid.

20   Q.   Other than that, did you ever go to the Google drive for

21   anything?

22   A.   No.

23   Q.   Was there anything that GMS ever provided you that you

24   considered to be a trade secret or proprietary information?

25   A.   No.

```
1    Q.   Did GMS give you some specific confidential information
2    to help you make sales for it?
3    A.   No.
4    Q.   What did -- I mean, all of the witnesses here have kind
5    of different background on -- you know, of the defendants.
6             What did you use to make sales, Sabrina?
7    A.   I make friends.  I believe that that's how you get
8    long-term customers.  People buy from who they like.  So, I
9    talk about everything, and yeah.  Usually I bring donuts or
10   cookies and we talk for a long time, if they're not busy, and
11   we become friends.
12   Q.   And I'm -- this is in no way intended to be sexist, but I
13   take it you don't really know the intricacies of the products
14   that GMS Industrial was selling?
15   A.   Yeah.  I know about the bathroom stuff pretty good.
16   Q.   All right.
17   A.   But, like, RTV and all of that, I don't really know much,
18   too much.
19   Q.   Okay.  And I take it the same would be true for G&S
20   Supply's products?
21   A.   True.  Yes.
22   Q.   Now, ma'am, you indicated that you yourself didn't make
23   any sales for G&S, but you did make successful sales for GMS
24   Industrial, correct?
25   A.   Yes.
```

```
1    Q.  And are there still commissions that are owed to you for
2    sales that you made for GMS Industrial prior to your
3    termination on April 3rd, that you haven't been paid for?
4    A.  Yes.
5    Q.  And did you have the opportunity to confirm that those
6    were sales for which GMS Industrial was paid by the
7    government?
8    A.  Yes.
9    Q.  And did you have an opportunity to confirm how much
10   you're still owed?
11   A.  Yes.
12   Q.  And what is that amount, ma'am?
13   A.  $9,760.50.
14   Q.  Before being named as a defendant in this lawsuit, ma'am,
15   had you ever come to our fair state, the Commonwealth of
16   Virginia?
17   A.  No.
18   Q.  Did you ever come here to do any work for GMS Industrial?
19   A.  No.
20   Q.  Did you ever come here for any reason for G&S Supply?
21   A.  No.
22          MR. MCFARLAND:  One moment, if I may, Your Honor.
23          THE COURT:  Certainly.
24   BY MR. MCFARLAND:
25   Q.  Ma'am, after you were terminated by GMS Industrial, did
```

```
 1   you receive an email from Gary Gorken?
 2   A.  Yes.
 3   Q.  And if we could have Defendants' 23.
 4           It should be on the screen before you, ma'am.  Do you
 5   see it?
 6   A.  Yes.
 7   Q.  Do you remember receiving this email on or about May 3rd
 8   of 2019?
 9   A.  Yes.
10   Q.  Okay.  And what is it, ma'am?
11   A.  It's a letter from Gary Gorken.
12   Q.  And how did you interpret this letter?
13           THE COURT:  Well, first, are you trying to move it
14   into evidence?
15           MR. MCFARLAND:  Yes.  I'm going to move it in, Your
16   Honor.  I was just laying a little foundation.
17           THE COURT:  Okay.
18           MR. MCFARLAND:  But if the Court is satisfied...
19   BY MR. MCFARLAND:
20   Q.  You received --
21           THE COURT:  Well, no.  No.  No.  Lay your
22   foundation.
23           MR. MCFARLAND:  Okay.
24           THE COURT:  And then we'll talk about this email,
25   if it comes in.
```

```
 1    BY MR. MCFARLAND:
 2    Q.  Is this an email that you and Mr. Greer received from
 3    Gary Gorken?
 4    A.  Yes.
 5    Q.  Okay.  And you have read it?
 6    A.  Yes.
 7            MR. MCFARLAND:  Okay.  We would move it in, Your
 8    Honor, as a party admission.
 9            THE COURT:  Any objection?
10            MR. GORDON:  I guess I object to the relevance.  I
11    mean, what fact does it make more or less likely?
12            THE COURT:  Well, there is a --
13            Go ahead, Mr. McFarland.
14            MR. MCFARLAND:  Your Honor, it goes to the
15    motivation for this lawsuit as opposed to my clients
16    admitting anything for which they're legally responsible,
17    and it is a party admission.
18            THE COURT:  Well, there is a very low bar under,
19    you know, 401 and 402 for relevance.  So, as I scan it, I
20    believe it's relevant, and the objection is overruled.
21            You can go ahead.
22            MR. MCFARLAND:  Thank you.
23            We would ask that this be published, Your Honor.
24            (Defendants' Exhibit No. 23 received in evidence.)
25            THE COURT:  You may publish.
```

```
1   BY MR. MCFARLAND:
2   Q.  Had Mr. Gorken called you, ma'am, before May 3rd of 2019?
3   A.  No.
4   Q.  How did you interpret personally -- as the recipient,
5   what did this email message mean to you?
6   A.  I was very upset over it, and I just assumed he was,
7   like, angry.
8   Q.  If we could scroll down, please.
9        Did you believe, ma'am, that you and your husband had
10  in any way stolen anything from GMS Industrial?
11  A.  No.
12  Q.  Did you watch your husband work hard for GMS Industrial?
13  A.  Yes.
14  Q.  Were there occasions when he had to leave the home and
15  miss out on activities with your son because of demands by
16  Mr. Gorken for GMS Industrial?
17  A.  Yes.
18  Q.  Can you just give us one example?
19  A.  Well, my son is in basketball since, like, kindergarten.
20  So, he's missed a lot of those games.  I'm pretty sure --
21  hold on.  I don't want to speculate.
22  Q.  Okay.
23  A.  I believe he was gone for a birthday as well.
24  Q.  Did you ever see your husband do anything but perform to
25  the utmost for GMS Industrial during the period from 20 -- I
```

1   guess he was hired in 2011, to when he was terminated in

2   2019?

3   A.   No.   He was very dedicated.

4   Q.   Even after he started G&S Supply in June of 2017, did you

5   ever see him or hear anything by him in which he was giving

6   less than 110 percent for GMS Industrial?

7            MR. GORDON:  Objection, leading, compound.

8            THE COURT:  Sustained.

9            MR. MCFARLAND:  I'll rephrase, Your Honor.

10  BY MR. MCFARLAND:

11  Q.   From being with your husband, did you ever see him do

12  anything but be dedicated to GMS Industrial?

13            THE COURT:  Asked and answered.

14            MR. MCFARLAND:  That's all of the questions I have,

15  ma'am.  If you would answer any questions that counsel,

16  Mr. Gordon, may have for you.

17            THE WITNESS:  Okay.

18            THE COURT:  All right.  Any cross?

19            MR. GORDON:  Yes, Your Honor.

20                      CROSS-EXAMINATION

21  BY MR. GORDON:

22  Q.   Good afternoon, Ms. Greer.

23  A.   Good afternoon.

24  Q.   All right.  The first exhibit that you looked at with

25  Mr. McFarland, or maybe it wasn't the first exhibit, but you

1    looked at your Sales Agent Agreement with Mr. McFarland.
2         Do you remember that?
3    A.   Yes.
4    Q.   All right.  And that was dated in 2016?
5    A.   I believe it was '17.
6    Q.   '17?
7    A.   Yeah.
8    Q.   All right.  Can we bring it up?  It's 8, Plaintiff's 8.
9         Okay.  Yes, 2017.  And you have testified that you
10   started to work for GMS Industrial prior to 2017, correct?
11   A.   Yes.
12   Q.   All right.  And you actually started in 2013?
13   A.   I don't think I was a sales agent in 2013.  I was a -- I
14   think they were, like, doing a trial to see if they could
15   make appointments with customers through the phone, and I was
16   testing that, and that did not work and go anywhere, so...
17   So, no, I didn't start being a sales agent until we moved to
18   Colorado in 2015.
19   Q.   And you first learned about GMS Industrial through your
20   husband, Westly Greer?
21   A.   Yes.
22   Q.   All right.  And you began selling products on behalf of
23   G&S Supply, Inc. shortly after its creation?
24   A.   No.
25   Q.   All right.  Do you recall in this matter that you

1    answered written questions that we call interrogatories?

2    A.  Yes.

3            MR. GORDON:  Ms. Jones, if you could switch to the

4    document camera, and make sure that we have the witness and

5    the parties only.

6            MR. MCFARLAND:  Your Honor, before he undertakes

7    any questions, is this an exhibit that the plaintiff has

8    identified to us or?

9            MR. GORDON:  It will be used for impeachment.

10           THE COURT:  I think he's using it for impeachment.

11           MR. MCFARLAND:  Okay.

12   BY MR. GORDON:

13   Q.  The heading there, it says "Defendant Sabrina Greer's

14   Objections and Responses to Plaintiff's First Set of

15   Interrogatories and Requests for Production."

16           Do you see that?

17   A.  Yes.

18   Q.  And if we flip here to number 1, it says "Sabrina Greer

19   and her counsel participated in the preparation of these

20   discovery responses."

21           Do you see that?

22   A.  Yes.

23   Q.  If we flip here to the final page here, is that your

24   signature?

25   A.  Yes.

```
1    Q.  Where it says, "Under penalty of perjury, the undersigned
2    states that to the best of his information and belief the
3    foregoing responses to the plaintiff's interrogatories are
4    true and correct."
5    A.  Yes.
6    Q.  And interrogatory 16 says, "Identify, as defined above,
7    when you first began selling products on behalf of G&S."
8            And then there is -- it states -- the answer is
9    "Sabrina Greer states that she began selling products on
10   behalf of" --
11           MR. MCFARLAND:  I'm sorry.  I can't see the answer.
12   We can't see.
13           THE COURT:  I can't see it.
14           MR. GORDON:  I apologize, Mr. McFarland.
15           All right.  There we go.
16   BY MR. GORDON:
17   Q.  So the answer, "Sabrina Greer states that she began
18   selling products on behalf of G&S Supply, Inc. shortly after
19   its creation."
20           Do you see that?
21   A.  Yes.
22   Q.  All right.  That was your sworn answer to your
23   interrogatory?
24   A.  It appears to be.
25   Q.  And is that statement correct?
```

```
1    A.   That is not correct.
2    Q.   So, you gave a sworn statement in this case that's
3    incorrect?
4    A.   Yes.
5    Q.   You had numerous sales at Fort Carson for GMS?
6    A.   GMS?
7    Q.   GMS Industrial?
8    A.   Yes.
9    Q.   All right.  And you had customers of yours on Fort Carson
10   place orders for products that you marketed of G&S Supply?
11   A.   I wouldn't say marketed.  I didn't go around presenting
12   G&S.
13   Q.   All right.  Ms. Greer, do you recall that I took your
14   deposition?
15   A.   Yes.
16   Q.   All right.  And if you could flip to page 116.
17   A.   Okay.
18   Q.   All right.  So on line 13 of 116, you were asked:  "Did
19   you have customers on Fort Carson place orders for products
20   that you marketed of G&S Supply?"
21        Do you see that?
22   A.   Yes.
23   Q.   And your answer there was "yes"?
24   A.   Uh-huh.  Yes.
25   Q.   So, you did in fact have customers on Fort Carson place
```

```
 1    orders for products that you marketed for G&S Supply?
 2    A.  Was this in reference to a specific time?
 3    Q.  The question is as it reads.
 4    A.  Because I did start marketing --
 5            MR. GORDON:  Move to strike as nonresponsive.
 6            MR. MCFARLAND:  No.  Wait a minute, Your Honor.
 7    She gets to explain her answer.  Now, that's improper.
 8    Mr. Gordon --
 9            THE COURT:  Mr. McFarland, I've heard your
10    objection.
11            All right.  She can explain her answer.
12            THE WITNESS:  Okay.  I didn't market G&S until
13    after I was terminated by GMS.
14    BY MR. GORDON:
15    Q.  And what did you do to market G&S?
16    A.  I just had a catalog with me.
17    Q.  You just walked around and handed out catalogs?
18    A.  Showed the catalog, maybe left some with some, but...
19    Q.  Well, when you and Mr. Greer made joint sales trips to
20    Fort Carson selling GMS Industrial products, you also
21    marketed G&S materials.
22    A.  I did not market G&S Supply.
23    Q.  All right.  Mr. Greer was a part owner of G&S Supply?
24    A.  Yes.
25    Q.  All right.  Mr. Greer is your husband?
```

1  A.  Yes.

2  Q.  All right.  And amounts paid to Mr. Greer by G&S Supply

3  were paid into the Greer Group bank account?

4  A.  Yes.

5  Q.  All right.  And you're a principal of the Greer Group?

6  A.  Yes.

7  Q.  All right.  And you had an interest in seeing G&S Supply

8  succeed?

9  A.  Yes.

10  Q.  All right.  You stood to benefit financially if G&S

11  succeeded?

12  A.  Yes.

13  Q.  And your understanding of why G&S Supply was formed is

14  because there were some customers outside of Fort Carson that

15  wanted something that they couldn't get from GMS, but they

16  wanted to order from somebody in this group?

17  A.  That was my guess at the time, yes.

18  Q.  All right.  All right.  And that answer is not based on

19  some bidding on electric motors?

20  A.  No.

21  Q.  All right.  Let's go back to the Independent Sales

22  Agreement, Plaintiff's 8.

23       All right.  And by letter A, it says here, "The

24  company is a supplier of certain industrial products, the

25  products."

1          Do you see that in all caps -- well, not all caps,
2   but the first letter is capped?
3   A.  Yes.
4   Q.  All right.  And your understanding of the word "products"
5   is that it could mean anything that a customer wants?
6   A.  Products in that statement, that would be referring to
7   GMS' products.
8   Q.  You would agree with me that you believe that it could
9   mean anything that the customer wants?
10          THE COURT:  Asked and answered.  She answered your
11  question, Mr. Gordon.  So, ask your next question.
12  BY MR. GORDON:
13  Q.  All right.  The second sentence there, it says, "The
14  agent agrees to aggressively promote the sale of products in
15  the territory."
16          Do you see that?
17  A.  Yes.
18  Q.  And where it says "to aggressively promote the sale of
19  products," that means to you to sell GMS products, and
20  advertise them, and to use your best efforts?
21  A.  Yes.
22  Q.  And that language means not to sell competing products?
23  A.  I did not sell competing products.
24  Q.  A little different question.  Is your understanding of
25  the contract, that that language that we just reviewed means

1    to not sell competing products?

2    A.   To -- can you repeat the question?

3    Q.   Sure.   Sure.

4         So you signed this contract?

5    A.   Yes.

6    Q.   All right.   So you have an understanding of what the

7    things mean in it?   You reviewed it before you signed it?

8    A.   Yes.

9    Q.   All right.   And there is a section that requires you to

10   aggressively promote GMS Industrial?

11   A.   Yes.

12   Q.   All right.   And that language "to aggressively promote,"

13   you understand that to mean not to sell competing products?

14        MR. MCFARLAND:   Well, Your Honor, the language says

15   what it says.

16        THE COURT:   He can ask her how she interprets it.

17   Overruled.

18        MR. MCFARLAND:   That's not what he's asking her.

19   He's asking her about words that aren't in the contract.

20        THE COURT:   He can ask her how she took that.   So,

21   overruled.

22        Go ahead and ask your question again, Mr. Gordon.

23        MR. GORDON:   Yes.

24   BY MR. GORDON:

25   Q.   So, the language requiring you to "aggressively promote,"

```
 1   did you understand that to mean not to sell competing
 2   products?
 3   A.  No.  To me the "aggressively promote" means to do
 4   whatever you can to get the sale.
 5   Q.  Okay.  If you could look in your transcript here.
 6   A.  Oh.
 7           THE COURT:  Is this the deposition transcript?
 8           MR. GORDON:  Yes, it is.
 9           THE COURT:  All right.
10           THE WITNESS:  What page?
11   BY MR. GORDON:
12   Q.  Sure.  Page 29.  We're going to start on 21, so the first
13   question, line 21:  "Does it mean not to sell competing
14   products?"
15           Your first answer was:  "I did not.  Those were not
16   competitive products, G&S."
17           Then there was a follow up, similar to what we've
18   just done here.  "I just said does that language mean not to
19   sell competing products?"
20           And your answer was:  "I mean, I could see that,
21   yes."
22           Did I --
23   A.  Yes.
24   Q.  Did I read that correctly?
25   A.  Yes.
```

```
 1    Q.  So this is how you testified under oath?
 2    A.  Yes.
 3    Q.  All right.  This was in the deposition?
 4    A.  Yes.
 5            MR. MCFARLAND:  I mean, she's testified, Your
 6    Honor, but this isn't impeachment.  At some point they're
 7    going to --
 8            THE COURT:  That is impeaching.  Overruled.
 9    BY MR. GORDON:
10    Q.  You did nothing to prepare for your sales calls on behalf
11    of GMS Industrial?
12    A.  No.
13    Q.  Could you go to page 57?
14            Again, this is in your deposition transcript.
15    A.  Okay.
16    Q.  All right.  And you were asked, if you're there with me,
17    on line 17:  "What did you do to prepare yourself for your
18    sales calls on behalf of GMS Industrial?"
19            The answer says:  "Nothing.  I would just show up at
20    buildings and show a catalog.  If they want something, they'd
21    say, and I want this one or not."
22            Was that your answer?
23    A.  Yes.
24    Q.  All right.  So, you did nothing to prepare for your sales
25    trips on behalf of GMS?
```

```
1   A.   No.
2            THE COURT:   What was impeaching about that,
3   Mr. Gordon?   Why were you referencing her transcript for
4   that?
5            MR. GORDON:   I asked her what she did to prepare
6   for her sales trips, and she said that she took some actions
7   to prepare.
8            THE COURT:   Well, I read your question to say:   Did
9   you do anything to prepare for your sales calls?   And she
10  said no.
11           MR. GORDON:   Your Honor, then I withdraw that.
12           THE COURT:   So, I'm striking that.
13           MR. GORDON:   Okay.
14  BY MR. GORDON:
15  Q.   All right.   You are asserting a counterclaim against GMS
16  Industrial?
17  A.   Yes.
18  Q.   All right.   And what was the exact amount of that?
19  A.   9,000 -- well, on there it said 10,000, because I didn't
20  have it.   It's, like, rounded on there.   But $9,760.50 would
21  be the exact number.
22  Q.   All right.   And have you or your counsel presented any
23  exhibits that identify the calculation of that number?
24  A.   I'm not sure.
25  Q.   All right.   Have you reviewed the exhibit list on behalf
```

1    of you and the other defendants?

2    A.   I don't think so.

3    Q.   All right.  So how did you calculate the $9,760.50?

4    A.   Yes.  So, my last orders with GMS were with Sergeant

5    Volora, and he ordered three of each of the hardware kits and

6    one of the bathroom refill kits, and I know that.  I have the

7    information that you submit to get paid for that.

8    Q.   And did you do that calculation on a piece of paper?

9    A.   Yes.

10   Q.   All right.  And have you brought it to court to explain

11   to the jury what you're owed?

12   A.   No.

13   Q.   And that calculation, did you provide it to GMS

14   Industrial in the box with other materials that you returned?

15   A.   Yes.

16   Q.   And that box, you returned that after termination?

17   A.   Yes.

18   Q.   All right.  And those unpaid commissions, you calculated

19   those after termination?

20   A.   I would have had it all written down, but I'm pretty sure

21   my husband submitted the actual paper with the information on

22   it.  I think he put that in the box.

23   Q.   Were you surprised when you were terminated from GMS

24   Industrial on April 3rd?

25   A.   No.

```
1    Q.  Did you use your GMS sales tracking sheet to calculate
2    the commissions that you claim are owed?
3    A.  Originally, before I lost access to it.
4    Q.  All right.  Prior to working for GMS Industrial, you did
5    not have any sales contacts at Fort Carson?
6    A.  I don't think so.
7    Q.  So, all of the contacts that you had on Fort Carson were
8    generated during the time when you were working for GMS
9    Industrial?
10   A.  Yes.
11   Q.  All right.  And you sourced materials for G&S Supply,
12   correct?
13   A.  No.
14   Q.  Well, you have an Amazon account, correct?
15   A.  I have an Amazon account?
16   Q.  Do you?
17   A.  Yes.
18   Q.  All right.  And was that account used to order products
19   on behalf of G&S Supply?
20   A.  I'm not sure.
21   Q.  Okay.
22          THE COURT:  I think the more proper question is:
23   Did you use your Amazon account to order products on behalf
24   of G&S Supply?
25          THE WITNESS:  No, I did not.
```

```
 1              THE COURT:  All right.  Next question.
 2    BY MR. GORDON:
 3    Q.   Did Mr. Greer use your Amazon account to order products
 4    for G&S Supply?
 5    A.   I'm not sure.
 6    Q.   In December of 2018, did you request that G&S Supply give
 7    you a quote for 18 fire extinguishers?
 8    A.   I do have a memory of fire extinguishers.
 9    Q.   Okay.
10    A.   I think I asked my husband if he knew how to get fire
11    extinguishers.
12    Q.   And that would have been in December of 2018?
13    A.   Possibly.
14    Q.   All right.  And you made that inquiry to your husband by
15    emailing his G&S Supply email address?
16    A.   Possibly.
17    Q.   All right.  And so December of 2018 is while you are
18    still employed by GMS Industrial?
19    A.   Yes.
20    Q.   All right.  And during that time frame you asked your
21    husband if G&S Supply could provide 18 fire extinguishers to
22    a customer?
23    A.   I'm not sure how it was worded.
24    Q.   All right.  Did you request that GMS Industrial provide
25    the 18 fire extinguishers?
```

1   A.   No.

2   Q.   Instead, you went to your husband and asked if G&S Supply

3   could provide the 18 fire extinguishers?

4   A.   I asked him.  I don't know if I said G&S or not, I don't.

5   Q.   Well, you testified that you weren't going to get it from

6   GMS.  Where else was he going to procure the fire

7   extinguishers?

8   A.   Well, G&S for him, so yeah.

9   Q.   You've not discussed your involvement with G&S Supply

10   with Gary Gorken?

11   A.   Did I discuss it with Gary Gorken?

12   Q.   Yes.

13   A.   No.

14   Q.   All right.  And you've not discussed it with Rachel

15   Gorken?

16   A.   No.

17   Q.   All right.  And other than perhaps your GMS Industrial

18   fellow defendants, you've not had a conversation with anyone

19   about your involvement with G&S Supply?

20   A.   No.

21   Q.   G&S Supply maintained a Google drive of their own?

22   A.   I'm not sure.

23   Q.   Did you do some office work for G&S Supply?

24   A.   No.

25   Q.   You never made phone calls on its behalf?

1   A.   None that I can remember.

2   Q.   Did Mr. Greer ask you if you could call and ask about

3   companies that are competitors of ours getting awards?

4   A.   I may have called somebody about asking about orders

5   being canceled.  I don't remember who I called, though.

6   Q.   And you were calling to check on the status of 283

7   orders?

8   A.   I don't remember.

9   Q.   Did you make calls to find out why orders were going

10  through to State Chemical Solutions?

11          MR. MCFARLAND:  Your Honor, I will just note we are

12  way beyond the scope of my direct here.

13          THE COURT:  Mr. Gordon.

14          MR. GORDON:  She testified on direct that she

15  essentially did nothing for G&S, and now we're establishing

16  that she did take affirmative actions on their behalf.

17          THE COURT:  All right.  Overruled.

18          THE WITNESS:  Did you have a question that I didn't

19  answer?

20          THE COURT:  Just hold on a second.  He'll ask you,

21  give him a second.

22          THE WITNESS:  Okay.

23          THE COURT:  Just give him a second.

24  BY MR. GORDON:

25  Q.   The question was:  Did Mr. Greer ask you to make calls

```
 1    about whether State Chemical Solutions was getting awards?
 2    A.  I'm not sure.  I don't remember.
 3    Q.  All right.  I believe you testified that you had no sales
 4    on behalf of G&S Supply; is that correct?
 5    A.  Correct.
 6    Q.  All right.  Well, in fact you did have one sale at Fort
 7    Carson, correct?
 8    A.  That was my sale?  No.
 9    Q.  So, whose sale would it have been?
10         THE COURT:  What sale are you talking about?
11         So, objection sustained to vagueness.
12    BY MR. GORDON:
13    Q.  All right.  The final document in your testimony was an
14    email from Mr. Gorken, 5/3/2019?
15    A.  Yes.
16    Q.  All right.  And I believe your testimony is that you felt
17    Mr. Gorken was angry when he sent that email?
18    A.  Yes.
19    Q.  All right.  Do you believe that Mr. Gorken was angry
20    because two of his trusted sales agents formed a company to
21    sell industrial products to the military?
22    A.  Um, I can't really --
23         MR. MCFARLAND:  I'm going to object to the extent
24    it calls for speculation unless a better foundation than
25    that is laid.  She can only say what's in the email.
```

```
 1              THE COURT:  Mr. Gordon.  Mr. Gordon.
 2              MR. GORDON:  Yes.
 3              THE COURT:  Response.
 4              MR. GORDON:  Response?  Oh, it was her testimony.
 5     She said he was angry.  I can follow up on that.
 6              THE COURT:  She said she believed that at the time
 7     he was angry.  So, I think you can ask another question
 8     about that.  So, I'm going to take his objection under
 9     advisement.
10     BY MR. GORDON:
11     Q.  Did you believe that Mr. Gorken was angry because five of
12     his trusted sales agents marketed G&S products on GMS sales
13     calls?
14     A.  I don't know exactly why he was angry.
15     Q.  Do you believe that Mr. Gorken was angry because for
16     two years five sales agents kept the existence of G&S secret
17     from him?
18     A.  Possibly.
19     Q.  Do you believe that Mr. Gorken was angry because G&S
20     Supply stole sales from GMS Industrial?
21     A.  No.
22              MR. GORDON:  That's all of the questions I have.
23              THE COURT:  All right.
24              Any redirect?
25              MR. MCFARLAND:  No, Your Honor, no redirect of
```

```
 1   Sabrina Greer.
 2            THE COURT:  All right.  Thank you very much.
 3            All right, Ms. Greer, you may return to your seat.
 4            THE WITNESS:  Thank you.
 5            THE COURT:  Thank you.
 6            THE WITNESS:  I just leave this?
 7            THE COURT:  Leave it up there, yes, ma'am.
 8            (End of excerpt.)
 9
10                         CERTIFICATION
11
12        I certify that the foregoing is a correct transcript
13   from the record of proceedings in the above-entitled matter.
14
15
16            _____/s/_____
17                         Jill H. Trail
18                         July 27, 2022
19
20
21
22
23
24
25
```

JILL H. TRAIL, Official Court Reporter